## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| THE UNITED STATES OF AMERICA and THE STATE OF FLORIDA *ex rel.* ANGELA RUCKH, | CASE NO. 8:11CV1303 SDM-TBM |
| Plaintiff, | |
| v. | |
| GENOA HEALTHCARE CONSULTING, LLC, d/b/a LAVIE CARE CENTERS, SALUS REHABILITATION, LLC d/b/a LAVIE REHAB, | |
| Defendants. | |

## FIRST AMENDED COMPLAINT

1.      This is an action brought on behalf of the United States of America by Plaintiff ANGELA RUCKH (hereafter referred to as "Relator") against Defendants Genoa Healthcare Consulting, LLC and Salus Rehabilitation, LLC pursuant to the *Qui Tam* provisions of the Federal Civil False Claims Act, 31 U.S.C. §§ 3729-33 ("Federal FCA" or "FCA") and the Florida False Claims Act, Fla. Stat. §§ 68.081 *et seq.*, (hereinafter the "*Qui Tam* Action"). Pursuant to 31 U.S.C. § 3730(b)(2).

2.      The allegations of this Complaint arise from the Relator's first-hand knowledge of the unlawful practices of the Defendants in the "upcoding" of claims submitted to the Medicare program and the creation of inaccurate records submitted to the Medicaid program.

3.      As more fully described below Relator witnessed firsthand the defrauding of the Federal Government and the State of Florida in the submission of false claims for payment.

## JURISDICTION AND VENUE

4.     This Court has jurisdiction over this action under the False Claims Act ("FCA") causes of action pursuant to 28 U.S.C. §§ 1331, 1345, and 31 U.S.C. §§ 3732(a), 3730.

5.     Venue is appropriate as to the Defendants in that the Defendants can be found, reside and/or transacts business in this judicial district, and/or acts proscribed by 31 U.S.C. § 3729 have been committed by the Defendants in this judicial district.  Therefore, venue is proper within the meaning of 28 U.S.C. § 1391(b) and (c), and 31 U.S.C. § 3732(a).

6.     Relator's action is not based upon the disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government [General] Accounting Office report, hearing, audit, or investigation, or from the news media. At the time the original complaint was filed, there was no such disclosure, and in any event this action is based on Relator's direct and independent knowledge, not on any such disclosure. Furthermore, as discussed and demonstrated in Relator's Complaint and amendments and prior proceedings before the Court, Relator is an "original source" of the information upon which her action is based: she has direct and independent knowledge of the information on which the action is based; and she voluntarily provided her information to the government before filing her Complaint.

## THE PARTIES

7.     Relator Angela Ruckh is a citizen of the United States of America and a Registered Nurse with more than twenty years experience.  In addition, Relator is Legal Nurse Consultant and member of the American Association of Legal Nurse Consultants and holds a current certification in the conduct of Minimum Data Sets 2.0 and 3.0.  In January 2011, Relator took a job with LaVie Care Centers and left that position in May 2011.

8.      Defendant, Genoa Healthcare Consulting, LLC is a corporation registered to conduct business in the state of Florida with principal address recorded as 10210 Highland Manor Drive, Suite 270, Tampa, FL 33610.   The company does business as "LaVie Care Centers" and operates independent healthcare facilities throughout Florida, including the "Marshall Health and Rehabilitation" facility located at 207 Marshall Drive, Perry, Florida, 32347 (the "Marshall Facility") and the "Governor's Creek" facility located at 803 Oak Street, Green Cove Springs, FL 32043 (the "Governor's Creek Facility").

9.      Defendant, Salus Rehabilitation, LLC is a corporation registered to conduct business in the state of Florida with principal address recorded as 10210 Highland Manor Drive, Suite 290, Tampa, FL 33610.   The company does business as "LaVie Rehab" and provides rehabilitation services to patients in skilled nursing facilities throughout Florida including the Governor's Creek and Marshall Facilities.

## FEDERAL AND STATE LAWS AND REGULATIONS

10.     The Federal FCA, 31 U.S.C. § 3729(a)(1)(A), makes "knowingly" presenting or causing to be presented to the United States any false or fraudulent claim for payment or approval, a violation of federal law for which the United States may recover three times the amount of the damages the government sustains and a civil monetary penalty of between $5,500 and $11,000 per claim for claims made on or after September 29, 1999.The Federal FCA, 31 U.S.C. § 3729(a)(1)(B), makes "knowingly" making, using, or causing to be used or made, a false record or statement material to a false or fraudulent claim for payment or approval by the Government, a violation of federal law for which the United States may recover three times the amount of the damages the Government sustains and a civil monetary penalty of between $5,500 and $11,000 per claim for claims made on or after September 29, 1999.

11.     The Federal FCA, 31 U.S.C. § 3729(a)(1)(C), makes any person, who conspires to defraud the United States by getting a false or fraudulent claim allowed or paid, liable for three times the amount of the damages the Government sustains and a civil monetary penalty of between $5,500 and $11,000 per claim for claims made on or after September 29, 1999.

12.     The Federal FCA, 31 U.S.C. § 3729(a)(1)(G), makes it illegal for any person to "knowingly" make, use, or cause to be made or used, a false record or statement, material to an obligation to pay or transmit money or property to the Government, *or* to "knowingly" conceal or knowingly and improperly avoid or decrease an obligation to pay or transmit money or property to the Government. For violation of this provision, the United States may recover three times the amount of the damages the Government sustains and a civil monetary penalty of between $5,500 and $11,000 per claim for claims made on or after September 29, 1999.[1]

13.     The Federal FCA 31 U.S.C. § 3729(b)(2), defines a "claim" to include any request or demand, whether under contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested.

14.     For purposes of the FCA,

The terms "knowing" and "knowingly" mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information,

---

[1] Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461 (notes), and 64 Fed. Reg. 47099, 47103 (1999), the False Claims Act civil penalties were adjusted to $5,500 to $11,000 for violations occurring on or after September 29, 1999.

and no proof of specific intent to defraud is required..

31 U.S.C. § 3729(b).

15.     In addition, the Federal FCA, 31 U.S.C. § 3730(h), provides relief to employees who have been retaliated against in their employment because of lawful acts done by the employee in furtherance of efforts to stop one or more violations of the FCA.  Such retaliation may include discharge, demotion, suspension, threats, harassment or any other type of discrimination in the terms and conditions of employment.  The employee is entitled to all relief necessary to make that employee whole, including reinstatement, two times back pay, interest on the back pay, and compensation for any special damages, including litigation costs and reasonable attorney's fees.

16.     The Florida False Claims Act, Fla. Stat. §§ 68.081 *et seq.*, is substantially similar to the Federal FCA and imposes liability on people and corporations who, among other violations, knowingly present fraudulent or false claims for payment to the state; misappropriate state property; or deceptively conceal or avoid an obligation to pay the state. A defendant may be ordered to pay up to three times the actual harm to the state, plus a fine of between $5,500 and $11,000 for each violation of the Act.

## GOVERNMENT HEALTH INSURANCE PROGRAMS

17.     The Health Insurance for the Aged and Disabled Program, popularly known as the Medicare Program, Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, *et seq.*, (hereinafter "Medicare"), is a health insurance program administered by the Government of the United States that is funded by taxpayer revenue.  Medicare is overseen by the United States

Department of Health and Human Services through its Center for Medicare and Medicaid Services ("CMS").

18.     Medicare was designed to be a health insurance program and to provide for the payment of hospital services, medical services and durable medical equipment to persons over sixty-five (65) years of age, and for certain others that qualify under the terms and conditions of the Medicare Program.

19.     Reimbursement for Medicare claims is made by the United States through CMS which contracts with private insurance carriers to administer and pay claims from the Medicare Trust Fund. 42 U.S.C. § 1395u.  In this capacity, the carriers act on behalf of CMS.

20.     While Medicare does not pay for long term care, residents of the long term care facilities in question are eligible for Medicare benefits when in need of acute, skilled medical services provided by physicians, nurses and hospitals. If a Medicaid resident requires hospital treatment for example, Medicare will pay for up to 100 days of skilled rehabilitative services in a nursing home.

21.     The Medicaid Program, Title XIX of the Social Security Act, 42 U.S.C. §§ 1396-1396v (hereafter "Medicaid"), is a Health Insurance Program administered by the Government of the United States and the various individual States and is funded by State and Federal taxpayer revenue.  The Medicaid Program is overseen by the United States Department of Health and Human Services.

22.     Medicare was designed to assist participating states in providing medical services, durable medical equipment and prescription drugs to, among others, financially needy individuals that qualify for Medicaid.  The States directly pay providers, with the States

obtaining the federal share of the payment from accounts which draw on the United States Treasury.  42 C.F.R. §§ 430.0-430.30 (1994).

23.     The Medicaid program is a State and Federal government program that pays for certain health services and nursing home care for older people with low incomes and limited assets. In most states, Medicaid also pays for some long-term care services at home and in the community. Who is eligible and what services are covered vary from state to state. Most often, eligibility is based on income and personal resources.

24.     Long term care is reimbursed based on a rubric known as the "Minimum Data Set" or MDS.  The MDS is a uniform set of elements extracted from the Resident Assessment Instrument (RAI) which is a standardized tool for assessing the functional capacity of residents of long term care facilities. In 1997, the Centers for Medicare and Medicaid Services ("CMS") published the final rule, which established the guidelines for the use of the data set and specified the data elements included in the assessment instrument. Long term care facilities are required to complete and transmit MDS data to state and federal agencies for all residents as a condition of participation in the Medicare and Medicaid programs. Automated transmission of all MDS data became a condition of participation on June 22, 1998.

25.     The most basic requirement for reimbursement eligibility under Medicare and Medicaid is that the service provided must be reasonable and medically necessary.  *See, e.g.*, 42 U.S.C. § 1395y(a)(1)(A); 42 U.S.C. § 1396, *et seq.*; 42 C.F.R. § 410.50.  Medical providers are not permitted to bill the government for medically unnecessary services or procedures performed solely for the profit of the provider. *See id.*

## THE RELATOR

26.     Relator ANGELA RUCKH is a Registered Nurse with more than twenty years

clinical experience.  In addition to her medical qualification, Relator is a Legal Nurse Consultant and member of the American Association of Legal Nurse Consultants and holds a current certification in the conduct of Minimum Data Sets 2.0 and 3.0.

27.    In January 2011, Relator took a job with LaVie Care Centers first at the Marshall Health and Rehabilitation Center in Perry, Florida, then in April 2011 she moved to the Governor's Creek Health and Rehabilitation Center in Green Cove Springs, Florida where she worked until her departure in May 2011.   At both locations, Relator witnessed flagrant "upcoding" of healthcare services and the submission of false claims to both the Federal government and the State of Florida.   The payor mix, ignoring private payors, at both these facilities is roughly 80% Medicaid and 20% Medicare.

28.    In her capacity as the Minimum Data Set ("MDS") Coordinator, Relator was responsible for the completion of MDS assessments (known as "MDS OBRA" assessments pursuant to the Omnibus Deficit Reduction Act) as mandated by the Federal and Florida governments.   In the course of her employment, Relator had contact with patients, as well as nursing, administrative and corporate staff and had access to patient charts and Defendants' billing software.   In the course of carrying out her duties, Relator discovered the wholesale upcoding of patient/resident care, backdating of documents submitted in support of claims for payment and the fabrication of billing data, all in the context of woefully inadequate, if not abusive, treatment of patients.

## MARSHALL HEALTH AND REHABILITATION CENTER, PERRY, FLORIDA

29.    Realtor began work at the Marshall Facility as the temporary MDS coordinator in January 2011.  She was initially assigned to complete late assessments which should have been done in the previous month or two, but Relator quickly realized that there were far more serious

problems than belated resident assessments. When Relator began work on the assessments, she found that they were routinely upcoded: the assessment software automatically "pulls" the billing levels from the last assessment and inserts it into the new draft assessment. Relator was surprised to see the pervasive use of the highest codes in these assessments. For example, the code "4/3" indicating a patient's complete dependency (code "4") requiring two aides (code"3") was used almost universally. Relator compared the codes to the nurses' notes in the patient files and the physical therapy notes and very quickly discerned that these codes bore no relation to the actual level of care and service.

30.    Relator also found that the "Care Area Triggers" in the assessments were improperly submitted because the assessments indicated that the "CAT" sheet had been filled out for the resident and a care plan had been completed. Every single assessment Relator saw at the Marshall Facility lacked both a complete CAT sheet and a care plan. This particular discrepancy (the lack of CAT sheets and care plans) was corrected at Relator's behest when the facility self-reported this failure and executed a two week intensive remedial plan.

31.    Relator also discovered that whenever the Marshall Facility accepted a new Medicare resident the practice was to provide any new patients with all three therapeutic services: speech; occupational; and physical therapy (regardless of whether that level of care was merited.) Thereafter the resident would be billed to Medicare at an "ultra" level. Immediately after their initial treatment, the level of care for these patients (the billable minutes) would drop off until the next MDS assessment was due. Such assessments are done on days 5, 14, 30, 60 and 90 days. A few days before the resident's next assessment, the provision of care would again be "ramped up" for billing purposes regardless of need.

32.    Relator found that the LaVie management was focused solely on the billing of

residential care and not on the provision of services to the residents. The Administrator and Regional MDS and Rehabilitation Director's focus was always on the RUG level. (The Resource Utilization Groups ("RUG"s) are the groups into which a nursing home resident is categorized, based on functional status and anticipated use of services and resources.) The RUG codes were also manipulated to increase the level at which Medicare could be billed. Marshall's Director of Rehabilitation would routinely falsify the date of the assessment submitted to the federal government if by that he could artificially inflate the number of minutes for which Medicare paid.

33.    The previous MDS coordinator at Marshall was LuAnn Stephens, who had had a very poor work attendance record due to ill health. However, the administrator, Joyce Denham, held her position open hoping to bring her back to the facility when she recovered.  Relator commented how considerate it was of Ms. Denham to do that for Ms. Stephens, to which the administrator responded "You give me too much credit, that girl knows how to boost the bottom line."  Relator subsequently learned that Ms. Stephens had been routinely upcoding claims to Medicare, a fact which Relator brought to the attention of the Regional MDS, Cheryl McAnally, and the facility administrator Joyce Denham.  In response administrator complained that they had the lowest RUG numbers in the State since Ms Stephens had been out sick.

34.    Part of Relator's job at Marshall was to train Ms. Erica Trani as MDS coordinator while Ms. Stephens was away. Marshall provided Ms. Trani with an electronic signature, which unknown to her had previously belonged to LuAnn Stephens.  This resulted in Ms. Trani's name appearing on upcoded assessments conducted prior to her work at the facility.

35.    Relator further observed the medical records clerk using the electronic signature Ms. Stephens on electronic MDS's sent to the state and federal government for billing purposes.

(Relator later learned that the Medical Records Clerk had access to everyone's password.)

36.     In addition to the overbilling of the state and federal governments, Relator was also witness to appallingly inadequate care. Staffing levels at the facility were so low that administrative staff "worked the floors" in place of nursing staff.  The standard of care was minimal: for example, Relator observed one Medicare patient with an untreated wound.  The nurse had written in the patient's notes "dressing not done – too much to do – not enough time to do it."  Furthermore, despite the need for seven day therapy, Marshall provided no physical therapy at the weekends.

37.     Relator had always intended for her role at Marshall to be a temporary position but she was surprised at the alacrity with which she was reassigned.  On two days' notice she was told that she was being transferred to the LaVie facility in Green Cove Springs, Governor's Creek.

## GOVERNOR'S CREEK, GREEN COVE SPRINGS, FLORIDA

38.     On leaving Marshal, Relator took a similar temporary position at the Governor's Creek Facility in Green Cove Springs, Florida ("Governor's Creek").  There Relator worked with the MDS coordinator Ronnie Blevins.  Once again, Relator discovered that the corporate culture was oriented on the "bottom line" rather than patient care and the billing was riddled with fraud.

39.     Ronnie Blevins was a Licensed Practical Nurse ("LPN") and as such had no authority to prepare assessments without the supervision of a Registered Nurse ("RN"). Nevertheless Ms. Blevins completed assessments on her own because she had access to the electronic identity of her friend the Director of Nursing, Rebecca Adams, Ms. Blevins simply added Ms. Adam's electronic signature falsely indicating that her assessments had been

approved by an RN. Relator and the MDS nurse in training, Lori, witnessed this fraud numerous times.

40.    Approximately three weeks after her arrival, Ronnie Blevins was escorted off the premises by police officers for reasons unknown. Thereafter Relator was assigned to Medicare billing in Ronnie's place and discovered in her review of the patient records, physical therapy notes and previous submissions to Medicare, that every single Medicare patient's bill had been upcoded: routinely the 4/3 codes were applied when they should have been far lower. Just like the Marshall Facility these patient files also lacked care plans and the CAA worksheets had been left blank.

41.    Every day, Governor's Creek had a daily Medicare utilization review with the office and business manager Karen Sparks. During these meetings the head of therapy, Christie Williams, would *dictate* the desired nursing RUG level. Relator was told several times that nurses would get a cash bonus if they exceeded the RUG goal. On information and belief RUG levels were upcoded in return for cash payments. Relator also attended conference calls for all LaVie Medicare MDS nurses in the region at which the same message was spread. At these meetings, Lee [LNU], the Regional MDS coordinator, would praise those with the highest RUG levels as if achieving higher RUG levels was simply a matter of choice rather than a reflection of the provision of reasonable and necessary care.

42.    Relator herself came under pressure to increase the level of her coding. Knowing that she was going to reach an impasse with management Relator warned the administrator that her codes would be lower than desired. In response, Relator was called into a meeting in the administrator's office with the Regional Vice President. The Regional MDS, Lee [LNU], was present and her superior, Karmen, was on the phone. Relator addressed the upcoding issues and

suggested that the facility should self-report. The administrator refused saying "We are not going to self-report but we do have a four point remedial action plan." Relator later learned that was a lie and there was never an attempt to address the issues she raised.

43.    In furtherance of the conspiracy to defraud the federal government, Governor's Creek orchestrated the admission or readmission into hospital of a resident in order to make that resident eligible for 100 days of Medicare support. When the 100 day period expired the patient would "fall back" into Medicaid, but after 60 days would once again be eligible for Medicare if for some reason that resident needed hospitalization. Relator observed the risk manager, Rochelle Henry, suggest they could make more money off "Resident AI" by sending him back to the hospital to start the 100 days running again. Resident AI was sent back into hospital for this purpose even though it was not medically necessary and, accordingly, became a Medicare recipient again.

44.    Governor's Creek also had the same problem which Relator had observed at Marshall, that electronic identities were being "recycled" and the names of current care providers, Lori Jones and Jim Yee (the dietary manager), were appearing on assessments which had been conducted prior to their arrival. Lori Jones had been given the identity, which previously belonged to Carolyn Packer, accordingly Lori's name appeared on all the assessments done by Ms. Packer. This caused great concern for Ms. Jones because Ms. Packer's assessments had been upcoded and now bore her name. After complaining to Michelle, the administrator, Lee, the regional MDS nurse and the Director of Nursing, Rebecca Adams, Lori Jones called American Health Tech ("AHT") the company who supplied the software for the billing of MDS. AHT informed Ms. Jones that "LaVie has known about this problem for years and they refuse to do anything about it."

45.     Relator also found that the computer would lock her out 4 or 5 times a day.  Just a few days before her departure from the facility, she discovered that this was because Lee, the regional MDS nurse, had been logging on under Relator's computer identity and changing Relator's assessments. On her penultimate day at the clinic, Relator was completing 5 or 6 sections on a Medicare assessment but was suddenly locked out of the system.  It was too late in the day to call IT so she had to make an unplanned return visit the next day to finish these assessments.  The next day, when she logged on, she found that the assessments (including one for "Resident PB") had been completed in her name and submitted to Medicare.

46.     That same day, Relator observed a meeting between the business office manager Karen Sparks, the MDS nurse (Lori) and the Rehabilitation Director (Christi Williams).  Lori was being pressured to sign a document saying that she personally had verified all the minutes billed for rehabilitation and all the billing codes for the Month of April 2011.  Karen told Lori, "It would take you hours to verify this information, just sign!"

47.     As was the case at the Marshall facility, the level of resident care at the Governor's Creek was appalling.  For example, Resident "M" was missing a leg brace to treat a fractured leg, when Relator inquired, she was told that Resident M had soiled it months ago, but the staff had not cleaned it or replaced it, so the patient suffered a fractured leg without the aid of a brace.

48.     The similarities between the two LaVie facilities at which Relator worked demonstrate a corrupt corporate culture not limited to the two named facilities.  The involvement and knowledge of a Regional Vice President and Regional MDS coordinators illustrate a state-wide, if not nationwide, scheme to defraud the Federal Government and State of Florida.

## LEGAL CLAIMS FOR RELIEF
## COUNT ONE

### Violations of the Federal False Claims Act, 31 U.S.C. §3729(a)(1)(A)
### Presenting or Causing to be Presented False or Fraudulent Claims

49.   Relator and the United States reallege and incorporate by reference each and every of the foregoing paragraphs as if fully set forth herein.

50.   This is a claim brought by Plaintiff and the United States to recover treble damages, civil penalties and the cost of this action, under the Federal False Claims Act, 31 U.S.C. § 3730, for Defendants' violations of 31 U.S.C. §§ 3729 *et seq.*

The Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(A)  provides:

"Liability for certain acts.  Any person who--

(A) knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval …." *Id.*

51.   By virtue of the above-described acts, among others, Defendants knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval, and continue to cause to be submitted false or fraudulent claims for payment or approval, directly or indirectly, to officers, employees or agents of the United States, in violation of 31 U.S.C. § 3729(a)(1)(A).

52.   The United States, unaware of the falsity of the claims that Defendants submitted, or caused to be submitted, and in reliance on the accuracy thereof, paid Defendants for claims that would otherwise not have been allowed.

53.   It was foreseeable and in fact the intended result that those claims would be submitted and paid.  Further, at all times relevant to the Complaint, Defendants acted with the requisite scienter.

54. The falsification of the nature of the services provided by Defendants was material and caused the resulting claims for payment to be false or fraudulent. Plaintiff United States, being unaware of the falsity of the claims and/or statements made or caused to be made by Defendants, and in reliance on the accuracy thereof paid, and continue to pay for such false or fraudulent claims.

55. It is believed that as a result of Defendants' violations of 31 U.S.C. § 3729 (a)(1)(A), the United States has suffered substantial losses and is therefore entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each such false claim presented or caused to be presented by Defendants.

## COUNT TWO

### Violations of the Federal False Claims Act, 31 U.S.C. §3729(a)(1)(B)
### Creation or Use of False Statements or Records Material to a False or Fraudulent Claim

56. Relator and the United States reallege and incorporate by reference each and every one of the foregoing paragraphs as if fully set forth herein.

57. This is a claim brought by Plaintiff and the United States to recover treble damages, civil penalties and the cost of this action, under the Federal False Claims Act, 31 U.S.C. § 3730 for Defendants' violations of 31 U.S.C. §§ 3729 *et seq.*

58. The Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(B) provides:

> "Liability for certain acts. Any person who--
> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim..."

*Id.*

59. By virtue of the above-described acts, among others, Defendants knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent

claims paid by the United States, and continue to do so, in violation of 31 U.S.C. § 3729(a)(1)(B).

60.  For those records and/or statements that Defendants made or used or caused to be made or used, it was foreseeable and in fact the intended result that those statements and/or records would result in the payment of false or fraudulent reimbursement claims.  Further, at all times relevant hereto, Defendants acted with the requisite scienter.

61.  The falsification of the nature of the services provided by Defendants was material.

62.  As a result of Defendants' violations of 31 U.S.C. § 3729 (a)(1)(B), the United States has suffered substantial losses and is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each such false record and/or statement made or used or caused to be made or used by Defendants.

## COUNT THREE

### Violations of the Federal False Claims Act, 31 U.S.C. §3729(a)(1)(G)

### Making, Using or Causing to be Made or Used, a False Record or Statement Material to an Obligation to Pay or Transmit Money or Property to the United States or Concealing, Improperly Avoiding or Decreasing an Obligation to Pay or Transmit Money or Property to the United States

63.  Relator and the United States reallege and incorporate by reference each and every one of the foregoing paragraphs as if fully set forth herein.

64.  This is a claim brought by Plaintiff and the United States to recover treble damages, civil penalties and the cost of this action, under the Federal False Claims Act, 31 U.S.C. § 3730, for Defendants' violations of 31 U.S.C. §§ 3729 *et seq.*

65.  The Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(G), prior to amendment by FERA (*see* fn. 1, *supra*), imposed liability for any person who "knowingly makes, uses, or

causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government." As amended by FERA, this section provides:

> "Liability for certain acts. Any person who--
>
>> (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government ..."

*Id.* The term "obligation" means:

> "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, form a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment..."

31 U.S.C. § 3729(b)(3).

66.   By virtue of the above-described acts, among others, Defendants knowingly made, used, or caused to be made or used false records or statements, and continue to do so, in violation of 31 U.S.C. § 3729(a)(1)(G). Moreover, Defendants have failed to take the required and appropriate steps to satisfy the obligation owed to the United States, by refunding or returning overpayments received, or to inform the Government fully and completely of the overbilling, and instead continue to retain such overpayments, and to overbill the Government.

67. As a result of Defendants' violations of 31 U.S.C. § 3729 (a)(1)(G), the United States has suffered substantial losses and is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each such false record and/or statement made or used or caused to be made or used by Defendants.

## COUNT FOUR

## VIOLATIONS OF THE FLORIDA FCA
### Fla. Stat. § 68.082(2)(a)

68.     Relator and the State of Florida reallege and incorporate by reference each and every one of the foregoing paragraphs as if fully set forth herein.

69.     The Florida False Claims Act, Fla. Stat. § 68.082(2)(a), specifically provides, in part, that any person who:

(a)     Knowingly presents or causes to be presented to an officer or employee of an agency a false claim for payment or approval; …is liable to the state for a civil penalty of not less than $5,000 and not more than $10,000 and for treble the amount of damages the agency sustains because of the act or omission of that person.

70.     Defendants knowingly presented or caused to be presented to the Florida Medicaid program false claims for payment and approval, claims which failed to disclose the material violations of law, in violation of Fla. Stat. § 68.082(2)(a).

71.     The State of Florida paid said claims and has sustained damages because of these acts by the Defendants.

## COUNT FIVE

## VIOLATIONS OF THE FLORIDA FCA
### Fla. Stat. § 68.082(2)(b)

72.     Relator and the State of Florida reallege and incorporate by reference each and every one of the foregoing paragraphs as if fully set forth herein.

73.     The Florida False Claims Act, Fla. Stat. § 68.082(2)(b), specifically provides, in part, that any person who:

(b)     Knowingly makes, uses, or causes to be made or used a false record or statement

to get a false or fraudulent claim paid or approved by an agency; …

is liable to the state for a civil penalty of not less than $5,000 and not more than $10,000

and for treble the amount of damages the agency sustains because of the act or omission

of that person.

74.     Defendants knowingly made, used and caused to be made and used, false records

and statements to get false and fraudulent claims paid and approved by an agency of the State of

Florida, in violation of Fla. Stat. § 68.082(2)(b).

75.     The State of Florida paid said claims and has sustained damages because of these

acts by the Defendants.

## COUNT SIX

### VIOLATIONS OF THE FLORIDA FCA
### Fla. Stat. § 68.082(2)(g)

76.     Relator and the State of Florida reallege and incorporate by reference each and

every one of the foregoing paragraphs as if fully set forth herein.

77.     The Florida False Claims Act, Fla. Stat. § 68.082(2)(g), specifically provides, in

part, that any person who:

(g) Knowingly makes, uses or causes to be made or used a false record or statement to

conceal, avoid, or decrease an obligation to pay or transmit money or property to an

agency. . .is liable to the state for a civil penalty of not less than $5,000 and not more than

$10,000 and for treble the amount of damages the agency sustains because of the act or

omission of that person.

78.     Defendants knowingly made, used, or caused to be made or used, a false record or

statement to conceal its actions and to avoid or decrease an obligation to pay or transmit money

to the state, in violation of Fla. Stat. § 68.082(2)(g).

79. The State of Florida paid said claims and has sustained damages because of these acts by the Defendants.

### PRAYERS FOR RELIEF

WHEREFORE, Relator, Angela Ruckh, acting on behalf of and in the name of the United States of America and the State of Florida and on her own behalf, demands and prays that judgment be entered as follows against the Defendants:

(a) In favor of the United States against the Defendants for treble the amount of damages to Government Programs from the Defendants' unlawful activities, plus maximum civil penalties of Eleven Thousand Dollars ($11,000.00) for each violation of the FCA;

(b) In favor of the United States against the Defendants for disgorgement of the profits earned by Defendants as a result of their illegal scheme;

(c) In favor of the Relator for the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) plus include reasonable expenses, attorney fees and costs incurred by Relator;

(d) In favor of the Relator and the State of Florida against Defendants in an amount equal to three times the amount of damages that Florida has sustained as a result of the Defendants' actions, as well as a civil penalty against the Defendants of a statutory maximum for each violation of Florida's FCA;

(e) For all costs of the Federal and State FCA civil action; and

(f) Such other relief as this Court deems just and appropriate.

PLAINTIFF/RELATOR DEMANDS A TRIAL BY JURY ON ALL COUNTS

Dated:  August 2, 2012

Respectfully submitted,

Kevin J. Darken
kdarken@tampalawfirm.com
Florida Bar No.: 0090956
THE COHEN LAW GROUP
201 East Kennedy Boulevard, Suite 1000
Tampa, Florida 33602
Telephone: (813) 225-1655
Facsimile:  (813) 225-1921


Rory Delaney, Esq. (BBO #655666)
rory@rorydelaney.com
7 Liberty Square, 2nd floor,
Boston, MA 02109
Telephone: (857) 498-0384

## CERTIFICATE OF SERVICE

I hereby certify that on August 2, 2012, a copy of the foregoing First Amended

Complaint was filed electronically.  Notice of this filing will be sent by operation of the Court's

CM/ECF system to all parties indicated on the electronic filing receipt.  Parties may access this

filing through the Court's CM/ECF system.

Kevin J. Darken (0090956)