UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

THE UNITED STATES OF
AMERICA and the STATE OF
FLORIDA *ex rel.* ANGELA RUCKH,

    Plaintiffs,

v.                                                     CASE NO.: 8:11-cv-1303-T-23TBM

GENOA HEALTHCARE
CONSULTING, LLC, d/b/a LAVIE
CARE CENTERS and SALUS
REHABILITATION, LLC, d/b/a
LAVIE REHAB,

    Defendants.
_____/

**ORDER**

Under the False Claims Act and the Florida False Claims Act, the *qui tam* relator, Angela Ruckh, sues (Doc. 16) Genoa Healthcare Consulting, LLC, and Salus Rehabilitation, LLC. A registered nurse and nurse consultant, the relator began employment with Genoa in January, 2011, at the Marshall Health and Rehabilitation Center in Perry, Florida. In April, 2011, Genoa moved the relator to the Governor's Creek Health and Rehabilitation Center in Green Cove Springs, Florida, where she worked for a month. Genoa "operates" both Marshall and Governor's Creek, and Salus provides rehabilitation services at each location.

For the purpose of this motion, the allegations of the amended complaint (Doc. 16) are accepted as true.  While employed by Genoa, the relator worked as a Minimum Data Set ("MDS") Coordinator generally responsible for organizing the delivery of care to long-term patients, for reviewing patient charts and treatment notes, and for completing clinical assessments required by Medicare and Medicaid.  While with Genoa, the relator observed an institutional scheme to "upcode" patient care, "backdate" documents in support of claims for payment, and fabricate billing data.  The relator observed that the codes used to bill the government insurance programs "bore no relation to the actual level of care and service."  The relator discovered that, when accepting a new Medicare resident, Marshall "routinely" provided patients with three therapeutic services – speech, occupational, and physical therapy – even if unnecessary for patient care.  "Thereafter the resident would be billed to Medicare at an 'ultra' level."  (Doc. 16 at 9)  The relator observed the medical records clerk forging electronic signatures on MDS submissions "sent to the state and federal government for billing purposes."  (Doc. 16 at 10)

The relator found management obsessed with the "RUG level," the "Resource Utilization Groups," which categorizes residents by the residents' anticipated use of services. In order to "artificially inflate the number of minutes for which Medicare paid," Marshall's Director of Rehabilitation "would routinely falsify the date" on which an assessment occurred. (Doc. 16 at 10)  The relator reported the "upcoding" to a supervisor, who responded that, during a colleague's sick-leave, the facility "had

the lowest RUG numbers in the state" because the colleague "knows how to boost the bottom line." (Doc. 16 at 10)

During meetings at Governor's Creek, the business manager would "dictate the desired nursing RUG level," and the relator "was told several times that nurses would get a cash bonus if they exceeded the RUG goal." (Doc. 16 at 12)  Three weeks after arriving at Governor's Creek, the relator was assigned to Medicare billing.  In a review of physical therapy notes and Medicare submissions, the relator discovered "that every single Medicare patient's bill had been upcoded," that is, using an improper code to ensure a larger payment. (Doc. 16 at 12)  Additionally, Governor's Creek "orchestrated" a resident's admission into a hospital, thereby qualifying the resident for a hundred days of Medicare support.  When the hundred days expired, the relator heard a colleague suggest a re-admission to start a new hundred days of Medicare support.

"Locked out" of her computer four or five times a day, the relator learned that the regional MDS nurse had been changing the relator's patient assessments and that the bogus assessments in the relator's name had been submitted to Medicare.  The same day, the relator heard the business office manager pressure an MDS nurse into signing a document "saying that she personally had verified all the minutes billed for rehabilitation and all the billing codes for the month of April." (Doc. 16 at 14)  The office manager told the MDS nurse, "It would take you hours to verify this information, just sign!" (Doc. 16 at 14)

Each defendant moves (Docs. 19 and 20) to dismiss and asserts (1) that under *United States ex rel. Clausen v. Laboratory Corporation of America*, 290 F.3d 1301 (11th Cir. 2002), the relator fails to allege the False Claims Act claims with particularity, (2) that the relator's allegations target neither defendant but instead Marshall and Governor's Creek, "related" companies that "share the same parent company" as each defendant, and (3) that the complaint fails to adequately plead vicarious liability.  The relator responds (Doc. 38) and argues (1) that the complaint meets the pleading standard in Rule 9(b), Federal Rules of Civil Procedure, and (2) that the complaint alleges Genoa "operated" each facility and Salus "provides rehabilitation service to patients" in each facility.

### The Submission of a False Claim

Each party agrees that *Clausen* governs the applicable pleading standard in the Eleventh Circuit.[1]  As explained in *United States ex rel. King v. DSE, Inc.*, No. 8:08-cv-2416-T-23EAJ, 2011 WL 1884012, *1 (M.D. Fla. May 17, 2011):

> *Clausen* holds that a relator asserting a claim for health care fraud must allege with specificity a claim or bill submitted to the government.  In other words, a relator who is aware of an improper, inferior, or bogus medical product or service cannot sustain a False Claims Act action without alleging a particular bill sent to, and paid by, the government.  *Clausen* states that "[t]he False Claims Act does not create liability

---

[1] The relator asserts in one paragraph "that the Rule 9(b) holding in *Clausen* . . . should not apply to her factual allegations to the extent that she also alleges that Defendants' conduct caused false, as opposed to fraudulent, claims to be submitted." (Doc. 26 at 16)  The relator cites no authority for the proposition and decides "not [to] belabor the point given the current [False Claims Act] pleading standard in the Eleventh Circuit." (Doc. 26 at 16)

- 4 -

> merely for a health care provider's disregard of Government regulations or improper internal policies unless, as a result of such acts, the provider knowingly asks the Government to pay amounts it does not owe." 290 F.3d at 1311.
>
> The purpose of Rule 9(b), as interpreted by *Clausen*, is to ensure (1) that an opportunistic relator is unable to tarnish the reputation of a medical provider by instituting a spurious lawsuit and (2) that a minor deviation from a standard of care does not expand into a quasi-criminal proceeding in federal court.

In addition, *Clausen*'s particularity requirement prevents a relator's learning the "bare essentials" through discovery and a relator's asserting "baseless allegations used to extract settlements." 290 F.3d at 1314 n. 24. The particularity requirement also helps to reasonably confine discovery:

> The Plaintiff will request production of every . . . claim submitted by the Defendant [during the time corresponding to Plaintiff's claims]. At that point, the Defendant may decide to settle the case to avoid the enormous cost of such discovery and the possible disruption of its ongoing business. On the other hand, the Defendant may choose to resist the discovery. In that case, the Court will be presented with the dilemma of allowing an unlimited fishing expedition or no discovery at all because of the difficulty in fashioning logical and principled limits on what has to be produced. The particularity requirement of Rule 9(b), if enforced, will not only protect defendants against strike suits, but will result in claims with discernable boundaries and manageable discovery limits.

*United States ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1359-60 (11th Cir. 2006) (quoting *United States ex rel. Clausen v. Lab. Corp. of Am.*, 198 F.R.D. 560, 564 (N.D. Ga. 2000)).

The latter concern is especially persuasive in this action, where the relator seeks in her first request for production:

> All subpoenas, civil investigative demands, or requests for production of documents, whether formal or informal, served upon Defendants by the Department of Justice, the Florida Attorney General, or any Government Health Agency related to this litigation or the allegations in the Complaint or First Amended Complaint.

(Doc. 43 at 11)  The relators second request seeks "[a]ny documents produced in response to any of the requests described in Request 1."  (Doc. 43 at 13)  Yet the relator alleges only one arguably sufficient allegation of "an actual false claim":

> Relator also found that the computer would lock her out 4 or 5 times a day.  Just a few days before her departure from the facility, she discovered that this was because Lee, the regional MDS nurse, had been logging on under Relator's computer identity and changing Relator's assessments.  On her penultimate day at the clinic, Relator was completing 5 or 6 sections on a Medicare assessment but was suddenly locked out of the system.  It was too late in the day to call IT so she had to make an unplanned return visit the next day to finish these assessments.  The next day, when she logged on, she found that the assessments (including one for "Resident PB") had been completed in her name and submitted to Medicare.

(Doc. 16 at 14, ¶ 45)  Although alleging the place of submission, the culprit, and the patient, the relator alleges no details about the fraudulent substance of the submission or about the time of the submission or about the government's overpaying the claim. *Clausen*, 290 F.3d at 1308-10 ("A plaintiff must plead 'facts as to time, place, and substance of the alleged fraud,' specifically 'the details of the defendant['s] allegedly fraudulent acts, when they occurred, and who engaged in them.") (quoting *Cooper v. Blue Cross & Blue Shield of Fla.*, 19 F.3d 562, 567-68 (11th Cir. 1994)).  Although some Eleventh Circuit opinions require less "particularity" than others, *compare Hill v. Morehouse Medical Assoc.*, 2003 WL 22019936 (11th Cir.

- 6 -

Aug. 15, 2003) (per curiam) *and Matheny v. Medco Health Solutions*, 671 F.3d 1217 (11th Cir. 2012) (Restani, Judge of the United States Court of International Trade, sitting by designation), *with Clausen v. Laboratory Corporation of America*, 290 F.3d 1301 (11th Cir. 2002) (Hull, J.) *and Atkins v. McInteer*, 470 F.3d 1350 (11th Cir. 2006) (Tjoflat, J.), the ultimate requirement is "'some indicia of reliability . . . to support the allegation of *an actual false claim* for payment being made to the Government.'" *Atkins*, 470 F.3d at 1357 (quoting *Clausen*, 290 F.3d at 1311). The allegation of a first-hand observation of a false submission arguably suffices under *Hill* and *Matheny*, but *Clausen* and *Atkins* gravitate toward dismissal. The circumstances weigh in favor of (1) dismissal with leave to amend and (2) limited discovery to confirm the reliability of the "Resident PB" allegation.

### The Defendants' Corporate Structure

The relator alleges that Genoa "operates" each facility and that Salus "provides rehabilitation services" at each facility, but the relator readily admits that "the corporate structure[] of Defendant[s'] privately-held companies is, as Churchill said of Russia, 'a riddle, wrapped in a mystery, inside an enigma.'" (Doc. 26 at 14) Rather than responding to the relator's discovery request concerning the corporate structure and rather than submitting evidence of the corporate structure in the motion to dismiss, the defendants state only that they are companies "related" to the Marshall and Governor's Creek companies and that the they are not "provider[s],

- 7 -

supplier[s], or beneficiar[ies], [are] not enrolled in Medicare or Medicaid, and do[] not submit claims to Medicare or Medicaid." However, the defendants produce no evidence, and the information, easily and inexpensively producible, remains within the defendants' control.

## CONCLUSION

The motion to stay discovery (Doc. 37) is **GRANTED** except that, by **MARCH 15, 2013**, the relator may send to each defendant a request for production or other discovery reasonably calculated and focused to explore the "Resident PB" allegation of paragraph forty-five. Any deponent should receive fourteen days' notice. Any objection to discovery is waived if not filed by **MARCH 22, 2013**. By **APRIL 12, 2013**, each defendant shall respond to the discovery.

The motion to compel (Doc. 43) is **GRANTED** as to the third request only and otherwise **DENIED WITHOUT PREJUDICE**. Accordingly, by **APRIL 12, 2013**, each defendant shall respond to the relator's third request for production (which concerns the defendants' corporate structure) as detailed on pages fifteen and sixteen in the relator's motion to compel.

The motions to dismiss (Docs. 19 and 20) are **GRANTED**, and the amended complaint is **DISMISSED WITHOUT PREJUDICE**. The relator shall submit the second amended complaint by **APRIL 30, 2013**. The second amended complaint (1) should include "specific, discrete facts of the who, what, when, and where

variety," *Feliciano v. City of Miami*, No. 12-11397 (11th Cir. Feb. 5, 2013), to support the "Resident PB" allegation or other allegations of fraud and (2) describe the defendants' corporate structure.

ORDERED in Tampa, Florida, on March 5, 2013.

*Steven D. Merryday*
STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE