# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

| | |
|---|---|
| THE UNITED STATES OF AMERICA and THE STATE OF FLORIDA *ex rel.* ANGELA RUCKH,<br><br>    Plaintiff,<br><br>        v.<br><br>CONSULATE MANAGEMENT COMPANY, LLC; SEA CREST HEALTH CARE MANAGEMENT, LLC, d/b/a LAVIE MANAGEMENT SERVICES OF FLORIDA; SALUS REHABILITATION, LLC, d/b/a LAVIE REHAB; 207 MARSHALL DRIVE OPERATIONS, LLC, d/b/a MARSHALL HEALTH AND REHABILITATION CENTER; 803 OAK STREET OPERATIONS, LLC, d/b/a GOVERNOR'S CREEK HEALTH AND REHABILITATION CENTER,<br><br>    Defendants. | CIVIL ACTION NO.<br>8:11 CV 1303 SDM-TBM |

## RELATOR'S SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

### NATURE OF THE ACTION

1.      This is an action brought on behalf of the United States of America and the State of Florida by Plaintiff Angela Ruckh (hereinafter referred to as "Relator") against Defendants pursuant to the *qui tam* provisions of the federal False Claims Act ("FCA"), 31 U.S.C. §§ 3729-33, and the Florida False Claims Act, Fla. Stat. §§ 68.081 *et seq.*

2.      The Relator in this case formerly worked at two skilled nursing facilities ("SNFs") owned or operated by Defendants.  The allegations of this Complaint result from the Relator's first-hand knowledge of Defendants' unlawful practices in knowingly falsifying numerous statements and claims submitted for reimbursement by the Medicare, Medicaid, and TRICARE programs.

3.      Defendants operate and provide services at 53 SNFs in the State of Florida.  As described in greater detail below, Defendants engaged in a scheme to defraud the United States and the State of Florida of millions of dollars of Medicare, Medicaid, and TRICARE funds each year by misrepresenting the medical condition of, and treatment provided to, residents at the SNFs.

4.      This fraudulent scheme was encouraged by senior officers of Defendants, who established target reimbursement rates for each SNF, offered employees financial bonuses for exceeding those rates, and actively encouraged employees to falsify statements and claims submitted to the United States Centers for Medicare and Medicaid Services ("CMS") and the Florida Agency for Health Care Administration ("AHCA").  Defendants also pressured and manipulated employees, such as Relator, who raised concerns about the fraud.

5.      The primary instrument of Defendants' fraud was the Minimum Data Set Assessment ("MDS Assessment"), a report established by CMS and AHCA that summarized the medical condition and treatment provided to a particular resident at a SNF.  Defendants were required regularly to submit MDS Assessments to CMS for each resident, and the information in those MDS Assessments formed the basis for reimbursement from Medicare, Medicaid, and TRICARE.  Defendants falsified MDS Assessments – thus making the resulting claims based on those MDS Assessments false – in several ways.

6.      First, Defendants falsified MDS Assessments for residents covered by Medicare and TRICARE by overstating residents' medical needs and the amount of care provided to them. Under the Medicare and TRICARE programs, a SNF's reimbursement for a resident is based on the resident's classification in one of over 50 Resource Utilization Groups ("RUGs") as reported in the resident's MDS Assessment.  The RUG level is determined based on information reported in the MDS Assessment and reflects the resident's need for nursing staff assistance to perform common Activities of Daily Living ("ADLs"), such as walking or using the toilet, and the amount of rehabilitative therapy (measured in minutes) provided to the resident.

7.      To increase their Medicare and TRICARE reimbursement rates, Defendants fraudulently inflated the RUG levels reported in MDS Assessments (and included in subsequent claims to CMS) by falsely representing that residents required extensive assistance for ADLs, when lesser levels or no such assistance was needed or provided; by providing medically unnecessary rehabilitative therapy; and by overstating the amount of rehabilitative therapy provided to residents.

8.      Second, Defendants systematically defrauded CMS and AHCA of Medicaid funds.  Unlike Medicare and TRICARE, Florida's Medicaid program pays a flat per diem rate for each covered resident.  To ensure that residents receive proper care, federal and Florida regulations require that SNFs provide care to residents pursuant to a written care plan designed to address any medical needs reflected in the resident's MDS Assessment.  Because Medicaid reimbursement levels are fixed, Defendants sought to increase their profits by avoiding the cost of completing care plans and providing necessary care to Medicaid residents.  To conceal their blatant violation of federal and Florida standards, Defendants routinely falsified MDS

Assessments to report that they had completed care plans for their Medicaid residents, when in fact no such care plans even existed.

9.     The absence of care plans for residents predictably resulted in inadequate staffing and appallingly poor levels of patient care.  Simply by way of example, Relator learned that one resident was left with an untreated open wound for several days, because the attending nurse was too busy to dress the wound; another resident limped for months with a fractured leg because the need for a leg brace was never documented in her care plan.  Yet another resident was forced to eat meals without her dentures because a staff person had locked the dentures in a nightstand drawer more than a year earlier, and no one had bothered to unlock the drawer to retrieve them. When Relator and other nurses attempted to record accurately residents' need for (costly) medical equipment or therapy, such documentation was removed from residents' medical files to conceal the fact that residents were not receiving necessary care.  Even as their Medicaid residents suffered from substandard care, Defendants derived millions in profits each year from their cost-cutting efforts.

10.    To avoid detection of this fraudulent scheme, Defendants would routinely create generic, boilerplate care plans for residents many months after their admission, but shortly before scheduled audit periods.  Defendants knew that AHCA surveyors inspecting their SNFs would discover the serious lack of care plans through routine audits.  Defendants therefore sought through post hoc care-planning to conceal their gross deviation from federal and Florida standards.

11.    Finally, Defendants routinely falsified the identities of the persons submitting MDS Assessments to facilitate their fraudulent scheme.  Federal and Florida regulations require that a Registered Nurse ("RN") coordinate the completion of an MDS Assessment and certify

that it has been properly completed.  Each RN is assigned an electronic signature and password

that is used to certify MDS Assessments submitted electronically to CMS.  Defendants

frequently had employees who were not RNs falsely certify the completeness of MDS

Assessments using the electronic signature of an RN who had not reviewed or certified the

proper completion of the MDS Assessment.  For example, Relator learned that one employee

(who was not an RN) falsely used an RN's electronic signature to certify the completeness of

MDS Assessments for Medicare residents on a daily basis for five months.  Defendants ignored

this practice because the employee consistently falsified the RUG levels in these MDS

Assessments, generating high reimbursement rates.  Additionally, when Defendants learned that

Relator was unwilling to inflate the RUG levels reported in the MDS Assessments she

completed, they simply falsified Relator's MDS Assessments and submitted them in her name.

12.     Defendants' fraudulent scheme extended to numerous SNFs across the state of

Florida, resulted in the submission of thousands of false MDS Assessments and related claims to

CMS and AHCA, and generated millions of dollars of profits for Defendants each year.  Relator

brings this action to recover for the United States and the State of Florida the funds unlawfully

obtained through Defendants' statewide scheme to defraud.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over Relator's claims under the federal FCA pursuant

to 28 U.S.C. §§ 1331, 1345, and 31 U.S.C. § 3732, and has jurisdiction over Relator's claims

under the Florida False Claims Act pursuant to 28 U.S.C. §§ 1367 and 31 U.S.C. 3732(b).

14.     Venue is proper under 28 U.S.C. § 1391(b) and (c) and 31 U.S.C. § 3732(a)

because the Defendants can be found, reside, and/or transact business in this judicial district, and

because acts proscribed by 31 U.S.C. § 3729 and Fla. Stat. § 68.082 have been committed by the Defendants in this judicial district.

15.     Relator's action is not based upon the disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or General Accounting Office report, hearing, audit, or investigation, or from the news media.  At the time the original complaint was filed, there was no such disclosure, and in any event this action is based on Relator's direct and independent knowledge, not on any such disclosure.  Furthermore, as discussed and demonstrated in Relator's Complaint and amendments and prior proceedings before the Court, Relator is an "original source" of the information upon which her action is based:  she has direct and independent knowledge of the information on which her action is based, and she voluntarily provided her information to the United States and the State of Florida before filing her Complaint.

## THE PARTIES

16.     Relator Angela Ruckh is a citizen of the United States of America and the State of Florida and is also an RN with more than twenty-five years of experience.  In addition, Relator is a member of the American Association of Nurse Assessment Coordination and holds a current certification in the conduct of Minimum Data Sets 2.0 and 3.0.  As further alleged below, in January 2011, Relator took a job at a SNF managed by Defendants, was subsequently transferred to another SNF managed by Defendants, and left that position in May 2011.

17.     Defendant Sea Crest Health Care Management, LLC is a limited liability company organized under the laws of the State of Delaware and has its principal place of business at 10210 Highland Manor Drive, Suite 250, Tampa, FL  33610.  In 2011, Defendant Sea

Crest Health Care Management, LLC did business under the name "LaVie Management Services of Florida," and is referred to herein as "LaVie Management Services."

18.     Defendant Salus Rehabilitation, LLC is a limited liability company organized under the laws of the State of Delaware and has its principal place of business at 10210 Highland Manor Drive, Suite 290, Tampa, FL  33610.  In 2011, Defendant Salus Rehabilitation, LLC did business under the name "LaVie Rehab," and is referred to herein as "LaVie Rehab."  LaVie Rehab and LaVie Management Services are collectively referred to herein as "LaVie."

19.     Defendant 207 Marshall Drive Operations, LLC is a limited liability company organized under the laws of the State of Florida.  Defendant 207 Marshall Drive Operations, LLC is the successor-in-interest to Perry Health Care Associates, LLC by way of a merger that occurred on or about February 2, 2012.  Defendant 207 Marshall Drive Operations, LLC and its predecessor do (or did) business under the name "Marshall Health and Rehabilitation Center," and operate (or operated) a SNF at 207 Marshall Drive, Perry, FL 32347.  Defendant 207 Marshall Drive Operations, LLC and its predecessor-in-interest are referred to herein as "the Marshall Facility."

20.     Defendant 803 Oak Street Operations, LLC is a limited liability company organized under the laws of the State of Florida.  Defendant 803 Oak Street Operations, LLC is the successor-in-interest to Oak Terrace Health Care Associates, LLC by way of a merger that occurred on or about February 2, 2012.  Defendant 803 Oak Street Operations, LLC and its predecessor do (or did) business under the name "Governor's Creek Health and Rehabilitation Center," and operate (or operated) a SNF at 803 Oak Street, Green Cove Springs, FL 32043. Defendant 803 Oak Street Operations, LLC and its predecessor-in-interest are referred to herein as "the Governor's Creek Facility."

21.     As explained in greater detail below, Defendant LaVie Management Services exercised supervision and control over the operations of the Marshall Facility and the Governor's Creek Facility (collectively, "the Facilities").  LaVie Management Services served as the management company for the Facilities and provided management services to the Facilities in return for compensation based on the Medicare, TRICARE, and Medicaid reimbursement received by the Facilities.  LaVie Management Services was responsible for selecting each Facility's Administrator – the senior employee at each Facility who is responsible for its operations – and had the authority to remove or replace the Administrator.

22.     In addition to these two Facilities, Defendant LaVie Management Services acted as the management company and received compensation for management services provided to 51 other SNFs located in the State of Florida (collectively with the Facilities, the "LaVie Facilities").  A list of these Facilities is attached hereto as Exhibit 1.  As further alleged below, LaVie Management Services established reimbursement targets for each of the LaVie Facilities and participated in the submission of false statements and false claims by these LaVie Facilities. Defendants LaVie Management Services, LaVie Rehab, and each of the LaVie Facilities were all under the common ownership of Genoa Health Care Group, LLC, which did business under the name "LaVie Care."

23.     Defendant LaVie Rehab provided rehabilitative therapy at the Marshall and Governor's Creek Facilities and was compensated based on the Medicare and TRICARE reimbursement received by the Facilities.  LaVie Rehab provided rehabilitative therapy services on similar terms to all of the LaVie Facilities.  As further alleged below, Defendant LaVie Rehab knowingly participated in the submission of false statements and claims.

24.    Defendant Consulate Management Company, LLC is a limited liability company organized under the laws of the State of Florida and has its principal address at 800 Concourse Parkway South, Suite 200, Maitland, FL 32751.  Prior to September 2012, Consulate Management Company, LLC was a subsidiary of Consulate Health Care, LLC, a limited liability company organized under the laws of the State of Florida and having its principal address at 800 Concourse Parkway South, Suite 200, Maitland, FL 32751.

25.    In September of 2012, Genoa Health Care Group, LLC or its affiliates acquired Consulate Health Care, LLC.  After the acquisition, on or about September 28, 2012, Consulate Health Care Group, LLC was merged into LV CHC Holdings I, LLC, a holding company established by Genoa Health Care Group, LLC or its affiliates.  Genoa Health Care Group, LLC thereafter adopted the name "Consulate Health Care" and all or substantially all of the employees of LaVie Management Services became employees of Consulate Management Company, LLC.

26.    As a result, Defendant Consulate Management Company, LLC now exercises operational control over all or substantially all of the LaVie Facilities, including the Marshall and Governor's Creek Facilities.  On its website, Consulate Management Company, LLC holds itself out as operating and controlling the LaVie Facilities.  *See* Consulate Health Care, Florida Facility Locations, http://www.consulatemgt.com/Locations.aspx?by=state (last visited Apr. 29, 2013).

27.    Defendant Consulate Management, LLC is liable as successor in interest for the conduct of LaVie Management Services because there is substantial continuity in business operations between Consulate Management Company, LLC and LaVie Management Services. Defendant Consulate Management, LLC is also directly liable for any false statements or claims occurring after it assumed control of the LaVie Facilities.

## GOVERNMENT HEALTH INSURANCE PROGRAMS

**A.    Health Insurance Through Medicare**

28.    The Health Insurance for the Aged and Disabled Program, popularly known as the Medicare Program, was established by Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, *et seq.*, (hereinafter "Medicare").  Medicare is a health insurance program administered by the Government of the United States that is funded by taxpayer revenue.  Medicare is overseen by the United States Department of Health and Human Services ("HHS") through CMS.

29.    Medicare is designed to be a health insurance program and to provide for the payment of hospital services, skilled nursing services, and durable medical equipment to persons over sixty-five (65) years of age, and certain other eligible individuals.

30.    Reimbursement for Medicare claims is made by the United States through CMS, which contracts with private insurance carriers referred to as Medicare Administrative Contractors ("MACs") to administer and pay claims from the Medicare Trust Fund.  42 U.S.C. §§ 1395h, 1395u.  In this capacity, MACs act on behalf of CMS.

31.    Medicare does not generally pay for long-term care.  However, Medicare Part A will pay for medically necessary services provided by a SNF for up to 100 days to a resident who has been recently discharged from a hospital and is in need of skilled nursing services to recover from hospital treatment.  *See* 42 U.S.C. §§ 1395d(a)(2), 1395f(a)(2)(B); 42 C.F.R. §§ 424.20, 409.20-.36.

32.    Medicare pays for SNF care in two ways:  directly, through the Prospective Payment System, or indirectly through Medicare Advantage plans established under Medicare Part C.

1.      **Federal Regulation of SNFs Receiving Medicare Reimbursement**

33.     In the Omnibus Budget Reconciliation Act of 1987 ("OBRA"), Congress imposed a number of requirements on SNFs receiving Medicare reimbursement to protect the rights of residents at such facilities and ensure that they receive appropriate care.  *See* Pub. L. No. 100-203, § 4201, 101 Stat. 1330, 1330-160 to -174, codified as amended at 42 U.S.C. § 1395i-3.

34.     Among other things, OBRA requires SNFs regularly to collect and submit to CMS certain information on each resident, which is used to assess the resident's medical condition and the treatment provided to the resident.  *See* 42 U.S.C. § 1395i-3(b)(3).  This information is reported in a form jointly established by CMS and each State, which is referred to as an MDS Assessment.  Attached hereto as Exhibit 2 and incorporated herein by reference is a blank MDS Assessment form developed by CMS.  Defendants used substantially similar forms to create and submit MDS Assessments to CMS and AHCA.

35.     OBRA requires SNFs to complete and submit to CMS and to the appropriate State agency a comprehensive MDS Assessment for each resident within 14 days of the resident's admission to the SNF, promptly after a significant change in the resident's physical or mental condition, and at least once every twelve months.  *See* 42 U.S.C. § 1395i-3(b)(3)(C).  More abbreviated assessments must be completed quarterly and upon the resident's entry into, and discharge from, the SNF.  *See id.*; 42 C.F.R. § 483.20(c), (*l*).

36.     Each MDS Assessment provides a variety of information about the resident's physical and mental condition and the resident's ability to perform certain ADLs such as walking and eating.  *See* Ex. 2, §§ C-N, at 6-26.  The MDS Assessment also reports the medications, therapy, and/or other skilled nursing services provided to the resident.  *See id.* § O, at 27-29.

37.     An RN must coordinate the completion of the MDS Assessment, and must sign the MDS Assessment to certify that it has been properly completed.  *See* 42 U.S.C. § 1395i-3(b)(3)(B)(i); 42 C.F.R. § 483.20(h), (i)(1); Ex. 2, § Z, at 38.  Each individual who completes a portion of an MDS Assessment must sign to certify the accuracy of that portion of the assessment.  42 U.S.C. § 1395i-3(b)(3)(B)(i); 42 C.F.R. § 483.20(i)(2); Ex. 2, § Z, at 38.  The MDS Assessment must "accurately reflect the resident's status," 42 C.F.R. § 483.20(g), and should be based on direct observation of the resident's condition or detailed and accurate medical records.  These requirements are designed to ensure the integrity and reliability of MDS Assessments.

38.     CMS has promulgated and regularly updates a Resident Assessment Instrument Manual ("RAI Manual"), which provides extensive guidance to SNFs on how to collect and report the information contained in the MDS Assessment.  The RAI Manual is designed "to facilitate the accurate coding of the MDS resident assessment and to provide assessors with the rationale and resources to optimize resident care and outcomes."  CMS, Long-Term Care Facility Resident Assessment Instrument User's Manual, Version 3.0 ("RAI Manual"), at 3-1 (Sept. 2010).

39.     The primary purpose of the MDS Assessment is to identify resident care needs that are addressed through a care plan developed for each resident.  *See id.* at 1-5.  SNFs are required to use MDS Assessments, which are essentially preliminary assessments, to conduct more extensive Care Area Assessments ("CAAs") for each resident that are focused on that resident's specific problems and needs.  *See id.*  SNFs must use the CAAs and the MDS Assessment to develop a comprehensive care plan for each resident "that includes measurable objectives and timetables to meet a resident's medical, nursing, and mental and psychosocial

needs that are identified in the comprehensive assessment."  42 C.F.R. § 483.20(k)(1); *see also*

*id.* § 483.20(d); 42 U.S.C. § 1395i-3(b)(4).  A comprehensive care plan must be developed

within seven days after the completion of a resident's comprehensive MDS Assessment and

periodically reviewed and revised after each subsequent MDS Assessment.  42 C.F.R.

§ 483.20(k)(2)(i).  Moreover, the care plan must be prepared by an "interdisciplinary team, that

includes the attending physician, a registered nurse with responsibility for the resident, and other

appropriate staff in disciplines as determined by the resident's needs."  *Id.* § 483.20(k)(2)(ii).

SNFs are required to maintain all MDS Assessments completed within the previous 15 months in

each resident's "active record" and "use the results of the [A]ssessments to develop, review, and

revise the resident's comprehensive plan of care."  42 C.F.R. § 483.20(d).

40.     The CAA process requires SNFs to identify "care areas" that are "triggered" by

the comprehensive assessment of a resident's medical condition and needs; evaluate each

triggered care area by "doing an in-depth, resident-specific assessment of the triggered condition

in terms of the potential need for care plan interventions"; decide what course of care to provide;

and document all of these steps in the CAA process.  RAI Manual at 4-14 to -17.  CMS has

prescribed twenty care areas that require a SNF to conduct further evaluation and care-planning,

including "ADL Functional/Rehabilitation," which addresses a resident's "potential for improved

functioning"; pain; dental care; the need for physical restraints; pressure ulcers; dehydration;

nutritional status; and other conditions, symptoms, and areas of concern that are common in

nursing home residents and are commonly identified or suggested by MDS Assessment findings.

*See id.* at 4-17 to -42.  A summary of the resident's care needs and the creation of a care plan is

reported in comprehensive MDS Assessments.  *See* Ex. 2, § V, at 32.  SNFs are required to

document CAAs and care plans for each resident; these materials must be maintained in the resident's medical records but are not submitted to CMS.

## 2. The Prospective Payment System

41. In the Balanced Budget Act of 1997, Congress established a Prospective Payment System ("PPS") for SNFs, pursuant to which CMS provides advance payments to SNFs for skilled nursing services to eligible residents. *See* Pub L. No. 105-33 § 4432, 111 Stat. 251, 414, codified as amended at 42 U.S.C. § 1395yy; *see also* 42 C.F.R. §§ 413.330, *et seq.*

42. In establishing the PPS for SNFs, Congress integrated reimbursement rates under the PPS with resident classification and assessment. *See* 42 U.S.C. § 1395yy(e)(4)(G). SNFs receive a predetermined per diem rate for each resident that is calculated based on the medical and physical condition of the patient and the patient's anticipated need for therapeutic and other skilled nursing services as reported in the resident's MDS Assessments. *See* 42 C.F.R. §§ 413.335-37, .343. Specifically, each resident is assigned to one of over 50 mutually exclusive groups, referred to as RUGs, based on his or her clinical, functional, and resource-based criteria. *See id.* § 413.333. Payments under PPS depend on the RUG level assigned to each resident. *See id.* §§ 413.335-37. To receive reimbursement under Medicare Part A for post-hospital SNF care provided to a resident, a SNF must certify that the resident "has been correctly assigned to one of the Resource Utilization Groups designated as representing the required level of care." *Id.* § 424.20(a)(ii).

43. To receive payment under PPS, SNFs must complete MDS Assessments more frequently than required by OBRA: MDS Assessments must be submitted on the 5th, 14th, 30th, 60th, and 90th days of a resident's stay at a SNF. *See* 42 C.F.R. § 413.343(b); *see also generally* 42 U.S.C. § 1395*l*(e). In submitting an MDS Assessment, a SNF must select an Assessment

Reference Date ("ARD") as of which information in the MDS Assessment is reported.  The information reported in each field of the MDS Assessment is based on a 7- or 14-day "look-back" period preceding the ARD.  *See* RAI Manual at 2-8, 2-15.  However, a SNF is allowed some flexibility in setting ARDs:  there is a window of four to nine days before each required MDS Assessment, and a SNF may add one to nine "grace days" to the required submission date.  *Id.* at 2-43.  Thus, for example, the ARD for a 14-day MDS Assessment can be set as early as the resident's 11th day at the SNF or, through the addition of grace days, as late as the 19th day.  *Id.* Grace days may be added to address "situations when an assessment might be delayed (*e.g.*, illness of RN assessor, a high volume of assessments due at approximately the same time) or additional days are needed to more fully capture therapy or other treatments."  *See id.* at 2-41.

44.     A properly completed MDS Assessment must be submitted within 14 days of the MDS Assessment's ARD in order for a SNF to receive full reimbursement.  *See* 42 C.F.R. §§ 413.337(c); 413.343, 483.20; RAI Manual at 2-45.  (A SNF receives a low, default reimbursement rate for days covered by any MDS Assessment that is not timely received by CMS.)  These MDS Assessments must contain a RUG level, which is reported in Section Z of the MDS Assessment.  *See* Ex. 2, § Z, at 38.  The RUG level is determined based on the information concerning ADLs and therapy or other rehabilitative services reported in the resident's MDS Assessment.  *See* RAI Manual at 6-3.  For example, the RUG level RUX (Rehabilitation Ultra, Extensive Services) is appropriate only for a resident who has an ADL score of 11 to 16, receives 720 minutes of therapy or more per week, and requires certain other forms of specialized care.  *See id.* at 6-24.

45.     The signature page for each MDS Assessment makes clear that it may be used as a basis for payment by Medicare:

> I certify that the accompanying information accurately reflects resident assessment
> information for this resident and that I collected or coordinated collection of this
> information on the dates specified.  To the best of my knowledge, this information was
> collected in accordance with applicable Medicare and Medicaid requirements.  I
> understand that this information is used as a basis for ensuring that residents receive
> appropriate and quality care, and as a basis for payment from federal funds.  I further
> understand that payment of such federal funds and continued participation in the
> government-funded health care programs is conditioned on the accuracy and truthfulness
> of this information, and that I may be personally subject to or may subject my
> organization to substantial criminal, civil, and/or administrative penalties for submitting
> false information.  I also certify that I am authorized to submit this information by this
> facility on its behalf.

Ex. 2, § Z, at 38.  The RN Assessment Coordinator must also provide the date that the MDS

Assessment is completed.  *See id.*

46.     In 2011, the per diem levels for rural SNFs varied from $747.84 per day for RUG

level RUX (Rehabilitation Ultra, Extensive Services) to as low as $192.25 for level PA1

(Reduced Physical Function).  *See* CMS, Medicare Program; Prospective Payment System and

Consolidated Billing for Skilled Nursing Facilities for FY 2011, 75 Fed. Reg. 42,886, 42,908-

909 (July 22, 2010).[1]  Manipulating the RUG level assigned to a resident could thus more than

triple the per diem payment for that resident.

47.     In addition to being accurately reported on a resident's MDS Assessment, skilled

nursing services for which a SNF seeks reimbursement must be reasonable, medically necessary,

and consistent with professionally recognized standards of care.  *See* 42 U.S.C. §§

1395y(a)(1)(A); 1320c-5(a).  In the context of skilled rehabilitation therapy, this means that the

services furnished must be ordered by a physician; consistent with the nature and severity of the

patient's individual illness, injury, or particular medical needs; consistent with accepted

---

[1] The reimbursement rates used in this Second Amended Complaint are those established
by CMS for the RUG-III classification system for the period from October 1, 2010 to September
30, 2011.  These are the rates that were applicable to Defendants at the time that Relator worked
at the Marshall and Governor's Creek Facilities.

standards of medical practice; and reasonable in terms of duration and quantity.  *See* Medicare Benefit Policy Manual, Ch. 8, § 30, *available at* http://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/bp102c08.pdf.

48.     SNFs bill Medicare-covered services on a Uniform Bill 04 ("UB-04"), or the electronic equivalent.  *See* Medicare Claims Processing Manual Ch. 6, § 30, *available at* http://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/clm104c06.pdf.  An example of a blank Form UB-04 used for Medicare billing is attached hereto as Exhibit 3 and incorporated herein by reference.  Defendants submitted claims to CMS or its agents on substantially similar forms.

49.     The contents of a Form UB-04 for a resident depend on the MDS Assessments submitted for that resident.  Each MDS Assessment can readily be traced to one or more claims that seek reimbursement for the services reported in that MDS Assessment.

50.     For per-diem billing, a SNF enters in field 44 – "HCPCS / Rate / HIPPS Code" – the RUG level assigned to the Health Insurance Prospective Payment System ("HIPPS") code field in Section Z of the resident's MDS Assessment, followed by a two-digit code reflecting the type of Assessment – *i.e.*, a 5-day MDS Assessment, 14-day MDS Assessment, *etc.* – in which the RUG level was reported.  *See* Medicare Claims Process Manual, Ch. 25, at 22, *available at* http://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/clm104c25.pdf.  Based on the SNF's location, the RUG level, and the MDS Assessment type, CMS automatically determines the number of days for which reimbursement should be provided, and the appropriate per diem rate.  *See id.*, Ch. 6, § 30.6.2-.3.  For example, the RUG level reported in the 5-day MDS Assessment determines the reimbursement rate for a resident's first 14 days at a facility,

the 14-day MDS Assessment determines the rate for days 15 to 30, and so on.  *See* RAI Manual at 2-45.

51.     To receive reimbursement, a SNF must submit Form UB-04s on a regular basis, and upon a Medicare-covered resident's discharge, exhaustion of benefits, or decrease in level of care to less than skilled care.  *See* Medicare Claims Process Manual, Ch. 6, § 40.  Bills must be submitted, and are processed in sequence.  *See id.* § 40-1.  Thus a bill corresponding to a 14-day MDS Assessment must be submitted before a bill can be submitted for a 30-day MDS Assessment, and so on.

### 3.     Medicare Advantage Plans

52.     In addition to direct reimbursement of SNFs for nursing care, Medicare also permits eligible individuals to cover the cost of skilled nursing care by enrolling in Medicare+Choice Plans or Medicare Advantage Plans ("MA Plans") established under Medicare Part C.  Medicare Part C enables private insurers to contract with CMS to establish an MA Plan, which offers individuals eligible for Medicare the same benefits they would receive under Medicare, and may also offer additional benefits not covered by Medicare.  *See* 42 U.S.C. §§ 1395w-21, 1395w-22.

53.     In exchange for covering the costs of prescription drugs and medical or skilled nursing services covered by Medicare, MA Plans receive from CMS a monthly capitation rate for each eligible participant.  *See* 42 U.S.C. § 1395w-23; 42 C.F.R. §§ 422.304-422.308.  The capitation rate is risk-adjusted for each participant based on risk diagnosis data provided by MA Plans to CMS.  *See* 42 U.S.C. § 1395w-23(a)(1)(C); 42 C.F.R. §§ 422.308(c).  Additionally, MA Plans are permitted, but not required, to charge a premium to Plan participants, which covers the cost of any additional services offered by the MA Plan in excess of those covered by Medicare.

*See* 42 U.S.C. § 1395w-24(b).  The majority of participants in MA Plans pay no premium.  In practice, the bulk of MA Plans' revenue comes from monthly capitation payments rather than premiums.

54.     In 2011, MA Plans received $124 billion from CMS (compared to about $5.6 billion in premiums from plan participants), and covered over 11.5 million people nationwide.  Over 25% of those receiving Medicare benefits in the United States and over 34% of those receiving Medicare benefits in the State of Florida did so through an MA Plan.  Paying for care through MA Plans costs CMS about 10% more on average than direct reimbursement through the PPS.

55.     Because MA Plans receive federal funds to cover the cost of providing medical and skilled nursing care to insureds, they are subject to substantial regulation and oversight by CMS – including oversight designed to prevent federal funds from being lost to fraud, waste, and abuse.  An MA Plan contracting with CMS must agree to establish an effective compliance program to prevent fraud, waste, and abuse.  *See* 42 C.F.R. § 422.503(b)(4)(vi).  Additionally, HHS is required to provide for the annual auditing of MA Plans, including their level of Medicare utilization and costs.  *See* 42 U.S.C. § 1395w-27(d)(1).  These requirements help ensure that CMS's risk-adjusted capitation payments to MA Plans accurately reflect MA Plan participants' medical condition and needs.

56.     MA Plans contract with SNFs to provide skilled nursing services for MA Plan participants.  Under these contracts, reimbursement is typically based on information reported in the MDS Assessment for each resident, and SNFs must complete an MDS Assessment accurately reflecting the resident's condition to receive payment.  A resident's MDS Assessment is used by an MA Plan for the MA Plan's internal reimbursement purposes, and may be used to provide risk

diagnosis data to CMS so that CMS can determine the appropriate risk adjustment to the capitation rate for that resident.  The MDS Assessment thus affects both a SNF's reimbursement from an MA Plan and the MA Plan's capitation payments from CMS.

**B.      TRICARE**

57.      TRICARE (formerly CHAMPUS) is a federally funded medical benefit program established by statute.  10 U.S.C. §§ 1071-1110.  TRICARE provides health care benefits to eligible beneficiaries, which include, among others, active duty military service members, retired military service members, and their dependents.  *See id.* § 1072.

58.      TRICARE covers the same skilled nursing services as Medicare.  *See* 32 C.F.R. § 199.4(b)(1)(vi).  The regulatory authority implementing the TRICARE program provides reimbursement to health care providers applying the same reimbursement scheme and coding parameters that the Medicare program applies.  *See* 10 U.S.C. § 1079(j)(2), (4).

59.      TRICARE, like Medicare, pays only for "medically necessary services and supplies required in the diagnosis and treatment of illness or injury."  32 C.F.R. § 199.4(a)(1)(i).  TRICARE follows Medicare's PPS and RUG level methodology and assessment schedule, and beneficiaries are assessed using the same MDS Assessment form used by Medicare.  *See* TRICARE Reimbursement Manual 6010.58-M, Ch. 8, § 2 (Dec. 3, 2010), *available at* http://manuals.tricare.osd.mil/DisplayManual.aspx?SeriesId=T3TRM&TR08=22#TR08.  Similarly, services provided to a resident covered by TRICARE are billed on the same UB-04 form and depend on the RUG levels reported in the MDS Assessment.  *See id.*

**C.      Health Insurance Through Medicaid**

60.      Title XIX of the Social Security Act, 42 U.S.C. § 1396, *et seq.*, provides for federal grants to support State Plans for Medical Assistance, and is commonly known as the

Medicaid program.  Each State has established and administers a Medicaid program to pay for medical and skilled nursing services, durable medical equipment, and prescription drugs for disabled or financially needy individuals, which must conform to certain requirements to receive federal financial support.  *See* 42 U.S.C. § 1396a.

61.    The States directly pay providers for services covered by Medicaid, with the States obtaining the federal share of the payment from accounts which draw on the United States Treasury.  *See* 42 U.S.C. § 1396b; 42 C.F.R. §§ 430.0-430.30.

**1.    Federal Medicaid Requirements for SNFs**

62.    Federal law imposes a number of requirements on SNFs that participate in a Medicaid program.  Specifically, SNFs must provide services pursuant to a written plan of care that is designed to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident.  *See* 42 U.S.C. § 1396r(b)(2).  If a resident's plan of care calls for rehabilitative therapy, the SNF is required by law to provide the therapy or contract with an outside provider to ensure necessary therapy is provided.  *See* 42 C.F.R. § 483.45(a).

63.    In order to develop, review, and revise each resident's plan of care, a SNF is required regularly to complete MDS Assessments for each resident.  *See* 42 U.S.C. § 1396r(b)(3)(A), (D).  An RN is required by law to conduct or coordinate the MDS Assessment, and must sign the MDS Assessment to certify that it has been properly completed.  *See* 42 U.S.C. § 1396r(b)(3)(B)(i); 42 C.F.R. § 483.20(h), (i)(1).  Each individual who completes a portion of the MDS Assessment must sign to certify the accuracy of that portion of the MDS Assessment. 42 U.S.C. § 1396r(b)(3)(B)(i); 42 C.F.R. § 483.20(i)(2).

64.    Like OBRA, Medicaid law requires that MDS Assessments be completed for each resident within 14 days of admission, promptly after a significant change in the resident's

physical or mental condition, and at least every 12 months.  42 U.S.C. § 1396r(b)(3)(C)(i).  Each

resident must be examined at least every three months to determine whether his or her

Assessment needs to be updated.  *See id.* § 1396r(3)(C)(ii).

       **2.**        **Florida Medicaid Requirements for SNFs**

      65.      The State of Florida has established a Medicaid program administered by AHCA.

*See* Fla. Stat. § 409.902.  Florida's Medicaid program covers nursing and rehabilitative services

provided at SNFs.  *See id.* § 409.905(8).

      66.      AHCA regulates the provision of care by SNFs that participate in Florida's

Medicaid program to ensure that residents receive appropriate care.  *See* Fla. Stat. § 409.919; Fla.

Admin. Code R. 59G-4.200.  These regulations are set out in AHCA's Florida Medicaid Nursing

Facility Services Coverage and Limitations Handbook (Oct. 2003 & rev. 2004) ("Nursing

Facility Handbook"), *available at*

http://portal.flmmis.com/FLPublic/Portals/0/StaticContent/Public/HANDBOOKS/CL_06_04070

1_Nursing_ver1_0.pdf.  *See* Fla. Admin. Code R. 59G-4.200(2).

      67.      Consistent with federal law, AHCA requires SNFs to develop a comprehensive

plan of care for each resident, which must include measurable objectives and timetables to meet

a resident's medical, nursing, mental and psychological needs.  *See* Nursing Facility Handbook,

at 2-27.  The plan of care must be based on the resident's MDS Assessment and must be

completed within seven days after completion of the MDS Assessment.  *Id.*  The MDS

Assessment must be completed within 14 days of the resident's admission to the nursing facility

and submitted to CMS.  *Id.*  The plan of care must be reviewed at least every 90 days by the

resident's physician and other personnel involved in the resident's care.  *Id.* at 2-28.

68.     The MDS Assessment must be kept in the resident's medical file and is subject to inspection and audit by AHCA.  Additionally, the information reported in a facility's MDS Assessments (including the summary of care planning in Section V of the MDS Assessment) is maintained in the Quality Improvement and Evaluation System ("QIES"), which is jointly established by CMS and each state, including Florida.  Florida has access to MDS Assessment data through QIES and uses this data to assess the quality of services provided by SNFs.

69.     The plan of care is central to the nursing services covered by Florida's Medicaid program.  Among the basic rights of a resident covered by Medicaid is the right to receive therapeutic and rehabilitative services consistent with the plan of care established by the resident. Nursing Facility Handbook, at 2-17.  In particular, rehabilitative therapy "must be provided by licensed personnel under a physician's written order and included in the plan of care."  *Id.* at 1-6. Accordingly, nursing facilities are required to maintain sufficient "staff to provide 24-hour nursing and related services to residents . . . as determined by resident MDS Assessments and documented in individual plans of care."  *Id.* at 1-6.  The per diem rate that AHCA pays to nursing facilities is designed to "cover[] rehabilitative and restorative care including physical, speech, occupational, and respiratory therapy ordered by a resident's physician and included in the plan of care."  *Id.* at 2-10.

### 3.     Reimbursement by Medicaid

70.     AHCA is responsible for reimbursing nursing facilities for services covered by Medicaid.  AHCA is empowered to determine appropriate reimbursement rates for nursing facilities, based primarily on the costs reported annually by each facility.  *See* Fla. Stat. § 409.908(2).  AHCA analyzes each nursing facility's cost reports and establishes a specific per diem rate for each facility every six months, or "semester."  *See, e.g.*, AHCA, Computation of

Nursing Home Medicaid Reimbursement Rate, Second Semester 2010, at 639-40, 647-48 (June

25, 2010), *available at*

http://www.fdhc.state.fl.us/medicaid/cost_reim/pdf/2010_07_nh_calculations.pdf; Computation

of Nursing Home Medicaid Reimbursement Rate, First Semester 2011, at 657-58, 665-66 (Dec.

21, 2010), *available at*

http://www.fdhc.state.fl.us/medicaid/cost_reim/pdf/2011_01_nh_calculations.pdf.

71.     Bills are submitted to the Florida Medicaid program's Fiscal Agent, HP

Enterprise Services, which acts on behalf of AHCA in reviewing and paying claims.[2]

Reimbursement by HP Enterprise Services is funded with federal and Florida funds.  *See* AHCA,

Medicaid Management Information System/Decision Support System/Fiscal Agent Services

Procurement:  Request for Proposal § 30.12 (Mar. 3, 2005), *available at*

http://www.fdhc.state.fl.us/medicaid/about/pdf/080724_MMIS_RFP_2008-2013.pdf.

72.     To receive reimbursement for Medicaid-covered services, a nursing facility must

submit a variation of the Form UB-04 developed by AHCA.  *See* Fla. Admin. Code R. 59G-

4.003; AHCA Medicaid Provider Reimbursement Handbook, UB-04, at 1-2 (July 2008),

*available at* http://portal.flmmis.com/FLPublic/Portals/0/StaticContent/Public/HANDBOOKS/

RH_08_080701_UB-04_ver1_3.pdf.  An example of a blank Form UB-04 is attached hereto as

Exhibit 4 and incorporated herein by reference.  Defendants billed AHCA electronically for

skilled nursing services on substantially similar forms.

---

[2] *See* AHCA, Medicaid Fiscal Agent,
http://www.fdhc.state.fl.us/medicaid/about/about4.shtml; AHCA, Medicaid Management
Information System/Decision Support System/Fiscal Agent Services Procurement Request for
Proposal § 30.5 (Mar. 3, 2005), *available at*
http://www.fdhc.state.fl.us/medicaid/about/pdf/080724_MMIS_RFP_2008-2013.pdf.

73.     The reverse side of a Form UB-04 contains the following statements (or

substantially similar statements):

> Submission of this claim constitutes certification that the billing information as shown on
> the face hereof is true, accurate and complete.  That the submitter did not knowingly or
> recklessly disregard or misrepresent or conceal material facts.  The following
> certifications or verifications apply where pertinent to this Bill:

<div align="center">* * *</div>

> 8.  For Medicaid purposes:  The submitter understands that because payment and
> satisfaction of this claim will be from Federal and State funds, any false statements,
> documents, or concealment of a material fact are subject to prosecution under applicable
> Federal State laws.

74.     AHCA's UB-04 Provider Handbook explains that a SNF certifies compliance

with applicable federal and Florida laws even when a Form UB-04 is submitted electronically

rather than on a signed paper form:

> Because the UB-04 claim form does not have the provider's signature, the provider's
> endorsed signature on the back of the remittance check issued by the Medicaid fiscal
> agent takes the place of a signature on a paper claim form.  It acknowledges the
> submission of the claim and the receipt of the payment for the claim. It certifies that the
> claim is in compliance with the conditions stated on the back of the paper claim form and
> with all federal and state laws.

> Any provider who utilizes the electronic funds transfer system is certifying with each use
> of the system that the claim(s) for which the provider is being paid is in compliance with
> the provisions found on the back of the paper claim form and with all federal and state
> laws.

AHCA Medicaid Provider Reimbursement Handbook, UB-04, at 1-48.

75.     Florida law expressly conditions payment under the Medicaid program on

compliance with federal and state regulations, including the regulations concerning care plans

and MDS Assessments described above.  Specifically:

> When presenting a claim for payment under the Medicaid program, a provider has an
> affirmative duty to supervise the provision of, and be responsible for, goods and services
> claimed to have been provided, to supervise and be responsible for preparation and
> submission of the claim, and to present a claim that is true and accurate and that is for
> goods and services that:

<div align="center">25</div>

* * *

(b) Are Medicaid-covered goods or services that are medically necessary.

* * *

(e) Are provided in accord with applicable provisions of all Medicaid rules, regulations, handbooks, and policies and in accordance with federal, state, and local law.

(f) Are documented by records made at the time the goods or services were provided, demonstrating the medical necessity for the goods or services rendered. Medicaid goods or services are excessive or not medically necessary unless both the medical basis and the specific need for them are fully and properly documented in the recipient's medical record.

The agency shall deny payment or require repayment for goods or services that are not presented as required in this subsection.

Fla. Stat. § 409.913(7).

## STATE AND FEDERAL FALSE CLAIMS ACTS

76.     The federal FCA imposes liability on any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" or who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."  31 U.S.C. § 3729(a)(1)(A)-(B).  It similarly imposes liability on any person who "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government."  *Id.* § 3729(a)(1)(G).

77.     The FCA defines "knowing" and "knowingly" with respect to information as meaning that the person "(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information."  *Id.* § 3729(b)(1)(A).  The FCA defines "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."  *Id.* § 3729(b)(4).

78.     The FCA defines a "claim" as "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that –

(i) is presented to an officer, employee, or agent of the United States; or

(ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government –

(I) provides or has provided any portion of the money or property requested or demanded; or

(II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded . . . .

31 U.S.C. § 3729(b)(2)(A).

79.     Accordingly, each MDS Assessment and each Form UB-04 submitted to CMS, MACs acting on CMS's behalf, or other government health programs constitutes a "claim" within the meaning of the FCA, because these documents are designed to induce, and do ordinarily induce, the payment of money by CMS.  Additionally, each MDS Assessment is a record or statement that is material to a Form UB-04.

80.     However, as the FCA makes clear, requests for money submitted to a federal grantee, contractor, or other recipient may also constitute a claim, if money requested is being spent to advance a Government purpose and a portion of the money is provided by the federal government.  Thus, each Form UB-04 and each MDS Assessment submitted to AHCA or Fiscal Intermediaries acting on its behalf – and each request for reimbursement and each MDS Assessment submitted to an MA Plan – constitutes a "claim" within the meaning of the federal FCA.  Further, each MDS Assessment constitutes a record or statement material to a Form UB-04 or other request for reimbursement.

81.     The Florida False Claims Act, Fla. Stat. § 68.081, *et seq.*, is substantially similar to the FCA, and also imposes civil liability on any person who "[k]nowingly presents or causes to be presented to an officer or employee of an agency a false or fraudulent claim for payment or approval" or who "[k]nowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by an agency."  Fla. Stat. § 68.082(2)(a)-(b).  As does the federal FCA, the Florida False Claims Act imposes liability on any person who "knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to an agency."  *Id.* § 68.082(2)(g).

82.     Each Form UB-04 submitted to AHCA is a "claim" within the meaning of the Florida False Claims Act, and each MDS Assessment submitted to CMS or TRICARE and accessible to AHCA is a record or statement that is material to such claims.  *See* Fla. Stat. § 68.082.

## DEFENDANTS' SCHEME TO DEFRAUD MEDICARE, MEDICAID, AND TRICARE

83.     Defendants engaged in a scheme to defraud Medicare, Medicaid, and TRICARE by submitting numerous false or fraudulent statements and false or fraudulent claims that contained fraudulently inflated RUG levels and that falsely represented that care was being provided in accordance with contemporaneously established care plans and physician certifications.  To conceal and facilitate their fraudulent scheme, Defendants also routinely misrepresented the identity and credentials of those who completed and certified the accuracy of these claims and statements.  Each of the Defendants knew, or was deliberately ignorant or reckless in not knowing, that the claims and statements generated by these improper practices claims were false or fraudulent.  Defendants nevertheless persisted in their fraudulent scheme because it generated millions of dollars in reimbursements from federal and Florida funds.

A.      **Relator's Knowledge of the Fraudulent Scheme**

84.      Relator was employed and supervised by Defendants, and she directly witnessed the creation and submission of numerous false statements and claims for Medicare and Medicaid reimbursement.  The description of the fraudulent scheme below is based on her personal knowledge.

85.      Relator was employed from January 2011 until on or about March 4, 2011 as an interim Minimum Data Set Consultant ("MDS Consultant") by the Marshall Facility.  Relator was subsequently employed as an interim MDS Consultant from on or about March 7, 2011 until on or about May 5, 2011 by the Governor's Creek Facility.

86.      In her role as an MDS Consultant, Relator was responsible for completing and submitting MDS Assessments for residents at the Marshall and Governor's Creek Facilities and for developing care plans for these residents.  To complete these tasks, Relator had regular contact with residents and nursing, therapeutic, administrative, and corporate staff, and reviewed resident medical records, billing information, and previously submitted MDS Assessments.

87.      In addition, Relator had access to Defendants' computer system, which she used each day to create MDS Assessments for submission to CMS, other government health programs, and MA Plans.  Specifically, Defendants used an interface by SimpleLTC to complete MDS Assessments and software by American Health Technologies ("AHT") to store, retrieve, and submit MDS Assessments.  Defendants used a number of AHT programs, including one referred to as "MDS Director," to automatically check completed MDS Assessments for errors and inconsistencies prior to submission.

88.      Defendants also used AHT software for billing purposes, in order to generate electronic bills for residents based on the MDS Assessments submitted for those residents.  The

Marshall and Governor's Creek Facilities typically billed Medicare, Medicaid, TRICARE, and MA Plans electronically, using a Form UB-04 for Medicare and TRICARE and the Florida-specified Form UB-04 for Medicaid.  *See* Exs. 3-4.  Bills for services provided each month were normally submitted in the following month (for example, Medicare billing was typically done on the fourth business day of each month), and there was often considerable pressure on the MDS nurses to complete MDS Assessments – particularly for Medicare residents – before that date so that bills could be submitted.

89.     Relator worked closely with MDS nurses at both Facilities.  Each Facility had two MDS nurses.  The first was referred to as the "MDS Coordinator" or "Reimbursement Nurse" and had primary responsibility for completing MDS Assessments for Medicare residents.  The second was referred to as the "Long-Term Care Nurse" and had primary responsibility for completing MDS Assessments for Medicaid residents.  In each Facility, Relator worked in a single room with the MDS nurses and frequently observed or participated in their completion of MDS Assessments.

90.     Relator also had frequent contact with the billing personnel at both the Marshall and Governor's Creek Facilities.  The Business Manager at each Facility was responsible for billing.  For example, Karen Sparks was the Business Manager at the Governor's Creek Facility.  Because billing must be closely coordinated with the submission of MDS Assessments, Relator and MDS nurses would discuss MDS Assessments and related billing matters with Sparks.

91.     In the course of developing and documenting care plans for residents at the Marshall and Governor's Creek Facilities, Relator had extensive contact with the Rehabilitation Director for each Facility (Panfilo Demayo at the Marshall Facility and Kristi Williams at the Governor's Creek Facility) as well as rehabilitative therapists working under their supervision.

The Rehabilitation Directors and the therapists working for them were employed by Defendant LaVie Rehab.  Additionally, while working at the Marshall Facility, Relator was called into a meeting with Risty Smith, a senior employee at LaVie Rehab, who wanted to discuss how Relator's completion of MDS Assessments could be "improved," *i.e.*, how to obtain higher RUG levels.

92.     Relator also worked closely with Regional Reimbursement Specialists employed by Defendant LaVie Management Services.  Relator's work at the Marshall Facility was overseen by Cheryl McAnally, who worked as a Regional Reimbursement Specialist for LaVie Management Services and was responsible for billing at multiple LaVie Facilities in the region.  Although Relator's direct supervisor was the Facility's Administrator, Joyce Denham, McAnally provided instruction and direction to Relator on the completion of MDS Assessments, and could have Relator or other MDS nurses disciplined by contacting the Administrator.

93.     Relator's work at the Governor's Creek Facility was similarly supervised by Leota ("Lee") Juliano, who also worked as Regional Reimbursement Specialist for Defendant LaVie Management Services and was responsible for billing at multiple LaVie Facilities in an adjoining region.  Specifically, in 2011, Juliano was responsible for nine LaVie Facilities:  Harts Harbor Health Center, San Jose Health and Rehabilitation Center, Governor's Creek Health and Rehabilitation Center, Grand Oaks Health and Rehabilitation Center, Deltona Health Care, Oaktree Health Care, Lake Mary Health and Rehabilitation Center, Rio Pinar Health Care, and Rosewood Health and Rehabilitation.  *See* Ex. 1.  McAnally was responsible for a comparable number of LaVie Facilities.

94.     McAnally and Juliano are now employees of Defendant Consulate Management Company, LLC, where they remain responsible for reimbursement and MDS Assessments in

regions containing a number of LaVie Facilities that are now managed by Consulate

Management Company, LLC.

**B.     Defendants Systematically Encouraged Fraudulent Practices in Order to Increase
Medicare, Medicaid, and TRICARE Revenue Without Complying with Program
Requirements**

95.     Defendants cultivated a work culture that focused on maximizing profits at the

expense of resident care and that systematically incentivized and pressured employees to resort

to any means – including fraud – to increase profits.

96.     Senior executives at Defendant LaVie Management Services, including its Chief

Financial Officer and its Regional Vice Presidents, established a Medicare "budget" for each

LaVie Facility, which was a targeted average per diem reimbursement rate for Medicare

residents.  These executives were not in a position to review the medical records of residents at

each LaVie Facility, and thus the Medicare "budget" did not reflect an assessment of the RUG

levels that were actually appropriate for residents at these Facilities.  Instead, these Medicare

"budgets" were set so as to maximize the profits derived from each Facility.

97.     Relator witnessed a relentless focus on achieving or exceeding Medicare budgets

in every aspect of LaVie's operations.

**1.     MDS Nurses Were Offered Cash Bonuses for Upcoding**

98.     Relator was hired to work at the Marshall Facility by McAnally, who used an

executive search consultant.  The consultant told Relator that LaVie Management Services

preferred MDS nurses who had an average RUG level of $650 per patient per day.

99.     Relator did not initially understand this directive:  a RUG level is an objective

classification, based on the resident's medical condition and the medically necessary therapy that

is provided.  *See supra* ¶¶ 42-44.  As a result, the RUG levels assigned to residents should

depend on each resident's condition and medical needs, which the MDS nurse is not in a position to control or change.

100.     However, as Relator worked at the Governor's Creek and Marshall Facilities, she soon discovered that Defendants expected and encouraged employees to "upcode" – *i.e.*, fraudulently inflate – the RUG levels reported on residents' MDS Assessments and bills for Medicare reimbursement.  Relator was also told several times by her coworkers that MDS nurses would be paid a bonus if they exceeded the Facility's Medicare "budget."  Relator was told that a number of MDS nurses received bonuses for fraudulently inflating RUG levels for residents at LaVie Facilities.

101.     The use of improper inducements to encourage MDS nurses to inflate RUG levels was widespread in LaVie Facilities.  After leaving the Governor's Creek Facility, in September 2011 Relator was contacted by a nurse working at a LaVie Facility in Juliano's region that is now managed by Defendant Consulate Management Company, LLC.  This nurse told Relator that there would be an opening in the Facility's MDS Department within seven weeks, and that Relator would need to go through LaVie Management Services training on RUGs and reimbursement to obtain the position.  The nurse explained that this Facility's "RUG budget" is $458 a day and that Relator "would receive a cash bonus under the table for any RUG levels that are higher than the budget."  Relator asked how much cash they were offering and was told the bonus would be at least $3,500 a year and possibly more depending on the Facility's RUG levels. The nurse went on to say that she gets paid more than $15,000 per year in cash and the Facility's Administrator receives an even larger bonus "if we keep the RUGs higher than budget."

102.     The nurse then showed Relator a newspaper displaying a job vacancy for an MDS nurse at a LaVie Facility known as Hart's Harbor Health Care Center (another Facility in

Juliano's region that is now managed by Consulate Management Company, LLC, *see* Ex. 1), and explained that the same bonuses applied to this position as well.  The position had been vacated by another nurse known to Relator.

103.    Because an MDS nurse is not in a position to control a RUG level that is accurately and honestly determined for a resident, the purpose and effect of these bonuses was to encourage MDS nurses to fraudulently inflate RUG levels.  Relator accordingly declined both of these positions.

>    **2.    Defendants Encouraged and Pressured MDS Nurses to Upcode MDS Assessments in Order to Meet Centrally Established Medicare Budgets**

104.    Regional Reimbursement Specialists such as McAnally and Juliano were responsible for ensuring that each of the LaVie Facilities in their region was meeting its Medicare budget.

105.    McAnally and Juliano informed the MDS nurses at each Facility in their respective regions of the target Medicare "budget" that had been set for that Facility.  If a Facility was not achieving or exceeding its Medicare budget, the Regional Reimbursement Specialist would "audit" the Facility to help it "improve" (*i.e.*, raise) its RUG levels.  The Regional Reimbursement Specialist would visit the Facility and review residents' MDS Assessments and medical records and suggest ways to upcode residents' MDS Assessments so that the Facility could achieve higher RUG levels.  Facilities that were meeting or exceeding their Medicare budget were rarely "audited."

106.    McAnally and Juliano would also regularly provide guidance and suggestions to MDS nurses on how to increase RUG levels.  For example, McAnally and Juliano each held a weekly call on Friday with all the MDS nurses that they supervised in their regions; during those calls, they praised the MDS nurses who had assigned the highest RUG levels to residents, and

provided suggestions about how to fraudulently inflate RUG levels.  Relator participated in a number of these calls, as did the MDS nurse who, as described *supra* ¶¶ 101-02, later told Relator that she could receive bonuses at LaVie Facilities for keeping RUG levels above "budget."

107.    The management of LaVie's Facilities was also focused on achieving or exceeding Medicare "budgets."  For example, the Governor's Creek Facility had a daily Medicare utilization review meeting with the business manager Karen Sparks, who was responsible for the Facility's billing and reimbursement.  During these meetings the Director of Rehabilitation, Kristi Williams, an employee of Defendant LaVie Rehab, would *dictate* to MDS nurses the desired RUG level on a particular resident's MDS Assessment.  Williams demanded that high RUG levels be assigned to residents' MDS Assessments but offered no clinical reason for such demands and was not in a position to know, for example, whether the resident's condition justified the ADL scores associated with a particular RUG level.  Such demands were effectively an instruction to MDS nurses to assign high RUG levels to certain residents, even if that score was false and not justified by the resident's medical condition and needs.

108.    As Defendants intended, this encouragement resulted in widespread fraud at LaVie Facilities.  For example, when Relator started work at the Marshall Facility in January of 2011, she was assigned to complete late MDS Assessments that had been due in December of 2010.  In the course of completing these MDS Assessments, Defendant's computer system automatically provided the coding for MDS Assessments that had previously been submitted for the same residents in October and November of 2010.  These MDS Assessments had been prepared by the former Reimbursement Nurse, Louann Stephens, while she was employed by the Marshall Facility.

109.    Upon review of the previously submitted MDS Assessments, Relator discovered that the vast majority of them falsely stated in Section V that Care Area Assessments ("CAAs") and corresponding care plans had been completed, when in fact no CAAs or care plans existed in the residents' medical records.  *See* Ex. 2, § V, at 32-33.  Relator also noticed that many of the MDS Assessments vastly overstated the amount of nursing assistance needed by residents. Specifically, section G of the MDS Assessments falsely represented that residents needed "extensive assistance" or were "totally dependen[t]" on assistance from nursing staff to perform various ADLs.  *See* Ex. 2, § G, at 14; *see also supra* ¶¶ 36-37, 42-44.  However, it was apparent from these residents' medical records that they did not need such assistance and nursing staff was not providing it.

110.    Relator promptly brought Stephens' fraudulent practices to the attention of the Marshall Facility's Administrator, Joyce Denham.  Despite Relator's concerns, Denham held Stephens' job open for her and repeatedly stated that Stephens would come back to work even though Stephens called in sick every day for several weeks.  One day Relator told Denham that it was very kind of her to continue to hold a position for Stephens despite her obvious difficulty showing up to work.  Denham responded:  "You give me too much credit.  That girl knows how to boost our bottom line.  That's why I want her back!"  When it became evident that Stephens was not returning to the Marshall Facility, Denham became frustrated and complained that the Marshall Facility now had the lowest RUG levels of all the LaVie Facilities in the region.

111.    Each of Stephens' false MDS Assessments that Relator reviewed constituted a materially false or fraudulent statement or claim, and subsequent billing forms containing the RUG levels from those Assessments constituted false or fraudulent claims.  Stephens made these statements and claims, and Stephens and Denham caused them to be presented to CMS and MA

Plans.  Both Stephens and Denham knew, or were deliberately ignorant or reckless in not knowing, that these statements and claims were false or fraudulent.

112.    In early March 2011, Relator was transferred from LaVie's Marshall Facility to the Governor's Creek Facility.  After learning of the transfer, Relator contacted Dean Barbosa, the executive search consultant who had placed her at the Marshall Facility, to ask him why she had been transferred.  Barbosa explained that the transfer had been made at the request of McAnally and other senior employees at LaVie Management Services, who were concerned that, with Relator handling the MDS Assessments for Medicare residents, the Marshall Facility was not hitting its reimbursement target.  (To avoid a similar problem at the Governor's Creek Facility, Relator was initially tasked with completing MDS Assessments for Medicaid, rather than Medicare, residents.)  In the course of leaving the Marshall Facility, Relator spoke with McAnally, who told her she was a "great nurse," a "great MDS nurse," but a "terrible reimbursement nurse."

113.    Relator observed a similar focus on inflating RUG levels at the Governor's Creek Facility.  Ronnie Blevins, a Licensed Practical Nurse ("LPN") employed by the Governor's Creek Facility, was particularly focused on fraudulently inflating RUG levels.  Blevins' primary responsibility was completing MDS Assessments for Medicare Part A residents.  Each day, she would print out a report showing the RUG levels she had assigned to residents and the resulting average daily reimbursement rate, and would take the report to Michelle Kreps, the Administrator of the Governor's Creek Facility, to show her the high RUG levels.  On or about April 8, 2011, Blevins was arrested by the police while working at the Facility.

114.    Relator later learned that Blevins had been stealing narcotics from the Facility for her personal use.  The Facility's Administrator, Kreps, initially suggested that this serious

misconduct not be reported to the Florida Department of Health, because Kreps hoped to rehire Blevins given her talent for assigning high RUG levels to residents irrespective of their medical needs.  Only after several employees insisted on reporting the misconduct did Kreps give up on her plan of rehiring Blevins and report her to the Department of Health.

115.     Relator was then assigned to complete the MDS Assessments for Medicare Part A residents that had previously been assigned to Blevins.  As in the Marshall Facility, Defendants' computer system automatically imported the information from the MDS Assessments previously completed for these residents by Blevins.  Upon reviewing the residents' medical records, Relator discovered numerous misrepresentations.  Like Stephens at the Marshall Facility, Blevins had falsely inflated the ADL scores assigned to residents in Section G of their MDS Assessments, to make them appear as though they needed more nursing care than was actually needed or provided.  *See* Ex. 2, § G, at 14-15.  Blevins had also falsely indicated in Section V of the MDS Assessments that the CAAs and corresponding care plans had been completed when in fact these documents were missing from the records of the vast majority of residents.  *See* Ex. 2, § V, at 32-33.

116.     Each of these MDS Assessments constituted a materially false or fraudulent statement or claim, and subsequent billing forms containing the RUG levels from those MDS Assessments constituted false or fraudulent claims.  Blevins made these claims and statements and Blevins and Kreps caused them to be presented to CMS, AHCA, or their contractors.  As a result, LaVie Facilities received reimbursement beyond that to which they were entitled by Medicare or Medicaid.  Blevins and Kreps knew, or were deliberately ignorant or reckless in not knowing, that these statements and claims were false or fraudulent.

117.    After learning of Blevins' upcoding of the MDS Assessments, Relator notified Kreps and warned her that the Governor's Creek Facility's RUG levels would be significantly reduced because Relator intended to accurately complete the outstanding MDS Assessments for the Facility's Medicare Part A residents.

118.    Kreps responded by calling Relator into a meeting with Juliano and John Stover, a Regional Vice President and employee of Defendant LaVie Management Services.  Karmen Morgan, Juliano's immediate supervisor and also an employee of LaVie Management Services, participated in the meeting by telephone.  (Morgan was responsible for reimbursement for all LaVie Facilities in the State of Florida; she is now an employee of Defendant Consulate Management Company, LLC.)  Relator explained her concerns about the false MDS Assessments she had reviewed to Kreps, Juliano, Morgan, and Stover, and suggested that the Government's Creek Facility should self-report the inaccuracies to CMS.

119.    Kreps stated that it was not necessary to self-report but stated that the Governor's Creek Facility had a "four-point remedial action plan" that it would implement to ensure that MDS Assessments were completed accurately.  In fact, there was no such plan, and Kreps lied to Relator about the plan to alleviate Relator's concerns about the upcoding she had observed and to ensure that Relator did not report this conduct to CMS.  Juliano, Morgan, and Stover also knew that the supposed "remedial action plan" was bogus and that the Governor's Creek Facility would continue with its highly lucrative practice of falsifying MDS Assessments.

120.    Relator later learned that the purported remedial action plan did not exist when she mentioned the plan to a surveyor for AHCA who was inspecting the Governor's Creek Facility.  The surveyor then asked the Facility's Director of Nursing, Rebecca Adams, about the action plan, and pandemonium ensued.  In a hastily called meeting in the MDS nurses' office,

Kreps, Adams, and Williams each accused the others of failing to develop and implement the action plan. It became apparent from their accusations and recriminations that there was no action plan and no one had ever intended to develop or implement such a plan. Relator overheard Kreps call Juliano from the MDS nurses' office to tell her to make sure that Relator was kept away from the AHCA surveyors for the rest of the day. Juliano then contacted the Relator and directed her to stay in the MDS nurses' office for the rest of the day. When Relator asked Juliano why she was being confined to the office, Juliano reprimanded her for truthfully relaying their statements about the action plan to the surveyor, and asked Relator not to come into work for the next few days while the AHCA surveyors completed their audit of the Facility.

121.    Like Relator, other employees were pressured by Defendants to facilitate and conceal Defendants' fraudulent scheme. For example, on or about May 4, 2011 – Relator's penultimate day at a LaVie Facility – Relator observed a meeting in which Sparks and Williams pressured an MDS nurse employed by the Governor's Creek Facility to sign a document attesting that she personally had verified all the therapy minutes billed for rehabilitation supporting all of the billing codes for the month of April 2011, even though the MDS nurse had not actually reviewed the records necessary to truthfully sign such a verification. Sparks told the MDS nurse, "It would take you hours to verify this information, just sign!"

## C.    Defendants Fraudulently Inflated RUG Levels to Increase Reimbursement for Residents Covered by Medicare or TRICARE

122.    As explained above, the per diem rate for skilled nursing services under Medicare Part A and TRICARE is determined by the RUG level reported in the MDS Assessments submitted for each resident. *See supra* ¶¶ 27-31. Defendants were keenly aware of this fact and used several strategies to fraudulently increase the RUG levels and resulting reimbursement rates assigned to each resident covered by Medicare or TRICARE.

### 1.    Defendants Falsely Inflated ADL Scores

123.    First, as explained above, MDS nurses such as Stephens and Blevins, with the encouragement of their Facility Administrators (Denham and Kreps) and their Regional Reimbursement Specialists (McAnally and Juliano), and Rehabilitation Directors (Demayo and Williams) would fraudulently increase the ADL scores reported in Section G of the MDS Assessment.  *See* Ex. 2, § G, at 14-15.  On information and belief, RUGs were inflated in LaVie Facilities throughout Florida based on the instruction and directives of the Regional Reimbursement Specialists.

124.    An ADL score is a number between 0 and 16 that reflects a resident's need for nursing staff assistance to perform four types of activities of daily living that are often challenging for older or sicker residents:  bed mobility, transfer, toilet use, and eating.  *See* RAI Manual at 6-18.  The score depends on observation of incidents in which the resident requires staff assistance to perform each activity.

125.    These incidents are summarized by assigning two numbers to each activity corresponding to the resident's capacity for self-performance and the amount of support the resident was provided.  *See* Ex. 2, § G, at 15-16.  The self-performance figure is a number between 0 and 4, with 0 indicating that the resident is "independent" and requires "no help or staff oversight at any time," and 4 indicating the resident's "total dependence" and need for "full staff performance every time during entire 7-day period."  *Id.*; RAI Manual at G-5.  The amount of support figure is a number between 0 and 3, with 0 indicating that "no setup or support from staff" is required for the resident to perform the activity and 3 indicating that physical assistance from two or more nursing staff is needed.  Ex. 2, § G; RAI Manual at G-5 to -6.

126.    The self-performance and support-provided figures are combined to generate a

score of 0 to 4 for each of the four key types of activity, and the sum of those scores is the

resident's combined ADL score.  *See* RAI Manual at 6-18.

127.    A higher combined ADL score is supposed to reflect the fact that the resident

requires more attention from nursing staff, and thus results in a RUG level corresponding to a

higher per diem rate of reimbursement.  Table 1 illustrates the connection between combined

ADL scores and per diem rates.

**Table 1.  FY 2011 Per Diem Medicare Reimbursement Rates for Rural SNFs[3]**

| Rehabilitation Level (Total Therapy Minutes over 5 Days) | Combined ADL Score | | |
|---|---|---|---|
| | 0-5 Class A | 6-10 Class B | 11-16 Class C |
| Rehab Ultra (over 720 minutes) | RUA $548.80 | RUB $575.94 | RUC $633.24 |
| Rehab Very High (500-720 minutes) | RVA $430.63 | RVB $480.39 | RVC $506.03 |
| Rehab High (325-500 minutes) | RHA $388.83 | RHB $418.99 | RHC $440.10 |
| Rehab Medium (150-325 minutes) | RMA $383.62 | RMB $392.66 | RMC $404.73 |
| Rehab Low (45-150 minutes) | RLA $300.82 | RLB $355.10 | |

128.    As the table illustrates, increasing a resident's ADL score even by one class – for

example, from RUB to RUC – can increase the per diem for that resident by as much $57 per

day, a 10% increase in the per diem rate.  Increasing the score by two classes can increase per

diem rates by as much $84 per day (a 15% rate increase).  Falsely inflating self-performance

and support-provided codes thus reliably increases per diem rates but is a difficult fraud to detect

because one must observe the assistance provided to the resident or review the resident's daily

charting to determine whether these codes are accurate.

---

[3] CMS, Medicare Program; Prospective Payment System and Consolidated Billing for
Skilled Nursing Facilities for FY 2011, 75 Fed. Reg. at 42,908.

129.    As alleged above, *see supra* ¶¶ 109, 115, Relator discovered from MDS Assessments previously submitted by Stephens and Blevins that they routinely inflated the self-performance and support-provided figures in those MDS Assessments in order to increase the ADL scores assigned to those residents.  Stephens and Blevins consistently assigned codes of 3 or 4 – indicating that the that resident needed "extensive assistance" or was "total[ly] dependen[t]" – to several ADL categories for each resident, even when it was apparent from the resident's daily charting that the resident did not need the reported level of staff assistance and was not receiving that level of staff assistance.

130.    For example, a Medicare-covered resident would be coded in Section G of his 5-day MDS Assessment as needing extensive assistance (self-performance score of 3) and the support of one or two nursing staff members (support provided score of 2 or 3) to get in and out of bed, use the toilet, and move from place to place in his room.  The resident would be coded as totally dependent (self-performance score of 4) and requiring the assistance of two nursing staff (support provided score of 3) to stand or move from a chair to another location and to perform personal hygiene (*i.e.* combing hair, *etc.*).  Such coding would yield an ADL score of 12. Combining this ADL score with therapy minutes and other services that a resident received, a resident would be assigned a RUG level of, *e.g.*, RUC, RVC, or RHC (all of which require an ADL score of at least 11).  A RUG level of RUC was typical.

131.    However, Relator observed that such coding in Section G of a resident's MDS Assessment frequently had no relation to – and indeed was completely contradicted by – the resident's actual medical records.  One type of record kept in a resident's medical file or "chart" is an ADL & Nutrition/Hydration Care Record, commonly referred to as an ADL flow chart. This is a one-page chart in which nursing staff (at LaVie Facilities, these were typically certified

nurse assistants ("CNAs")) would record, for each shift and each day of the month, the resident's

self-performance and the amount of assistance they provided to the resident.  This chart is

typically reviewed by an MDS nurse in the course of completing a resident's MDS Assessment.

Even for some residents with an ADL score of 11 or higher, Relator noticed that CNAs would

consistently report on those residents' ADL monthly flow charts that they were fully independent

and required no assistance to get in and out of bed, transfer between surfaces, and use the toilet.

In addition to ADL flow charts completed by CNAs, nurses (at LaVie Facilities, these were

typically LPNs) would typically complete a daily "Care Track" form providing a narrative

summary of the resident's condition and activities.  These forms are also typically reviewed by

an MDS nurse in the course of completing a resident's MDS Assessment.  Even for certain

residents with an ADL score of 11 or higher, Relator observed notes from LPNs in those

residents' Care Track forms documenting the fact that the residents could use the toilet and move

about their rooms without any assistance from CNAs.

132.    Relator recalls two residents, Resident J.S. and Resident E.H., who were

Medicare residents at the Governor's Creek Facility in March of 2011 and whose ADL scores

were fraudulently inflated in exactly this fashion.

133.    In both cases, the residents' medical records were completely inconsistent with

their MDS Assessments, which falsely reported that they were totally dependent or needed

extensive assistance from one or two CNAs for these same activities.  If J.S.'s and E.H.'s MDS

Assessments had been accurately completed, the resulting ADL score would have been much

lower than 11 or 12.  Moreover, the MDS nurse completing J.S.'s and E.H.'s MDS Assessments

knew, or was deliberately ignorant or reckless in not knowing, that the ADL scores assigned to

J.S. and E.H. were false.  This falsehood was also material, as it dramatically increased J.S.'s and E.H.'s ADL scores, resulting in higher RUG levels and higher levels of reimbursement.

### 2. Defendants Provided Medically Unnecessary Rehabilitative Therapy and Fraudulently Manipulated Reporting of Therapy Minutes

134.    In addition to fraudulently increasing ADL scores, Defendants also billed Medicare for unnecessary rehabilitative therapy and manipulated their reporting of therapy minutes to make it appear that Medicare residents were receiving more therapy than they were actually provided.

135.    As Table 1 illustrates, *supra* ¶ 127, the total therapy minutes provided to a resident directly affects the resident's RUG level and resulting per diem reimbursement rate.  On average, increasing the intensity of therapy by just one level increases the per diem rate by over $60, or 12 to 20%.  In particular, the maximum level – Rehabilitation Ultra – has per diem reimbursement rates that are $95 to $127 (over 20%) higher than the level immediately below it (Rehabilitation Very High).  Defendants were keenly aware of this fact and employed a variety of fraudulent strategies to classify as many residents as possible in the Rehabilitation Ultra level.

136.    Medicare requires (as does TRICARE) that rehabilitative therapy be reasonable and medically necessary as certified by a physician.  Defendants were aware of this requirement but often failed to obtain a physician's certification for therapy provided to residents.  Even when Defendants obtained a certification of medical necessity for the therapy they provided, the certification was often procured by fraud.

137.    Specifically, Relator observed that when a new Medicare resident was admitted to the Marshall and Governor's Creek Facilities, the Rehabilitation Director or therapists acting under the Director's supervision would create a therapy plan for the resident.  Regardless of the resident's actual needs, they would typically overstate the resident's therapy needs, assess the

45

resident as needing extensive physical, occupational, and/or speech therapy, and recommend the maximum possible amount of therapy for the resident.  The Rehabilitation Director or therapists would then complete a form for the resident's physician to sign that certified the medical necessity of the therapy recommended.  The physicians assigned to the Facilities often signed these certifications without independently verifying the residents' need for therapy, trusting and relying on the factual accuracy of the therapists' assessments.

138.    For example, Relator recalls a frail, elderly man who was receiving hospice care and was admitted to the Marshall Facility in February of 2011 due to difficulty breathing.  Hospice care is end-of-life care provided in the last six months of a resident's life, and is designed to help a resident control pain and other symptoms so that the resident can have peace, comfort, and dignity in the final days and weeks of life.  Medicare Part A covers temporary SNF stays during hospice care under certain circumstances.  *See* 42 U.S.C. § 1395d(d).

139.    Because this resident was covered by Medicare Part A, therapists at the Marshall Facility were determined to provide him the maximum possible amount of therapy, despite his request for hospice care.  As a result, the resident was assessed as needing physical and occupational therapy even though he could hardly walk, and spent hours performing pointless and potentially counterproductive physical and occupational therapy.  After only a week in the Facility, the resident left.  He died several weeks later.  This resident's right to comfort and dignity as he approached the end of his life was marred by disruptive and unnecessary therapy that was provided to generate additional revenue from Medicare rather than to address his needs.

140.    The MDS Assessment and subsequent bills that were submitted to CMS by the Marshall Facility for this resident falsely represented that the therapy provided to him was medically necessary, when in fact it was not.  The therapists – employees of Defendant LaVie

46

Rehab – who assessed this resident and provided him therapy, and the MDS nurse who completed the resident's MDS Assessment, knew, or were deliberately ignorant or reckless in not knowing, that the therapy provided to this resident was not medically necessary. Nevertheless, they knowingly created false records or statements concerning his care and knowingly caused false claims to be presented to CMS.

141.    In addition to providing medically unnecessary therapy, Defendants frequently also inflated the number of therapy minutes reported on MDS Assessments by misrepresenting the type of therapy provided.  The number of therapy minutes provided a resident during the seven days preceding an MDS Assessment is reported in Section O of the MDS Assessment.  *See* Ex. 2, § O, at 27-29.  Therapy minutes are divided into types of therapy – occupational, speech, physical, *etc.* – and further subdivided into three ways in which therapy is provided:  individual minutes, concurrent minutes, and group minutes.  *See id.*

- Individual minutes reflect the number of minutes of therapy provided in a one-on-one session between the therapist or assistant and the resident.  *See* RAI Manual at O-15.

- Concurrent minutes reflect the number of minutes of therapy provided to two residents at the same time, where the residents are performing *different* therapeutic activities under the supervision of a single therapist. *See id.*

- Group minutes reflect the number of minutes of therapy provided by a single therapist to a group of two to four residents performing the *same* therapeutic activity.  *See id.*

142.    The distinction between these types of therapies is significant in calculating total therapy minutes for purposes of determining a resident's RUG level.  For purposes of this calculation, concurrent minutes are discounted by 50%, and the number of group therapy minutes that count toward the total cannot exceed one third of the sum of the individual minutes and the discounted concurrent minutes.  *See* RAI Manual at 6-19 to -20.  These discounts reflect the fact that concurrent and group therapy are less costly to provide, because a single therapist can assist multiple residents.

143.    The MDS nurses' office at the Governor's Creek Facility was directly across the hallway from the Facility's therapy center – a large open room where residents were provided rehabilitative therapy.  Relator could observe therapeutic activity from her office, and noticed that the therapists almost invariably worked with residents in groups.  Relator was therefore surprised to find that many of the MDS Assessments recently completed by Lavie MDS nurses and therapists reported large amounts of individual therapy in Section O of the MDS Assessments, when in fact no such therapy was provided.  Instead, the MDS nurses and therapists had been coding concurrent or group therapy as individual therapy, thereby fraudulently doubling or tripling the amount that these therapy minutes contributed to the calculation of total therapy minutes.

144.    In addition to these strategies for falsely inflating therapy minutes, Defendants also manipulated the timing of therapy reporting to avoid having to actually incur the cost of providing the amount of therapy reported in residents' MDS Assessments.  Specifically, Defendants took advantage of the fact that for purposes of determining RUG levels, the number of therapy minutes provided is only measured during periodic 7-day look-back periods.  *See supra* ¶¶ 43-44.  Defendants arranged for residents to receive the maximum amount of rehabilitative therapy (720 minutes) during these look-back periods but provided far lower amounts of therapy outside these periods.

145.    When reviewing medical records and previously submitted MDS Assessments for residents, Relator noticed a consistent pattern:  residents would receive 720 minutes or more of rehabilitative therapy during look-back periods and receive half or less that amount of therapy – typically around 350 to 400 minutes or less – during periods outside the look-back periods.

146.    For example, on or about April 12, 2011, Relator worked on an annual MDS Assessment for a Medicaid resident at the Governor's Creek Facility who suffered from Alzheimer's disease and could not walk.  However, Relator's subsequent review of this resident's medical record showed that he had been admitted over a year before under Medicare Part A.  The resident's 5-day, 14-day, and 30-day MDS Assessments were submitted in March of 2010 by Carolyn Packer, an MDS nurse who worked at the Governor's Creek Facility; his 60-day Assessment was submitted by Packer in May of 2010.  Each Assessment reported in Section O that the resident had been provided 720 minutes of therapy (half physical therapy and half occupational therapy) during the relevant 7-day look-back period and thus he was assigned a RUG level in the Rehab Ultra range.  However, outside these 7-day windows, Relator was surprised to discover that this resident had been provided far less therapy, on average about 350 to 400 minutes per week (split about evenly between physical and occupational therapy).  The resident's therapy was supervised by the Facility's Rehabilitation Director, Williams.

147.    As a result, CMS had been billed for 90 days (about 13 weeks) at Rehab Ultra rates, but the resident had only been provided Rehab Ultra levels of therapy (720 minutes of therapy) for 5 of these 13 weeks.  During the remaining 8 weeks, the resident had been provided far lower levels of therapy (200-400 minutes), which would have triggered a significantly lower RUG level (Rehabilitation High) and a correspondingly lower level of reimbursement. Moreover, the fact that the resident was provided far lower levels of therapy outside the 7-day look-back periods used for his MDS Assessments shows that Williams and others at the Facility recognized that the levels of care provided to the resident during these periods were excessive and not medically necessary.

148.    This resident's MDS Assessments submitted to CMS were false and fraudulent, because they reported therapy minutes that were not medically necessary and because they contained RUG levels that did not reflect the actual amount of therapy needed by, or provided to, the resident.  The bills submitted to CMS for this resident were likewise false because they were based on falsified MDS Assessments and because they contained the fraudulently inflated RUG levels reported in those MDS Assessments.  Packer, Williams, and the therapists working at Williams' direction knew, or were deliberately ignorant or reckless in not knowing, that these MDS Assessments and resulting bills were false.  Packer, Williams, and the therapists caused the MDS Assessments to be used and caused the resulting bills to be presented to CMS.

149.    Despite the efforts of MDS nurses and therapists at the Facilities, it was not always possible to fit the maximum amount of therapy minutes into the appropriate 7-day look-back period.  The look-back periods are the seven days preceding the Assessment Reference Date ("ARD") for an MDS Assessment, which are set at 5, 14, 30, 60, and 90 days after a resident is admitted to the facility.  *See supra* ¶¶ 43, 144.  If the ARD fell at the end of a week, or therapy was not scheduled in advance, the therapy minutes during the look-back period would often not reach the 720-minute maximum.

150.    To overcome this difficulty, MDS nurses at the Marshall and Governor's Creek Facilities would take advantage of the fact that CMS permits a SNF to adjust the ARD by setting it a few days before the deadlines above, or extending past the deadlines by adding a number of "grace days" and scheduling extensive therapy during the reporting period.  *See supra* ¶ 43.  This practice was fraudulent.  The amount of therapy minutes reported, and the resulting RUG level, should "accurately reflect the resident's status."  42 C.F.R. § 483.20(g); *see also id.* § 424.20. Where the selection of the ARD is manipulated to generate an amount of therapy minutes that

50

does not correspond to the treatment normally provided to the resident, the resulting RUG level does not accurately reflect the resident's status.  Additionally, grace days may be added only for legitimate reasons such as the MDS nurse's illness or the need to more accurately reflect the amount of therapy provided to a resident.  *See supra* ¶ 43; RAI Manual at 2-41.  LaVie Facilities' MDS nurses, including Stephens and Blevins, improperly used grace days for the opposite purpose:  to *misrepresent* the amount of therapy actually provided to residents solely for the purpose of increasing the amount of reimbursement they could seek on behalf of the LaVie Facilities.

151.    The Rehabilitation Directors at the Marshall and Governor's Creek Facilities were aware of, and actively facilitated, the fraudulent reporting of therapy minutes.  For example, at the end of her tenure at the Marshall Facility, Relator was asked to complete MDS Assessments for Medicare residents, but she had considerable difficulty completing them in a timely fashion.  One of the main reasons for the delay was that, in many cases, after Relator had selected an ARD for the resident and had begun completing the MDS Assessment as of that date, the Facility's Rehabilitation Director, Demayo, would insist that the ARD be moved forward several days if it would generate a larger amount of therapy minutes during the look-back period.  Demayo insisted on these changes to inflate reported therapy minutes, even though he knew that these residents would be provided far fewer therapy minutes outside the look-back periods.

152.    Juliano and McAnally also actively encouraged this fraudulent scheme.  In their weekly calls with all MDS nurses in the region, they would remind MDS nurses to ensure that therapy was properly scheduled to generate the maximum number of therapy minutes during each look-back period and to adjust ARDs when necessary to capture a higher amount of therapy.

153.    Defendants' method of reporting therapy minutes conveyed the false impression that residents were receiving far more therapy than they were actually provided, and resulted in RUG levels that did not accurately reflect the condition and needs of residents.  Accordingly, each of the MDS Assessments containing therapy minutes inflated in this manner constituted a false statement or claim, and subsequent bills based on those MDS Assessments were false claims.  MDS nurses such as Stephens and Blevins made these false statements or claims, and they, along with Demayo, Williams, Juliano, and McAnally caused false claims to be submitted to CMS and MA Plans.  Stephens, Blevins, Demayo, Williams, Juliano, and McAnally knew, or were deliberately ignorant or reckless in not knowing, that these statements and claims were false and fraudulent.

### 3.    Defendants' Scheme Resulted in Millions of Dollars of Fraudulent Claims Being Presented to CMS for Payment

154.    Defendants' fraudulent scheme to inflate ADL scores and therapy minutes was remarkably effective.  During the full year ended June 30, 2011, the Governor's Creek Facility provided care to approximately 160 Medicare residents for a total of approximately 4,285 resident-days that were billed to Medicare.  Of these, about 3,485 resident-days (81%) were billed to Medicare at the Rehab Ultra level.  Similarly, of the Marshall Facility's 5,675 resident-days billed to Medicare during the full year ended June 30, 2011, 3,397 (60%) were billed at the Rehab Ultra level.

155.    These figures vastly exceed normal levels of Rehab Ultra in a typical SNF resident population, which in Relator's experience range from 10% to 15%.  The reason that Rehab Ultra levels at the Governor's Creek and Marshall Facilities were as much as five times higher than typical rates was not because these Facilities had five times as many residents in

need of therapy as a typical SNF.  Rather, this was the result of Defendants' systematic fraudulent inflation of RUG levels.

156.    Defendants' fraudulent scheme was very lucrative.  The Governor's Creek Facility received approximately $2.28 million in PPS payments from the Medicare Part A program during the full year ended June 30, 2011.  Of these payments, approximately 86% corresponded to resident-days coded as Rehab Ultra.  Similarly, the Marshall Facility received approximately $2.63 million in PPS payments from the Medicare Part A program during the full year ended June 30, 2011.  Of these payments, approximately 66% corresponded to resident-days coded as Rehab Ultra.

157.    Much of the PPS reimbursement received by the Marshall and Governor's Creek Facilities for Rehab Ultra residents was the result of MDS Assessments and subsequent bills containing RUG levels that falsely and fraudulently represented that the residents at these Facilities needed and were receiving high amounts of rehabilitative therapy.  The MDS nurses working for the Facilities, the Regional Reimbursement Specialists working for LaVie Management Services and the rehabilitative therapists working for LaVie Rehab all participated in creating and submitting these false MDS Assessments and bills, and all knew, or were deliberately ignorant or reckless in not knowing, that the representations contained therein were false.

**D.    Defendants Falsely Certified That Residents Were Treated Pursuant to Timely Care Plans in Order to Avoid the Cost of Providing Adequate and Properly Planned Care**

158.    When seeking reimbursement from Medicare, Medicaid, or TRICARE for each resident, Defendants certified – either expressly or impliedly – that they were in compliance with federal and Florida regulations requiring them to assess the resident's medical and therapeutic needs upon his or her admission to a Facility, to promptly create a detailed plan of care to

address those needs, and to regularly reassess the resident's needs and plan of care.  But Defendants were well aware that for many residents no meaningful plan of care was ever created, let alone within the timeframe established by federal and Florida regulations, and that no regular reassessment of residents' needs and care plans was or would be conducted.

159.    Throughout her tenure at both the Marshall Facility and the Governor's Creek Facility, Relator was surprised to discover that Defendants had not created any care plan for many residents, and that the care plans which did exist were almost exclusively generic, boilerplate, and unconnected to the residents' particular medical conditions and needs.  As explained above, Relator discovered that the practice of Stephens and Blevins and other MDS nurses at the Marshall and Governor's Creek Facilities had been to represent falsely in Section V of residents' initial MDS Assessments that CAAs and corresponding care plans had been completed for the residents, when in fact adequate CAAs had not been completed and no care plans had been created.  *See supra* ¶¶ 80, 85.

160.    Relator also discovered that the Facilities' "care plan library" – an electronic database of possible care plan strategies and interventions from which MDS nurses could draw when completing specific resident care plans – was grossly inadequate.  The care plan library at both Facilities was barebones, populated with generic and boilerplate descriptions of resident conditions and interventions.  While Relator was working at the Governor's Creek Facility, she attempted to improve the care plan library by adding specific interventions that MDS nurses could use when creating future care plans (for example, "assess lung sounds every shift" and "monitor for edema").  For these efforts, Relator received a verbal reprimand from Kreps, the Facility Administrator, for "wasting valuable time" when Relator could be focused on increasing the completion rate of MDS Assessments for Medicare Part A residents.  Relator understood

54

from this admonition that Kreps wanted to discourage MDS nurses from creating particularized care plans specific to each triggered care area, because that would force Defendants to provide additional care (or risk questions from government surveyors about the disconnect between a resident's care plan and actual level of care).

161.    Unfortunately for the residents at the Marshall and Governor's Creek Facilities, the dearth of care plans was not merely a technical violation of federal and Florida regulations; rather, the absence of any meaningful assessment of residents' medical needs and of any coherent plan to meet those needs fundamentally impaired the quality of care these residents received.

162.    The Administrators, MDS nurses, and therapists working at the Governor's Creek and Marshall Facilities knew, or were deliberately ignorant or reckless in not knowing, that they were required to have care plans in place for all Medicare, Medicaid, and TRICARE residents. Defendants chose not to create such care plans because doing so would require time and effort and would reveal the need for additional resident care that triggered additional costs (and thus would reduce Defendants' profits).

163.    Relator witnessed firsthand how Defendants' obsession with reducing costs and increasing profits prevented the creation and implementation of care plans for residents, resulting in appallingly deficient levels of patient care.  For example, Relator noticed that the Marshall Facility was seriously understaffed and as a result could not assess residents' medical needs or provide needed patient care.  Many residents' treatment records and other daily logs were simply blank, because the Facility's staff was too busy and overwhelmed to assess and document their assessments in residents' records.  Even basic and immediate medical needs were neglected:  one resident had a serious open wound that was untreated for three or four days; the treating nurse

had written in the resident's medical record:  "dressing not done – too much to do – not enough time to do it."

164.    At the Governor's Creek facility, Relator observed the same pattern of appalling patient care as a result of inadequate or nonexistent care planning.  The treatment of Resident V.D. was just one of many troubling examples.  Relator first met V.D. about a month after being transferred to the Governor's Creek Facility.  V.D. was a very pleasant and alert Medicaid resident who had no trouble making her needs known.  V.D. told Relator that she could not currently walk without assistance, and she requested rehabilitative therapy to help her walk on her own again.  V.D. also asked Relator for a new chair; she had been relegated to a Geri-reclining chair, and she said that the chair was uncomfortable and caused her pain.  The chair also physically restrained V.D.; because the chair was reclined, she could not rise out of the chair without another person first adjusting the chair to an upright position.

165.    Federal and Florida regulations strictly limit SNFs' use of physical restraints for residents.  First, physical restraints may not be imposed where not medically necessary to treat a resident's symptoms.  42 C.F.R. § 483.13(a).  Second, even where a restraint is deemed medically necessary, care providers must meet with the resident to discuss the use of the restraint and to periodically assess and document the basis for the restraint in the resident's care plan.  *See* Am. Health Care Ass'n, *Long-Term Care Survey*, PP-63 to -65 (Oct. 2010).

166.    After reviewing V.D.'s medical records, Relator realized that no care plan had been prepared to structure V.D.'s care, and that V.D. had not received a therapy screen to determine what rehabilitative therapy, if any, she should be given.  Moreover, there was no indication in V.D.'s records of any medical need to restrain her.  Relator also learned from a CNA that V.D. was in fact able to walk with assistance.  After observing V.D. and evaluating her

56

medical needs, Relator screened V.D. for therapy and added a request to V.D.'s patient file for a therapy assessment and a new chair that would not impose a medically unwarranted restraint on V.D.

167.     When Relator mentioned these requests to Williams, the Facility's Rehabilitation Director, Williams became irate.  Williams claimed that Resident V.D. was crazy, and that in any case she "had no payor source"; V.D. therefore could not receive a new chair and Williams and her staff would not be providing any therapy to her.  Williams was particularly upset that Relator had added a request to Resident V.D.'s medical records, because this document would necessitate a response from Williams:  she would either need to provide the chair and the requested therapy or conduct a meaningful assessment of Resident V.D. that would justify refusing this care.

168.     Relator explained to Williams that V.D.'s medical records indicated that she was able to walk with some assistance, and that with proper therapy, she might eventually be able to walk entirely on her own.  Without so much as glancing at V.D. or her medical records, Williams screamed "She cannot walk!" and physically ripped Relator's request for therapy and a new chair from V.D.'s patient file.

169.     Several weeks later, Relator again encountered resident V.D., who was pale, worried, and in obvious discomfort.  Resident V.D. again requested a new chair because her current chair was "so uncomfortable."  Relator again added a request for a new chair and for rehabilitative therapy to V.D.'s patient file.  When Relator spoke to Williams about the request, Williams ripped out the new document requesting a chair and medically necessary therapy for V.D., scolding Relator:  "I told you:  NO PAYOR SOURCE!"

170.    In fact, Resident V.D. did have a payor source – Medicaid.  What Williams meant by her repeated statements that Resident V.D. lacked a payor source was that, because Medicaid (unlike Medicare) pays a flat per-diem for each resident, the Facility would receive no additional reimbursement for providing a new chair and rehabilitative therapy to Resident V.D.  This is a patently impermissible basis for refusing to provide care to a resident and is inconsistent with federal and Florida regulations, pursuant to which SNFs *must* provide rehabilitative therapy where a resident's comprehensive plan of care requires it.  *See* 42 C.F.R. § 483.45; Florida Medicaid Nursing Facility Handbook at 1-6, 2-10.  As explained above, federal and Florida law entitled V.D. to receive from the Governor's Creek Facility skilled nursing care and rehabilitative therapy based on a comprehensive assessment of her medical needs and pursuant to a care plan designed to meet those needs.  *See supra* ¶¶ 39-40, 62, 67, 69.  Williams knowingly deprived V.D. of this right.

171.    Each of the monthly bills submitted by the Governor's Creek Facility to AHCA for skilled nursing care provided in the months of March and April of 2011 to V.D. certified – both expressly and by implication – that this care had been provided in accordance with federal and Florida regulations.  *See supra* ¶¶ 73-75.  Each of these bills was a false claim because that certification was false:  no care plan had been completed for V.D., in violation of federal and Florida regulations, and Relator's efforts to document V.D.'s medical needs were systematically and fraudulently removed from V.D.'s medical records for categorically improper reasons.

172.    Williams knew, or was deliberately ignorant or reckless in not knowing, that her refusal of care to Resident V.D. was irreconcilable with federal and Florida regulations.  Moreover, Williams' repeated removal of Relator's reasonable requests for care from Resident V.D.'s patient file intentionally and fraudulently concealed this gross deviation from required

standards of care, thereby creating a knowingly false or fraudulent record that was material to the false claims submitted for Resident V.D.  This record was materially false because it was subject to audit – and records of this kind were in fact audited – by AHCA, and had AHCA known that the record had been fraudulently altered by Williams, it would not have paid claims submitted for Resident V.D.'s care.  At a minimum, knowledge of this alteration was capable of influencing AHCA's decision to pay such claims.

173.    V.D. was far from the only resident for whom the lack of a meaningful care plan dramatically affected the level of care received.  Resident W.S. was another.  W.S. was an alert, oriented Medicaid resident in his early 40s who had been seriously injured in a car accident and, after leaving the hospital, had been discharged to the Governor's Creek facility for rehabilitation, where Relator came into contact with him.  As with V.D., therapists at the Facility (employees of Defendant LaVie Rehab) declined to create a comprehensive care plan for therapy to rehabilitate W.S. and teach him to walk again – despite W.S.'s repeated pleas to nurses and therapists for such therapy.

174.    On or about April 26, 2011, Relator watched as W.S. was called into the MDS nurses' office for a "care plan meeting."  In fact, the real reason for this meeting was that surveyors from AHCA were inspecting the Facility and Williams was concerned that W.S.'s repeated complaints about not receiving therapy would be noticed and investigated.  Williams, Adams, and the Facility's risk coordinator, Rochelle Henry (an LPN), were present at the meeting.  W.S. begged Williams for therapy, and Williams gave the same answer Relator had heard her give time and again to other Medicaid residents: "You have no payor source."  When W.S. persisted in requesting therapy, Williams became angry and told him – without conducting any medical assessment (let alone an expert one) – that he would never walk again.  W.S.

59

became very upset with this (baseless) diagnosis and began weeping.  Adams told Williams to

stop crying and threatened that if he continued to cry, she would add a note to his medical record

that he was mentally unsound and required psychiatric treatment.  Cowed by these threats, W.S.

left the office and returned quietly to his room.

175.    In fact, W.S. had the same payor source (Medicaid) that V.D. did.  Williams

denied W.S. the rehabilitative therapy to which he was legally entitled because the provision of

that therapy would not have translated to more dollars for Defendants. W.S.'s need for therapy

was not evaluated in a care area assessment process – and he was cruelly deterred from asserting

his need – because that would have required Defendants to provide therapy without additional

per-minute remuneration, or to manufacture a reason why such therapy was not medically

necessary.

176.    Each of the monthly bills submitted by the Governor's Creek Facility to AHCA

for skilled nursing care provided in the months of February, March, and April 2011 to W.S.

certified – both expressly and by implication – that W.S.'s care had been provided in accordance

with federal and Florida regulations.  *See supra* ¶¶ 73-75.  Each of these bills was a false claim

because that certification was false:  no meaningful assessment or care plan had been completed

for W.S., in violation of federal and Florida regulations.

177.    In addition, by threatening W.S. for requesting care to the point that W.S. was

afraid to mention therapy to AHCA surveyors, Williams, Henry, and Adams successfully

concealed from AHCA Defendants' prior violations of law.

178.    Williams, Henry, and Adams knew, or were deliberately ignorant or reckless in

not knowing, that their refusal of care to Resident W.S. violated federal and Florida regulations.

Moreover, their rejection of W.S.'s requests for care, without assessing the need for such care in

the context of the care area assessment process, intentionally and fraudulently concealed this gross deviation from required standards of care, thereby creating a knowingly false or fraudulent record that was material to the false claims submitted for Resident W.S.  This record was materially false because it was subject to audit – and records of this kind were in fact audited – by AHCA, and had AHCA known that no meaningful care plan had been created for W.S., it would not have paid claims submitted for Resident W.S.'s care.  At a minimum, knowledge of this alteration was capable of influencing AHCA's decision to pay such claims.

179.    The absence of appropriate care plans in the medical records of Medicaid residents was not limited to a few residents.  Rather, failure to perform even minimal resident assessment or care planning was pervasive at the Marshall and Governor's Creek Facilities.  At one meeting with Williams, Kreps, Jones, and other employees of the Governor's Creek Facility, including the Director of Nursing, Relator noted that Medicaid residents should be receiving quarterly assessments to screen for additional therapy needs.  Williams firmly opposed the request.  Her reason was simple:  "My therapists and I do not get paid for screening Medicaid residents.  My corporate boss would be mad if he knew I was allowing that!" When Relator pointed out that quarterly reassessments of Medicaid residents were required by law, Williams became very agitated and shouted:  "Fine! I will look at these residents. But my therapists and I are not going to touch them – we will do a 7-second visual assessment and that is it!"  A mere seven-second visual assessment of a resident is not consistent with any plausible interpretation of federal and Florida regulations requiring quarterly review of each Medicaid resident's MDS Assessment and care plan.

180.    Federal and Florida regulations require periodic reviews of MDS Assessments and care plans for good reason.  Without such reviews, MDS Assessments and care plans will

often become outdated and cease to effectively organize resident care; CMS and AHCA dollars will be paid to SNFs for the provision of medically unnecessary, misguided, or inadequate care; and residents will not receive appropriate care.

181.     Resident M was one victim of the Governor's Creek Facility's disregard for quarterly review of MDS Assessments for Medicaid residents.  Relator learned about Resident M in April 2011, in a daily clinical meeting with other nurses at the Governor's Creek Facility. During the meeting, one of the nurses mentioned a doctor's note she had received, reporting that Resident M had come to the doctor's office without the leg brace that the doctor had ordered to treat Resident M's leg fracture, and that the CNA accompanying Resident M could not recall the last time she had seen the brace.  Relator learned that Resident M's leg had been fractured several months earlier, at which time she had been provided a brace, but that the leg brace had become unusable after Resident M soiled it, and despite repeated requests, it was never replaced.

182.     Resident M did not have a care plan in place to guide the treatment of her fracture, and her MDS Assessment contained no indication that her leg had been fractured, that a leg brace had been prescribed, or that she was in need of a new one.  In short, Resident M suffered for months with a fractured leg and no leg brace as a direct result of the absence of meaningful review of residents' MDS Assessments and care plans.

183.     Resident M was covered by Medicaid, and the Governor's Creek Facility submitted a MDS Assessment to CMS and monthly bills to AHCA concerning her care.  These MDS Assessments and bills represented that a care plan had been completed for Resident M, and that she was being provided care in accordance with federal and Florida regulations when that was plainly untrue.  Nurses at the Governor's Creek Facility knew, or were deliberately ignorant

or reckless in not knowing, that Resident M lacked any meaningful care plan, and that her treatment was not consistent with federal and Florida regulations.

184.    The Facilities' frequent and fraudulent disregard of federal and Florida regulations requiring that treatment be provided pursuant to a plan of care resulted in the submission of false claims to the federal and Florida governments.  The Facilities received substantial revenues from CMS and AHCA to reimburse them for their "care" of Medicaid residents.  For the year ended June 30, 2011, for example, the Marshall Facility reported 29,331 Medicaid resident-days, and the Governor's Creek Facility reported 32,615 Medicaid resident-days.  Each Facility reported more than $5 million in Medicaid revenues for that year.

**E.    Defendants Falsified Documents to Conceal Previous Overpayments of Medicare, Medicaid, and TRICARE Funds**

185.    As set forth above, Defendants received substantial remuneration from CMS, AHCA, TRICARE, and their agents for the care Defendants represented that they were providing to residents.  As a condition of receiving those funds, Defendants' employees certified to CMS, AHCA, TRICARE, and their agents that Defendants were in compliance with Medicare, Medicaid, and TRICARE regulations.  In fact, Defendants systematically flouted those regulations, choosing not to complete or update care plans for residents within the time period established by federal and Florida regulations because regular attention to care plans would result in more costs to Defendants.  Because Defendants falsely represented that they had satisfied all conditions of payment, and subsequently accepted payment on the basis of those false representations, Defendants received Medicare, Medicaid, and TRICARE funds to which they were not lawfully entitled.

186.    Defendants employed multiple strategies to conceal this fact.  For example (as described above), Defendants intentionally removed documents from patient files to conceal the

fact that residents' care plans were inadequate and that they were not being provided the required care.

187.    In addition, at the Marshall and Governor's Creek Facilities, Relator witnessed a consistent effort to paper over Defendants' utter disregard for care plans and the care area assessment process.  In Florida, AHCA conducts Annual Surveys of all SNFs accepting Medicare or Medicaid funds.  AHCA surveys each of these SNFs roughly once a year, but it can survey a facility anywhere between nine and fifteen months after its last survey.

188.    When the window for AHCA's next survey approached, the Facilities pushed Relator and others to create (woefully late) care plans for residents admitted several months earlier – after residents had suffered for months without appropriate care plans, and after Defendants had accepted Medicaid funds in part on the basis of their representation that they *had* established such care plans.  Defendants' post hoc efforts to manufacture these care plans were intended to create the illusion that they had been in compliance with their obligations under federal and Florida law all along – and had been providing patient care consistent with a contemporaneous care plan – and thus that Defendants had not improperly received Medicaid and Medicare funds.

189.    Defendants' after-the-fact creation of these care plans concealed their obligation to repay the Medicaid funds they had improperly received.  Nurses at the Marshall and Governor's Creek Facilities knew, or were deliberately ignorant or reckless in not knowing, that these residents lacked any meaningful care plan within the time period established by federal and Florida regulations, and that the creation of care plans at a much later date was unlawful and concealed Defendants' previous violations of federal and Florida law.

**F.      Defendants Routinely Falsified the Identities of Persons Certifying the Proper Completion of MDS Assessments**

190.    To facilitate and conceal the fraudulent schemes described above, Defendants' employees routinely misrepresented their identities on MDS Assessments submitted to CMS, AHCA, and MA Plans.

191.    As explained above, federal and Florida regulations require that an RN coordinate the completion of an MDS Assessment for each resident in a SNF, and require the RN coordinating the MDS Assessment to sign and certify that it is complete and properly performed. *See supra* ¶¶ 11, 37, 63; *see also* Ex. 2, § Z, at 38.

192.    To facilitate electronic submission of MDS Assessments, CMS now provides MDS nurses with an electronic password so that they can electronically submit an MDS Assessment to CMS.  A SNF submitting electronically signed MDS Assessments "must have written policies in place that meet any and all state and federal privacy and security requirements to ensure proper security measures to protect the use of an electronic signature by anyone other than the person to whom the electronic signature belongs."  RAI Manual at Z-8.

193.    Defendants had no such policy.  Rather, multiple individuals at each Facility had access to the MDS nurses' passwords, and this access was routinely used to sign falsely MDS Assessments in the name of an MDS nurse who had not completed or reviewed the MDS Assessment.

194.    For example, at the time Relator was transferred to the Governor's Creek Facility, the MDS nurse at the Facility with primary responsibility for submitting MDS Assessments for Medicare Part A residents was Blevins.  As described above, Blevins consistently and knowingly falsified MDS Assessments to generate higher RUG levels and conceal the fact that care plans were not being completed for residents.  *See supra* ¶¶ 113-17.

195.     Blevins was an LPN, not an RN.  In Florida, to become an RN, one must complete years of formal education and on-site training, and pass certain examinations designed to ensure the nurse is able to perform acts requiring "specialized knowledge, judgment, and nursing skill," including "observation, assessment, nursing diagnosis, planning, intervention, and evaluation of care."   Fla. Stat. § 464.003(20), (22).  By contrast, an LPN has less training and is licensed only to perform "selected acts," including the administration of treatments and medications and patient care under the direction of an RN.  *Id.* § 464.003(16), (19).  In particular, an LPN is not required to have training in assessment, diagnosis, planning, and evaluation of care.

196.     Because Blevins was not an RN, federal and Florida regulations did not permit Blevins to serve as an RN Assessment Coordinator for purposes of the MDS Assessments she completed.  To circumvent these regulations, Blevins applied the electronic signature of RN Rebecca Adams (the Director of Nursing for the Governor's Creek Facility and a friend of Blevins') to Section Z of each of the MDS Assessments that Blevins completed.  *See* Ex. 2, § Z, at 38.  In fact, Adams did not coordinate the completion of any of the MDS Assessments, did not supervise Blevins' completion of the Assessments, and did not review them to ensure that, as certified in the Assessments, they were properly completed.  Through her review of previous MDS Assessments and conversations with Blevins, Relator learned that Blevins had been doing this since November 2010.

197.     From November 2010 until on or about April, 8, 2011, Blevins submitted numerous MDS Assessments in Adams' name.  Each of these MDS Assessments was materially false, because each falsely represented that the completion of the MDS Assessment had been coordinated by Adams and that Adams had reviewed and certified the completeness of the MDS

Assessment, when Adams had never even seen the MDS Assessment, let alone coordinated its completion. Moreover, each Assessment falsely represented that an RN had coordinated or certified the Assessment when the person completing and coordinating the MDS Assessments was actually not an RN.

198. The Governor's Creek Facility reported the following number of Medicare resident-days between November 2010 and March 2011:

| Month | Medicare Resident-Days |
|---|---|
| November 2010 | 351 |
| December 2010 | 379 |
| January 2011 | 330 |
| February 2011 | 306 |
| March 2011 | 391 |
| **Total** | **1,757** |

These 1,757 resident-days account for 41% of the Facility's 4,285 Medicare resident-days during the full year ended June 30, 2011, and thus account for close to half of the $2.28 million in PPS payments that the Facility received that year.

199. Consistent with its normal practice, the Governor's Creek Facility arranged for the submission of bills seeking reimbursement from CMS for many or most of these resident-days on or about the fourth business day of the month following each of the months listed above (*i.e.*, from November 2010 to April 2011). The vast majority of these bills were false or fraudulent because they were based on Blevins' knowingly falsified MDS Assessments. Blevins accordingly made false statements and caused false claims to be presented for payment, even though she knew, or was deliberately ignorant or reckless in not knowing, that these statements and claims were false.

200.   Adams, the Facility Administrator Kreps, and Juliano were complicit in this fraud. Each knew, or was deliberately ignorant or reckless in not knowing, that Blevins was an LPN and was fraudulently certifying the completeness of MDS Assessments in the name of an RN. They all turned a blind eye to this conduct because Blevins consistently delivered high RUG levels and kept the Facility above the Medicare "budget" established by Defendant LaVie Management Services.

201.   In her final days at the Governor's Creek Facility, Relator learned that her own name was being falsely applied to MDS Assessments that she had not completed or reviewed. As explained above, in April of 2011, after Blevins was arrested, Relator was assigned to complete the MDS Assessments for Medicare Part A that had previously been assigned to Blevins.  *See supra* ¶¶ 113-17.  However, Relator had difficulty completing the MDS Assessments because she was frequently unable to log-in to the Facility's computer system, *i.e.*, she would be "locked out."

202.   Although Relator did not realize this at the time, the reason she was locked out was that someone else at the Facility had logged into the computer system with her user name and password, and the system does not permit multiple computers to be logged in with the same user name at the same time.  Relator had never given anyone her password, and had never given anyone permission to use her password.  At the time, Relator thought there must be a problem with her own password.  Thus each time she was locked out, she would request and obtain a new password from Karen Sparks, the Facility Business Manager.  The Facility Administrator, Kreps, and the Director of Nursing, Adams, were also aware of these requests and the resulting passwords.

203.     After leaving the Governor's Creek Facility, Relator learned from a former colleague at the Facility that Relator had supposedly achieved the highest RUG levels in the region.  Relator was shocked to hear this, as she had consistently assigned much lower RUG levels in her MDS Assessments (because they were accurate) than Blevins.  On information and belief, the reason that Relator's RUG levels were so high was that someone else – a person working at LaVie Management Services or at the Governor's Creek Facility – had been fraudulently altering Relator's MDS Assessments to increase the RUG levels and submitting the altered Assessments with Relator's electronic signature.

204.     Relator first became concerned in mid-April 2011 when she spoke with Juliano about the MDS Assessments submitted for Resident P.B., who was covered by an MA Plan sponsored by Universal Care Health Care ("Universal"), an insurer headquartered in St. Petersburg, Florida.  P.B.'s medical records indicated that his MDS Assessments should be completed as if he was covered by Medicare, and Relator accordingly had completed a combined Admission and 5-day MDS Assessment for P.B. in early April 2011.  In mid-April, Juliano told Relator that she needed to submit a 5-day MDS Assessment for P.B. because only an Admission MDS Assessment had been submitted.  Relator was confused because she had already completed a combined Admission and 5-day MDS Assessment for P.B.  Juliano explained that she had changed this Assessment to an Admission-only MDS Assessment before it was submitted. When Relator called AHT software support for help in changing P.B.'s MDS Assessment, she learned that Juliano's electronic signature did not appear on the modified Admission MDS Assessment.  Relator asked Juliano about this, who explained, "I don't have an electronic signature; I work in the background."

205.     The reason that P.B.'s MDS Assessment needed to be changed was that, under P.B.'s MA Plan, Universal reimbursed the Facility based on the information reported in P.B.'s MDS Assessment and required the Facility to submit separately a 5-day Assessment reflecting resident P.B.'s RUG level.  On or about May 4, 2011, Relator's penultimate day at the Governor's Creek Facility, Relator was working on P.B.'s 5-day MDS Assessment, but had not completed the Assessment, when she was again locked out of the Facility's computer system. Because she was unable to continue working and could not secure a new password to access the system, Relator decided to go home and complete the MDS Assessment the following morning.

206.     The next morning, Relator returned to the Governor's Creek Facility and requested a new password.  Once she obtained the new password, she was able to log into the Facility's computer system.  However, when she attempted to open Resident P.B.'s MDS Assessment, she was surprised to discover that it had been completed in her name and submitted electronically to CMS with Relator's electronic signature.  Relator did not complete and submit P.B.'s MDS Assessment.  Rather, on information and belief, Juliano or another person at the Governor's Creek Facility completed P.B.'s MDS Assessment and unlawfully submitted it in Relator's name.

207.     P.B.'s MDS Assessment was improperly upcoded in several respects.  In particular, Section G of resident P.B.'s 5-day and 14-day MDS Assessments reported his four key ADLs as follows:

**Table 2.  Resident P.B.'s ADLs as Reported in his 5-Day and 14-Day MDS Assessments**

| ADL Category | Self-Performance | Support Provided |
|---|---|---|
| Bed Mobility | 4 (Total Dependence) | 2 (One Person) |
| Transfer | 4 (Total Dependence) | 3 (Two Person) |
| Toilet Use | 4 (Total Dependence) | 2 (One Person) |
| Eating | 1 (Supervision Only) | 1 (Setup Help Only) |

Resident P.B.'s resulting ADL score was therefore 10.  *See* RAI Manual at 6-18.

208.    However, the CNAs providing assistance to P.B. reported on his ADL flow charts for the period covered by these MDS Assessments that P.B. required only extensive assistance and was not totally dependent on staff assistance for bed mobility (*i.e.*, the self-performance figure should have been a 3, not a 4), and that P.B. was independent and did not require supervision for eating (*i.e.*, the self-performance figure should have been a 0 and not a 1). Moreover, the nurse's Care Track forms for P.B. reported that he required only limited assistance, rather than extensive assistance for bed mobility (*i.e.*, the self-performance figure should have been a 2, not a 4), and that he required only extensive assistance from one staff member for transfers, rather than being totally dependent and requiring the assistance of two staff members (*i.e.*, the self-performance figure should have been a 3 and not a 4 and the support provided figure should have been a 2 and not a 3).

209.    Thus, had Relator reviewed and completed Resident P.B.'s MDS Assessment, as certified in Section Z of the Assessment, Section G would have read as follows:

**Table 3.  Resident P.B.'s ADLs as Relator Would Have Reported Them (with Relator's Changes Italicized)**

| ADL Category | Self-Performance | Support Provided |
|---|---|---|
| Bed Mobility | *2 (Limited Assistance)* | 2 (One Person) |
| Transfer | *3 (Extensive Assistance)* | *2 (One Person)* |
| Toilet Use | 4 (Total Dependence) | 2 (One Person) |
| Eating | *0 (Independent)* | 1 (Setup Help Only) |

P.B.'s resulting ADL score would therefore have been 6, rather than 10.  *See* RAI Manual at 6-18.

210.    The MDS Assessment for P.B. was materially incorrect in another respect as well. According to the MDS Assessment, P.B. had no dental issues.  In reality, however, P.B.'s dental

problems were severe: he had a left front tooth broken in half, was missing back teeth, and had inflamed gums.  In a meeting with AHCA surveyors on April 27, 2011, Relator realized these issues and intended to correct them in the MDS Assessment she was working on at the time.  But another individual at the Facility completed and submitted the MDS Assessment in her name before Relator had the chance to finish her work.

211.    P.B. was covered by an MA Plan administered by Universal.  Universal required the Governor's Creek Facility to provide it with completed MDS Assessments, and reimbursed the Facility based on information reported in the MDS Assessments.  In or around May 2011, the Facility provided the false MDS Assessments described above to Universal and thereafter billed Universal for the services reflected in these MDS Assessments.

212.    As an MA Plan sponsor, Universal was a contractor of the federal government, and received government funds from CMS in the form of monthly risk-adjusted capitation payments.  *See supra* ¶¶ 52-54.  Most of the MA Plans offered by Universal charged no premiums to participants, and the few MA Plans with premiums charged very little – $29 to $69 per month.  Thus, the bulk of Universal's revenue came from CMS's monthly capitation payments.

213.    Universal spent these federal funds on behalf of CMS and in order to advance CMS's interest in ensuring that participants in Universal's MA Plans such as P.B. received the medical care guaranteed by the Medicare program.  Universal was subject to extensive regulation established by CMS to advance this objective.  *See supra* ¶¶ 55-56.  Accordingly, bills or reimbursement requests submitted by the Governor's Creek Facility to Universal were paid at least in part with federal funds and are "claims" within the meaning of the federal FCA.  *See supra* ¶¶ 79-80.

214.    The MDS Assessments provided to Universal were false in multiple ways:  they were upcoded, they falsely represented that P.B. had no dental issues; and they falsely represented that they had been completed by Relator, when in fact she did not complete them. The bills sent by the Facility to Universal as a result of these MDS Assessments were likewise false because they were based on falsified MDS Assessments.  These falsehoods were material: had Universal known the bills and MDS Assessments upon which they were based were false, this would have influenced its decision whether to pay these bills.  Universal would benefit financially by refusing payment of falsified bills and in any case was contractually obligated to CMS to prevent fraud, waste, and abuse.  The person who submitted the MDS Assessments in Relator's name – Juliano or another employee at the Facility – knew, or was deliberately ignorant or reckless in not knowing, that these MDS Assessments were false, and that any bills based on these MDS Assessments were likewise false.  This person therefore knowingly caused false claims and materially false statements to be submitted.

## **CLAIMS FOR RELIEF**

### **COUNT I**
**Violation of the Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(A)**

215.    Relator and the United States reallege and incorporate by reference each and every of the foregoing paragraphs as if fully set forth herein.

216.    Defendants presented, or caused to be presented, false or fraudulent claims to CMS and its agents, other government health programs, and MA Plans.

217.    Defendants knew, or were deliberately ignorant or reckless in not knowing, that these claims were false.

218.    Accordingly, Defendants are liable for treble damages, civil penalties, and the cost of this action under 31 U.S.C. § 3729(a)(1) and (3).

**<u>COUNT II</u>**
**Violation of the Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(B)**

219.    Relator and the United States reallege and incorporate by reference each and every of the foregoing paragraphs as if fully set forth herein.

220.    Defendants made, used, or caused to be made or used false or fraudulent records or statements, including MDS Assessments and patient records containing such MDS Assessments and other falsified information, as alleged above.

221.    These false records or statements were material to false or fraudulent claims made to CMS and its agents, other government health programs, and MA Plans.

222.    Defendants knew, or were deliberately ignorant or reckless in not knowing, that these records or statements were false.

223.    Accordingly, Defendants are liable for treble damages, civil penalties, and the cost of this action under 31 U.S.C. § 3729(a)(1) and (3).

**<u>COUNT III</u>**
**Violation of the Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(G)**

224.    Relator and the United States reallege and incorporate by reference each and every of the foregoing paragraphs as if fully set forth herein.

225.    Defendants made, used, or caused to be made or used false or fraudulent records or statements, including MDS Assessments and other falsified information, as alleged above.

226.    These false records or statements were material to Defendants' obligation to pay or transmit money or property to CMS, its agents, and other government health programs – including Defendants' obligation to repay money or property they had previously improperly received from CMS, its agents, or other government health programs.

227.    Defendants knew, or were deliberately ignorant or reckless in not knowing, that these records or statements were false.

74

228.     Defendants concealed or improperly avoided their obligation to pay or transmit money or property to CMS and its agents.

229.     Defendants knew, or were deliberately ignorant or reckless in not knowing, that their conduct concealed or improperly avoided their obligation to pay or transmit money or property to CMS, its agents, or other government health programs.

230.     Accordingly, Defendants are liable for treble damages, civil penalties, and the cost of this action under 31 U.S.C. § 3729(a)(1) and (3).

## COUNT IV
### Violation of the Florida False Claims Act, Fla. Stat. § 68.082(2)(a)

231.     Relator and the State of Florida reallege and incorporate by reference each and every of the foregoing paragraphs as if fully set forth herein.

232.     Defendants presented, or caused to be presented, false or fraudulent claims to AHCA and its agents.

233.     Defendants knew, or were deliberately ignorant or reckless in not knowing, that these claims were false.

234.     Accordingly, Defendants are liable for treble damages, civil penalties, and the cost of this action under Fla. Stat. §§ 68.082(2), 68.086.

## COUNT V
### Violation of the Florida False Claims Act, Fla. Stat. § 68.082(2)(b)

235.     Relator and the State of Florida reallege and incorporate by reference each and every of the foregoing paragraphs as if fully set forth herein.

236.     Defendants made, used, or caused to be made or used false or fraudulent records or statements, including MDS Assessments and patient records containing such MDS Assessments and other falsified information, as alleged above.

237.     These false records or statements were material to false or fraudulent claims made to AHCA and its agents.

238.     Defendants knew, or were deliberately ignorant or reckless in not knowing, that these records or statements were false.

239.     Accordingly, Defendants are liable for treble damages, civil penalties, and the cost of this action under Fla. Stat. §§ 68.082(2), 68.086.

<div align="center">

**COUNT VI**
**Violation of the Florida False Claims Act, Fla. Stat. § 68.082(2)(g)**

</div>

240.     Relator and the State of Florida reallege and incorporate by reference each and every of the foregoing paragraphs as if fully set forth herein.

241.     Defendants made, used, or caused to be made or used false or fraudulent records or statements, including MDS Assessments and other falsified information, as alleged above.

242.     These false records or statements were material to Defendants' obligation to pay or transmit money or property to AHCA and its agents – including Defendants' obligation to repay money or property they had previously improperly received from AHCA and its agents.

243.     Defendants knew, or were deliberately ignorant or reckless in not knowing, that these records or statements were false.

244.     Defendants concealed or improperly avoided their obligation to pay or transmit money or property to AHCA and its agents.

245.     Defendants knew, or were deliberately ignorant or reckless in not knowing, that their conduct concealed or improperly avoided their obligation to pay or transmit money or property to AHCA and its agents.

246.     Accordingly, Defendants are liable for treble damages, civil penalties, and the cost of this action under Fla. Stat. §§ 68.082(2), 68.086.

## CLAIMS FOR RELIEF

WHEREFORE, Relator, Angela Ruckh, acting on behalf of and in the name of the United States of America and the State of Florida and on her own behalf, demands and prays that judgment be entered as follows against the Defendants:

(a)     In favor of the United States against the Defendants for treble the amount of damages to Government Programs (including CMS and MA Plans) from the Defendants' unlawful activities, plus maximum civil penalties of Eleven Thousand Dollars ($11,000.00) for each violation of the federal False Claims Act;

(b)     In favor of the United States against the Defendants for disgorgement of the profits unlawfully obtained by Defendants as a result of their illegal scheme;

(c)     In favor of the Relator for the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) plus reasonable expenses, attorney fees and costs incurred by Relator;

(d)     In favor of the Relator and the State of Florida against Defendants in an amount equal to three times the amount of damages to the State from the Defendants' unlawful activities, plus maximum civil penalties of Eleven Thousand Dollars ($11,000.00) for each violation of the Florida False Claims Act;

(e)     In favor of the Relator for the maximum amount allowed pursuant to Fla. Stat. § 68.085 plus reasonable expenses, attorney fees and costs incurred by Relator

(f)     Such other relief as this Court deems just and appropriate.

PLAINTIFF/RELATOR DEMANDS A TRIAL BY JURY ON ALL COUNTS

Dated:  April 30, 2013                          Respectfully submitted,


                                                _____s/ Silvija A. Strikis_____


Kevin J. Darken                                 Silvija A. Strikis (pro hac vice)
Florida Bar No. 0090956                         Joseph S. Hall (pro hac vice)
THE COHEN LAW GROUP                             Christopher A. Klimmek (pro hac vice)
201 East Kennedy Boulevard, Suite 1000          John B. Ward (pro hac vice)
Tampa, Florida 33602                            KELLOGG, HUBER, HANSEN, TODD,
Telephone: (813) 225-1655                         EVANS & FIGEL, P.L.L.C.
Facsimile: (813) 225-1921                       1615 M Street, N.W., Suite 400
kdarken@tampalawfirm.com                        Washington, D.C. 20036
                                                Telephone:  (202) 326-7900
                                                Facsimile:  (202) 326-7999
Rory Delaney (pro hac vice)                     sstrikis@khhte.com
Charles F. Kester (pro hac vice)                jhall@khhte.com
DELANEY KESTER LLP                              cklimmek@khhte.com
7 Liberty Square, 2nd Floor,                    jward@khhte.com
Boston, MA  02109
Telephone:  (857) 498-0384
royston@delaneykester.com
charles@delaneykester.com

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on April 30, 2013, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to counsel of record for Defendant Salus Rehabilitation, LLC, d/b/a LaVie Rehab.

<u>s/  Silvija A. Strikis</u>

Anna G. Small
Allen Dell, P.A.
202 S. Rome Ave., Suite 100
Tampa, FL 33606-1854
Phone: (813) 223-5351
Facsimile: (813) 229-6682
Email: asmall@allendell.com

Kari Aasheim
Jennifer L. Watson
Mancuso & Dias, P.A.
5102 W. Laurel Street, Suite 700
Tampa, FL 33607
Phone: (813) 769-6280
Facsimile: (813) 769-6281
Email: kaasheim@mdlegal.net
Email: jlwatson@mdlegal.net