# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

| | |
|---|---|
| THE UNITED STATES OF AMERICA and THE STATE OF FLORIDA *ex rel.* ANGELA RUCKH, | |
| Plaintiffs, | |
| v. | CIVIL ACTION NO. 8:11 CV 1303 SDM-TBM |
| CMC II, LLC; SEA CREST HEALTH CARE MANAGEMENT, LLC, d/b/a LAVIE MANAGEMENT SERVICES OF FLORIDA; SALUS REHABILITATION, LLC, d/b/a LAVIE REHAB; 207 MARSHALL DRIVE OPERATIONS, LLC, d/b/a MARSHALL HEALTH AND REHABILITATION CENTER; 803 OAK STREET OPERATIONS, LLC, d/b/a GOVERNOR'S CREEK HEALTH AND REHABILITATION CENTER, | |
| Defendants. | |

**RELATOR'S MOTION *IN LIMINE* TO ADMIT EXPERT STATISTICAL SAMPLING TESTIMONY**

_____

Relator moves *in limine* for a ruling admitting under Federal Rule of Evidence 702 the expert testimony of Dr. Constantijn Panis regarding statistical sampling. As set forth in the expert report of Dr. Panis, attached as Exhibit A ("Panis Sampling Rep."), statistical sampling provides a reliable method for determining the number of false claims submitted by Defendants and the corresponding damages under the federal and Florida False Claims Acts. Courts have long accepted statistical sampling as a highly reliable method for determining the characteristics of a given population based on a subset of that population. *See*, *e.g.*, Manual for Complex Litigation § 11.493 (4th ed. 2004) ("Acceptable sampling techniques, in lieu of discovery and presentation of voluminous data from the entire population, can save substantial time and expense, and in some cases provide the only practicable means to collect and present relevant data."). And courts have admitted sampling evidence in cases materially indistinguishable from this one. *See*, *e.g.*, Order, *United States ex rel. Martin v. Life Care Ctrs. of Am., Inc.*, Nos. 1:08-cv-251, *et al.*, Doc. 137, slip op. at 33 (E.D. Tenn. Sept. 29, 2014) (attached as Exhibit B). Given Defendants' assertion that it would be impossible to produce all medical records for their Florida residents for the Court-ordered discovery period – at least on any reasonable timetable – sampling is particularly warranted here.

## BACKGROUND

This case involves allegations of Medicare and Medicaid fraud at facilities owned or operated by Defendants in the state of Florida during the period including January 2008 through January 2012. Defendants' employees allegedly committed Medicare fraud by inflating ("upcoding") the Resource Utility Group ("RUG") levels assigned to residents in MDS Assessments and corresponding bills submitted to the federal government. Revised

Second Amended Complaint, Doc. 75, ¶¶ 122-57 (June 3, 2013) ("RSAC").  Defendants' employees allegedly committed Medicaid fraud by falsely certifying that they had created timely and adequate care plans – a condition of reimbursement – when in fact they had not. *Id.* ¶¶ 8-9, 158-84.

As part of her proof at trial, Relator will present expert analysis of the medical records underlying Defendants' false claims for federal and state reimbursement.  That expert analysis will determine, among other things, whether Defendants upcoded RUG levels and whether Defendants created timely and adequate care plans for their residents.  To present this analysis, Relator must obtain the medical records, and related bills and receipts, for residents of Defendants' Florida facilities.

Defendants have indicated that it would be impossible to produce these records on a reasonable schedule.  During meet and confers in November 2014, Defendants stated that they would not be able to comply with the Court-ordered deadline for production of "paper documents."  *See* Dec. 2, 2014 Letter from J. Ward to V. Martinez at 3, Doc. 166-1 (summarizing November meet and confers); *accord* Relator's Resp. to Defs.' Notice of Substantial Compliance, Doc. 166, at 5 (Dec. 23, 2014).  Defendants later informed the Court that "canvas[sing] and gather[ing] records from some fifty-three (53) facilities and some fifty-three (53) off-site storage locations within 28 days . . . is a simple, logistical and mathematical impossibility."  Defs.' Mot. To Stay or Modify Produc. Deadlines, Doc. 157, at 12 (Nov. 28, 2014); *see also id.* at 2 n.1 (noting that resident records were maintained at least in part as "paper records and based upon the review to date, are ordinarily encompassing multiple boxes per resident").  More recently, Defendants represented to Relator that it would

take them several weeks to produce a few hundred resident files. At that pace, it would take years for Defendants to produce the medical records for all residents of their fifty-three Florida facilities for the four-year Court-ordered discovery period. Gathering all the records would also considerably add to the expense of this case, the amount of time required to analyze each record, and the Court's and jury's time to hear evidence regarding every patient in the population.

Relator has therefore proposed the use of sampling to identify false claims in the patient population without the need for discovery of the records of all residents at Defendants' Florida facilities for the relevant period. As Relator has explained, after "disclosure of sufficient factual information to allow a sampling expert to determine what the relevant sample size should be" and to select a sample, the parties could rely on expert opinion and motion practice to determine an approach to permit proof of this case through sampling. Tr. 25:17-19 (Jul. 10, 2014) (excerpts attached as Exhibit C); *see also* Am. Case Mgmt. Rep., Doc. 100, at 7-8 (Jan. 31, 2014) (proposing "initial discovery into the general contours of Defendants' patient population, patient records, and numbers of claims" to enable Relator's expert to design a sampling methodology and select a sample). Following the July 2014 pretrial conference, the Court invited Relator to submit her sampling proposal by motion. *See* Rep. on Prelim. Pretrial Conference, Doc. 124, at 2 & n.4 (July 10, 2014); Order, Doc. 131, at 1 (July 29, 2014); *see also* Tr. 37:17-22 (Ex. C) (indicating that sampling should be resolved by separate motion).

Relator has now obtained the discovery necessary to support a motion to admit sampling evidence in this case. Defendants have produced data extracted from AHT claims

4

databases they maintain, which Defendants have represented contain information for every resident of their Florida facilities during the period from January 2008 through January 2012 who had a government (Medicare or Medicaid) payor source.  Feb. 3, 2015 Email from T. Dunsford to J. Ward (attached as Exhibit D).  Using resident-days – that is, the days when patients resided in Defendants' Florida facilities between January 2008 and January 2012 – as the unit to be sampled, Relator's expert has drawn a sample from the resident-days represented in the AHT claims data.  *See* Panis Sampling Rep. ¶¶ 26, 34-36.  As required by the case management schedule, Relator has provided the list of identified resident-days (including identification of the relevant residents) to Defendants, and the parties are now negotiating a timeframe for production of the relevant records to Relator.  *See* Second Am. Case Mgmt. Rep., Doc. 167, at 2-3 (Dec. 29, 2014).

## ARGUMENT

Rule 702 assigns the district court " 'the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.' "  *United Fire & Cas. Co. v. Whirlpool Corp.*, 704 F.3d 1338, 1341 (11th Cir. 2013) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993)).  "Pertinent evidence based on scientifically valid principles will satisfy those demands."  *Daubert*, 509 U.S. at 597.  "The focus [of the reliability inquiry] must be solely on principles and methodology, not on the conclusions that they generate."  *Id.* at 595.  One significant consideration is whether the expert is "proposing to testify about matters growing naturally and directly out of research [he has] conducted independent of the litigation."  *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995).  If so, that provides "objective proof that the [methodology] comports with

5

the dictates of good science." *Id.* Because "most statistical methods relied on in court are described in textbooks or journal articles and are capable of producing useful results when properly applied," "[s]tatistical studies suitably designed to address a material issue generally will be admissible" under Rule 702. David H. Kaye & David A. Freedman, *Reference Manual on Scientific Evidence*, *Reference Guide on Statistics*, at 86 (Fed. Judicial Ctr. 3d ed. 2011), available at http://www.fjc.gov/public/pdf.nsf/lookup/sciman02.pdf/$file/sciman02.pdf.

Dr. Panis's statistical sampling methodology easily satisfies Federal Rule of Evidence 702 and the *Daubert* standards.

### A. Dr. Panis Is Qualified as a Statistics Expert

Dr. Panis is eminently qualified by knowledge, skill, experience, training, and education to testify as to his statistical sampling methodology. Panis Sampling Rep. ¶¶ 4-9. He holds Bachelor of Arts and Master of Arts degrees in Economics from the University of Groningen, Netherlands, and a doctorate in Economics from the University of Southern California. *Id.* ¶ 5. He has worked as a senior manager with the Economic and Statistical Consulting group at Deloitte Financial Advisory Services LLP, and as a senior economist with the RAND Corporation. *Id.* ¶¶ 6, 8. Dr. Panis also co-founded and led EconWare, whose software segregated causality, reverse causality, and selection effects in economic models. *Id.* ¶ 6. He has taught economics, statistics, and econometrics at the University of Southern California Economics Department and Marshall School of Business, and at the University of California Irvine Graduate School of Management. *Id.* Dr. Panis has published more than 20 books and articles in the Journal of Health Economics, Journal of

Human Resources, Medical Care, Health Affairs, Health Policy Research, and other professional journals, including on statistical methods to distinguish causality from correlation. *Id.* ¶ 7. Both in his research and litigation support activities, he routinely designs sampling plans, draws samples, analyzes samples, and extrapolates from samples. *Id.* ¶ 9.

Dr. Panis is a Principal of Advanced Analytical Consulting Group, Inc., a firm that provides expert witness and consulting services on economic, statistical, and computing matters. *Id.* ¶ 4. He has considerable experience developing and implementing statistical sampling methodologies, including in healthcare cases. *Id.* ¶¶ 7-9.

### B. Statistically Valid Random Sampling Is Well-Accepted and Reliable

Statistical sampling is a scientifically valid, common, and widely accepted technique for making reliable estimates about the characteristics of large populations. *See United States v. Rosin*, 263 F. App'x 16, 29 (11th Cir. Jan. 16, 2008) ("The purpose of statistical sampling is to provide a means of determining the likelihood that a large sample shares characteristics of a smaller sample."); Laurens Walker & John Monahan, *Sampling Evidence at the Crossroads*, 80 S. Cal. L. Rev. 969, 973-74 (2007) (describing random sampling as "a sine qua non of scientific research"); Panis Sampling Rep. ¶ 15. Statisticians can estimate the characteristics of a population with a known degree of precision based on analysis of a representative sample of that population. *Id.* ¶ 16. As a leading treatise on evidence explains, "[t]he researcher tries to collect information from a manageable portion (a sample) of a larger group (a population) in order to learn something about the population." 1 Kenneth S. Broun, *McCormick on Evid*. § 208 (7th ed. 2013); *see also* Manual for Complex Litigation

7

§ 11.493 ("Statistical methods can often estimate, to specified levels of accuracy, the characteristics of a 'population' or 'universe' of events, transactions, attitudes, or opinions by observing those characteristics in a relatively small segment, or sample, of the population.").

The U.S. government commonly uses statistical sampling to draw conclusions about large populations. For instance, Congress has authorized the U.S. Census Bureau to use sampling for a variety of purposes. *See* 13 U.S.C. § 195 ("Except for the determination of population for purposes of apportionment of Representatives in Congress among the several States, the Secretary shall, if he considers it feasible, authorize the use of the statistical method known as 'sampling' in carrying out the provisions of this title."); *Current Population Survey*, *Sampling*, U.S. Census Bureau, *available at* http://www.census.gov/cps/methodology/sampling.html. Private industry likewise uses sampling for a variety of purposes. *See*, *e.g.*, *Vigilant Ins. v. Sunbeam Corp.*, 231 F.R.D. 582, 587 (D. Ariz. 2005) (insurance industry samples damaged goods to determine total losses in a fire); *Cities Serv. Co. v. Derby & Co.*, 654 F. Supp. 492, 497-98 (S.D.N.Y. 1987) (noting that the American Society for Testing and Materials and the American Petroleum Institute jointly developed industry standards for sampling petroleum and petroleum products), *aff'd*, 835 F.2d 1429 (2d Cir. 1987); *Nielsen Co.* (*US*)*, LLC v. Truck Ads, LLC*, No. 08 C 6446, 2011 WL 3857122, at *2 & n.1 (N.D. Ill. Aug. 29, 2011) (describing Nielsen's statistical sampling process to measure the audience for television programs).

As with private industry and other branches of government, federal courts employ statistical sampling to manage the scope of discovery. "Such mathematical and statistical methods are well recognized by the courts as reliable and acceptable in determining

8

adjudicative facts." *Rosado v. Wyman*, 322 F. Supp. 1173, 1180 (E.D.N.Y. 1970), *aff'd*, 437 F.2d 619 (2d Cir. 1970), *aff'd*, 402 U.S. 991 (1971); *see also*, *e.g.*, *United States v. Rogan*, 517 F.3d 449, 453 (7th Cir. 2008) ("[Defendant's] argument that the district judge had to address each of the 1,812 claim forms is a formula for paralysis. Statistical analysis should suffice."). The Federal Judicial Center expressly endorses statistical sampling. *See* Manual for Complex Litigation § 11.422 ("When limits are placed on discovery of voluminous transactions or other events, consider using statistical sampling techniques to measure whether the results of the discovery fairly represent what unrestricted discovery would have been expected to produce."); *id.* § 11.493 ("Acceptable sampling techniques, in lieu of discovery and presentation of voluminous data from the entire population, can save substantial time and expense, and in some cases provide the only practicable means to collect and present relevant data."); *see generally* Kaye & Freedman, *Reference Guide on Statistics*.

For these reasons, numerous courts have ruled that statistical sampling is a reliable and admissible means of quantifying Medicare and Medicaid overpayments, including under the False Claims Act. For example, in *Rosin* – a criminal health care fraud case – the Eleventh Circuit ruled admissible a statistical expert's extrapolation of loss findings from a statistically random sample. *See Rosin*, 263 F. App'x at 29. And in *United States v. Halifax Hospital Medical Center*, No. 6:09-cv-1002-Orl-31TBS, 2014 WL 68579 (M.D. Fla. Jan. 8, 2014), the court rejected a motion to exclude statistical sampling evidence in an FCA case, reasoning that criticisms of "the sample as being too small and unrepresentative" went to "the weight of the evidence rather than its Rule 702 admissibility." *Id.* at *2. Other courts have

9

reached similar conclusions in the False Claims Act and similar contexts.[1]

### C.     Dr. Panis Has Applied His Statistical Sampling Methodology Reliably

The process of sampling and reviewing patient files involves four general steps: (1) design a methodology to obtain a statistically valid random sample of patient files to be reviewed; (2) apply that methodology to the population of residents of Defendants' Florida facilities during the Court-ordered discovery period to select the patient files composing the

---

[1] *See Pruchniewski v. Leavitt*, No. 8:04-CV-2200-T-23TBM, 2006 WL 2331071, at *7 & n.9 (M.D. Fla. 2006) (Merryday, J.) (approving use of statistical sampling to prove Medicare overpayments); *State of Ga., Dep't of Human Res. v. Califano*, 446 F. Supp. 404, 409-10 (N.D. Ga. 1977) (same); *see also United States v. Jones*, 641 F.3d 706, 712 (6th Cir. 2011) (recognizing that evidence from a "representative statistical sample" "could have reliably established" falsity and damages for the entire population, but concluding that the government's statistical analysis was flawed because the government did not present evidence that the statistical sample was representative); *Rogan*, 517 F.3d at 453; Order, *United States ex rel. Martin v. Life Care Ctrs. of Am., Inc.*, Nos. 1:08-cv-251, *et al.*, Doc. 184, slip op. at 38 (E.D. Tenn. Sept. 29, 2014) ("[S]tatistical sampling may be used to prove claims brought under the FCA involving Medicare overpayment . . . ."); *United States ex rel. Loughren v. UnumProvident Corp.*, 604 F. Supp. 2d 259, 261 (D. Mass. 2009) ("[E]xtrapolation is a reasonable method for determining the number of false claims so long as the statistical methodology is appropriate."); *United States ex rel. Barron v. Deloitte & Touche, LLP*, No. SA-99-CA-1093, 2008 WL 7136869, at *2 (W.D. Tex. Sept. 26, 2008) ("The underlying focus continues to be the Supreme Court's ruling in *Daubert* which permits the use of statistical methods of scientific research and proof"); *United States v. Cabrera-Diaz*, 106 F. Supp. 2d 234, 240 (D.P.R. 2000) ("Numerous cases involving Medicaid and Medicare overpayments have endorsed proof of damages through the use of statistics and statistical sampling."); *United States v. Lahey Clinic Hosp., Inc.*, 399 F.3d 1, 18 n.19 (1st Cir. 2005) ("[S]ampling of similar claims and extrapolation from the sample is a recognized method of proof" in "cases for abuse of the Medicare system"); *Chaves Cnty. Home Health Serv., Inc. v. Sullivan*, 931 F.2d 914, 919 (D.C. Cir. 1991) ("[C]ourts have routinely permitted the use of statistical sampling to determine whether there has been a pattern of overpayments spanning a large number of claims where case-by-case review would be too costly."); *United States v. Fadul*, No. DKC 11-0385, 2013 WL 781614, at *14 (D. Md. Feb. 28, 2013) ("Courts have routinely endorsed sampling and extrapolation as a viable method of proving damages in cases involving Medicare and Medicaid overpayments where a claim-by-claim review is not practical."); *cf. Ratanasen v. State of Cal., Dep't of Health Servs.*, 11 F.3d 1467, 1471 (9th Cir. 1993) (in a California FCA case, "join[ing] other circuits in approving the use of sampling and extrapolation as part of audits in connection with Medicare and other similar programs").

10

random sample; (3) obtain and review the patient files selected for the sampling; and (4) extrapolate the average overpayment in the sample to the patient population. Dr. Panis's Sampling Report resolves the first two steps. As set forth below, Dr. Panis selected a random sample of 300 resident-days for false claims submitted to Medicare, and 300 resident-days for false claims submitted to Medicaid, which is expected to result in total overpayment calculations with a margin of error of roughly ±20% at a 95% confidence level. *See* Panis Sampling Rep. ¶ 33.

    1.    *Random Sample of 300 Resident-Days*: As Dr. Panis details in his Sampling Report, it is statistically appropriate to obtain patient files relating to two resident-day samples randomly selected from the total population of resident-days in Defendants' Florida facilities for the relevant discovery period. *Id.* ¶¶ 26-33. Here, Dr. Panis selected two random samples of 300 resident-days. *Id.* ¶ 34. Because it may not be possible to obtain patient files relating to each of the 300 randomly selected resident-day samples (some files may be lost, misplaced, or otherwise unavailable), Dr. Panis also randomly selected 100 supplemental (or "backup") resident-days from claims submitted to Medicare and to Medicaid. *Id.* ¶¶ 35-36. In the event that files for some resident-days in the initial samples are unavailable, those resident-days will be replaced with resident-days from the backup sample according to a preselected, random order that maintains the statistical validity of the sample. *Id.*

    2.    *Confidence Level and Margin of Error*: When a sample is randomly selected, it provides an unbiased description of the population from which the sample was drawn. *Id.* ¶¶ 13, 37. Once the sample has been reviewed, the average daily overpayment will be

11

extrapolated to the population of resident-days to estimate the total overpayment across all resident-days in all 53 facilities during the relevant period. *Id.* ¶ 37-41. Because that estimate is derived from a sample of resident-days, rather than all resident-days, it is subject to a degree of uncertainty. Statisticians quantify this uncertainty as the "margin of error" that exists at a certain level of confidence. *Id.* ¶¶ 16-18. For example, the statistician may be 90% confident that results are accurate within ±15%, or 95% confident that the results are accurate within ±20%. Suppose the average overpayment in the reviewed sample was $30 per day; with 95% likelihood, the true average overpayment would then differ at most by 20% ($6) from $30, *i.e.*, the overpayment would be between $24 and $36 per day. Alternatively, suppose the expert reviewer determined that 40% of the sampled claims were false; with 95% likelihood, the true share of false claims would then differ at most by 20% from 40%, *i.e.*, the share of false claims would be between 32% and 48%. While at this pre-review stage it is impossible to precisely quantify the margin of error that will result from the sample, Dr. Panis explains that a sample size of 300 resident-days for the Medicare claims and 300 resident-days for the Medicaid claims is expected to generate results with a margin of error of roughly ±20% at a 95% confidence level. *Id.* ¶ 33.

      3.    *Implementation*: Implementation of Dr. Panis's sampling methodology was a mechanical process. *See id.* ¶¶ 34-36. Dr. Panis used standard statistical software to assign a random number to each resident-day. *Id.* ¶ 34. Then he reordered the resident-days by the random number. *Id.* The sample consists of the first 300 resident-days, and the backup sample consists of the next 100 resident-days in the group. *Id.* ¶¶ 34-36.

### D. The Proposed Sampling Methodology Is Relevant and Helpful to the Trier of Fact

Based on Defendants' representations, it would not be feasible for them to collect and produce, and for Relator to review, all of the patient files at issue in this case in time for a trial next year. Because fewer than all of these patient files can be reviewed, the parties have two options: statistically valid random sampling or some other method of reviewing an unspecified number of patient files. Relator's statistically valid sampling methodology will help the trier of fact "to understand the evidence" and "to determine a fact in issue," Fed. R. Evid. 702, because sampling allows the trier of fact to estimate the characteristics of the patient population with a known degree of accuracy (such as a 95% confidence level and ±20% margin of error). Panis Sampling Rep. ¶¶ 13, 33. As Magistrate McCoun noted last year, "we've done [sampling] in other cases and [it] seems to be the appropriate way – oftentimes is the appropriate way in these matters." *See* Tr. 14:7-9 (Ex. C).

### E. The Court Should Rule Now on the Admissibility of the Statistical Sampling Methodology

A ruling on the admissibility of Dr. Panis's statistical sampling testimony now will facilitate "the just, speedy, and inexpensive determination" of this case. Fed. R. Civ. P. 1. *First*, it will provide critical guidance to the parties. Absent such guidance, the parties would begin the costly and time-consuming process of producing and reviewing sample patient files without some assurance that the sample chosen will be deemed admissible. *Second*, a ruling now that Dr. Panis's sampling methodology is admissible will reduce the burden on all parties: Defendants would be relieved of the obligation to search for, collect, and produce tens of thousands of patient files – which they have asserted would be an impossibility given

13

the constraints of the case management schedule – and the parties would be relieved of the need to review each of those tens of thousands of files.  Critically, Defendants will not be prejudiced by an early ruling on this issue.  An early ruling will benefit Defendants by allowing them to decide whether to rely on Relator's sample, create their own separate sample, or adopt some other course.  Uncertainty on this issue benefits no one and will result in a more protracted, burdensome, and expensive discovery process.

## CONCLUSION

For the foregoing reasons, Relator respectfully requests a ruling *in limine* admitting Dr. Panis's expert testimony regarding statistical sampling pursuant to Federal Rule of Evidence 702.

**LOCAL RULE 3.01(g) CERTIFICATION**

Counsel for the Relator and the Defendants have conferred in good faith but have been unable to reach agreement as to the relief requested in Relator's motion.

Dated:  February 20, 2015

Respectfully submitted,

*s/ Silvija A. Strikis*

| | |
|---|---|
| Kevin J. Darken (FL. Bar No. 0090956)<br>THE COHEN LAW GROUP<br>201 East Kennedy Boulevard, Suite 1000<br>Tampa, Florida 33602<br>Telephone: (813) 225-1655<br>Facsimile: (813) 225-1921<br>kdarken@tampalawfirm.com | Silvija A. Strikis (*pro hac vice*)<br>Joseph S. Hall (*pro hac vice*)<br>Christopher A. Klimmek (*pro hac vice*)<br>John B. Ward (*pro hac vice*)<br>KELLOGG, HUBER, HANSEN, TODD,<br>  EVANS & FIGEL, P.L.L.C.<br>1615 M Street, N.W., Suite 400<br>Washington, D.C. 20036<br>Telephone:  (202) 326-7900<br>Facsimile:  (202) 326-7999<br>sstrikis@khhte.com<br>jhall@khhte.com<br>cklimmek@khhte.com<br>jward@khhte.com |
| Rory Delaney (*pro hac vice*)<br>DELANEY KESTER LLP<br>7 Liberty Square, 2nd Floor,<br>Boston, MA  02109<br>Telephone:  (857) 498-0384<br>royston@delaneykester.com | Charles F. Kester (*pro hac vice*)<br>DELANEY KESTER LLP<br>4505 Las Virgenes Road, Suite 203<br>Calabasas, CA  91302<br>Telephone:  (818) 974-8627<br>Facsimile:  (818) 914-6911<br>charles@delaneykester.com |

*Counsel for Relator*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on February 20, 2015, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to counsel of record for Defendants.

                                                 s/ Silvija A. Strikis

Tina Dunsford
Scott Lilly
Stephen V. Iglesias
GREENSPOON MARDER
SunTrust Financial Centre
401 East Jackson Street, Ste. 1825
Tampa, FL  33602
Phone: (813) 769-7020, Ext. 1769
tina.dunsford@gmlaw.com
(Counsel of Record)