# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

|  |  |
|---|---|
| THE UNITED STATES OF AMERICA<br>and THE STATE OF FLORIDA<br>*ex rel.* ANGELA RUCKH,<br><br>      Plaintiff,<br><br>v.<br><br>CMC II, LLC; SEA CREST HEALTH<br>CARE MANAGEMENT, LLC, d/b/a<br>LAVIE MANAGEMENT SERVICES OF<br>FLORIDA; SALUS REHABILITATION,<br>LLC, d/b/a LAVIE REHAB; 207<br>MARSHALL DRIVE OPERATIONS,<br>LLC, d/b/a MARSHALL HEALTH AND<br>REHABILITATION CENTER; 803 OAK<br>STREET OPERATIONS, LLC, d/b/a<br>GOVERNOR'S CREEK HEALTH AND<br>REHABILITATION CENTER,<br><br>      Defendants. | CIVIL ACTION NO.<br>8:11 CV 1303 SDM-TBM |

## RELATOR'S MOTION TO PRECLUDE DEFENDANTS' USE OF UNTIMELY PRODUCED DOCUMENTS AND FOR SANCTIONS

Relator Angela Ruckh, by and through her attorneys, respectfully submits this Motion to preclude Defendants from using documents produced months after the close of discovery and sanction Defendants for their discovery misconduct.  On January 22, 2016, months after the conclusion of document discovery and after they had repeatedly and unequivocally assured Relator that they had produced all responsive medical records in their possession relating to the patient sample chosen in early 2015, Defendants purported to "supplement"

their production with more than 18,000 pages of "[Minimum Data Set] assessments . . . that were obtained from the company's electronic database containing such assessments." Defendants' untimely production reveals that they failed to take reasonable steps to locate and produce readily available and critical documents in this case in violation of the Court's July 1, 2015 Order (Dkt. No. 231), which required the completion of fact discovery by October 30, 2015.  It also shows that several of the representations they previously made regarding their production of medical records were false.

Defendants should not be permitted to benefit from their abuses of the discovery process.  Accordingly, Relator requests that the Court (1) preclude Defendants and their experts from using or relying on Defendants' untimely production or any other medical records Defendants have not yet produced; (2) sanction Defendants by entering judgment for Relator with respect to the claims relating to those patients for whom Defendants have belatedly attempted to supplement discovery; and (3) award Relator attorney's fees and costs for bringing this motion.

## BACKGROUND

Medical records, including Minimum Data Set ("MDS") Assessments, have been at issue in this litigation for years.  MDS Assessments are central to this case because they are the standardized form by which skilled nursing facilities determine and report patients' resource utilization group ("RUG") levels and other care needs; that information, in turn, is used to determine the reimbursement rates these facilities receive from the government. *See*, *e.g.*, Revised Second Am. Compl. ¶¶ 5-7 (Dkt. No. 75) ("RSAC").  The complaint in

this case expressly alleges that MDS Assessments were "[t]he primary instrument of Defendants' fraud." *Id.* ¶ 5.

More than two years ago, Relator requested that Defendants produce "All Patient Records, MDS Assessments, Claims, and any drafts of the foregoing relating to any resident specifically referred to in the Complaint." *See* Relator's Third Set of Reqs. for Produc. No. 4 (Jan. 23, 2014) (attached as Exhibit A). Relator subsequently requested production of a broader set of MDS Assessments: "All MDS Assessments submitted to any Government Health Agency during the Relevant Period and relating to services or treatment provided at any of the Relevant Facilities." *See* Relator's Fourth Set of Reqs. for Produc. No. 20 (Aug. 18, 2014) (attached as Exhibit B). Following discussions between the parties, this request was narrowed to medical records relating to the 800 patients identified in Relator's statistical sample. *See* Email from J. Ward to T. Dunsford (Feb. 6, 2015) (attached as Exhibit C without attachment); Email from J. Ward to Tina Dunsford (Feb. 14, 2015) (attached as Exhibit D) (clarifying that the request includes "MDS assessments relating to the reference date or any prior date or period").

Between March and June 2015, Defendants produced patient records, including MDS Assessments, for the 800 patients in the statistical sample. At a hearing on April 27, 2015, Defendants represented to the Court and to Relator that they had "made production of the medical records," and that Relator had "the medical records . . . need[ed] in order to finish the [expert review] methodology." *See* Tr. of Mot. Hrg. 27:24-25, 23:4-5 (Apr. 27, 2015); *see also* Defendants' Medical Records Update (Apr. 27, 2015) (document handed up by Defendants to the Court stating that medical records for 742 of the requested patient files had

been produced) (attached as Exhibit E).  To confirm that Defendants' production was complete, Relator issued another request for production, for "All Documents referencing or relating to any of the Sample Patients, including any medical records, correspondence, MDS assessments, and documentation of any Claim made to any Government Health Agency (including, but not limited to, any Forms UB-04), to the extent any such Documents were not previously produced in this action."  *See* Relator's Fifth Set of Reqs. for Produc. No. 21 (June 30, 2015) (attached as Exhibit F).

On August 10, 2015, in response to Relator's June 30, 2015 request, Defendants unambiguously represented that they had already produced all MDS Assessments in their possession.  *See* Defs.' Resp. and Objs. to Relator's Fifth Set of Reqs. for Produc., Resp. to No. 21 (Aug. 10, 2015).[1]  Specifically, Defendants stated:

> Defendants assert that they have produced all reasonably responsive documents in response to previous requests for production of documents from Relator, including, without limitation, medical records for Sample Patients produced March 26, 2015, through and including June 4, 2015.  In addition, MDS Assessments are included within the Sample Patients medical records, which were previously produced to Relator, as stated above, and in the Defendants' Response to Relator's Second Request for Production, dated April 12, 2013.

*Id.*  On October 30, 2015, Defendants reiterated, in response to Relator's Requests for Admission, that they had produced all responsive medical records in their possession.[2]

---

[1] Because Defendants have labeled this document "Confidential," Relator has not attached it as an exhibit, but is prepared to file a copy under seal should the Court find it helpful.

[2] Specifically, in response to Relator's Request for Admission Nos. 56 and 57, Defendants admitted that they "produced, or otherwise made available to Relator, all responsive medical records in their possession."  *See* Defs.' Resps. to Relator's First Set of Reqs. For Admis. Nos. 56 & 57 (Oct. 30, 2015) (attached as Exhibit G).  During a meet-and-confer call on November 3, 2015, Relator's counsel pointed out that Defendants had not produced any

4

In supplemental interrogatory responses served on October 27, 2015, Relator identified numerous issues arising out of the review of the medical files of the 800 sample patients.  Among other things, Relator informed Defendants that no MDS Assessments had been identified in the files for 72 of the 91 patients for which Defendants have now untimely produced MDS Assessments, and stated that she intended to seek relief under the False Claims Act based on these missing MDS Assessments and the other deficiencies that had been identified in the audit.[3]  On October 30, 2015, fact discovery closed, pursuant to this Court's Order of July 1, 2015 (Dkt. No. 231) ("All discovery shall be conducted so as to be completed on or before October 30, 2015.").  Although the parties jointly sought and received extensions for certain depositions, neither party requested an extension to that deadline for the production of documents.

On December 11, 2015, Relator served Defendants with opening expert reports.  Relator had engaged SCIO Health Analytics, at substantial expense, to examine the patient records produced by Defendants to assess whether Defendants had overbilled Medicare or

---

records for more than 60 of the 800 sample patients; in response, counsel for Defendants represented that they had produced all responsive documents in their possession.  Following that teleconference, Defendants supplemented their initial responses to admit that "the patient files for some of the 800 Sampled Patients were unable to be located."  *See* Defs.' Supplemental Resps. to Relator's First Set of Reqs. for Admis. No. 34 (Nov. 11, 2015) (attached as Exhibit H).  Defendants also conformed their responses to Requests Nos. 56 and 57 to admit that "for the 800 Sampled Patients they produced all responsive medical records that, to the best of their knowledge, were in their possession at the time such Requests were made" (Supplemental Resp. No. 56) and that "are now, to the best of their knowledge, in their possession" (Supplemental Resp. No. 57), aside from the patient files that were missing as described in Defendants' supplemental response to Request No. 34.  *See id.*

[3] Relator has not attached these supplemental interrogatory responses as an exhibit as they contain protected patient information, but is prepared to file a copy under seal should the Court find it helpful.

Medicaid based on the medical records, including MDS Assessments, Defendants had produced for the 800 sample patients.  SCIO's examination revealed numerous instances in which the amounts Defendants had billed were unsupported by the medical documentation produced.  Consistent with the Relator's October 27, 2015 supplemental interrogatory responses, SCIO determined that, for approximately 90 of the patient-record audits it conducted, Defendants' claims submitted to Medicare were not supported because MDS Assessments were missing from the files.  Relator's expert Marc Vianello reviewed the reimbursement requests associated with the patient-record audits that revealed overbilling, including due to missing MDS Assessments, to calculate damages from each audit, and Relator's expert Dr. Constantijn Panis then incorporated Mr. Vianello's results into a statistical model to calculate total damages.

Without any prior notice to Relator, on January 22, 2016 — more than two months after the close of fact discovery, more than five months after representing that they had produced all responsive MDS Assessments, and years after Relator first requested production of MDS Assessments relevant to this action — Defendants sent Relator a letter enclosing a production of more than 18,000 pages of new MDS Assessments for 91 patients that Defendants represented "were obtained from the company's electronic database containing such assessments."  *See* Letter from T. Lynam to R. Beynon (Jan. 22, 2016) (attached with redactions as Exhibit I).[4]  Relator has not yet had the opportunity to review this untimely

---

[4] The letter stated that the production was responsive to Request No. 21 of Relator's Fifth Set of Requests for Production.  In fact, the materials are responsive to Request No. 20 of Relator's Fourth Set of Requests for Production.  The production also includes MDS Assessments for the patient with initials "J.S.," who is mentioned in the complaint; those

production fully, but from the examination conducted to date, it appears that all of these files are for patients for whom Relator's expert had concluded, based on Defendants' affirmed complete productions of medical records, that the amounts Defendants had billed the government were not supported by MDS Assessments.

Based on the parties' recent communications, Relator expects that Defendants will attempt to justify their untimely production by claiming that, prior to December 11, 2016, they did not understand that missing MDS Assessments would be an issue in the litigation, and that they did not discover until after December 23, 2015, that MDS assessments not previously produced were available on an electronic database.  As explained below (at 11-13), that position is simply not credible.  In recent communications, Defendants have also acknowledged that the January 22, 2016 production does not contain all of the responsive MDS Assessments within the electronic database; rather, Defendants apparently have cherry-picked  only the information they believe will help their defense by searching only for those MDS Assessments that Relator's experts concluded were missing from the patient files.

This Court has previously sanctioned Defendants for failure to comply with their discovery obligations.  In its Order of May 20, 2013 (Dkt. No. 71), this Court imposed monetary sanctions against Defendants in connection with their conduct in requiring Relator to seek judicial intervention in discovery.  At a hearing on November 7, 2014, Magistrate Judge McCoun observed that Defendants' resistance to Relator's discovery requests "comes across, frankly, as just stonewalling."  Tr. 42:5-6 (Nov. 7, 2014).  And in a May 19, 2015

---

MDS Assessments are responsive to Request No. 4 of Relator's Third Set of Requests for Production, dated January 23, 2014.

Report & Recommendation (Dkt. No. 218), which this Court adopted in an Order dated August 12, 2015 (Dkt. No. 235), Magistrate Judge McCoun explained that "the course of [Defendants'] conduct evidenced here is nothing if not willful and in bad faith."  Dkt. No. 218 at 20.  That Order adopted the sanctions from the Report and Recommendation, including granting a rebuttable presumption against Defendants as to the knowledge element of Relator's claims and awarding attorney's fees and costs to Relator in connection therewith. Dkt. No. 235 at 2.

## ARGUMENT

The Court should not permit Defendants to benefit from their repeated abusive discovery conduct.  Federal Rule of Civil Procedure 26(e) provides that, following an initial response to a request for production, a party "must supplement or correct" its production "*in a timely manner* if the party learns that in some material respect the disclosure or response is incomplete or incorrect."  Fed. R. Civ. P. 26(e)(1)(A) (emphasis added).  Rule 37(c), in turn, provides:

> If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.  In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard:
>
> (A)    may order payment of the reasonable expenses, including attorney's fees, caused by the failure;
>
> (B)    may inform the jury of the party's failure; and
>
> (C)    may impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)-(vi).

Fed. R. Civ. P. 37(c)(1).  The sanctions permitted by Rule 37(b)(2)(A) include, *inter alia*, "directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims"; "prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence"; and "rendering a default judgment against the disobedient party."  Fed. R. Civ. P. 37(b)(2)(A)(i), (ii), (vi).   This Court has "broad discretion to fashion appropriate sanctions" for abuses of the discovery process.  *Malautea v. Suzuki Motor Co.*, 987 F.2d 1536, 1542 (11th Cir. 1993); *see also Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 944 (11th Cir. 2005) ("We have long acknowledged the broad discretion of the district court to impose sanctions. . . . [S]anctions for discovery abuses are intended to prevent unfair prejudice to litigants and to insure the integrity of the discovery process.").

Defendants have made no showing that their failure timely to produce these documents was "substantially justified or is harmless," and without this Court's intervention, Defendants' belated production will result in severe prejudice to Relator.  Among other things, Relator would be forced to incur significant additional expenses arising from her counsel's and experts' examination of the new files.  Additionally, fundamental fairness would require the reopening of discovery so that Relator could obtain critical discovery about the form and contents of the thousands of pages of newly produced MDS Assessments. The reopening of discovery, in turn, would still further delay a trial that has already been postponed repeatedly due to Defendants' dilatory tactics.  Moreover, this untimely production raises serious concerns over Defendants' conduct in discovery and whether they

have made other misrepresentations regarding their production of medical records.  Relator

respectfully submits that it would be appropriate, in these circumstances: (1) to prohibit

Defendants and their experts from using the newly produced documents; (2) to sanction

Defendants by entry of a judgment against Defendants as to the claims relating to the patients

for whom MDS assessments were not timely produced; and (3) to award Relator attorney's

fees and costs incurred in addressing this matter.[5]

## I.      Prohibition on Defendants' Use of Belatedly Produced Documents

As an initial matter, the Court should prohibit Defendants and their experts from

relying on the new documents "on a motion, at a hearing, or at a trial," as they cannot meet

their burden of showing their failure timely to produce these documents was "substantially

justified or harmless."[6]  *See* Fed. R. Civ. P. 37(c); *Mitchell v. Ford Motor Co.*, 318 F. App'x

---

[5] In the alternative, Relator requests that this Court hold an evidentiary hearing to determine whether Defendants had a substantial justification for their failure to produce these documents earlier, and require Defendants to establish the steps that they have taken to identify, preserve, and produce MDS Assessments and other medical records responsive to Relator's requests.  Should the Court permit Defendants to use or rely on any of the documents produced on January 22, 2016, it should also (1) direct Defendants to immediately produce all other MDS Assessments for the sample patients in the electronic database; (2) permit Relator to depose, or redepose where applicable, all relevant witnesses regarding the contents of the newly produced MDS assessments; (3) modify the scheduling order (including delaying the trial date) so that Relator's experts have an adequate opportunity to review and respond to the untimely produced information; and (4) require Defendants to bear the additional costs and associated attorney's fees of Relator's experts, Relator's additional discovery, and this motion.

[6] This remedy typically allows the non-offending party to rely on the documents even though the offending party is precluded from doing so.  *See* Fed. R. Civ. P. 37(c)(1) ("If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), *the party* is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial . . . ." (emphasis added)); *Rabello v. Bell Helicopter Textron, Inc.*, 200 F.R.D. 484, 489 (S.D. Fla. 2001) ("[I]t is appropriate to deny Defendant . . . the use of all the documents

821, 824 (11th Cir. 2009).  In evaluating whether Defendants' failure to produce was substantially justified or harmless, the Court should consider their "explanation for [their] failure to disclose, the importance of the information, and any prejudice to the opposing party if the information [were] admitted."  *Lips v. City of Hollywood*, 350 F. App'x 328, 340 (11th Cir. 2009) (citing *Romero v. Drummond Co.*, 552 F.3d 1303, 1321 (11th Cir. 2008)).  Applying these factors here, exclusion is justified.

*First*, Defendants have provided no adequate explanation for their failure to produce these documents in a timely manner.  Defendants were obligated to undertake a reasonable and diligent search for documents responsive to Relator's document requests, and should have taken steps years ago to identify the locations of potentially responsive documents, including any electronic sources of the requested information.  *See* Fed. R. Civ. P. 34(a) advisory committee's note to 2006 amendment ("[D]iscovery of electronically stored information stands on equal footing with discovery of paper documents.").  If Defendants maintained documents both electronically and in paper format, they were required to produce documents from both repositories.  *Id.* ("Discoverable information often exists in both paper and electronic form, and the same or similar information might exist in both.").  Defendants appear not to have taken these steps.

Defendants should not be heard to argue that it was only after December 11, 2015, that they were on notice that certain patient files were missing an MDS Assessment and that this was the basis for a false claim allegation.  It is beyond argument that MDS Assessments

---

[belatedly] produced . . . , but permitting Plaintiffs to use any documents belatedly produced . . . .").  Relator requests that this be a component of the relief here.

are a central part of any patient's medical record and were repeatedly requested in discovery. It was thus incumbent on Defendants to search for and produce *all* MDS Assessments for the sample patients in a timely manner.  Moreover, Defendants were on notice by at least October 27, 2015, that Relator intended to seek relief under the False Claims Act based on missing MDS Assessments (and numerous other deficiencies in the medical records).  *See* Relator's Supplemental Interrogatory Responses (Oct. 27, 2015).  Any claim that Defendants had no knowledge, until a few weeks ago, that they were in possession of a centralized electronic repository of MDS assessments simply beggars belief.  Indeed, in 2014, Defendants produced a number of MDS Assessments that, in light of this recent production, appear to have been collected from an electronic database independent of the patients' paper files.[7]  The documents produced on January 22, 2016, appear to have been kept in a readily accessible, centralized electronic database, and it appears that Defendants have known of the electronic database and have had access to these documents at all relevant times.  *See*, *e.g.*, Ardoin Dep. Tr. at 100:13-15 (Nov. 19, 2015) (attached as Exhibit J) ("Q.  Okay.  And do you have — do the defendants have access to the [electronic] American HealthTech records? A.  Yes, we do.").[8]

 In recent correspondence, Defendants have attempted to excuse their untimely production on the ground that it has taken them weeks to absorb the PDF files and Excel spreadsheets transmitted by Relator with her expert reports.  The Court should reject this

---

[7] *See*, *e.g.*, RUQT 057990-RUQT 058107.  Relator cites these documents solely by Bates number because they include HIPAA-protected information but is prepared to file copies under seal should the Court find them helpful.

[8] American HealthTech is the software Defendants used to complete MDS Assessments electronically.  *See* Ex. J at 90:3 (A: "AHT is the [software] that creates the MDS record.").

argument, which grossly mischaracterizes these materials.  Virtually all of the PDF pages

Relator provided are merely copies of medical records for the sample patients that

Defendants already had (and produced to Relator months ago).  For Defendants'

convenience, Relator provided these materials in the format in which Relator's expert had

organized them.  The Excel spreadsheets that Relator provided are simply extractions of data

from Defendants' own accounting records relating to the sample patients.  *See* Relator's

Corrected Opp'n to Defs.' Mot. for Additional Time at 7-8 (Dkt. No. 257) (Jan. 7, 2016)

(further explaining the contents of these materials).

 *Second*, allowing Defendants to rely on these documents will severely prejudice

Relator.  If Defendants and their experts are permitted to use or rely on these untimely

produced documents, Relator's experts will be required to re-audit each of the patients for

whom an MDS Assessment was missing in the initial audit, calculate a new estimate of

damages for those patients, and extrapolate the updated results to the whole sample.[9]  This

will be a time-consuming and very costly undertaking that would have been entirely

unnecessary had Defendants timely produced all required documents.  Moreover, Relator has

been denied the opportunity to obtain discovery from Defendants about the form and

contents of these MDS Assessments, many of which appear to be unsigned or lacking other

---

[9] Relator's experts cannot simply examine those MDS Assessments that correspond to initial audit findings of a missing MDS Assessment.  Several of the expert findings involved information that spanned multiple MDS Assessments, such as evidence of "ramping" therapy up and back down around the time of an MDS Assessment.  Relator's experts would need to reexamine each of the approximately 90 patients for whom it appears that a new MDS Assessment has been produced.  The fact that these MDS Assessments have now been produced also does not guarantee that the newly produced assessments will not generate findings of their own.

information (which makes them inadequate to support a claim for reimbursement), or to

depose current and former employees of Defendants regarding those newly produced forms

on which their signatures appear.[10]

Reopening discovery to allow Relator to obtain such information would also severely

prejudice Relator.  Not only would additional discovery impose a substantial financial burden

on Relator, but it would also even further delay trial in this matter.  Relator has already stated

her opposition to further delays in this case.  *See* Relator's Corrected Opp'n to Defs.' Mot.

for Additional Time (Dkt. No. 257) (Jan. 7, 2016).  This opposition is borne of past

prejudice: the long history of this case has already hampered Relator's ability to prove her

claims, and further delays will only compound those problems.  Defendants, for instance,

have represented that certain of their corporate data from before October 2009 is no longer

"available."  *See* Ltr. from T. Lynam to R. Beynon at 1 (Dec. 23, 2015) (Exhibit 2 to Strikis

Decl.) (Dkt. No. 257-3).  Several of Defendants' former employees, moreover, claimed

during their depositions not to remember relevant facts or events because they occurred too

far in the past.  *See*, *e.g.*, Rousey Dep. Tr. at 175:16-18 (Oct. 21, 2015) (Ex. 6 to Strikis

Decl.) (Dkt. No. 257-7) ("Q:  Is that your testimony?  You don't know?  A:  What year are

---

[10] Specifically, unlike the MDS Assessments contained in prior productions, many of the new MDS Assessments indicate an electronic username with the notation "Entered by" along with a date and time for each section of the MDS Assessment.  *See*, *e.g.*, RUQT_PROD-0000006. Relator is unable to ascertain whether this notation refers to the initial entry of the data, a "signature" or completion time, or subsequent edits.  Relator further notes that Defendants had an incentive to withhold MDS Assessments of this type because Relator has alleged that certain forms bearing her electronic signature were in fact modified by other employees of Defendants, that Defendants "routinely falsified the identities of the persons submitting MDS Assessments," and that MDS Assessments were not, as required by law, signed by Registered Nurses.  *See*, *e.g.*, RSAC ¶¶ 11, 204.

we talking about here – 2010?  I don't remember.  That was five years ago."); Morgan Dep.

Tr. at 87:23-24, 89:1-2 (Oct. 21, 2015) (Exhibit 7 to Strikis Decl.) (Dkt. No. 257-8) (A: "No,

that's five years ago, so I don't – do not have a recollection."; A:  "Can I give you specifics?

No, because I don't remember back in 2010."). These issues will only grow if Defendants are

allowed to delay this case once again.

     *Third*, the Eleventh Circuit has held that a defendant should be precluded from using

untimely produced documents even if they contain important information, when the

defendant has failed to justify its untimely production and where the plaintiff would be

prejudiced by the defendant's use of the materials.  *See*, *e.g.*, *Bearint ex rel. Bearint v. Dorell*

*Juvenile Grp., Inc.*, 389 F.3d 1339, 1353 (11th Cir. 2004) ("Regardless of the importance of

[the information], the reasons for the delay in the [plaintiffs'] disclosure and the consequent

prejudice that his testimony would have caused [defendant] require us to affirm the district

court's ruling."); *accord Romero*, 552 F.3d at 1321.  Here, Relator is certainly prejudiced by

Defendants' failure to have produced this material in a timely manner, and Defendants have

offered no acceptable explanation for failing to produce it previously.  Moreover, the form

and importance of the information itself suggests that Defendants may have chosen to hide it

from earlier discovery.  Defendants are well aware that Relator has alleged that Defendants

inflated their claims to the government and submitted claims to the government without

sufficient (and required) documentation.[11]  That claim depends on a comparison of the

---

[11] For example, Relator alleged that Defendants failed to have Registered Nurses sign their
MDS Assessments, as required by regulation.  *See* RSAC ¶ 11.  Even a cursory review of
Defendants' untimely produced documents shows that many are not signed by an RN.
*See*, *e.g.*, RUQT_PROD-0000419.

information contained in MDS Assessments, including the RUG level, against the supporting

documentation in the patient's file and against the amounts billed on UB-04 claim forms.

For this reason, Relator requested all of Defendants' MDS Assessments more than a year

ago.  Defendants should not be able to sandbag Relator by producing them after the close of

discovery.

Given the prejudice to Relator  that would result from Defendants' use of their

belated production of the MDS Assessments, the Court should preclude Defendants and their

experts from using or relying on the untimely produced documents, while still permitting

Relator to use them.  *See Rabello*, 200 F.R.D. at 488-89 (where defendant produced

thousands of pages of clearly relevant documents "more than a year after their initial

requests" and after the close of discovery, "it is appropriate to deny Defendant . . . the use of

all the documents [belatedly] produced . . . , but permitting Plaintiffs to use any documents

belatedly produced").

## II.      Further Sanctions

Pursuant to Rule 37(c)(1), further sanctions are justified in addition to precluding

Defendants from using or relying on their untimely production.  Specifically, Relator

requests that this Court enter a judgment against Defendants with respect to all patients in the

sample for whom Defendants had not produced relevant MDS Assessments by the close of

fact discovery (October 30, 2015).  This remedy is available under Rule 37(b)(2)(A)(vi).

To be sure, "a default judgment sanction requires a willful or bad faith" violation of the

discovery process and "is appropriate only as a last resort, when less drastic sanctions would

not ensure compliance with the court's orders."  *Malautea*, 987 F.2d at 1542 (collecting

cases).  But the Court must also consider deterrence — that is, "whether the [offending

party's] conduct, if not appropriately sanctioned, would cause 'other parties to . . . feel freer

than . . . Rule 37 contemplates they should feel to flout other discovery orders of other

District Courts,'" *Bray & Gillespie Mgmt., LLC v. Lexington Ins. Co.*, No. 607-CV-0222,

2010 WL 55595, at *6 (M.D. Fla. Jan. 5, 2010) (ellipses in original) (quoting *Aztec Steel Co.

v. Florida Steel Corp.*, 691 F.2d 480, 481 (11th Cir. 1982)) — as well as "[t]he prejudice

sustained by the requesting party due to the discovery violations," *First Coast Energy, LLP

v. Mid-Continent Cas. Co.*, No. 3:12-CV-281, 2015 WL 5159140, at *5 (M.D. Fla. Sept. 2,

2015).  With these principles in mind, entry of default judgment as to the affected patients is

justified here.

    *First*, this Court has already concluded that Defendants have engaged in willful

misconduct and bad faith during the discovery process.  *See*, *e.g.*, Report & Recommendation

at 16 (Dkt. No. 218) (May 19, 2015) ("Defendants' willful non-compliance with their

discovery obligations began at least as early as January 2014 . . . ."); *id.* at 20 ("[Defendants']

course of conduct evidenced here is nothing if not willful and in bad faith.").  As to these

particular requests, Relator first requested certain MDS Assessments relevant to this action in

January 2014, *see* Ex. A at 11, and requested all of Defendants' relevant MDS Assessments

in August 2014, *see* Ex. B at 5.  Relator repeatedly renewed her request for those documents

in early 2015, *see*, *e.g.*, Exs. C & D, and Defendants were plainly on notice of the importance

of MDS Assessments to this litigation.  Defendants themselves then represented expressly

that they had produced all responsive MDS Assessments by August 10, 2015, *see supra* at 4

& note 2, although it is now apparent that they had failed to take appropriate steps to locate

and produce readily available responsive documents.  *Cf. First Coast Energy*, 2015 WL 5159140, at *3 (finding entry of default judgment justified where "the inquiries [by plaintiff's counsel] were instead met with false assurances that production was complete"). The months-long delay in producing these documents after they were initially requested, after Defendants assured Relator that they had produced all responsive documents, after the close of discovery, and after Relator served her expert reports, overwhelmingly supports the conclusion that Defendants acted in bad faith and engaged in willful misconduct.

The format of the belatedly produced records further supports an inference of bad faith or willful misconduct, as these records contain electronic username and timestamp information likely to bear out Relator's contentions that documents bearing her electronic signature were improperly altered by other employees of Defendants and that Defendants falsified the identities of individuals submitting MDS Assessments.  *See supra* notes 10-11. By withholding the newly produced records until now, Defendants prevented Relator from using them to explore those allegations during fact discovery.

Likewise, the quantity and selection of newly produced documents is evidence of Defendants' bad faith or willful misconduct.  Defendants' belated production includes over 18,000 pages of clearly responsive materials.  Given that Defendants have now represented that they have an "electronic database containing such assessments," the fact that such a large number of readily accessible documents were not produced until after the close of discovery indicates bad faith or willful misconduct.  *Cf. Flury*, 427 F.3d at 945 (holding that failure to make available obviously relevant evidence was a "clear dereliction of duty" that supported sanction of dismissal of plaintiff's case).  At the same time, Defendants have acknowledged

18

that they did not search for all of the potentially responsive documents from the database in which the MDS Assessments were kept, but cherry-picked the information they believe helps their defense by producing only those MDS Assessments that Relator's experts concluded were missing from the patient files.  There is no reason to believe that the electronic database would include files relating only to those approximately 90 patients for whom Relator's expert had concluded MDS Assessments were missing.  Relator expects that the electronic database contains many more responsive MDS Assessments than Defendants have belatedly produced, indicating that Defendants did not take steps to produce all responsive MDS Assessments from this electronic database.

Viewed against the backdrop of their conduct throughout this litigation, Defendants' untimely production cannot be understood as anything other than bad faith or willful misconduct.  From the beginning of discovery, Defendants resisted giving Relator any relevant information.  Only after Relator sought judicial intervention in late 2014 did Defendants begin to make meaningful productions.  Yet even then, Defendants delayed in producing documents, ultimately resulting in this Court's previous sanction for discovery misconduct.  Now, Defendants admit that they had not produced MDS Assessments from an electronic database — a repository that should be straightforward to search — for more than a year after Relator requested production of MDS Assessments.  The only plausible explanation for that behavior is Defendants' bad faith.[12]

---

[12] Relator expects that Defendants will argue that they engaged new counsel in August 2015, and that new counsel promptly produced the documents upon learning they had been withheld previously.  But even if that were true, default judgment is appropriate where the party itself bears "substantial responsibility" for the misconduct.  *Gratton v. Great Am. Commc'ns*, 178 F.3d 1373, 1375 (11th Cir. 1999).  Further, it has been readily apparent for

*Second*, the course of this litigation makes clear that lesser sanctions will not achieve compliance and will not serve the interests of justice.  Defendants have already been subject to monetary sanctions in this litigation.  *See* Order (Dkt. No. 71) (May 20, 2013).  They are also subject to the sanction of a rebuttable presumption in Relator's favor as to the knowledge element of Relator's claims.  *See* Order (Dkt. No. 235) (August 12, 2015).  Despite these earlier sanctions, Defendants apparently remain undeterred in their misconduct.  Default judgment is the only way to ensure compliance.  *See*, *e.g.*, *Gratton*, 178 F.3d at 1375 (explaining that dismissal of plaintiff's claims was appropriate sanction where "the court twice tried lesser sanctions, and found that these did not deter [plaintiff's] conduct"); *see also Malautea*, 987 F.2d at 1544 (explaining that "a default sanction may be proper even when not preceded by the imposition of lesser sanctions" if it is necessary to ensure compliance).

Moreover, lesser sanctions threaten to leave Relator without a sufficient remedy.  "[W]here any other sanction would fail to cure the harm that the [offender's] misconduct would cause to the defendant, [default judgment] may be appropriate."  *Gratton*, 178 F.3d at 1375.  A lesser sanction in this case "would not restore confidence that all discoverable information has been produced."  *First Coast Energy*, 2015 WL 5159140, at *6.  Likewise, a sanction that requires "[d]elaying the trial to permit time to counter this evidence in an orderly fashion would penalize [the non-offending party] by increasing the litigation costs in this matter."  *Bray & Gillespie Mgmt.*, 2010 WL 55595, at *6.  Due to Defendants' misconduct, Relator faces substantially increased costs, both in terms of attorney's fees and

---

years that MDS Assessments are central to Relator's case.  And in any event, sanctions, including default judgment, remain appropriate even in the absence of culpability when they are necessary to cure the harm done to the other party.  *See id.*

expert fees, and an inability to understand the meaning of 18,000 pages of potentially highly relevant documents through ordinary discovery processes.  Default judgment is amply justified as a discovery sanction to address these harms to Relator.

### III.    Attorney's Fees and Costs

Relator further requests that the Court enter an award of Relator's counsel's attorney's fees and costs associated with the instant motion.  Attorney's fees and costs are justified when a party must pursue sanctions associated with another party's failure to produce all responsive documents in discovery.  *See* Fed. R. Civ. P. 37(c)(1)(A); *Bray & Gillespie Mgmt.*, 2010 WL 55595, at *6 (ordering flat amount of $75,000 to compensate for attorney's fees).

## CONCLUSION

Relator requests that the Court enter an order: (1) prohibiting Defendants and their experts, but not Relator, from relying on the documents in Defendants' belated January 22, 2016 production; (2) entering judgment against Defendants with respect to claims relating to all patients in the sample for whom Defendants had not produced relevant MDS Assessments by the close of fact discovery; and (3) granting an award of attorney's fees and costs for bringing this motion.[13]

---

[13] In the alternative, Relator requests that the Court enter an order granting the relief described *supra* note 5.

## LOCAL RULE 3.01(g) CERTIFICATION

Counsel for Relator has attempted in good faith to work with Defendants' counsel and met and conferred with Defendants' counsel on January 25 and January 27, 2016, but has been unable to reach agreement as to the relief requested in this Motion.

Dated:  January 28, 2016                    Respectfully submitted,

                                            s/ Silvija A. Strikis

| | |
|---|---|
| Kevin J. Darken (FL. Bar No. 0090956) | Silvija A. Strikis (*pro hac vice*) |
| THE COHEN LAW GROUP | Rebecca A. Beynon (*pro hac vice*) |
| 201 East Kennedy Boulevard, Suite 1000 | Joseph S. Hall (*pro hac vice*) |
| Tampa, Florida 33602 | Bradley E. Oppenheimer (*pro hac vice*) |
| Telephone: (813) 225-1655 | Jeffrey A. Love (*pro hac vice*) |
| Facsimile: (813) 225-1921 | KELLOGG, HUBER, HANSEN, TODD, |
| kdarken@tampalawfirm.com |   EVANS & FIGEL, P.L.L.C. |
| | 1615 M Street, N.W., Suite 400 |
| | Washington, D.C. 20036 |
| | Telephone:  (202) 326-7900 |
| | Facsimile:  (202) 326-7999 |
| | sstrikis@khhte.com |
| | rbeynon@khhte.com |
| | jhall@khhte.com |
| | boppenheimer@khhte.com |
| | jlove@khhte.com |
| | |
| Rory Delaney (*pro hac vice*) | Charles F. Kester (*pro hac vice*) |
| DELANEY KESTER LLP | DELANEY KESTER LLP |
| 7 Liberty Square, 2nd Floor, | 4505 Las Virgenes Road, Suite 203 |
| Boston, MA  02109 | Calabasas, CA  91302 |
| Telephone:  (857) 498-0384 | Telephone:  (818) 974-8627 |
| royston@delaneykester.com | Facsimile:  (818) 914-6911 |
| | charles@delaneykester.com |

*Counsel for Relator*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on January 28, 2016, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to counsel of record for Defendants.

*s/  Silvija A. Strikis*