# Exhibit A

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | |
|---|---|
| THE UNITED STATES OF AMERICA and THE STATE OF FLORIDA *ex rel.* ANGELA RUCKH,<br><br>Plaintiffs,<br><br>v.<br><br>CMC II, LLC; SEA CREST HEALTH CARE MANAGEMENT, LLC, d/b/a LAVIE MANAGEMENT SERVICES OF FLORIDA; SALUS REHABILITATION, LLC, d/b/a LAVIE REHAB; 207 MARSHALL DRIVE OPERATIONS, LLC, d/b/a MARSHALL HEALTH AND REHABILITATION CENTER; 803 OAK STREET OPERATIONS, LLC, d/b/a GOVERNOR'S CREEK HEALTH AND REHABILITATION CENTER,<br><br>Defendants. | CIVIL ACTION NO.<br>8:11 CV 1303 SDM-TBM |

### DECLARATION OF RICHARD DAVIS THOMAS, JR.

I, Richard Davis Thomas, Jr., am over the age of eighteen (18) and am competent to make this Declaration based upon my personal knowledge of all matters contained herein. I hereby declare under penalty of perjury as follows:

1. I am an attorney licensed to practice in Arkansas since 1982. I am currently employed as Deputy General Counsel at CMC II, LLC, also commonly referred to as Consulate Health Care or Consulate. I have held this position since December 2012. Between June 2005 and December 2012, I worked as General Counsel for Delta Health

1

Group and, after its assets were acquired by Gulf Coast Health Care in 2011, worked as the Senior Vice President of Litigation Management for its consulting company, Health Care Navigator. Prior to those jobs, I worked in private practice for approximately 10 years representing nursing home providers in state and federal regulatory appeals of penalties imposed after surveys of their nursing homes.

2. In my in-house nursing home positions, my job duties required me to oversee a variety of lawsuits and to be familiar with processes and strategies required to address issues within them, including processes and strategies to address discovery production in False Claims Act cases. In my work representing providers in nursing home appeals of state surveys, I acquired a detailed knowledge of the regulatory standards applicable to nursing homes as well as the typical interactions between various state and federal agencies, including processes by which those agencies request, and nursing homes provide, documents to assist them in their reviews and audits of facilities.

3. The facts and opinions I make herein are based upon my personal knowledge or knowledge gained through my duties and responsibilities at Consulate and other work experiences. I have been directly involved in the management of this litigation for Consulate since November 2014, which covers the time period involved in producing most of the medical records and electronic discovery in this case.

4. I have reviewed Relator's Motion to Preclude Use of Untimely Produced Documents and For Sanctions recently filed in this case. I believe that Motion misrepresents Defendants' discovery efforts, reflects a lack of understanding of the medical record keeping realities in long term care facilities (particularly those that have

undergone a sale and change in management as occurred here), and ignores the significant obstacles and hurdles that were presented to Defendants in responding to Relator's extensive discovery requests.

5. Relator's discovery requests are the largest I have encountered in my experience managing nursing home litigation. Responding to them presented many logistical difficulties that Consulate was not staffed or equip to handle. Consulate has previously submitted affidavits in response to earlier discovery disputes in this case that describe the significant efforts and costs Consulate expended to acquire software and vendor relationships to retrieve and manage the Relator's broad electronic discovery requests, as Consulate had no systems that could perform the required work. The total cost Consulate incurred for those vendors alone has exceeded $570,000. The volume of discovery Relator demanded was too large to permit any meaningful review of individual documents or files by attorneys prior to production, though Consulate did hire personnel (or used existing attorneys within its legal department) at significant cost to attempt that review of some of the email records. Since the beginning of discovery, Consulate has paid in excess of one million dollars in legal fees to counsel for representation that has, in large part, been required to respond to Relator's discovery requests and to defend depositions.

6. Responding to Relator's requests for 800 separate resident medical files presented difficult challenges to Consulate. The first challenge was responding to a large discovery request in a short period of time. Relator did not identify the 800 residents whose charts she wanted to review until February 6, 2015, clarified the request on February 14, 2015 and, by this Court's Order, Defendants were expected to produce those files by

3

February 27, 2015, a deadline that was difficult to meet. Nonetheless, Consulate promptly began the time-consuming and labor-intensive process of coordinating collection of the 800 requested patient medical records.

7. Patient medical records are kept in paper form at the facility where the patient is treated. Over approximately the past 20 years, I have had experience in responding to requests for resident records, whether the request comes in the form of a discovery request in a lawsuit against a nursing home, or in the form of a request from a state audit agency, which regularly conduct audits of nursing homes and request access to resident records. In responding to these requests, the usual practice for the company is to retrieve and copy the paper copy of the resident file at the facility where the resident was treated.

8. Consulate followed that practice in this case, which required the work of three persons working in its legal department. This production process included the following: communicating with the medical records custodians at the 53 facilities regarding what records were requested; determining whether any records had been destroyed pursuant to normal record retention policies; inquiring as to where the available records were located—many were in storage locations either on or off-site; assisting with the retrieval of the records; coordination of the transmittal of the available records to Consulate; and keeping track of what residents' records were produced and what could not be located. It is my understanding that Consulate ultimately obtained and produced approximately 1.1 million pages of patient records, which filled 350 boxes. At approximately the same time in 2015, Consulate personnel were also busy with the

retrieval and production of 4.8 million emails and other documents to Relator. It would be difficult for me to estimate how many hours were spent in the production of the resident records and other documents, but it was considerable.

9. Due to the large volume of patient records that were retrieved and the short time period in which to make them available to the Relator, Consulate personnel did not undertake a page-by-page review of the 1.1 million pages of records contained in these boxes prior to their production. Doing so would have substantially delayed the production to Relator. Resident files can be voluminous, especially for long-term care residents, and conducting a page-by-page review of the patient records prior to production would have required an enormous expenditure of man-hours. Consulate did not have the personnel resources available to conduct such a review and Relator was unwilling to bear any of the costs of discovery.

10. Therefore, I made the strategic decision to produce the 350 boxes of resident files, as they were kept in the usual course of business at the facility, without conducting a page-by-page review of them first. My decision was based upon what I believed was a reasonable belief that the systems in place to store the requested records were designed to secure all of the records created for a resident, while recognizing that no storage system of voluminous paper records over a four-year period will be perfect. In fact, this belief as to the general completeness of the resident records has proven to be correct as most of the requested records were in the files produced to Relator.

11. My decision not to review the files prior to production was also predicated on my experience in other document productions I have done in which the receiving party

5

assumes some responsibility for informing the producing party if they believe some documentation is missing from the resident file. For example, it is typical in government audits for an agency to request multiple resident charts and to inform a facility after production and review if there are missing documents. I am currently involved in a multi-facility audit of Pre-Admission Screening requirements by the Florida Agency for Health Care Administration ("AHCA") in which AHCA followed that exact process. Because discovery is oftentimes described as a two-way street, because the approach I adopted is typical for responding to requests for nursing home records, and because of the volume of records requested and the short time available for production, I believe it was not unreasonable to assume that Relator, as part of her review of the charts, would inform Defendants of documents that she did not receive that she expected to receive.

12. One of the many records in a patient's file is an MDS assessment that is periodically performed according to CMS regulations. I understand that it was LaVie's practice, consistent with Consulate's practice and CMS requirements, to maintain a paper copy of MDS assessments in the patient's file at the facility, and that facility medical record custodians were expected to follow this practice. The MDS assessment was then available and utilized by medical professionals and other caregivers at the facility in treating the patient. In accordance with this practice, Consulate expected and reasonably believed that the final signed copies of MDS assessments were included in the resident file at the facility and were produced along with all the other documents in the resident file as part of the 1.1 million pages of records that Consulate made available to Relator for

copying. It is my understanding that, in fact, most of the resident files in the 800 sample patient group contained the MDS assessments for the period in question.

13. The MDS assessment is completed electronically and then printed and placed in the patient file. The electronic completion of the MDS creates an electronic version of the record that is saved in Consulate's IT system. In my experience, whenever a skilled nursing home provider receives a request for a resident file (whether from a state auditor or in connection with a lawsuit), the usual practice is to produce the file at the facility and not to search electronic databases as the entire file is not maintained electronically. Whatever documents are in electronic form, such as an MDS assessment, are supposed to be printed and maintained in the paper file for the resident at the facility. Therefore, Consulate personnel followed this practice and did not search the electronic database for additional resident records in response to Relator's February 6, 2015 Request because they reasonably believed that it would have been duplicative to do so and unnecessarily increased the time and expense necessary to complete the production.

14. Relator's expert Shirley Bradley's report of December 11, 2015 identified MDS assessments for 91 patients as missing from the paper copies of the resident files that Consulate produced to Relator. After receipt of this expert report, Consulate attempted to determine whether the missing MDS assessments for these 91 patients still existed in electronic form in the database that LaVie created and Consulate now maintained. The process for determining this was time–consuming and had to be done manually for each patient. Consulate's IT department did not have the resources to conduct this search. Accordingly, Consulate granted Defendants' expert Peter Dressel and his team at FTI

access to the electronic database that contains the MDS assessments to perform manual resident-by-resident searches to determine if any of the allegedly missing MDS assessments could be located. I understand that this search proved successful and Mr. Dressel and his team were ultimately able to locate electronic copies of the MDS assessments for the 91 patients that were not in the resident's facility file. I further understand that Consulate promptly produced these MDS assessments to Relator.

15. In my experience, the process that occurred here is not unusual. Skilled nursing homes rely on their paper copy of the resident file, as it is the most complete source of records regarding the care and treatment of the patient. If a state auditor, or a plaintiff in a lawsuit, requests a copy of a resident file, the facility's resident file is produced. Only if it is later determined that a document expected to be in the file is not there does a further search for other sources of the document take place. The additional record, once produced, is then considered by the auditor as part of the resident file.

I declare, under penalty of perjury, that the foregoing statements are true and correct.

_____          2/11/16
Richard Davis Thomas, Jr.                Date
Deputy General Counsel, Consulate Health Care