# Exhibit B

Case 8:11-cv-01303-SDM-TBM   Document 267-2   Filed 02/11/16   Page 2 of 25 PageID 5183

CHRISTINE ALLSION BENNETTS  Subject to Protective Order        October 20, 2015
U.S.A. ex rel. vs. CMC II, LLC, et al.                                                    1

```
 1                UNITED STATES DISTRICT COURT
             FOR THE MIDDLE DISTRICT OF FLORIDA
 2                     TAMPA DIVISION
           CIVIL ACTION NO. 8:11 CV 1303 SDM-TBM
 3
     THE UNITED STATES OF AMERICA and
 4   THE STATE OF FLORIDA ex rel.
     ANGELA RUCKH,
 5
           Plaintiffs,
 6   vs.

 7   CMC II, LLC; SEA CREST HEALTH CARE
     MANAGEMENT, LLC, d/b/a LAVIE
 8   MANAGEMENT SERVICES OF FLORIDA; SALUS
     REHABILITATION LLC, d/b/a LAVIE REHAB;
 9   207 MARSHALL DRIVE OPERATIONS, LLC,
     d/b/a MARSHAL HEALTH AND REHABILITATION
10   CENTER; and 803 OAK STREET OPERATIONS,
     LLC, d/b/a GOVERNER'S CREEK
11   HEALTH AND REHABILITATION CENTER,

12         Defendants.
     _____/
13

14            ** SUBJECT TO PROTECTIVE ORDER **

15    VIDEOTAPED DEPOSITION OF CHRISTINE ALLISON BENNETTS
                Taken By Counsel for Plaintiffs
16                   (Pages 1 - 334)

17
                  Tuesday, October 20, 2015
18                   9:02 a.m. - 6:09 p.m.

19
                  Esquire Deposition Solutions
20                101 East Kennedy Boulevard
                         Suite 3350
21                     Tampa, Florida

22
     Stenographically Reported By:
23   Jennifer Figueroa, RPR, CLR, FPR
     Notary Public, State of Florida at Large
24   Esquire Deposition Solutions - Tampa Office
     Phone - 813.221.2535, 800.838.2814
25   Esquire Job No. J0195333
```



Case 8:11-cv-01303-SDM-TBM   Document 267-2   Filed 02/11/16   Page 3 of 25 PageID 5184

CHRISTINE ALLSION BENNETTS  Subject to Protective Order        October 20, 2015
U.S.A. ex rel. vs. CMC II, LLC, et al.                                                316

1    individual.

2        Q.    Have you had a chance to review the complaint

3    in this case?

4        A.    I have.

5        Q.    And one of the allegations, or one of the

6    principal allegations in the complaint, is that senior

7    management at LaVie Rehab and at the nursing and

8    facility side of LaVie knowingly pressured staff

9    members, employees, to engage in fraud by setting

10   targeted reimbursement rates for each facility, offering

11   financial bonuses to exceed those rates, telling staff

12   to falsify MDS assessments and other data that went into

13   an MDS assessment, and other documents that were

14   submitted to CMS.  Are you aware that those are the

15   allegations in this case?

16       A.    Yes, I am.

17       Q.    Now, with regard to LaVie Rehab, where you

18   worked, are those allegations true?

19       A.    No.

20       Q.    Did you or anyone that you know at LaVie Rehab

21   encourage facilities to fraudulently increase the number

22   of minutes of therapy that were provided to patients?

23       A.    Never.

24       Q.    Did you encourage the therapist to bill

25   medically unnecessary care in order to meet a target



Case 8:11-cv-01303-SDM-TBM   Document 267-2   Filed 02/11/16   Page 4 of 25 PageID 5185

CHRISTINE ALLSION BENNETTS  Subject to Protective Order          October 20, 2015
U.S.A. ex rel. vs. CMC II, LLC, et al.                                          317

1    reimbursement level?

2         A.   Never.

3         Q.   Did you ever offer financial -- did the

4    company ever offer, or you personally -- let me restate

5    it.

6              Did you personally or did the company ever

7    offer financial incentives or bonuses to therapists to

8    increase RUG levels or provide medically unnecessary

9    care?

10             MS. STRIKIS:  Object to the form.

11        A.   Never.

12   BY MR. LYNAM:

13        Q.   Did you ever submit or encourage anyone else

14   to submit false documentation to CMS or any other state

15   or federal agency?

16             MS. STRIKIS:  Object to the form.

17        A.   No.

18             MR. LYNAM:  All right.  Let me show you what

19        we'll mark as Exhibit 39.

20             (Exhibit 39 marked for identification.)

21   BY MR. LYNAM:

22        Q.   Take a look at Exhibit 39, please.

23        A.   Yes.

24        Q.   Is that an e-mail from Risty Smith to you and

25   Tina Schwind, dated January 11, 2010?



Case 8:11-cv-01303-SDM-TBM   Document 267-2   Filed 02/11/16   Page 5 of 25 PageID 5186

JIGNASA DABHI                                    October 07, 2015
U.S.A. ex rel. vs. CMC II, LLC                                  1

1              UNITED STATES DISTRICT COURT
                MIDDLE DISTRICT OF FLORIDA
2                    TAMPA DIVISION

3

4     THE UNITED STATES OF
      AMERICA and THE STATE OF
5     FLORIDA ex rel. ANGELA
      RUCKH,
6
          Plaintiffs,          CASE NO.: 8:11 CV 1303
7                              SDM-TBM
      vs.
8
      CMC II, LLC; SEA CREST
9     HEALTH CARE MANAGEMENT,
      LLC, d/b/a LAVIE MANAGEMENT
10    SERVICES OF FLORIDA; SALUS
      REHABILITATION, LLC, d/b/a
11    LAVIE REHAB, 207 MARSHALL
      DRIVE OPERATIONS, LLC,
12    d/b/a MARSHALL HEALTH AND
      REHABILITATION CENTER; 803
13    OAK STREET OPERATIONS, LLC,
      d/b/a GOVERNOR'S CREEK
14    HEALTH AND REHABILITATION
      CENTER,
15
          Defendants.
16
      _____
17    STATE OF FLORIDA   )
      COUNTY OF DUVAL    )
18

19              VIDEOTAPED DEPOSITION OF

20                   JIGNASA DABHI

21              9:07 a.m. - 1:07 p.m.

22           Wednesday, October 7, 215

23       1301 Riverplace Boulevard, Suite 1609
                 Jacksonville, Florida
24
          Sandra G. Pemberton, RPR, CRR, FPR
25



Case 8:11-cv-01303-SDM-TBM   Document 267-2   Filed 02/11/16   Page 6 of 25 PageID 5187

JIGNASA DABHI                                       October 07, 2015
U.S.A. ex rel. vs. CMC II, LLC                                   121

1    A.    Yes.

2    Q.    Do you see paragraph 11?

3    A.    (The document was examined.)

4          Yes.

5    Q.    Okay.  What is your understanding of what the

6    term upcoding means in connection with this case?

7    A.    Upcoding means the wrong information.  The

8    information is not there and you're putting this

9    information there that is not there in the chart,

10   medical record, wrong, you know, coding.

11   Q.    And is that your understanding that that's Ms.

12   Ruckh's allegation in this case?

13   A.    Yes, she has alleged that, yeah.

14   Q.    Did you ever upcode when you worked at any

15   facility?

16   A.    No.

17   Q.    Did you ever see anyone else upcode?

18   A.    No.

19   Q.    Did you ever direct anyone to upcode?

20   A.    No.

21   Q.    Do you have any knowledge of anyone ever

22   upcoding?

23   A.    No.

24   Q.    Did you ever receive a bonus for upcoding?

25   A.    No.



Case 8:11-cv-01303-SDM-TBM   Document 267-2   Filed 02/11/16   Page 7 of 25 PageID 5188

JIGNASA DABHI                                    October 07, 2015
U.S.A. ex rel. vs. CMC II, LLC                              122

1       Q.   Did you ever receive a promise of a bonus for

2   upcoding?

3       A.   No.

4       Q.   Did you help to develop a plan of care for

5   patients?

6       A.   Yes.

7       Q.   And what -- what role did you play in

8   developing that plan of care?

9       A.   We talk about the residents' care, talk about

10  the problem, look at the whole picture of the

11  residents, keeping the residents at the center, and

12  then provide the information based on the whole

13  department -- you know, department.  Pretty much,

14  social service, activity director, you know, because

15  you're not looking at only the medical history, you're

16  looking at psychosocial, you're looking at their

17  background.  And based on that, you put the plan of

18  care to make sure that we are taking care of the

19  residents or patient based on what their history and

20  what their diagnosis or any psychosocial needs that

21  they have.

22      Q.   And would you record the plan of care in the

23  patient file?

24      A.   Yes.

25      Q.   Okay.  Did you ever make any entry in the file



Case 8:11-cv-01303-SDM-TBM   Document 267-2   Filed 02/11/16   Page 8 of 25 PageID 5189

JIGNASA DABHI                                    October 07, 2015
U.S.A. ex rel. vs. CMC II, LLC                              148

1    complaint, which attached --

2          MS. CREELY:  19.

3    BY MR. LYNAM:

4      Q.   I'm sorry, 19, which attached the -- to the

5    complaint was attached the -- as Exhibit 2 the MDS

6    version 3.0 document.  And I've directed your attention

7    to one particular page that has section G.

8      A.   Yes.

9      Q.   And is section G -- what is the number under

10   section G?  There's a series of numbers right

11   underneath it.

12     A.   It's G00110, activity of daily living

13   assistance.

14     Q.   So is that the same as the slide in Exhibit 24

15   that we just looked at, the same heading?

16     A.   Yes.

17     Q.   And is the information in the slide in Exhibit

18   24 the same as on -- consistent with the government's

19   own form for the MDS assessments in section G?

20     A.   Yes.

21     Q.   Okay.  Thank you.  I have no further

22   questions.

23          Oh, one more question.

24          Did you follow that guideline from the

25   government?



Case 8:11-cv-01303-SDM-TBM   Document 267-2   Filed 02/11/16   Page 9 of 25 PageID 5190

JIGNASA DABHI                                          October 07, 2015
U.S.A. ex rel. vs. CMC II, LLC                                    149

1      A.    Yes.

2      Q.    Okay.   No further questions.

3                       REDIRECT EXAMINATION

4    BY MR. DELANEY:

5      Q.    I have a few questions arising from that.

6      A.    Yes.

7      Q.    Looking at Exhibit 24, could you identify for

8    me which is your email address?

9      A.    24?

10      Q.    Yeah.

11      A.    (The document was examined.)

12      Q.    Is it DON@ --

13      A.    Yes.

14      Q.    San Jose Health and Rehab?

15      A.    Yes.

16      Q.    .com?

17      A.    Yes.

18      Q.    Got you.   On Exhibit 23, that email -- I'm

19    sorry, the email in question is dated April 27th, 2011.

20    Do you see that?

21      A.    Yes.

22      Q.    Okay.   And does your email address appear

23    halfway down that list?

24      A.    (The document was examined.)

25            Yes.



Case 8:11-cv-01303-SDM-TBM  Document 267-2  Filed 02/11/16  Page 10 of 25 PageID 5191

DERICK DEETER Volume II Subject to Protective Order          October 19, 2015
U.S.A. ex rel. vs. CMC II, LLC, et al.                                    114

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CIVIL ACTION NO.:  8:11 CV 1303 SDM-TBM

THE UNITED STATES OF AMERICA
and THE STATE OF FLORIDA, ex
rel., ANGELA RUCKH,

    Plaintiff,

vs.

CMC II, LLC; SEA CREST HEALTH
CARE MANAGEMENT, LLC, d/b/a
LAVIE MANAGEMENT SERVICES OF
FLORIDA; SALUS REHABILITATION,
LLC, d/b/a LAVIE REHAB; 207
MARSHALL DRIVE OPERATIONS,
LLC, d/b/a MARSHALL HEALTH AND
REHABILITATION CENTER; 803 OAK
STREET OPERATIONS, LLC, d/b/a
GOVERNOR'S CREEK HEALTH AND
REHABILITATION CENTER,

    Defendants.


*  *  *  *  *  *  *  *  *  *  *  *  *  *
SUBJECT TO PROTECTIVE ORDER


VIDEOTAPED DEPOSITION OF:     Derick Deeter (Volume II)

DATE TAKEN:                   October 19, 2015

TIME:                         12:23 a.m. - 4:07 p.m.

PLACE:                        Esquire Depo Solutions
                              200 East Robinson Street
                              Suite 725
                              Orlando, Florida 32801

REPORTED BY:                  Stacey B. Walters
                              Notary Public

*  *  *  *  *  *  *  *  *  *  *  *  *  *



```
 1   completing MDS assessments?

 2        A.    No.

 3        Q.    Did you have any role in reviewing MDS

 4   assessments?

 5        A.    No.

 6        Q.    Were you responsible for setting RUG levels as

 7   a regional vice president?

 8        A.    No.

 9        Q.    Did you ever direct anyone to change

10   assessment reference dates to improperly elevate RUG

11   levels?

12        A.    Never.

13             MR. HALL:  Object to the form.

14   BY MR. SALCIDO:

15        Q.    Did you ever direct anyone to change ADLs to

16   improperly elevate RUG levels?

17        A.    No.

18             MR. HALL:  Object to the form.

19   BY MR. SALCIDO:

20        Q.    Did you ever direct anyone to include therapy

21   minutes that were not medically necessary in resident's

22   record to improperly elevate RUG levels?

23             MR. HALL:  Object to the form.

24        A.    No.

25        Q.    Did you ever direct anyone to include therapy
```



Case 8:11-cv-01303-SDM-TBM   Document 267-2   Filed 02/11/16   Page 12 of 25 PageID 5193

DERICK DEETER Volume II Subject to Protective Order          October 19, 2015
U.S.A. ex rel. vs. CMC II, LLC, et al.                                245

1    minutes that were not provided in a resident's record to

2    improperly elevate RUG levels?

3              MR. HALL:  Object to the form.

4        A.    No.

5        Q.    Did you ever encourage your facilities to

6    apply coding that did not accurately reflect the care

7    provided to residents?

8              MR. HALL:  Object to the form.

9        A.    No.

10       Q.    Did you ever encourage your facilities to seek

11   reimbursement for services that were not provided to

12   residents?

13             MR. HALL:  Object to the form.

14       A.    No.

15       Q.    Did you ever encourage your facilities to

16   assign RUG levels that were not appropriate for the

17   level of care provided to residents?

18             MR. HALL:  Object to the form.

19       A.    No.

20       Q.    With respect to the short time period you were

21   with Consulate that overlaps with this case, once the

22   company became Consulate, did you ever witness anyone at

23   Consulate engage in unlawful activity?

24             MR. HALL:  Object to the form.

25       A.    No.



Case 8:11-cv-01303-SDM-TBM   Document 267-2   Filed 02/11/16   Page 13 of 25 PageID 5194

DERICK DEETER Volume II Subject to Protective Order                    October 19, 2015
U.S.A. ex rel. vs. CMC II, LLC, et al.                                                  246

```
 1          Q.   Did you ever witness anyone at Consulate deny
 2   services to a Medicaid patient that should have been
 3   provided?
 4               MR. HALL:   Object to the form.
 5          A.   No.
 6          Q.   Did you ever witness anyone at Consulate ever
 7   providing excess therapy to a patient to achieve a
 8   budget number?
 9               MR. HALL:   Object to the form.
10          A.   No.
11          Q.   Did you ever witness anyone at Consulate
12   inflate ADL scores to achieve a budget number?
13               MR. HALL:   Object to the form.
14          A.   No.
15          Q.   In terms of -- if you refer back to
16   Exhibit 3.
17          A.   (Witness complies.)
18          Q.   Now, on this, Mr. Deeter, I'm going to start
19   with the very last e-mail, and specifically the
20   reference that starts, "Hi Karmen.  See AHCA's comment
21   letter to CMS regarding the proposed SNF PPS Rule for
22   fiscal year 2012.  If you look at page 114, you will see
23   a chart outlining ADL findings from RUG III (fiscal year
24   2010) to RUG IV (fiscal year 2011).  It appears that ADL
25   A level increased from 11% to 27%."
```



Case 8:11-cv-01303-SDM-TBM  Document 267-2  Filed 02/11/16  Page 14 of 25 PageID 5195

LEOTA JULIANO  Subject to Protective Order                    October 17, 2015
U.S.A. ex rel. vs. CMC II, LLC, et al.                                      1

```
 1              UNITED STATES DISTRICT COURT
           FOR THE MIDDLE DISTRICT OF FLORIDA
 2                  TAMPA DIVISION

 3                   CIVIL ACTION NO.:
                     8:11 CV 1303 SDM-TBM
 4
    THE UNITED STATES OF AMERICA and
 5  THE STATE OF FLORIDA, ex rel.
    ANGELA RUCKH,
 6
            Plaintiffs,
 7
    v.
 8
    CMC II, LLC; SEA CREST HEALTH
 9  CARE MANAGEMENT, LLC, d/b/a
    LAVIE MANAGEMENT SERVICES OF
10  FLORIDA, SALUS REHABILITATION,
    LLC. d/b/a LAVIE REHAB; 207
11  MARSHALL DRIVE OPERATIONS, LLC,
    d/b/a MARSHALL HEALTH AND
12  REHABILITATION CENTER; 803 OAK
    STREET OPERATIONS, LLC, d/b/a
13  GOVERNOR'S CREEK HEALTH AND
    REHABILITATION CENTER,
14
            Defendants.
15  _____

16          Videotaped Deposition of

17              LEOTA JULIANO

18          Saturday, October 17, 2015
                    9 a.m.
19

20          SUBJECT TO PROTECTIVE ORDER

21

22          Esquire Deposition Services
          444 Seabreeze Boulevard, Suite 740
23            Daytona Beach, FL  32118

24

25          Georgeanne Rodriguez, RPR
```



```
 1   BY MR. SALCIDO:

 2        Q.   -- in your role as regional reimbursement

 3   specialist for La Vie?

 4             MR. OPPENHEIMER:  Objection.

 5             THE WITNESS:  Correct.

 6   BY MR. SALCIDO:

 7        Q.   What was your role with respect to the MDS

 8   assessment process?

 9        A.   My role was to treat -- teach and train and be

10   a support for the MDS coordinators and to make sure that

11   they got everything done and -- according to the

12   guidelines.

13        Q.   Now, in that role, did you ever direct anyone

14   to change an assessment reference date to improperly

15   elevate a RUG level?

16        A.   No.

17        Q.   Did you ever direct anyone to change an ADL to

18   improperly elevate a RUG level?

19        A.   No.

20        Q.   Did you direct anyone to include therapy

21   minutes that were not provided in order to improperly

22   elevate a RUG level?

23        A.   No.

24        Q.   Did you ever -- did you ever direct anyone to

25   include therapy minutes that were medically unnecessary
```



Case 8:11-cv-01303-SDM-TBM   Document 267-2   Filed 02/11/16   Page 16 of 25 PageID 5197

LEOTA JULIANO  Subject to Protective Order                    October 17, 2015
U.S.A. ex rel. vs. CMC II, LLC, et al.                                    263

1  to elevate a RUG level?

2       A.   No.

3            MR. OPPENHEIMER:  Objection.

4  BY MR. SALCIDO:

5       Q.   Now, as regional reimbursement specialist, did

6  you personally experience negative consequences if one

7  of your facilities failed to meet budget?

8       A.   No.

9       Q.   And in your experience, were facilities

10  penalized if they failed to meet the budgeted historical

11  rate that had been set for the facility?

12            MR. OPPENHEIMER:  Objection.

13            THE WITNESS:  No.

14            MR. SALCIDO:  I was just going to use a couple

15       more exhibits.  Why don't we change the tape now.

16       I see we had only five minutes late.

17            VIDEOGRAPHER:  The time is 4:56 p.m., off the

18       record.

19            (Short break from 4:56 p.m. to 5:01 p.m.)

20            VIDEOGRAPHER:  The time is 5:01 p.m., on the

21       record.

22  BY MR. SALCIDO:

23       Q.   A few more questions, Ms. Juliano.

24            Have you ever changed a code to make the code

25  reimbursable when, in fact, it wasn't appropriately



```
 1    reimbursable?

 2        A.    No.

 3            MR. OPPENHEIMER:  Objection.

 4            THE WITNESS:  No, it always has to be

 5        appropriate.

 6    BY MR. SALCIDO:

 7        Q.    Was -- in your experience at -- working with

 8    the defendants, did you ever encounter a situation where

 9    medically necessary services were not provided to a

10    Medicaid patient?

11            MR. OPPENHEIMER:  Objection.

12            THE WITNESS:  No.

13            MR. SALCIDO:  Let's introduce the following

14        exhibit, which we should be up to 36, I gather.

15            (Exhibit 36 marked for identification.)

16    BY MR. SALCIDO:

17        Q.    And I believe that previously, you were asked

18    some questions regarding bonuses obtained while you were

19    employed by the defendants; is that accurate?

20        A.    Yes.

21        Q.    And with respect to this particular email and

22    where -- I want to refer you -- first is the email

23    toward the middle of the first page from Karmen Morgan

24    to, among others, Lee Juliano.

25            And there it says:  The error rate calculation
```



Case 8:11-cv-01303-SDM-TBM  Document 267-2  Filed 02/11/16  Page 18 of 25 PageID 5199

KRISTI WILLIAMS                                    October 08, 2015
U.S.A. ex rel. vs. CMC II, LLC, et al.                            1

```
1              UNITED STATES DISTRICT COURT
               MIDDLE DISTRICT OF FLORIDA
2                    TAMPA DIVISION

3

4     THE UNITED STATES OF AMERICA
      and THE STATE OF FLORIDA ex
5     rel. ANGELA RUCKH,

6          Plaintiffs,
                              CASE NO.: 8:11 CV
7     vs.                     1301 SDM-TBM

8     CMC II, LLC; SEA CREST HEALTH
      CARE MANAGEMENT, LLC, d/b/a
9     LAVIE MANAGEMENT SERVICES OF
      FLORIDA; SALUS REHABILITATION,
10    LLC, d/b/a LAVIE REHAB, 207
      MARSHALL DRIVE OPERATIONS,
11    LLC, d/b/a MARSHALL HEALTH AND
      REHABILITATION CENTER; 803 OAK
12    STREET OPERATIONS, LLC, d/b/a
      GOVERNOR'S CREEK HEALTH AND
13    REHABILITATION CENTER,

14
           Defendants.
15
      _____
16    STATE OF FLORIDA   )
      COUNTY OF DUVAL    )
17
                  VIDEOTAPED DEPOSITION OF
18
                     KRISTI WILLIAMS
19
                  9:26 a.m. to 3:39 p.m.
20
                Thursday, October 8, 2015
21
           1301 Riverplace Boulevard, Suite 1609
22                 Jacksonville, Florida

23         Sandra G. Pemberton, RPR, CRR, FPR

24

25
```



Case 8:11-cv-01303-SDM-TBM    Document 267-2    Filed 02/11/16    Page 19 of 25 PageID 5200

KRISTI WILLIAMS                                          October 08, 2015
U.S.A. ex rel. vs. CMC II, LLC, et al.                              23

1    Q.    Okay.   Did you ever come under any pressure
2  not to give so much treatment to Medicaid patients for
3  that reason?
4    A.    No.
5    Q.    Okay.   So is it right that you always gave
6  Medicaid patients as much therapy as they clinically
7  required?
8    A.    Yes, as much as it was clinically necessary,
9  everybody receives.
10    Q.    Okay.   Do you agree that more therapy is
11  always better?
12    A.    No.
13    Q.    No.   Why not?
14    A.    It depends.   The level of therapy required is
15  based on the evaluating therapist's clinical knowledge
16  and assessment of the patient, their discharge --
17  discharge location, prior level of function, what they
18  need to be able to do with the family, and then the
19  patient's desires.   If you go in to see a patient and
20  they say, "I want as much therapy as I can get so I can
21  get out of here, I don't want to be here a second
22  longer than I have to," which is pretty much every
23  single patient you meet in a nursing home, because
24  nobody wants to be in a nursing home, you go with that,
25  as long as it's clinically appropriate and the patient



1    can tolerate it.

2        Q.   Uh-huh.   And what are the circumstances in

3    which more therapy is not appropriate?

4        A.   When the patient doesn't need as much therapy.

5    Not everybody needs speech therapy, not everybody needs

6    physical therapy, not everybody needs occupational

7    therapy.   It's based on patient need.

8        Q.   Okay.   So at a certain point, would it be

9    pointless to give more therapy with some patients?

10       A.   If there's not a clinical, functional need,

11   they don't receive the therapy, no.

12       Q.   Because they wouldn't need it.

13       A.   Correct.

14       Q.   Okay.   Are you familiar with care plans?

15       A.   Uh-huh.

16       Q.   What are care plans?

17       A.   It's a meeting held, I don't know, I think

18   quarterly or as needed with patients, usually run by

19   the MDS department, they take the leading role in those

20   meetings, and they review the care plan, patient

21   satisfaction, that type of thing.

22       Q.   Okay.   I think -- I think maybe you're talking

23   about care planning?

24       A.   You review the care plan that the nurse wrote

25   in that care plan meeting.



Case 8:11-cv-01303-SDM-TBM   Document 267-2   Filed 02/11/16   Page 21 of 25 PageID 5202

KRISTI WILLIAMS                                    October 08, 2015
U.S.A. ex rel. vs. CMC II, LLC, et al.                          145

```
1        A.   I'm not saying I didn't, I just don't recall.
2        Q.   Okay.  Do you have any reaction to the
3   contents of this document?
4        A.   It's harsh.  My feelings -- I don't recall
5   ever being told this.  Like, you know, the education on
6   ultra, the minutes, the disciplines, and all that,
7   like, I received that, but I don't ever recall ever
8   being told, quote/unquote, "The higher the RUG level,
9   the happier Salus and the building is."  I -- that's
10  not something I ever heard.  I was always told by Bob
11  to make sure what you were doing was functionally
12  appropriate.  And to make sure we gave the patients the
13  most therapy for their benefit to go home, yes, but
14  based on patient need, not on --
15       Q.   Uh-huh.
16       A.   -- you know -- clinical judgment, not based on
17  a monetary value.
18       Q.   So -- so whilst nobody said to you directly
19  the higher the RUG levels the happier is Salus, you
20  understood that the higher the RUG levels, the more
21  that Salus would make, didn't you?
22       A.   Yeah.
23       Q.   Okay.  Tell me -- I'm going to read a couple
24  of sentences to you and you can tell me if you agree or
25  disagree with those sentences.
```



Case 8:11-cv-01303-SDM-TBM   Document 267-2   Filed 02/11/16   Page 22 of 25 PageID 5203

KRISTI WILLIAMS                                    October 08, 2015
U.S.A. ex rel. vs. CMC II, LLC, et al.                      153

1      A.   Do these stay here or do these go back?

2      Q.   They can stay there for right now.

3                      CROSS EXAMINATION

4   BY MR. LYNAM:

5      Q.   Ms. Williams, thank you for your patience and

6   going in and out and looking at the files.  I'm going

7   to ask you a few questions, and we'll try to keep this

8   moving.

9           What did you base the amount of therapy minutes

10  provided to a patient on?

11     A.   That would be based on the evaluating

12  therapist who completed the initial evaluation and the

13  ongoing assessments there of the plan.  They went in,

14  they would review the patient, do the eval, and they

15  would say this patient has extensive needs, they want

16  to be home as quickly as possible, I would like to give

17  them as much minutes as I possibly can, or this patient

18  is very critical, they have a lot of failure to thrive,

19  they're very elderly, there's a lot psych going on, I

20  really would like to stay in that moment for maybe a

21  half hour a day.

22     Q.   Was there clinical judgment exercised in

23  making those assessments?

24     A.   That's what all those decisions were based on.

25     Q.   Did you ever provide therapy services to a



Case 8:11-cv-01303-SDM-TBM   Document 267-2   Filed 02/11/16   Page 23 of 25 PageID 5204

KRISTI WILLIAMS                                          October 08, 2015
U.S.A. ex rel. vs. CMC II, LLC, et al.                              154

1   resident that you believed was medically unnecessary?

2        A.    No.

3        Q.    Were you ever directed by anyone at La Vie to

4   provide therapy services that you believed were not

5   medically necessary?

6        A.    No.

7        Q.    Did you ever feel pressure to provide therapy

8   services that you believed were not necessary?

9        A.    No.

10        Q.    Did you direct -- did you ever direct anyone

11   to provide therapy services that you believed were not

12   necessary?

13        A.    No.

14        Q.    Did you ever change an ARD date or an

15   assessment reference date in order to improperly

16   elevate a RUG level?

17        A.    No.

18        Q.    Did anyone ever direct you to do that?

19        A.    No.

20        Q.    Did you ever falsify the number of therapy

21   minutes that were provided to a patient?

22        A.    Never.

23        Q.    Did you ever direct anyone to falsify the

24   number of therapy minutes provided to a resident?

25        A.    No.



Case 8:11-cv-01303-SDM-TBM   Document 267-2   Filed 02/11/16   Page 24 of 25 PageID 5205

KRISTI WILLIAMS                                    October 08, 2015
U.S.A. ex rel. vs. CMC II, LLC, et al.                          155

1       Q.   Did you ever sign progress notes that

2   contained therapy minutes that you knew were not

3   accurate?

4       A.   No.

5       Q.   Did you ever sign progress notes containing

6   therapy minutes that you knew were not medically

7   necessary?

8       A.   No.

9       Q.   Did you ever work on and develop plans of care

10  for treatment of residents that you believed were not

11  medically necessary?

12      A.   No.

13      Q.   Now, you've been asked some questions about

14  budgets and RUG levels.  Were there ever any negative

15  consequences to you and the therapy part of the

16  facility that you were director of --

17      A.   Uh-huh.

18      Q.   -- for failing to meet a particular level in a

19  budget?

20      A.   No.

21      Q.   Did you actually even share the budgets that

22  you've shown -- that you were shown?  Did you share

23  them with all of your therapists that were working

24  under you?

25      A.   No, I never did.



1    Q.   What is your ultimate goal in providing
2  therapy to residents?
3    A.   To make sure the residents receive the therapy
4  that is clinically necessary to then achieve their
5  highest level of function and to discharge to whatever
6  location best suits their needs.
7    Q.   Do you believe you did that?
8    A.   Yes.
9    Q.   Do you believe that the therapists working
10 under your direction did that?
11   A.   Absolutely.
12   Q.   Okay.  I want to show you the second amended
13 complaint and ask you a few questions about that.
14        MR. CREEL:  (A document was handed.)
15        THE WITNESS:  Thank you.
16        MS. CREELY:  Are you going to put it as an
17   exhibit?
18        MR. LYNAM:  Let's make it Williams 9, the
19   complaint.  All right?
20        MR. DELANEY:  Okay.
21 BY MR. LYNAM:
22   Q.   Let me just get that marked first.
23   A.   Oh, I'm sorry.
24   Q.   That's all right.
25        (Exhibit-9 was marked for identification.)

