# Exhibit C

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | |
|---|---|
| THE UNITED STATES OF AMERICA and THE STATE OF FLORIDA *ex rel.* ANGELA RUCKH,<br><br>    Plaintiffs,<br><br>         v.<br><br>CMC II, LLC; SEA CREST HEALTH CARE MANAGEMENT, LLC, d/b/a LAVIE MANAGEMENT SERVICES OF FLORIDA; SALUS REHABILITATION, LLC, d/b/a LAVIE REHAB; 207 MARSHALL DRIVE OPERATIONS, LLC, d/b/a MARSHALL HEALTH AND REHABILITATION CENTER; 803 OAK STREET OPERATIONS, LLC, d/b/a GOVERNOR'S CREEK HEALTH AND REHABILITATION CENTER,<br><br>    Defendants. | CIVIL ACTION NO.<br>8:11 CV 1303 SDM-TBM |

## DECLARATION OF PETER DRESSEL

I, Peter Dressel, am an individual over the age of eighteen (18) and am competent to make this Declaration based upon my personal knowledge of all matters contained herein and declare under penalty of perjury as follows:

1.    I am currently employed as a Senior Managing Director at FTI Health Solutions, which is a division of FTI Consulting. I hold a Bachelor's degree in Economics and a Masters of Business Administration with a concentration in Accounting. I have over 14 years of experience in health care industry investigations and compliance matters,

1

including experience in billing and coding investigations, Medicare and Medicaid reimbursement issues, and Independent Review Organization ("IRO") engagements.

2.  On behalf of the Defendants, I submitted an expert report in this matter on December 11, 2015.

3.  In connection with my engagement, I have reviewed the patient records that Defendants produced for the 800 sample patients that Relator requested and her experts have reviewed. These patient records are voluminous and comprise more than 2,500 PDF files with more than 1.1 million pages of documentation.

4.  As set forth in my declaration in support of Defendants' Motion for Additional Time To Submit Expert Reports (Dkt No. 255, Dec. 23, 2015), I also analyzed the reports and supporting materials submitted by Relator's experts, Shirley Bradley, Marvette Lowrie-Morris, Constantijn Panis, and Marc Vianello. Included in the supporting materials were some of the patient records that Defendants had produced to Relator. However, the patient records provided with Relator's experts' reports were not merely copies of the more than 1.1 million pages of patient records produced by Defendants for the sample patients, but rather over 439,000 excerpted pages of these records selected by Relator's expert Ms. Bradley in support of her findings. The over 439,000 pages of selected patient records required careful review and analysis to determine which of the more than 1.1 million pages of patient records were considered and excluded as support for Ms. Bradley's findings. In addition, Relator's experts supporting materials included non-patient documents such as more than 1,100 Microsoft Excel files with over 2,000 tabs and over 750 PDF pages.

5. My team and I conducted a review of the patients' records to test Ms. Bradley's findings, including her finding that MDS assessments were missing for 91 of the sample patients. My team and I found that, for 88% of the sample patient records produced, MDS assessments were present in the medical records produced. Furthermore, my team and I validated that the medical records collected from 11 facilities had no missing MDS assessments and the medical records collected from 18 facilities had only a single missing MDS assessment.

6. However, for 91 patients we were unable to locate the relevant MDS assessment in the patient records produced, consistent with Ms. Bradley's finding on this point. It is important to note, however, that even when an MDS assessment is not present in the produced file for a resident, UB-04 forms produced in this litigation identify the date when the assessment reflected in the MDS occurred, the MDS assessment type, and the number of days covered in the MDS for which payment is sought.

7. I relayed this finding to Defendants' counsel, who I understand in turn relayed this finding to Defendants. My team was subsequently engaged to conduct a search in an electronic database maintained by Defendants to determine if the MDS assessments that were not in the patient file could still be obtained in electronic form, because Defendants did not have the resources available to conduct this labor-intensive search.

8. On January 7, 2016, my team and I were granted access to Defendants' database to search for the missing MDS assessments. This was a manual time-intensive process that required searching first by facility, and then within each facility by individual

3

patient. In total, my team spent approximately 50 hours on this project. This included confirming the list of missing MDS assessments, gaining access to Defendants' system, searching for the individual MDS assessments in the electronic database, and verifying and printing to PDF the electronic MDS assessments. My team was successful in locating all the MDS assessments for the 91 patients identified as missing in Ms. Bradley's expert report.

9. After retrieving the MDS assessments from the electronic database, my team printed them in PDF format and provided them to counsel for the Defendants. These additional MDS assessments represented 1.7% of the total records Defendants produced for the 800 sample patients. I understand that these documents were subsequently produced to Relator on January 22, 2016.

10. I swear, under penalty of perjury, that the foregoing statements are true and correct.

Date:    2/11/2016

_____

Peter L. Dressel
Senior Managing Director, FTI Health Solutions
FTI Consulting