## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

| | |
|---|---|
| THE UNITED STATES OF AMERICA and THE STATE OF FLORIDA *ex rel.* ANGELA RUCKH,<br><br>Plaintiffs,<br><br>v.<br><br>CMC II, LLC, *et al.*,<br><br>Defendants. | CIVIL ACTION NO.<br>8:11 CV 1303 SDM-TBM |

## **DEFENDANTS' OPPOSITION TO RELATOR'S FURTHER SUPPLEMENT TO MOTION TO PRECLUDE AND FOR SANCTIONS**

Defendants respectfully submit this Opposition to Relator's Further Supplement to Motion to Preclude Defendants' Use of Untimely Produced Documents and for Sanctions ("Further Supplement") (Dkt. No. 272). At the conclusion of the February 22, 2016 hearing, the Court indicated that it would give the Relator an opportunity to explain what, if any, specific prejudice she incurred upon receipt of Defendants' expert reports as a result of (1) Defendants' production of the additional MDS Assessments on January 22, 2016; (2) Defendants' production of some additional records for 12 Medicaid patients on February 10, 2016; and (3) Defendants' production of some additional records for some Medicare patients on February 24, 2016 (the day before Defendants produced their expert reports). In her Further Supplement, Relator chose not to supply any specifics to support her claim of prejudice. Instead, Relator makes broad, sweeping statements that

Defendants produced "numerous" additional documents on which their experts relied, without, for example, explaining what, if anything, they have done to review them since Defendants first produced the MDS Assessments over one month ago. In addition, Relator resorts to making several misleading assertions to support her broad claims. In short, Relator's Further Supplement fails to support the relief she seeks, which is exclusion of the additional records that Defendants' experts relied on.[1] Defendants have already stated that they have no opposition to Relator supplementing her expert reports in light of the Defendants' expert reports to the extent they rely on the additional records.

---

[1] The two cases Relator cites in footnote 1 of her Further Supplement as support for the extraordinary relief she seeks are not only inapposite, they are contrary to established case law in this district concerning the appropriate remedy here.

Relator first cites *United States v. N. E. Med. Servs.*, a California case, in support of her argument that the documents should be excluded. In that case, however, the documents at issue were located and produced *after* the producing party's expert report was served. Notably, the court stated that the outcome in that case "might differ" if, as here, the documents had been located during the course of the producing party's expert's analysis. No. 10-cv-01904-CW(JCS), 2014 WL 7208627, at *5 (N.D. Cal. Dec. 17, 2014). The facts in Relator's second case from Michigan, *Sunroof de Mexico, S.A. de C.V. v. Webasto Roof Sys., Inc.*, are also distinguishable. In that case, the producing party was subject to a specific court order precluding their use of documents produced after the date of the order. No. 05-40031, 2006 WL 1042072, at *3 (E.D. Mich. Apr. 19, 2006). The producing party disregarded the court order, which naturally resulted in the documents being excluded. *Id.* at *3. There is obviously no such order here.

Federal courts in Florida reach a different conclusion about the appropriate remedy here, which Relator does not acknowledge. For example, in *Curtis Int'l, Ltd. v. Sunbeam Products, Inc.*, the Southern District granted an extension of time to supplement expert reports, the exact solution Defendants have proposed, when there was a late response to the defendant's discovery requests. No. 06-81079-CIV, 2007 WL 5957951, at *1 (S.D. Fla. Apr. 18, 2007) (declining to impose the "excessive sanction" of exclusion). Similarly, the Middle District approved the remedy Defendants believe is appropriate here. In *Caslin v. Personal Care Products, Inc.,* the Court granted the plaintiff leave to file an amended expert report when there was a delay in the defendant's production of responsive documents. No. 6:08-cv-1275-Orl-35DAB, 2009 WL 4510116, *3 (M.D. Fla. Dec. 1, 2009). These cases demonstrate that there is no support among Florida federal courts for the extreme sanctions Relator is asking this Court to impose.

Relator has not indicated that she will do so, nor has she asked for additional time in the current case schedule.

**A. Defendants have at all times been fully candid about their production of the additional resident file documents.**

It is disingenuous for Relator to claim that Defendants "were not fully candid with the Court during the February 22, 2016 hearing" and "withheld" information from the Court and Relator about the production of additional medical records. Further Supplement at 3. That assertion is simply wrong. The record is clear that Defendants were fully transparent, not only about the circumstances surrounding their production of the missing MDS Assessments, but also about the production of additional pages from the resident medical files. **First**, the fact that Defendants were in the process of producing additional pages of resident medical records was disclosed *before* the February 22 hearing – indeed Defendants had already produced the additional Medicaid records to Relator on February 10, 2016 (twelve days before the hearing). **Second**, this supplemental production was the subject of Relator's first Supplement to her Motion to Preclude (Dkt. 266) and Defendants' Supplemental Opposition (Dkt. 268), all of which were filed *before* the February 22 hearing. **Third**, Defendants' Supplemental Opposition also disclosed that some additional documents from resident files would be produced on or before the February 25, 2016 due date for expert reports. *See* Defendants' Supplemental Opposition to Relator's Supplement, at 5 n.4. (Dkt. 268). These documents were produced to Relator on February 24, 2016.

Defendants withheld nothing from the Court or Relator about these additional productions. Indeed, during the February 22 hearing, when Relator's counsel attempted to raise the topic of the additional medical records that Defendants were producing, the Court said that matter was not before the Court at this time, and instead focused solely on the additional MDS Assessments that were the subject of the original Motion to Preclude. In light of the Court's clear indication that the issue to address at the February 22 hearing was the MDS records, that is what the parties addressed. The Court was obviously aware that Defendants were producing some additional medical records (as disclosed in the briefing described above at Dkt. 266 and 268) as well as expert reports, and therefore decided that it would not rule on the Motion to Preclude until those events had occurred. It is surprising that Relator would ignore these undisputable facts and suggest that Defendants were not candid.

During the hearing, Defendants advised the Court that with regard to the MDS assessments, their expert would be relying on their existence and production to rebut Relator's expert's claims that MDS assessments were missing for ninety-one residents when they were not in fact missing. That is exactly what Defendants' expert, Peter Dressel, stated in his report, as Relator acknowledges. Further Supplement at 4.[2] However, Relator then goes on to state that Defendants failed to advise the Court that

---

[2] Because the MDS assessments for these ninety-one residents exist and were produced on January 22, 2016, Defendants' experts relied on them in their calculations of so-called "error rates", *i.e.*, how many issues raised by Relator's experts were rebutted by the existence of these records and how many remained. These calculations are part and parcel of the fact that the MDS assessments exist.

their experts would also rely on the additional pages Defendants produced from the residents' medical files. *Id*. This assertion is also wrong.

As stated above, the hearing was focused on the MDS Assessments, and that is what the Court and the parties addressed. But there is no surprise that Defendants would also be relying on the other additional records—Defendants *told Relator that* in their letter of February 10, 2016 (twelve days before the hearing) when they produced the additional records from the Medicaid group. Relator filed this letter with the Court as Exhibit 1 in support of her first Supplement to her Motion to Preclude (Dkt. 266). Defendants' letter clearly stated "Defendants' expert will be relying on them in his rebuttal report." *Id*.

Additionally, Defendants' Supplemental Opposition also advised the Court about the production of these additional documents, that their expert would rely on them, and that additional documents would be produced on or before Defendants' expert reports were due on February 25, 2016. *See* Defendants' Supplemental Opposition to Relator's Supplement, at 4-5 & n.4. (Dkt. 268). Again, it is surprising that Relator would claim that Defendants failed to inform the Court about something that was clearly disclosed in several court filings before the hearing.

### B. Defendants' original production of the resident files in 2015, and the additional production in 2016, were conducted in good faith and were reasonable.

Relator's contention that Defendants' document production constituted an "inexcusable disregard for the authority of the Court" (Further Supplement at 2) is false

and belied by the evidence of Defendants' reasonable efforts to produce a massive amount of documentation to Relator – which they did – at substantial expense.

In 2015, Defendants produced 1.1 million pages of resident records for the 800 sample residents that Relator selected. Defendants incurred over $570,000 in vendor costs in doing so. *See* Defendants' Opposition to Relator's Motion to Preclude and for Sanctions (Dkt. 267) ("Defendants' Opposition"), Exhibit A, Decl. of R. D. Thomas at ¶ 5. Once Relator identified the names of the residents in the sample group on February 6, 2015, Defendants' production of those documents was timely and was not occasioned by the delays that accompanied the Defendants' production of the 4.8 million emails and related documents that resulted in the Court's previous sanctions order. Therefore, the Court should evaluate the Defendants' production of these resident records as a separate matter, unrelated to the delays in the earlier email production.

The issue is whether Defendants acted reasonably and in good faith in producing the paper copy of the resident files that is kept at the facilities where the residents were treated. As the declaration of Mr. Thomas makes clear, the answer to that question is yes. Thomas Decl. ¶¶ 8-11. It was a reasonable, good faith approach for the Defendants to proceed that way because whenever they receive a request for a resident file, whether from a state auditor or in a lawsuit, their usual and customary practice is to pull and copy the file from the facility. *Id.* at ¶ 7. It is reasonable to believe that this file is the most complete file. For the vast majority of the 800 residents, that has proven to be true. It was also reasonable for the Defendants to produce these 1.1 million pages without auditing them first to see if anything that should be there was not. As the Thomas

Declaration makes clear, Defendants did not have the resources to conduct such a review before production and it was reasonable to believe all requested material would be in the resident file. *Id.* at ¶ 9 -10. If the duty were otherwise, and large healthcare facilities must audit a million pages of medical records before production in litigation, then astronomical costs will be imposed on these facilities and given that a substantial portion of the healthcare industry is nonprofit, the provision of healthcare would inevitably suffer. Notably, Relator has not claimed that it was unreasonable for Defendants to produce these resident records without first doing such an audit.

Defendants had no reason to search for any missing MDS assessments in some other location until Relator produced her expert report on December 11, 2015 and pointed out that MDS Assessments were missing for ninety-one residents in the sample group. At that point, Defendants had reason to search to see if the MDS data was backed up in the legacy LaVie data system. When they found that it was, Defendants produced these additional assessments on January 22, 2016. Relator has now had these MDS assessments for over five weeks and her Further Supplement fails to explain whether she has begun reviewing them or what impact, if any, these documents will have on her expert reports.

Similarly, Defendants' production of the additional pages of records for some of the Medicaid and Medicare patients was also reasonable and done in good faith. First, it is not surprising, in a production of 1.1 million pages of resident records, covering a four-year period from January 2008 to January 2012, that some of the files might have missing documentation. As the Thomas Declaration states, and the Relator does not contend

otherwise, when this happens in an audit by a state agency, the facility goes back and tries to locate the missing documentation and produces it and it is considered as part of the audit. Thomas Decl. at ¶ 11. Here, after receipt of Relator's expert reports pointing out missing documentation, it was reasonable for Defendants to try to locate the missing documents, especially when it became clear that there were gaps in the time period of the documents that were produced, indicating that a file of documents might have been inadvertently overlooked. Defendants were ultimately able to locate some of the gaps of missing documents. They produced the first group to Relator on February 10, 2016, before the production of their expert reports. This group consisted of records for twelve of the 300 Medicaid group, consisting of 5,164 pages, some of which may have already been produced in the 2015 original production of 7,469 pages for these twelve residents. They produced the second group on February 24, 2016, the day before they produced their expert reports. The second group consisted of 8,039 additional pages of records for twenty-four residents (twenty-three of whom were Medicare and one additional Medicaid resident). As with the first group, it is possible that some of these records were included in the original production of the 1.1 million records in 2015. Thus, the total number of pages in these two groups of additional documents is 13,203. When compared to the 1.1 million pages produced in the original 2015 production, this represents an additional production of 1.2%.[3]

---

[3] The total Relator uses in her Further Supplement of 31,500 pages includes the approximately 18,000 pages comprising the additional MDS Assessments produced on January 22, 2016. As previously explained, the additional MDS Assessments were not the paper copies that were in the resident file, but rather were printed from a database into

In summary, the Defendants' original production of the 1.1 million pages of records was conducted in a reasonable good faith fashion. When Relator's expert reports pointed out that some documentation was missing from these records, Defendants proceeded reasonably in attempting to locate these records. Once they found some of them, they were obligated (whether the documents ultimately help them or hurt them or have no impact) to produce them as a supplement to their original production and because their experts would need to rely on them to address Relator's new theory of a false claim based on missing documentation. Accordingly, Defendants produced these records pursuant to Fed. R. Civ. P. 26(e) and 26(a)(2)(B).

C. **Relator fails to articulate specific prejudice warranting exclusion of the recently produced documents.**

Relator fails to explain what she has done to review and evaluate the additional MDS Assessments that Defendants produced over five weeks ago.[4] This is not surprising, as the only issue that Relator's expert raised regarding these MDS assessments was that they were not in the resident file, and therefore Defendants allegedly submitted a false claim based on allegedly missing documentation. Now that it is clear that the MDS assessment was done, it is difficult for Relator to articulate a specific claim of prejudice so she does not attempt to do so. She does not request

---

a format that doubled the number of pages comprising the MDS as compared to the original paper copy. *See* Defendants' Opposition at 14 n. 9.

[4] It is disingenuous for Relator to claim that she "will have three weeks to evaluate more than 31,500 pages of newly produced medical records" (Further Supplement at 6), when she has already had over five weeks to review more than half of them, *i.e.*, the MDS Assessments.

additional time to remove that portion of her damages calculation, which clearly would not take very long to do.

As for the additional pages of records from the Medicaid and Medicare group of patients, Relator makes a broad statement that Defendants' expert Dr. Palega "relies on numerous documents not produced to Relator until February 24." Further Supplement at 5. But Relator does not identify how many files are affected and how many they will need to review. Indeed, the only specific number of files that Relator describes is that "for at least 13 patients" Defendants' expert Scott Heichel relies on "records that were not produced to Relator until February 24." *Id.* Defendants have already stated that they have no objection to Relator amending her expert reports based on the new documents; Relator does not request any additional time in which to do so for the 13 files she identified.

Relator's only other claim of prejudice is that, had the documents been produced earlier, Relator "would have had an opportunity to probe their authenticity and reliability through depositions and written discovery." Further Supplement at 2. But this claim does not withstand basic scrutiny. Relator's review of the resident files was done by her expert witnesses, not by fact witnesses who were deposed earlier in the case. Relator fails to identify one fact witness whose testimony she would need regarding the contents of these files. It is important to remember that portions of *all* these resident files were produced in the original 2015 production. If there was some issue regarding these files that Relator attempted to discover in a fact witness deposition, which is now affected by the additional documents, she could have identified it. However, she did not. That is

because Relator is relying on her experts to analyze the resident records. Finally, as Defendants previously explained, Relator's claim that someone falsified her signature on MDS Assessments is not affected by these MDS Assessments because (1) they were not done during the short time that Relator worked at one of Defendants' facilities in 2011, and (2) these MDS Assessments were printed from the electronic database and so do not bear handwritten signatures as a general rule. *See* Defendants' Opposition at 19 n. 16. Relator does not explain why she would need to take discovery on these particular MDS Assessments for this issue because she cannot.

### D. Conclusion

Defendants acted in good faith and reasonably believed that all available resident records for the 800 patients in the sample group were produced back in 2015. When they found that some records had not been produced, they again acted in good faith and located and produced them to Relator. The additional records amount to a very small percentage when compared to the original production, which was voluminous. In a case involving an enormous production of documents by Defendants (1.1 million resident records plus over 5 million emails and other documents), it is unfortunate, but not entirely surprising, that some documents were not included in the original production. In response to a comment that the Court made at the February 22 hearing, Defendants are not blaming Relator for this development. But Defendants should not be blamed, either—they acted in good faith in producing these resident files. The earlier delay in producing the emails (and the sanction imposed) does not apply to these records. It *is* fair to question why Relator did not use the replacement set of Medicaid and Medicare

resident files when key documents were missing from some of the original core group files.

On the issue of whether Relator has been prejudiced, their Further Supplement makes clear that the only prejudice to them is in their experts making some adjustments to their reports based on the additional documentation. Defendants have no objection to Relator having the opportunity to do so. If Relator does, then Defendants request a reasonable time to rebut any additional expert opinions based on the additional documents.

Relator is claiming damages of over $300 million, mainly based on documentation issues that her experts identified in the resident files. Because the stakes are very high, and the trial should be a search for truth, this relatively small amount of additional records should not be excluded.

Dated: March 2, 2016                                Respectfully submitted,

                                                                                                                               */s/ Terence J. Lynam*

Terence J. Lynam (*pro hac vice*)
tlynam@akingump.com
Robert S. Salcido (*pro hac vice*)
rsalcido@akingump.com
AKIN GUMP STRAUSS HAUER & FELD LLP
1333 New Hampshire Avenue, NW
Washington, D.C. 20036
Telephone: (202) 887-4000
Facsimile: (202) 887-4288

Tina Dunsford (Florida Bar No. 624721)
tdunsford@flhealthlaw.com

FLORIDA HEALTH LAW CENTER
501 E. Kennedy Blvd., Suite 775
Tampa, Florida 33602
Telephone: (813) 517-1661
Facsimile: (813) 517-1668

13

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on March 2, 2016, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to counsel of record for Plaintiffs.

*/s/ Terence J. Lynam*
**Terence J. Lynam**

*Attorney for Defendants*