# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

THE UNITED STATES OF AMERICA
and THE STATE OF FLORIDA *ex rel.*
ANGELA RUCKH,

     Plaintiffs,

           v.

CMC II, LLC et al.,

     Defendants.

CIVIL ACTION NO.
8:11 CV 1303 SDM-TBM
**ORAL ARGUMENT REQUESTED**

## DEFENDANTS' MOTION TO EXCLUDE THE TESTIMONY OF RELATOR'S PROPOSED EXPERT ON STATISTICAL SAMPLING

Defendants hereby move to exclude the testimony of Relator's proposed expert on statistical sampling, Dr. Constantijn Panis.

## I.    INTRODUCTION

In this False Claims Act (FCA) case involving Medicare and Medicaid payments to Defendants' 53 Skilled Nursing Facilities (SNFs) in Florida, Relator intends to use Dr. Panis to testify to the amount of alleged overpayments based on a flawed and unreliable statistical sampling methodology.  Dr. Panis constructed a sample of 300 Medicare resident files and 300 Medicaid resident files using a "resident-day" approach as the sampling unit.  Another expert (Shirley Bradley) retained by Relator then reviewed the files for these resident-days and made "findings" of alleged overpayments, based on such items as a file allegedly missing a care plan

or a Minimum Data Set ("MDS") assessment for the day selected.[1]  Based on such alleged

missing (or incomplete) documentation, Relator's experts (Ms. Bradley and Marc Vianello)

concluded that Defendants submitted false claims and that the entire amount (or a significant

amount) of each payment received was an overpayment. These experts concluded that the total

amount of overpayments in the Medicare sample was $31,770 and the total amount of

overpayments in the Medicaid sample was $10,667.

From these relatively small amounts, Dr. Panis then extrapolated over a four-year period

(January 2008-January 2012) and concluded that the total Medicare overpayments are

$159,304,952 and the total Medicaid overpayments are $143,140,709, for a grand total of

$302,445,661.  Thus Relator intends to allege false claims totaling over $302 million based on a

sample size that consists of .01% of the universe of resident-days.[2]  The small sample size has

led directly to a margin of error that is staggering: according to Dr. Panis, the margin of error in

his Medicare sample is $23,269,070, which, because the actual amount of error could fluctuate in

either direction, implies an aggregate error range of $46.4 million.  Dr. Panis' margin of error for

the Medicaid sample is $32,340,044, which implies an aggregate error range of $64.7 million.

Earlier in the case, Relator filed a Motion *In Limine* To Admit Expert Statistical Sampling

Testimony (ECF No. 172).  The Court subsequently entered an Order denying the Motion,

finding a *Daubert* hearing was premature at that time, as was a ruling on the admissibility of the

Relator's sampling evidence.  In doing so, the Court also stated that there is "no universal ban on

expert testimony based on statistical sampling" in a qui tam case and that "no expert testimony is

---

[1] An MDS assessment is "an accumulation of questions that help [caregivers] recognize and . . . write a care plan for . . . patients so [the caregivers] get a full picture of the patient as a whole person."  Packer Dep. 14:21-15:1 (excerpts are attached hereto as Exhibit A ("Ex. A")).

[2] Dr. Panis found that there were 5.5 million resident-days in the four-year period comprising the universe from which he selected the sample of 600.  Panis Dep. 13:16-20 (excerpts are attached hereto as Exhibit B ("Ex. B")).

excludable in this action for that sole reason (although defects in method, among other evidentiary defects, might result in exclusion)."  (Order, ECF No. 215).  Based on that Order, Relator proceeded with the statistical sampling methodology and Dr. Panis wrote a report dated December 11, 2015, to which Defendants' expert, Stefan Boedeker, submitted a rebuttal report dated February 24, 2016.  The parties then took the depositions of each other's statistical experts. Based on a review of the report of Dr. Panis and his subsequent deposition, Defendants now move to exclude his testimony for the reasons discussed below.[3]

## II.   DR. PANIS' STATISTICAL SAMPLING METHODOLOGY IS UNRELIABLE

Relator worked at only two of Defendants' 53 SNFs in Florida, on a part-time basis, for a total of 39 days during the period of January 2011 through May 2011.  Based on her limited knowledge of Defendants' facilities, Relator alleged that Defendants perpetrated a scheme to overbill Medicare and Medicaid at all 53 facilities over a four-year period.  Relator was permitted to take discovery from Defendants regarding all 53 of Defendants' Florida facilities for this period, which resulted in Defendants producing over 5 million documents in the form of emails and other documents, as well as 1.1 million pages of residents' medical records. However, the Court has not ruled that Relator has established a state-wide scheme to defraud Medicare and Medicaid, which would be required to establish liability under the FCA.  Similarly, there has been no ruling from the Court that Relator should be permitted to proceed to trial by presenting evidence regarding Medicare/Medicaid payments received by the 51 facilities where she never worked.  Relator intends to attempt to establish such a state-wide scheme through the

---

[3] In Defendants' Response in Opposition to Relator's Motion *in Limine* to Admit Expert Statistical Sampling Testimony (ECF No. 179), Defendants argued that such sampling and extrapolation should not be permitted in an FCA case.  Defendants will not repeat their prior arguments on this point but simply preserve them in light of the Court's ruling that there was no universal bar on such sampling and extrapolation.

use of experts (e.g., Shirley Bradley) who have reviewed a sample of resident files, based on a

methodology developed by Dr. Panis.  Thus Dr. Panis' testimony is a key component of Relator's

attempt to prove a state-wide scheme, as he devised the sampling methodology at the front end

and then utilized the alleged "findings" of the other experts at the back end to extrapolate to the

$302 million amount that Relator claims for alleged overpayments.  However, Dr. Panis'

methodology for the sampling that he conducted is unreliable, not capable of being tested, and

reflects significant sampling and non-sampling error.

1.    Dr. Panis utilized a sorting procedure that cannot be tested because it
      cannot be replicated.

Dr. Panis chose that his sampling unit would be a resident-day, rather than an entire claim

submitted to either Medicare or Medicaid.  Therefore, in constructing the universe of 5.5 million

resident-days that he used as the basis of his $302 million extrapolation from sample results that

totaled only $42,000, Dr. Panis first had to calculate what the resident-days were.  He did so by

analyzing the claims data that Defendants produced in discovery.  This database often contained

several entries for a single resident, for time periods that overlapped.  In addition, the database

often contained different payor information, as a resident might be billed under both Medicare

and Medicaid during this overlapping period.  Some of this data showed zero in the amount paid

column. Boedeker Decl. at ¶ 14.  As a result, Dr. Panis had to apply a sorting procedure to

eliminate duplicate information and also select who the payor was, so that the resident-day could

be placed in the appropriate bucket (Medicare or Medicaid) for purposes of drawing a random

sample.  His report acknowledges that he employed a de-duplication methodology to do so.  *Id.*

In evaluating any expert's methodology, it is critical that its reliability can be tested,

which means that it can be replicated by the opposing party.  *Rembrandt Vision Techs., L.P. v.*

*Johnson & Johnson Vision Care, Inc.*, 282 F.R.D. 655, 667 (M.D. Fla. 2012) (noting that

"reproducible testing is a hallmark of reliable science"), *aff'd* 725 F.3d 1377 (Fed. Cir. 2013).

In this case, it is critical that Defendants be able to replicate Dr. Panis' sorting procedure because it is that procedure that selects the payor for the duplicate claims data and thus establishes the universe of Medicare or Medicaid resident-days from which a random sample was selected. The sampling universe should not itself be a random sample—rather it must be a pre-determined universe from which sample resident-days are randomly selected. Boedeker Decl. ¶ 16. However, Dr. Panis' determination of the sampling universe was itself done randomly because he inadvertently utilized a random methodology to eliminate duplicate claims data and select the payor. *Id.* Dr. Panis admitted in deposition that he used an unstable sorting mechanism in his computer program that randomly selected which claims data would be selected when there were duplicates. Panis Dep. 80:7-81:8. As a result, his sampling universe cannot be replicated, as he acknowledged. *Id.* at 81:9-21. The computer program that he used, known as STATA, has two options for selecting a sorting procedure: an unstable one that randomly selects an item (and thus a payor) and a stable one that preserves the items that are selected so that they would be selected and assigned to the same payor again in the event that the sort were run again. Boedeker Decl. ¶ 15. Dr. Panis knew that the default in the program was that the unstable sort would be used but he did not think further about it. Panis Dep. 81:4-8. But proceeding with the unstable sort meant that the sort would be random and could not be replicated. Defendants' expert (Stefan Boedeker) pointed out this flaw in Dr. Panis' methodology when he submitted his rebuttal expert report and Dr. Panis admitted in his deposition that he read Mr. Boedeker's report and agreed that as a result of the unstable sort that he used, the sorting could not be replicated. Panis Dep. 84:10-11. As a result, Defendants cannot test Dr. Panis' universe of resident-days because they cannot replicate his methodology for constructing the universe. As Dr. Panis admitted, if he ran the sort again, he

would get a different result, which would affect the assignment of the payor to either Medicare or Medicaid, resulting in a different result for the universe of days in each bucket.  Panis Dep. 92:18-93:5.  This in turn means that a different extrapolation amount would result every time he ran the program.  Boedeker Decl. ¶ 15.  This admitted inability to replicate his results means that Dr. Panis' methodology is not reliable because it cannot be tested.  Boedeker Decl. ¶¶ 14, 28.  Therefore, his extrapolations based on this methodology should not be admitted.

During his deposition, Dr. Panis tried to downplay the significance of the effect of his use of an unstable sorting procedure.  He testified that the night before his deposition, he ran some calculations and determined that the unstable sort affected only 460 resident-days in the universe.  Panis Dep. 102:3-7.  Defendants asked to see his supporting materials and Relator produced them by letter of March 28, 2016.  *See* Letter from R. Beynon to T. Lynam attached hereto as Exhibit D ("Ex. D").  That letter and the supporting materials provided with it serve only to further reinforce the flaw in Dr. Panis' sampling methodology by his use of an unstable, non-replicable sorting procedure.  According to the letter, sometime after the deposition, Dr. Panis ran 1,000 different simulations of the unstable sorting procedure and got 1,000 different results.  Boedeker Decl. ¶ 17.  Contrary to his deposition testimony, the unstable sort does not affect 460 resident-days.  Rather, the number affected *changes every time a new simulation is run*.  According to Dr. Panis' new data, the largest number of resident-days affected is 1,604, *i.e.*, in that simulation, the sorting procedure increased the Medicaid universe by 1,604 resident-days (with a corresponding decrease in the number of Medicare days).  The smallest number of days affected is -1,044, which means that the Medicaid resident-days decreased by 1,044 (with a corresponding increase in the number of Medicare days).  *Id.*  The combined range of variation is 2,648.  If Dr. Panis ran more simulations, he would get an even wider range of variation because

there are 35,000 resident-days in the claims data that were subject to his unstable sort procedure. *Id.* Again, it is important to remember that the randomness described here does not refer to the random sample of 300 resident-days selected for each of Medicare and Medicaid; rather, this randomness is inherent in the universe of the days from which the random sample was selected. The universe should be pre-determined and not random. *Id.* at ¶ 16. Dr. Panis' universe of resident-days varies every time he runs his program, which means it cannot be tested to determine whether his sort of the universe into Medicare and Medicaid resident-days is correct.

Relator will attempt to minimize this error but even her own expert agrees that he used an unstable sort that prevents Defendants from replicating his results. Relator will also try to blame Defendants for the format of the claims data that Dr. Panis used, which contained the overlapping time periods with different payors. But it is not Defendants' fault that their business data did not conform to the resident-day unit that Relator's expert chose to use. Relator's expert chose a sampling unit (resident-days) that Defendants do not use in their business and Relator must now bear the consequences of her expert's flawed sorting procedure by which he attempted to construct a universe from which to draw a random sample.

2.    Dr. Panis' sample is not representative of all 53 of Defendants' Florida facilities and neither are his extrapolations.

At a minimum, Relator's sampling methodology should have at least been designed to test the theory of a state-wide scheme to overbill Medicare and Medicaid. That is, a sampling frame should have been designed to assure that all 53 facilities were represented in the sample and that each facility's representation in the sample was proportional to its representation in the four-year universe from which the sample was drawn, so that a facility was not over- or under-represented. However, Dr. Panis did neither. On the instructions of Relator's counsel, who hired him, Dr. Panis decided not to select a sample that analyzed, or "stratified," by facility. Panis

Dep. 64:17-66:18.  Instead, he placed all 53 facilities into one large pool and calculated the

number of "resident-days" for Medicare and Medicaid over the four-year period for the entire

pool.[4]  He determined that there were 4,025,801 Medicaid resident-days and 1,504,288 Medicare

resident-days.  From this group he selected a sample of 300 Medicare resident-days and 300

Medicaid resident-days, Panis Dep. 13:5-6, along with 100 replacement resident-days for each

group in the event that a resident file could not be located, *id.* at 28:10-12 ("Q.  Were the -- was

there a core group of 300 and then a replacement group of 100? A.  Precisely.").

     As a result of this approach to constructing the sampling frame, Dr. Panis' resulting

sample *did not contain any resident-days for five of the 53 facilities* in the Medicaid sample and

*did not contain any resident-days for two of the 53 facilities* in the Medicare sample.  Boedeker

Decl. ¶ 11 (attached hereto as Exhibit C ("Ex. C")); Panis Dep. 46:17-47:3; 62:6-10.  That is,

Relator neither selected nor reviewed any resident files for five facilities (for her Medicaid

review) and two facilities (for her Medicare review) and she therefore made no findings of

overpayments for these facilities.  Nevertheless, Dr. Panis extrapolated the relatively small

amount of alleged overpayments in the sample group over the entire universe of resident days (4

million for Medicaid and 1.5 million for Medicare), *including the resident-days for the facilities*

*that were not in the sample and were never reviewed.* Boedeker Decl. ¶ 11; Panis Dep. 48:9-14;

62:18-63:1; 76:12-17.  The resulting extrapolation amount of $302 million is not reliable because

it is based on a statistical model that purports to test all 53 facilities when in fact it did not do so.

Boedeker Decl. ¶ 11.

---

[4] Dr. Panis derived a resident-day as his sampling unit by taking a bill, "typically . . . for 30 days or so," and replicating "that bill 29 more times, so that there was one record for every day."  *See* Panis Dep. 82:12-82:18.

Relator will undoubtedly argue that it is not necessary to assure that every facility is represented in the sample.  But Relator will be hard-pressed to explain why facilities that were never sampled and whose resident files were never reviewed should be used as part of Dr. Panis' calculation of a state-wide overpayment in the amount of $302 million.  Dr. Panis admitted that he could have stratified by facility but did not do so on the instructions of Relator's counsel.  Panis Dep. 64:17-66:18.  Perhaps Relator did not want to draw any added attention to the fact that she did not work at 51 of the 53 facilities and did not want the sample results to be analyzed on a facility-by-facility basis for that reason, preferring instead to utilize her experts to attempt to create the appearance of a state-wide corporate scheme, which she has yet to prove.  In any event, as a result of the methodology Dr. Panis used at the direction of counsel, his sampling is flawed and his results are not representative of the alleged overpayments he is attempting to prove.  Boedeker Decl. ¶ 11.

Furthermore, the representation of the facilities in the sample is not proportional to their representation in the universe of resident-days from which the sample was selected.  For example, Sea Breeze Health Care (one of the 53 facilities) contains ten Medicaid resident-days in Dr. Panis' sample of 300 (3.33%)  However, in the entire universe of Medicaid resident–days, only 2.31% are assigned to this facility.  In other words, Sea Breeze is overrepresented in the Medicaid sample by a factor of 1.44 (3.33 divided by 2.31).  This over-representation skews the average of alleged Medicaid overpayments, as the average at this facility is alleged to be $121.09, well in excess of the alleged Medicaid overpayment average of $35.56 across Relator's entire Medicaid sample.  *Id*. at ¶ 12.  There are numerous other examples where facilities are over-represented in the sample; some of them have alleged Medicaid overpayments above the $35.56 average, which inflates the alleged overpayment.  Conversely, some facilities are under-

represented in the sample relative to their total resident-days in the universe and some of these facilities have alleged overpayments that are below the $35.56 average, which also inflates the overpayment estimate. *Id.* Relator will probably point to some facilities that are over-represented but lower the average and some that are under-represented that lower the average. That too may occur. However, for purposes of testing whether the sample is representative, Dr. Panis has presented no data that shows the net effect of the over- and under-representation of individual facilities. As a result, whether the sample selected is truly representative of the universe of all 53 facilities is pure guesswork and does not satisfy the reliability requirements for admission. *Id.* at ¶¶ 9, 12.

In addition, in the Medicaid sample, there were ten facilities where multiple resident-days were included in the sample but only one day per facility was found to have an overpayment and the other days were found to have zero overpayments. *Id.* at ¶ 13. An extrapolation calculation based on a single day with an overpayment is inherently unreliable.[5] Yet that is what Dr. Panis did. The alleged overpayments for these ten days total $1,588, which Dr. Panis then extrapolated to an amount in excess of $21.3 million. *Id.* The same sparse sampling occurred with the Medicare sample. Six facilities were represented with a sample size of one yet Dr. Panis used the alleged overpayment for that one day as part of his extrapolation. For example, Relator's experts found a single overpayment of $458 for one resident-day at Seaview Nursing and Rehab Center. That single alleged overpayment contributed over $2.2 million to Dr. Panis' extrapolated Medicare total of $159 million. *Id.*

---

[5] A statistical valid sample has to have at least two observations because the margin of error calculations that measure the precision and thus the reliability of the sample use a division of "n-1" where "n" is the sample size. If the sample size is one, that implies division by zero, which is not possible. It should be noted that the minimum statistically valid sample size of two does not guarantee that the resulting extrapolations are reliable. In fact, small sample sizes typically result in unreliable extrapolations. *Id.* at 6 n.1.

Dr. Panis' failure to assure that the sample of 300 Medicare and 300 Medicaid resident-days was representative of all 53 facilities is not factored into the margin of error that Relator will surely point to. The margin of error (which is itself enormous and a separate ground on which to exclude Dr. Panis' extrapolation, as discussed *infra*) measures "sampling error." Sampling error assumes that the sample was correctly constructed and measures the precision of the sample based on factors such as the standard deviation of the results obtained from the sample. However, the margin of error does not address "non-sampling error," which can arise from improper universe definition; inaccurate sampling frames that do not represent the underlying population of interest; and data issues, such as that discussed in the next section. *Id.* at ¶ 21. So it is no response for Relator to rely on the margin of error that Dr. Panis reported from his extrapolations as if that cures the flaws in his failure to create a representative sample in the first place.

3.  Dr. Panis' choice of a resident-day as the sampling unit does not reflect
     sound scientific principles.

Dr. Panis has no prior experience in selecting a sampling methodology in a Medicare/Medicaid FCA case. *See* Panis Dep. 274:10-278:3. Notwithstanding that the focus of the FCA is whether a false claim was submitted, Dr. Panis chose not to use claims submitted for payment by Defendants as the sampling unit. Therefore, he has not estimated the number of false claims in the universe of claims submitted. Instead, he chose an individual resident-day as the sampling unit.[6] In doing so, Dr. Panis failed to create sampling units that were independent of each other, thus violating a principle of statistical sampling. Boedeker Decl. ¶ 18.

---

[6] In February 2015 when he filed his first report, Dr. Panis justified the choice of resident-day as the sampling unit because he expected that "a daily overpayment is probably much less variable." Panis Report at 7. In his later report, he calculated the standard deviation of the alleged overpayments, which is a measure of the variability in the alleged overpayments that were found by Relator's other experts. The standard deviations were significant—for the

The amount paid by Medicare and Medicaid is determined, in part, as a result of on-going assessments of the resident. For Medicare residents, these assessments occur at the 5th, 14th, and 30th day of a stay and every 30th day thereafter. For Medicaid residents, these assessments are updated as needed to reflect changes in the resident and the care provided. The amounts paid are identical for every day between any two assessments. *Id.* at ¶ 19. Therefore, each resident-day is perfectly correlated to all other resident-days in the assessment period and the amount paid is identical for each of the resident-days within these periods. *Id.*

By constructing a sampling universe of resident-days, Dr. Panis has constructed a universe of resident-days that are not independent of each other. *Id.* at ¶ 22. The alleged overpayment occurring on one day is highly likely (indeed, guaranteed) to occur on all other days within the assessment period. Similarly, a lack of overpayment on one day is highly correlated with a lack of overpayment on all other days within the assessment period. Id. However, under accepted principles of statistical sampling, each sampling unit must come from an independent and identical distribution (the "IID property"). *Id.* at ¶ 20. Dr. Panis' methodology did not create a universe that adhered to the IID property. By failing to construct a universe that contained independent sampling units, Dr. Panis' extrapolations are invalid and cannot be relied upon. *Id.*

4.     Dr. Panis' methodology and workpapers reflect other errors.

Dr. Panis' workpapers and computer code contain at least four other errors. **First**, Dr. Panis used the wrong formula for calculating the standard error, creating a biased estimate of the standard error. *Id.* at ¶ 23. In short, Dr. Panis' spreadsheet shows that he divided by (sample size

---

average Medicaid overpayment of $35.56 the standard deviation was twice that amount, i.e., $70.59. For the alleged average Medicare overpayment of $105.90, the standard deviation was 128% of that amount, *i.e.*, $135.92.

– 1) when the correct formula is to divide by the sample size. *Id.* Although the impact of the bias may seem small, when multiplied by the hundreds of millions of dollars he alleges in his extrapolation, this will be a significant number.

**Second**, Dr. Panis included resident-days in the sampling frame where the claims data that he used indicated negative amounts in the "total paid column." *Id* at ¶ 24. The negative amount could reflect reversals, credits and reversals, etc., but obviously does not reflect payments received. *Id.* Nevertheless, four of these days are included in the Medicaid sample that Dr. Panis selected. Ms. Bradley and Mr. Vianello found an alleged overpayment for one of these four sampling units. While one may seem small, the impact when this "negative-amount-paid-day" is included in Dr. Panis' extrapolation is significant—it alone contributes over $2.9 million to his Medicaid total. *Id.*

**Third**, as discussed previously, the claims data that Dr. Panis used to construct his universe of Medicare/Medicaid resident-days contains multiple entries with different payor information, *i.e.*, Medicare or Medicaid. Of the 600 sampling units that Dr. Panis selected for his sample (and used in his extrapolation), 40 of the 300 Medicaid sampling units and 21 of the 300 Medicare sampling units are associated with claims data with varying payor information. *Id.* at ¶ 25. In these situations, Dr. Panis arbitrarily assigned payors without providing any indication that he did any checking to confirm that the payor was correct. *Id.* As a result, in at least one instance, he identified a payor for a resident as Medicare but Relator's expert Ms. Bradley treated the payment as a Medicaid payment. The fact that such an incorrect payor assignment occurred in a small sample of only 300 is an indicator that it occurs much more frequently in a universe of over 4 million Medicaid days. *Id.*

**Fourth**, Dr. Panis assigned claims from the claims database where the period covered by the claim does not include the sampled day.  For example, for resident 4484, Dr. Panis' methodology selected 6/30/2011 as the sampled resident-day.  However, Ms. Bradley's review of the file for this resident indicates that the period she reviewed was from 6/1/2011 through 6/23/2011, *i.e.*, the sample day selected by Dr. Panis was not in the period covered by the file review.  *Id.* at ¶ 27.  While the impact of these types of discrepancies cannot be quantified, they show that the sampling frame constructed by Dr. Panis does not accurately represent the universe from which the sampling unit was selected.  *Id.*

     5.     <u>The margin of error calculated by Dr. Panis is enormous and does not reflect the non-sampling errors discussed above.</u>

The margin of error in Dr. Panis' extrapolation can be expressed as an absolute dollar amount and as a percentage of the total extrapolation.  As an absolute dollar amount, the margin of error is enormous: $23.2 million in his Medicare extrapolation which (because the error can go in either direction) implies a range of error of $46.4 million.  The margin of error in the Medicaid extrapolation is $32.3 million, which implies a range of $64.6 million.  The margin of error as a percentage of the total extrapolation is 14.6% of Dr. Panis' $159 million Medicare extrapolation amount and 22.6% of the $143 million Medicaid extrapolation amount.  Relator will probably point to these percentages and argue that they are small, but a percentage viewpoint misses the enormous dollar amounts that these percentages represent.[7]  Furthermore, the margin of error analysis reflects only the "sampling error," which is the error that flows from the fact that there can be many different samples of a given size from a fixed population size and

---

[7] An error range of this magnitude is indicative of a lack of precision in the extrapolation, which warrants exclusion of the result.  *Cf. United States ex rel. Loughren v. UnumProvident Corp.*, 604 F. Supp. 2d 259, 269 (D. Mass. 2009) (excluding expert testimony in an FCA case when the range of potential false claims established by an expert lacked precision and noting that "'a broad interval signals that random error is substantial'" (citation omitted)).

all of these different samples will yield different results.  Boedeker Decl. ¶ 21.  As discussed

above, the margin of error does not consider the non-sampling error that is pervasive in the

methodology employed by Dr. Panis.  *Id.*  The margin of error assumes that the sample is

representative of the universe—but it was not.  It assumes that the methodology employed can be

tested and replicated—it cannot.  It assumes that the sampling units are independent—they are

not.  It assumes that there are no other errors in calculations or the data selected—there are.  In

short, the margin of error – as enormous as it is – does not tell the entire story.  The non-

sampling errors are not quantifiable because they affect the entire methodological approach used

by Dr. Panis.

Moreover, the margin of error is misleading because it assumes that the underlying data

being extrapolated is reliable.  The underlying data here is represented by Ms. Bradley's

"findings" of an alleged overpayment.  Dr. Panis simply assumed that her analysis was correct

and that if she made a "finding" of an overpayment, then an overpayment occurred.  However,

her findings are not sound.  As just one example, Ms. Bradley assumed that if a resident file that

she reviewed was lacking a care plan for the selected day, then the entire amount paid for that

period constituted a false claim.[8]  This analysis is based on the flawed assumption that missing

documentation equals a false claim, which is not correct.  *See* Def.s' Mot. Summ. J., filed with

this Motion.  It also assumes that because a care plan was not in the resident file when Ms.

Bradley reviewed it in 2015, no care plan existed for the time period in question, which ranges

---

[8] When a resident file was missing documentation, such as when documents appeared to
be missing from the file for the period surrounding a sampled resident-day, Ms. Bradley could
have selected a replacement file for review, from the 100 replacement files that Dr. Panis
selected for each of Medicare and Medicaid.  Ms. Bradley chose not to do so, preferring instead
to treat missing documentation as establishing a false claim.  Dr. Panis did not question Ms.
Bradley's approach, even though he acknowledged in deposition that she could have selected one
of the replacement files to review in that situation.  *See* Panis Dep. 32:2-33:15.

from January 2008 to January 2012, and further assumes that no payment credit would be given

for the care that was provided, even if a written care plan could not be produced years later.

Those conclusions also do not follow.  Dr. Panis' calculations proceed on the assumption that

every finding by Ms. Bradley is correct and that the amount paid is an overpayment.  His

extrapolation total is simply a calculation of the average amount of alleged overpayments found

by Ms. Bradley, extrapolated across the universe that he constructed of 5.5 million resident-days.

His margin of error calculation does not does not reflect all the unreliable assumptions that go

into it, such as assuming that missing documentation equals a false claim.

## III.    ARGUMENT

### A.    Legal Standard

In *Daubert*, the Supreme Court charged trial judges with the responsibility of acting as

"gatekeepers" to ensure that expert testimony is relevant, does not usurp the role of the judge or

the jury, and is based on a proper factual and methodological foundation.  *See Daubert v. Merrell

Dow Pharms., Inc.*, 509 U.S. 579, 589-97 (1993).  In *Kumho Tire Co., Ltd. v. Carmichael,* 526

U.S. 137 (1999), the Court clarified that "this basic gatekeeping obligation" applies not only to

"scientific" testimony, but "to all expert testimony."  *Id.* at 147.  The district court must "make

certain that an expert, whether basing testimony upon professional studies or personal

experience, employs in the courtroom the same level of intellectual rigor that characterizes the

practice of an expert in the relevant field."  *Id.* at 152.

In evaluating expert testimony, the Court is guided by Federal Rule of Evidence 702,

which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training,
> or education may testify in the form of an opinion or otherwise if: (a) the expert's
> scientific, technical, or other specialized knowledge will help the trier of fact to
> understand the evidence or to determine a fact in issue; (b) the testimony is based
> on sufficient facts or data; (c) the testimony is the product of reliable principles

and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  In evaluating admissibility under Rule 702, the Eleventh Circuit has stated:

> [Courts must] engage in a rigorous three-part inquiry [considering] whether: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.  While there is inevitably some overlap among the basic requirements – qualification, reliability, and helpfulness – they remain distinct concepts and the courts must take care not to conflate them.

*United States v. Frazier*, 387 F. 3d 1244, 1260 (11th Cir. 2004) (citation omitted).

The burden lies on the party proffering the expert testimony to establish, by a preponderance of the evidence, that it is admissible.  *See Allison v. McGhan Med. Corp*., 184 F.3d 1300, 1306 (11th Cir. 1999) (citing *Daubert,* 509 U.S. at 592 n.10).  Specifically, the burden of proving that an expert satisfies all three parts of the inquiry – qualification, reliability, and helpfulness – "rests on the proponent of the expert opinion, whether the proponent is the plaintiff or the defendant in a civil suit, or the government or the accused in a criminal case." *Frazier*, 387 F.3d at 1260.  An expert need only fail one of these parts to be disqualified as an expert. *See, e.g.*, *United Food Mart, Inc. v. Motiva Enters., LLC*, 404 F. Supp. 2d 1344, 1347 (S.D. Fla. 2005).

**B.      The Methodology Must be Capable of Being Tested**

In order for statistical sampling to be admissible in Medicare/Medicaid payment cases, the proffered evidence must meet the *Daubert* and Rule 702 requirements of reliability and helpfulness, and be presented by an expert with the requisite qualifications.  *See, e.g.*, *United States v. AseraCare, Inc.*, No. 2:12-CV-245-KOB, 2014 WL 6879254, slip op. at *7 (N.D. Ala. 2014) (discussing standards of admissibility in an FCA case involving statistical sampling).  To

assure that the statistical sample satisfies the requirement of reliability, it must be capable of being tested. *Frazier*, 387 F. 3d at 1262. In order to be tested, the methodology employed must be capable of being replicated. *Rembrandt Vision Techs., L.P.*, 282 F.R.D. at 667 ("'Someone else using the same data and methods must be able to replicate the result.'" (quoting *Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 419 (7th Cir. 2005))). Indeed, the Center for Medicare and Medicaid Services (CMS) emphasizes this requirement in the guidance it provides to Medicare contractors conducting audits and employing sampling methodology. In its Medicare Program Integrity Manual ("MPIM"), CMS sets forth requirements for "Documentation of [Sampling] Universe and Frame." MPIM § 8.4.4.4.1. This section states that "[s]ufficient documentation shall be kept so that the sampling frame can be re-created, should the methodology be challenged." *Id.*[9]

Dr. Panis' statistical sampling and results cannot be tested and replicated because he used the unstable sorting procedure in the STATA program to construct the universe of resident-days, *i.e.*, the sampling frame from which the sample resident-days were drawn. The claims data that Dr. Panis analyzed required that he analyze overlapping claims data in order to determine whether the payor was Medicare or Medicaid, which are the two groups by which he stratified his sample. Dr. Panis had to sort the resident-days into these two buckets. In doing so, he was not careful to use a sorting procedure that could be replicated. As a result, every time his program is run, the number of resident-days in each bucket varies, often by significant amounts. His own post-deposition analysis shows that the variation in the number of resident-days can be

---

[9] CMS also requires that "before using extrapolation to determine overpayment amounts to be recovered by recoupment, offset or otherwise, there must be a determination of sustained or high level of payment error, or documentation that educational intervention has failed to correct the payment error." MPIM, § 8.4.1.2. None of those prerequisites has occurred here. Accordingly, a CMS auditor would not be permitted to do the extrapolation that Dr. Panis conducted.

as much as 2,648.  However, Dr. Panis ran only 1,000 simulations for his test, whereas there are approximately 35,000 resident-days affected by his unstable sorting procedure.  Boedeker Decl. ¶ 17.  As a result of his methodology, Defendants cannot replicate his sorting procedure and confirm that the universe of resident-days is what he claims it is when he did his extrapolation. The sampling frame of resident-days is critical as it forms the basis for his extrapolation, *i.e.*, he multiplied the total resident-days by the average overpayment in the sample to arrive at his $302 million result.  Dr. Panis' methodology results in a randomly generated universe or sampling frame, whereas reliable sampling methodology requires a pre-determined sampling frame.  *Id.* at ¶ 16.  Therefore, his extrapolation result is random and cannot be replicated.  It should not be admitted.

### C.    The Sample Must be Representative of the Universe

One of the threshold requirements that must be met for statistical sampling to be admissible is that the sample be representative of the population universe that it purports to represent.  *See United States ex rel. El-Amin v. George Washington Univ.*, 533 F. Supp. 2d 12, 50 (D.D.C. 2008) (stating that if statistical sampling is to be used in an FCA case, "the sample that is ultimately presented to the jury should be . . . representative of the universe of claims").  In *United States v. Jones*, 641 F.3d 706,712 (6th Cir. 2011), a criminal Medicare fraud case, the court rejected the government's statistical sample used for sentencing because "[w]ithout a sound representative sample, that analysis was flawed" rendering the resulting extrapolation "clearly erroneous."  *Id.*   Expert statistics "are unreliable if they are based on 'incomplete data sets and inadequate statistical techniques.'"  *EEOC v. Freeman*, 961 F. Supp. 2d 783, 792 (D. Md. 2013). In *Freeman*, the court granted the defendant's motion to exclude the EEOC's expert who had conducted a statistical analysis of defendant's hiring practices, finding several significant errors that rendered the expert's conclusions "completely unreliable."  Among the errors cited was the

expert's failure to include data from all the defendant's branch offices in his analysis – an omission that lead the court to question how that offices that were sampled "should be considered a representative sample." *Id.* at 796-97. *See also R & R Int'l, Inc. v. Manzen, LLC*, No. 09-60545-CIV, 2010 WL 3605234, at *13 (S.D. Fla. Sept. 12, 2010) (finding that "'samples . . . [should] [be] chosen using some method that assures the samples are appropriately representative'" of the population (citing *Allgood v. Gen. Motors Corp.*, No. 102CV1077DFHTAB, at *11 (S.D. Ind. Sept. 18, 2006))); *IGT v. Alliance Gaming Corp.*, No. 2:04-CV-1676-RCJ-RJJ, 2008 WL 7084606, at *10 (D. Nev. 2008) (stating that, in order to be valid, a sample must be "representative of the population" (citing *United Parcel Serv., Inc. v. U.S. Postal Serv.*, 184 F.3d 827, 840 n.14 (D.D.C. 1999)); *Menasha Corp. v. News Am. Marketing In-Store, Inc.*, 238 F. Supp. 2d 1024, 1030 (N.D. Ill. 2003) (explaining that reliability of survey results depended on "a sample that accurately represents the target population"), *aff'd* 354 F.3d 661 (7th Cir. 2004); *United States v. Mikos*, No. 02 CR 137, 2003 WL 22922197, at *4 (N.D. Ill. Dec. 9, 2003) (finding that a database could not "form the basis for expert opinion testimony under the requirements of *Daubert*" where the record didn't "reflect that . . . samples [from the database] were gathered in any . . . manner so as to be considered as representative of the . . . population as a whole").

Dr. Panis' sample does not satisfy this requirement. His sample omits five of Defendants' facilities from his Medicaid sample and two from his Medicare sample. No resident files from these facilities were selected for review by Ms. Bradley and no "findings" were made by her based on these facilities. Yet these facilities contributed their four-year total of resident-days to the total resident-days used by Dr. Panis when he extrapolated to arrive at his enormous $302 million total. This is not a simple overpayment case but a False Claims Act case in which

Relator is attempting to prove a state-wide fraud.  Before any extrapolation should even be considered for admission, it should at least be based on a sample that includes every facility to which the subsequent extrapolation will be applied.  Without that fundamental requirement satisfied, the sample is not "representative of the universe of claims."  *El-Amin*, 533 F. Supp. 2d at 50.

Dr. Panis' sample is also not representative because the facilities are not represented in the sample in the same proportion as they are in the universe from which the sample was taken.  As a result, different facilities are over and under-represented and skew the resulting average that Dr. Panis used for the extrapolation.  Dr. Panis made no effort to determine the net effect of this bias.  In addition, Ms. Bradley made only a single finding of an overpayment for many of the facilities.  Yet Dr. Panis' methodology treated a single finding as if it established a norm and extrapolated from it to find millions of dollars of alleged overpayments when the data suggests it was not the norm.  Boedeker Decl. ¶13.  The lack of basic logic to this approach is illustrated by this example.  Under Dr. Panis' sampling methodology, if there were only a single finding of one $300 overpayment in the Medicaid sample, he would divide that overpayment by the 300 resident-days in the sample to find an average of $1.00 in overpayments in the sample group.  Under his extrapolation formula, he would then multiply that $1.00 by the 4 million Medicaid resident-days and find a total overpayment of *$4 million*.[10]  The fact that *a single $300 overpayment could be extrapolated to a $4 million total* illustrates that Dr. Panis' methodology is not sound.

### D.    The Expert Testimony Must be Reliable and Helpful To the Jury

---

[10] Dr. Panis' extrapolation method was to multiply the average overpayment in the sample group by the total universe of resident-days, which were 4,025,801 for the Medicaid group. Panis Dep. 75:12-15.

Unreliable expert testimony is inadmissible. *See Daubert*, 509 U.S. at 584 (stating that this demand is satisfied by "evidence based on scientifically valid principles"); *see also United States v. Warren*, 349 Fed. Appx. 393, 396 (11th Cir. 2009) (indicating that "an expert's testimony [must] rest[] . . . on a reliable foundation"). Expert testimony is unreliable if (1) the purported expert is not "qualified to testify competently as to the subject matter," (2) the method the purported expert used to reach her conclusions is unreliable, or (3) the offered testimony fails to assist "the trier of fact to comprehend the evidence through the application of the witness's expertise." *Lopez v. Allstate Fire & Cas. Ins. Co.*, No. 14-20654, 2015 U.S. Dist. LEXIS 127495, *4 (S.D. Fla. Sept. 13, 2015) (citing *Quiet Tech. DC-8, Inc. v. Hurel-Dubois U.K. Ltd.*, 326 F.3d 1333, 1340-41 (11th Cir. 2003)).

Expert testimony must "'assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Quiet Tech. DC-8, Inc.*, 326 F.3d at 1347 (quoting *Daubert*, 509 U.S. at 591). See also *Allison*, 184 F.3d at 1312 (explaining that, in determining admissibility of expert testimony, courts must consider likeliness that the testimony will "assist [the jury] in factual determinations" as well as the testimony's "potential to create confusion"). Expert testimony is relevant and thus helpful when (1) the expert testimony "'relate[s] to any issue in the case,'" and (2) the disputed evidence "'ha[s] a valid scientific connection to the disputed facts in the case.'" *Quiet Tech. DC-8, Inc.*, 326 F.3d at 1347 (citations omitted). In order for evidence to have a "valid scientific connection" to disputed facts, the methodology used to test a population must be sound and "there must be good grounds to extrapolate from [the population tested] to [the population at issue in the case]." *Id.* at 1348. Further, an opinion that is "imprecise" is not helpful to the jury because it "easily could serve to confuse the jury, and might well [mislead] it." *See Frazier*, 387 F.3d at 1266.

22

In *United States ex rel. Barron v. Deloitte & Touche, LLP*, Civ. No. SA-99-CA-1093-FB, 2008 WL 7136869 (W.D. Tex. Sept. 26, 2008), a Medicaid FCA case, the relators' statistical expert (Levine) constructed a sample of Medicaid claims that were reviewed by another expert (Parrish). Levine then relied on Parrish's findings to extrapolate damages totaling $53 million. In granting the defendants' motion to exclude Levine's extrapolation, the court noted that it was based entirely on Parrish's findings and that Parrish (much like Ruckh's expert Bradley did here) found a claim to be "invalid" if it lacked sufficient documentation. The court rejected that reasoning, finding that Parrish made no attempt to account for "obvious alternative explanations for the missing documents" (such as that they "once existed [but] no longer did so"). *Id.* at *3. Parrish admitted that his findings "did not suggest that services were not provided, were medically unnecessary, or were not reimbursable." *Id.* The court rejected the relators' argument that Levine's reliance on Parrish's findings went to the weight of his testimony rather than its admissibility. Instead, the court found that Levine's reliance on Parrish and his resulting extrapolation of damages were "mere speculation 'connected to existing data only by the *ipse dixit* of the expert.'" The court excluded Levine's statistical extrapolation as unreliable. *Id.* at *4.

Dr. Panis' extrapolation results do not satisfy these requirements of reliability and helpfulness. As in the *Barron* case, Dr. Panis simply accepted the findings of another person (Ms. Bradley) who made such erroneous findings as a missing care plan in a resident file equals a false claim. As *Barron* held, that conclusion is "mere speculation." There are numerous other reasons why Dr. Panis' methodology is not reliable. The sample he selected is not representative of the universe nor is it capable of being replicated. For many facilities, Dr. Panis extrapolated from a single alleged overpayment to millions of dollars in alleged damages. A sample size of

23

one is an insufficient basis on which to draw reliable results.  Boedeker Decl. ¶ 13.   Permitting

such testimony will not assure that it has "'a valid scientific connection to the disputed facts in

the case.'"  *Quiet Tech. DC-8, Inc.*, 326 F.3d at 1347 (citations omitted).  Dr. Panis chose to use a

resident-day as his sampling unit, which, due to the fact that payments are identical between two

assessments, means that the sampling units are not independent of each other.  This procedure

violates the statistical sampling principle requiring independent and identical distribution.

Boedeker Decl. ¶ 20.  The jury cannot be expected to evaluate the necessity of these

requirements for statistical sampling and the resulting flaws in Dr. Panis' methodology, which is

why the Court's "gatekeeper" role is so important here.  Before the Relator should be permitted

to introduce testimony of alleged overpayments totaling $302 million, the Court must assure that

the reliability and helpfulness requirements are met.  They are not here.

Even if the Court concludes that the sampling units need not be independent, there are

other errors in Dr. Panis' methodology that foreclose the use of the resident-day as the sampling

unit.  Dr. Panis arbitrarily assigned resident-days to payors (Medicare or Medicaid) without any

indication that he checked to confirm that the assignment was correct.  He also selected resident-

days that were outside the period of the resident file that Ms. Bradley reviewed to make her

findings.  This raises fundamental questions about the methodology employed, as Dr. Panis

chose a sample day to review while Ms. Bradley reviewed a different period to make her

findings.  This discrepancy is another example of the non-sampling error that is present in Dr.

Panis' methodology.

Finally, Dr. Panis' extrapolation is not helpful to the jury because the margin of sampling

error is enormous: a $46.4 million range for his Medicare sample and a $64.6 million range for

his Medicaid sample.   This margin of error calculation assumes that the sampling frame was

correctly constructed, which it was not, and it does not take into account all the non-sampling errors that exist in Dr. Panis' methodology and results.  It is not helpful for the jury to be presented with testimony regarding such wide margins of error, which are compounded by the non-sampling error that is pervasive throughout Dr. Panis' methodology.  His extrapolation results lack the precision needed for admissible expert testimony and can more accurately be described as "guesswork."  *Id.* at ¶ 9.  The testimony should be excluded.[11]

## REQUEST FOR ORAL ARGUMENT

Defendants respectfully request oral argument on this Motion and estimate that 30 minutes will be needed for argument.

## LOCAL RULE 3.01(g) CERTIFICATION

Counsel for the Defendants has conferred with counsel for the Relator regarding this Motion.  Relator's counsel has advised that they oppose it.

April 5, 2016                                  Respectfully submitted,

                                               */s/ Terence J. Lynam*
                                               Robert S. Salcido (*pro hac vice*)
                                               rsalcido@akingump.com
                                               Terence J. Lynam (*pro hac vice*)
                                               tlynam@akingump.com
                                               AKIN GUMP STRAUSS HAUER & FELD LLP
                                               1333 New Hampshire Avenue, NW
                                               Washington, DC 20036
                                               Telephone: (202) 887-4000
                                               Facsimile: (202) 887-4288

                                               Tina Dunsford (Florida Bar No. 624721)
                                               tdunsford@flhealthlaw.com
                                               FLORIDA HEALTH LAW CENTER
                                               501 E. Kennedy Blvd., Suite 775

---

[11] Dr. Panis also intends to offer testimony regarding his estimate of potential False Claims Act penalties.  Because he relies on the same faulty methodology as he did for his overpayment extrapolation, his penalty estimates should also be excluded.

Tampa, Florida 33602
Telephone: (813) 517-1661
Facsimile: (813) 517-1668

*Counsel for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on April 5, 2016, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to counsel of record for Plaintiffs.

/s/ Terence J. Lynam
**Terence J. Lynam**

*Attorney for Defendants*