# Exhibit B

1             IN THE UNITED STATES DISTRICT COURT

2             FOR THE MIDDLE DISTRICT OF FLORIDA

3                     TAMPA DIVISION

4

5   THE UNITED STATES OF AMERICA and
    THE STATE OF FLORIDA ex rel.
6   ANGELA RUCKH,

7             Plaintiffs,

8   V.                              CIVIL ACTION NO.

9   CMC II, LLC; SEA CREST HEALTH      8:11 CV 1303
    CARE MANAGEMENT, LLC, d/b/a        SDM-TBM
10  LAVIE MANAGEMENT SERVICES OF
    FLORIDA; SALUS REHABILITATION,
11  LLC, d/b/a LAVIE REHAB; 207
    MARSHALL DRIVE OPERATIONS, LLC,
12  d/b/a MARSHALL HEALTH AND
    REHABILITATION CENTER; 803 OAK
13  STREET OPERATIONS, LLC, d/b/a
    GOVERNOR'S CREEK HEALTH AND
14  REHABILITATION CENTER,

15            Defendants.          **CONFIDENTIAL**

16

17            VIDEOTAPED DEPOSITION OF

18             CONSTANTIJN PANIS, PHD

19              Washington, DC 20036

20                March 17, 2016

21

22  By:  Denise D. Vickery, CRR/RMR   Job No. J0317014



1         A.   No.  Actually, that was actually a

2   Medicaid case, if I recall.  Sorry.  It was -- it

3   was over -- in part it was over sampling, but it was

4   a Medicaid reimbursement case.

5         Q.   All right.  Is that the only case that

6   involved sampling where you testified in court?

7         A.   It's the only case of which, unless you

8   count depositions but --

9         Q.   Okay.

10        A.   -- I've only testified once in court in

11  my career.

12        Q.   How many -- in how many cases did you

13  prepare reports where the report that you prepared

14  involved sampling and extrapolation in either

15  Medicare or Medicaid?

16        A.   I'd have to check my resume.

17        Q.   Okay.  We'll go over that in more

18  detail.

19        A.   Okay.

20        Q.   I just -- I just want to get a little

21  feel for that.  We'll go back over that.

22             In this case that we're here for today,



1    did you select a sample group of residents?

2              A.    I selected resident-days as a sample.

3              Q.    All right.  And what was the size you

4    selected?

5              A.    I selected 300 Medicare resident-days

6    and 300 Medicaid resident-days.

7              Q.    And what was the universe of

8    resident-days for the Medicare and Medicaid

9    population?

10             A.    Well, the universe is conceptually

11   defined and is not something that we get to work

12   with.  We get to work with a sampling frame, and the

13   sampling frame, which is derived from the universe,

14   contains about one and a half million Medicare days

15   and four million Medicaid days.

16             Q.    So the combined total of Medicare and

17   Medicaid days was about 5.5 million; is that right?

18             A.    That's correct.

19             Q.    And your sample was 600 combined

20   Medicare and Medicaid?

21             A.    That is correct.

22             Q.    In any of the other cases in which



1    you've either written reports or testified as an

2    expert involving Medicare and Medicaid

3    reimbursement, did you choose a sample size that was

4    comparable to the sample size here when compared to

5    the universe?

6            A.    The sample sizes are comparable.  The

7    universe tends to be smaller.

8            Q.    Well, as a percentage, could you

9    compare the -- let me back up.

10            In this case, can you estimate what the

11    sample size of the 600 days was relative to the 5.5

12    million days in the universe?

13            A.    I'm just doing this by heart.  I think

14    it's 0.01 percent or so.  We --

15            Q.    Would it help if you had a calculator?

16            A.    I can probably do it.

17            Q.    Yeah, let me give you a calculator, if

18    you don't mind.  Just -- I just want to see if you

19    can help me understand the -- the percentage here.

20            A.    (Pause).  Yeah.  It's slightly more

21    than 0.01 percent.

22            Q.    Okay.  So slightly more than 1/100 of



1   requirements are not met and there would be an

2   overpayment.

3        Q.   Does a care plan have a specific format

4   or title?

5        A.   I don't know.

6        Q.   You don't know what a care plan looks

7   like?

8        A.   No.

9        Q.   Is there a requirement that a care plan

10  consist of a -- of a specified format?

11       A.   I don't know.

12       Q.   So you prepared a spreadsheet with

13  these residents' names on them.

14            Was there anything else on the

15  spreadsheet?

16       A.   Oh, yeah.  The resident name, the

17  resident day, because I selected a specific day, and

18  there was some identifying information like this day

19  was billed -- was billed as part of a bill that

20  spanned a certain period.  And there may have been

21  additional information, such as Medicare ID or some

22  identifying information, that would make it easier



1           A.    The results would likely change.

2           Q.    Okay.  I know you said your opinions

3   are as stated in your report, and we'll go through

4   them.

5               Can you summarize the basis for your

6   opinions?

7           A.    Can you clarify that?

8           Q.    Well, maybe I'll ask it this way.

9               Can you tell us the methodology you

10  employed to reach your opinions in your report?

11          A.    Okay.  I drew a random sample from a

12  claims database that was provided to me by the

13  defendants or by counsel from the defense.  I handed

14  that sample, which consists of a list of

15  resident-days.  I handed that list to counsel, who

16  provided it to Ms. Bradley is my understanding.

17              She and a certain Mr. Vianello, I

18  believe, determines the overpayment, and I took

19  those overpayments and extrapolated them to the

20  sampling frame.

21          Q.    You say you provided a list of the

22  sample patients?



1          A.    Correct.

2          Q.    In what form was that list?

3          A.    It was an Excel spreadsheet.

4          Q.    Okay.  How many patients are on that

5     list for Medicare?

6          A.    There were 400 patients in total,

7     patient-days in total.

8          Q.    How many were on for Medicaid?

9          A.    The same thing.

10         Q.    Were the -- was there a core group of

11    300 and then a replacement group of 100?

12         A.    Precisely.  My -- my intent was to

13    sample 300 patient-days.  In case certain, files

14    could not be found or were illegible, or whatever

15    the circumstance may be.  If the -- the other

16    experts were unable to determine the overpayments,

17    then I instructed them to take a replacement.  And

18    so for the purpose of those replacements, I added a

19    hundred additional resident-days.

20         Q.    How did you identify the core group and

21    the replacement group on your spreadsheet that you

22    provided Ms. Bradley?

1        A.    I believe the first 300 rows were

2   marked "core" and the next 100 "replacement."

3        Q.    And you provided instructions as to

4   when a replacement file should be used?

5        A.    Yes.

6        Q.    And what were those instructions?

7        A.    If -- if the other experts were unable,

8   for whatever reason, to determine an overpayment,

9   they were instructed to select a replacement.

10       Q.    What would be one of the reasons why

11  the other expert could not determine an overpayment?

12       A.    If the file was not there or the file

13  was illegible.

14       Q.    What if the file was incomplete?

15       A.    Well, it would depend.  For Medicare,

16  if a file was incomplete to the extent that it could

17  not be determined what the overpayment was, then it

18  would need to be replaced, even though there might

19  be other elements of the file present.

20            For Medicaid, if, for example, a care

21  plan was missing, that will be key to the -- the

22  overpayment calculation, and so for that purpose if



 1    for the -- for the other experts to find that file.

 2          Q.   Now, did you provide any instructions

 3    on the order in which a replacement file should be

 4    used if a core group file could not be located or

 5    was incomplete?

 6          A.   Yes.  For the first file that was

 7    missing, the first replacement resident-day should

 8    be taken.  For the second one, the second day, etc.

 9    It should be done sequentially.

10          Q.   Did you provide that instruction in

11    writing?

12          A.   No.  I think I just communicated that

13    to counsel.

14          Q.   You communicated that to counsel before

15    Ms. Bradley did her review?

16          A.   Yes.

17          Q.   Do you know if Ms. Bradley followed

18    that procedure?

19          A.   My understanding is that Ms. Bradley

20    reviewed all files that she could find.

21          Q.   Including all the replacement files?

22          A.   Correct.



1        Q.   Did she review more than 300 then for

2   each group?

3        A.   Yes.

4        Q.   Do you know why she did that?

5        A.   I can't speak for her.  No.

6        Q.   Did she follow your instructions then

7   to only use a replacement -- to only review a

8   replacement file if a core file could not be

9   located?

10        A.   There may have been some confusion as

11   to which file should be taken and, maybe out of an

12   abundance of caution, she took them all.  It makes

13   no difference from my perspective.

14        Q.   Are you speculating when you say that?

15        A.   Yes.

16        Q.   Okay.  Why did you decide that 300

17   patients in each of the groups, Medicare and

18   Medicaid, was the appropriate size for the core

19   group sample?

20        A.   Okay.  So the appropriate size of a

21   sample depends on the precision that the judge or

22   the jury or counsel would like to see.  The way we



1    express it is with, for example, with 95 percent

2    confidence, we want to have a margin of error that

3    is less than, let's say, 20 percent.  It's that kind

4    of expression.

5              With that information, the sample size

6    can be -- the minimum required sample size can be

7    calculated, provided that we also know what the

8    variation is of overpayments in the population.

9              Now, that number --

10       Q.   I'm sorry.  Could you just say that

11   last part again?  I didn't -- I didn't quite hear

12   what you said.

13       A.   Another important determinant of the

14   sample size, the minimum required sample size, is

15   the variation in the outcome of interest.  The

16   variation in daily overpayments in the population.

17       Q.   Okay.

18       A.   That is a difficult metric to find

19   because no review has been done yet, and so there

20   are several ways of trying to estimate that -- that

21   standard deviation, that variation.

22              One would be to conduct a probe sample.



1   too small, the effect would be that the margin of

2   error would grow and that the lower bound of the

3   overpayments -- the estimated overpayments would

4   become lower.  So not only would the overpayments --

5   well, it would become lower and that would work in

6   the favor of the defense.

7           Q.   Yeah.

8           A.   Okay.

9           Q.   But the margin of error would increase

10  significantly, wouldn't it?

11          A.   Right, and I think you would like that.

12          Q.   I would like that?

13          A.   Yes.

14          Q.   (Laugh).  Thank you.

15          A.   (Laugh).

16          Q.   How many LaVie facilities in Florida

17  are in the population universe?

18          A.   53.

19          Q.   Okay.  When you selected the sample

20  group, did you do anything to make sure that every

21  facility was represented in the sample?

22          A.   No, I did not.



1          Q.    And why was that?

2          A.    My charge was to estimate total

3    overpayments across the 53 facilities.

4          Q.    Your charge from whom?

5          A.    From counsel.

6          Q.    So they instructed you not to consider

7    individual facilities?

8          A.    No, they didn't instruct me any of the

9    details.  They just asked me to devise a method -- a

10   method that would be able to calculate the total

11   overpayments for the system for the 53 facilities

12   combined.

13         Q.    Now, you said you reviewed

14   Mr. Boedeker's report that was in rebuttal to your

15   report?

16         A.    I have seen that, yes.

17         Q.    And in his report, Mr. Boedeker says

18   that five of the 53 facilities were not in the

19   Medicaid sample?

20         A.    Yeah.

21         Q.    Do you agree with that?

22         A.    You know, I haven't double-checked it,

1    but it's quite possible.

2          Q.    You don't disagree with it?

3          A.    I don't disagree with it.

4          Q.    Okay.  In fact, you gave a deposition

5    in this matter about a year ago; right?  When you

6    first devised your sampling methodology?

7          A.    I did.

8          Q.    And in your deposition, you said that

9    there might be some facilities that would have zero

10   days in your sample; isn't that right?

11         A.    I don't recall, but that sounds

12   consistent with my understanding, yes.

13         Q.    And that turned out to be the case;

14   right?

15         A.    Okay.

16         Q.    So how many resident-days were in the

17   universe for Medicaid?

18         A.    It was about 4 million.

19         Q.    Okay.  Did you remove the Medicaid days

20   for the five facilities that were not in your sample

21   before you calculated the overpayments?

22         A.    Could you repeat that?



1          Q.    Yes.  You said you don't disagree that

2    there were five facilities that weren't represented

3    in your sample; right?

4          A.    Yes.

5          Q.    And you also said there were

6    approximately 4 million Medicaid resident-days in

7    the universe; right?

8          A.    Correct.

9          Q.    Okay.  So did you remove the Medicaid

10   days associated with those five facilities from your

11   universe that you were extrapolating to before you

12   did your calculation?

13         A.    I did not because that would have been

14   inappropriate.

15         Q.    Why would it have been inappropriate?

16         A.    The sample I drew -- let's just focus

17   on Medicaid.  The sample I drew would be a simple

18   random sample of the Medicaid population, and the

19   fact that certain facilities were not there makes no

20   difference.  The fact that maybe certain years were

21   not there would not have made a difference.  Maybe

22   men would be underrepresented or overrepresented.



1    Would not make a difference.

2              In a simple random sample, you draw the

3    sample and you extrapolate back to the original

4    sampling frame.  You don't remove things that are

5    underrepresented or not represented.

6         Q.   So is it your testimony that you never

7    stratified by subgroups?

8         A.   Oh, I do.

9         Q.   Yeah.

10        A.   In fact, in a larger scheme here, I

11   stratified by program, right?  I have 300 Medicare

12   and 300 Medicaid.

13        Q.   Right.

14        A.   So it's a sample of 600 that are

15   stratified by program.

16        Q.   Right.  And is it your understanding

17   that each of the facilities is a separate payor for

18   Medicare and Medicaid -- I'm sorry -- a separate

19   facility that bills Medicare and Medicaid?

20              MR. LOVE:  Objection.

21              THE WITNESS:  I don't know that.

22   Billing may be done centrally.  I don't know how the



 1    defense works.

 2    BY MR. LYNAM:

 3         Q.   Is the sole reason that you decided not

 4    to stratify by facility because counsel told you not

 5    to?

 6         A.   Oh, no.  No.

 7         Q.   What were the other reasons?

 8         A.   There was no reason to.

 9         Q.   Did you attempt to do a probe sample to

10    see if there's any variation among the facilities?

11         A.   I did not.

12         Q.   And you had five facilities that

13    weren't even in your sample for Medicaid; right?

14         A.   Correct.

15         Q.   So when you multiplied out -- you took

16    an average overpayment from the sample group;

17    correct?

18         A.   Correct.

19         Q.   And then applied it to the universe;

20    right?

21         A.   Correct.

22         Q.   So when you did that calculation for



1   Medicaid, you multiplied the average overpayment by

2   the universe that included five facilities that you

3   did not sample; correct?

4          A.   Correct.

5               I know there's a lot of emphasis on

6   facility-by-facility issues.  That's not relevant to

7   me here.  Again, my scope was to calculate total

8   overpayments for the system, and facilities are just

9   one characteristic.  Year of admission is another

10  characteristic.  Male versus female is one.  None of

11  that is relevant.

12         Q.   Well, what is relevant, though, is the

13  variation in the overpayments; right?  You testified

14  to that earlier, didn't you?

15         A.   Well, it matters for determining the

16  standard deviation and, therefore, the margin of

17  error.

18         Q.   Right.  And if the overpayments vary by

19  facility, that would be relevant, wouldn't it?

20         A.   Not -- not if they vary by facility,

21  but the fact that they vary, that will be relevant.

22         Q.   Right.  And if it turns out that part



1    would have to have the actual numbers, but it is

2    possible that at that moment the estimated

3    overpayment would no longer be statistically

4    significant from zero.  That's an implication that

5    could follow from your scenario, but the method

6    remains exactly the same.

7             Q.   Okay.  So the number of facilities with

8    overpayments is irrelevant to your analysis?

9             A.   Correct.

10            Q.   Okay.  And even if one facility had an

11   overpayment, you'd do the same analysis; right?

12            A.   Correct.

13            Q.   Okay.  So, therefore, is it fair to say

14   you're not really -- you're not expressing an

15   opinion about a corporate-wide scheme?

16            A.   That's correct.

17                      MR. LOVE:  Objection.

18                      THE WITNESS:  That is correct.

19   I'm not expressing an opinion on that.

20   BY MR. LYNAM:

21            Q.   All right.  So you're -- you're taking

22   someone else's finding of an overpayment and then



1    just doing some multiplication; is that what you're

2    doing?

3          A.    That's pretty much it.

4          Q.    Okay.  All right.  Let's talk about the

5    Medicare group for a moment.

6                You read Mr. Boedeker's report, and he

7    said that of the 53 facilities, two of them were not

8    in your Medicare sample.

9                Do you disagree with that?

10         A.    I don't disagree with that.

11         Q.    Okay.  And how many resident-days were

12   in the universe for Medicare?

13         A.    About a million and a half.

14         Q.    Okay.  Did that million and a half

15   number include the resident-days for the two

16   facilities that were not in the sample?

17         A.    Yes.

18         Q.    So you did not remove the resident-days

19   for those facilities before you extrapolated over

20   the million and a half?

21         A.    That is correct.  The analysis was

22   exactly analogous to what we just went over for



1    Medicaid.

2          Q.   Okay.  And of the remaining 51

3    facilities, Mr. Boedeker found that there were

4    findings of overpayment by the other expert in 48 of

5    the 51.

6               Do you disagree with that?

7          A.   I didn't -- I didn't check, but I don't

8    disagree.

9          Q.   So under the assumption that that

10   calculation is correct, there were three facilities

11   in the Medicare sample that did not have findings by

12   Ms. Bradley of overpayments, but you included them

13   as well in your extrapolation when you multiplied by

14   the 1.5 million days?

15         A.   Yes.

16         Q.   Okay.  So then your total extrapolation

17   amount was approximately $159 million for Medicare?

18         A.   That is correct.

19         Q.   And that calculation of $159 million in

20   alleged overpayments, that also does not depend on

21   how many facilities in the sample group of 53 were

22   represented; right?



1          A.   Correct.

2          Q.   And it doesn't depend on how many had

3     overpayments?

4          A.   Well, it's -- t follows from the

5     average overpayments, and so the average overpayment

6     is affected by how many overpayments there were.

7          Q.   But you're taking the average and

8     multiplying it by all the facilities, even the ones

9     that had no findings?

10         A.   Yes, and the average is calculated over

11    all facilities as well.  Yes.

12         Q.   So, again, even if only 10 facilities

13    or five facilities or even one facility had an

14    overpayment, you'd still multiply it by the million

15    and a half days to get your total; right?

16         A.   Correct.

17         Q.   Now, you could have sampled on a

18    facility basis; right?

19         A.   I could have.

20         Q.   And is it correct that counsel told you

21    not to stratify by facility?

22                   MR. LOVE:  I'm going to instruct



1    you not to answer that if it goes to conversations

2    with counsel.

3    BY MR. LYNAM:

4         Q.   All right.

5         A.   I think I already.

6         Q.   I think you've already testified to

7    that; right?

8         A.   Yeah.  (Laugh).

9         Q.   in your prior deposition.

10        A.   No, but today even, right?

11        Q.   Yeah, I think you did today.  But why

12   don't we mark this as Exhibit 2.

13                  (Document marked, for

14   identification purposes, as Panis Exhibit No. 2.)

15   BY MR. LYNAM:

16        Q.   I placed before you a copy of the

17   transcript of the deposition you gave in this case

18   on March 10, 2015.

19             Do you recall giving that deposition?

20        A.   Yes, I do.

21        Q.   Okay.  And --

22        A.   I recall a long discussion with



1    Mr. Lilly about the fact that the sample was only

2    0.01 percent of the population.

3              Q.    Right.    Directing your attention to

4    page 143 of the transcript.

5              A.    Yes.

6              Q.    There's a -- there's a series of

7    questions there about why you didn't stratify by

8    facility; is that right?

9              A.    Yes.

10             Q.    And you said that your understanding

11   was the objective was not to produce estimates by

12   facility.

13                   Do you see that?

14             A.    Yes.

15             Q.    And the question was:    "Who explained

16   to you the objective?"

17                   And you said:    "Counsel."

18             A.    Correct.

19             Q.    And then you were asked:    "Did you ask

20   counsel why you were being told that was your

21   objective?"

22                   And you said:    "No, but I reviewed the



 1  facilities including --

 2               MR. MILLER:  Object.  Terry, if

 3  you could let him finish?

 4               MR. LYNAM:  Uh?

 5               MR. MILLER:  If you could let him

 6  finish.  You've been interrupting him.

 7               MR. LYNAM:  I didn't think I was

 8  interrupting him.

 9  BY MR. LYNAM:

10       Q.   I'm sorry.  I thought you were

11  finished.

12       A.   So the extrapolation involves

13  multiplying the population size, or the sampling

14  frame size, let's say 4 million, times an average

15  overpayment.

16       Q.   How is the average overpayment

17  calculated?  Maybe that's where we're --

18       A.   Exactly.  The average overpayment -- I

19  think it was $35 -- is calculated over all

20  facilities in the sample, including the ones that

21  had no overpayments in the sample.  And so the 4

22  million stays the same, but it's that average



1   overpayment that goes down because so many

2   facilities did not have any overpayment.

3       Q.   So you calculate an average overpayment

4   over the sample?

5       A.   Yes.

6       Q.   That's the first step?

7       A.   The entire sample.

8       Q.   Okay.  And that's affected by which

9   facilities had findings of overpayment and which

10  facilities did not?

11      A.   Sure.

12      Q.   Okay.  But when you took that average

13  overpayment, you then multiply it by the entire

14  universe, including all the facilities that were not

15  in the sample or the facilities that had findings

16  within the sample?

17      A.   Correct.

18      Q.   Okay.  All right.  In order to verify

19  your work, is it -- is it necessary for another

20  expert to be able to replicate the sample?

21      A.   Statistical textbooks don't talk about

22  replication or the requirement for replication.



 1  However, in litigation support, it's a very good

 2  idea and possibly even a requirement that

 3  replication of the sample is required, yes.

 4          Q.   Okay.  And, in fact, in your prior

 5  testimony last year in this case, you said that

 6  another reviewer could test your work by drawing the

 7  same sample; right?

 8          A.   Correct.  Yes.

 9          Q.   And would you agree that when

10  developing statistical samples then in litigation

11  work, it's important that another expert be able to

12  verify what you did by replicating the sample?

13          A.   Yes, I do.

14          Q.   Okay.  In this case, in order to select

15  the sample, you used a random number generator?

16          A.   Correct.

17          Q.   And was that part of the Stata program?

18          A.   Yes.

19          Q.   Now, you read Mr. Boedeker's report in

20  which he said that you did not select a stable sort

21  when using this program?

22          A.   Yeah.



1   universe.  What we received was a database with

2   claims.  Okay.  That is now the basis for

3   determining the sampling frame, which is the actual

4   list of resident-days from which the sample is

5   drawn.  You know, I cannot draw a sample from a

6   conceptual universe.  It needs to be from a specific

7   list.  That is the sampling frame.

8            Q.   Did you get such a list in this case?

9            A.   Well, so defendants provided a

10  database, a claims database --

11           Q.   Okay.

12           A.   -- from which I created that list.

13           Q.   Okay.  And is that the sampling frame

14  then, the list that you created?

15           A.   Correct.

16           Q.   Okay.  Now, when you created that list,

17  you used a program within the Stata program to sort

18  out the list?

19           A.   Sure.  It's a command.  Sure.  Yes.

20           Q.   I'm sorry?

21           A.   It's a command.

22           Q.   A command.

1             And was that a random generator or

2     random --

3          A.   No.

4          Q.   -- generator command?

5          A.   No, no.  It's a command that sorts

6     numbers.

7          Q.   Okay.  Now, was that a stable sort or

8     an unstable sort?

9          A.   There was a feature in there that there

10    was some instability there, yes.

11         Q.   Okay.  Were you aware at the time you

12    were doing that sort within the stable program that

13    you were utilizing the unstable sort feature?

14         A.   I didn't realize that it was an issue

15    at that time.  I'm aware of the issue in general,

16    but I didn't notice it.

17         Q.   You're aware in general that there is a

18    stable sort and an unstable sort --

19         A.   No.

20         Q.   -- within the Stata program?

21         A.   I'm aware that by default there is an

22    unstable sort.



1          Q.    A default.  And you used that default

2     in this case?

3          A.    Yes.

4          Q.    And did you -- did you intend to use

5     the unstable sort at that time?

6          A.    Well, it's -- it's the default.  It's

7     what I always use.  I have no objections to an

8     unstable sort.

9          Q.    But by using the unstable sort, that

10    means your sample cannot be replicated; right?

11         A.    Yes, it can because I turned over the

12    sampling frame and from that the sample can be

13    replicated.

14         Q.    No.  But devising the -- the problem is

15    the inability to replicate the sampling frame;

16    right?

17         A.    Well, if that's a requirement, then

18    that -- indeed, the exact sampling frame could not

19    be replicated.

20         Q.    Cannot?

21         A.    Cannot.

22         Q.    Okay.  And what you were faced with was



1    claims data; right?

2            A.    Yes.

3            Q.    Okay.  And that claims data included

4    certain billing periods; right?

5            A.    Correct.

6            Q.    And you had to sort of dissect that

7    claims data into sort of different rows of data to

8    analyze which one you were going to use; is that

9    right?

10           A.    Let me characterize it, if that helps.

11           Q.    Yes, why don't you try to explain it.

12           A.    So a bill would typically be for 30

13   days or so, and so it would contain 30

14   resident-days.  And I would replicate that bill 29

15   more times, so that there was one record for every

16   day because that will be my sampling unit, a day.

17           Q.    Right.

18           A.    A resident-day.

19           Q.    But the sampling frame is the list of

20   all those days?

21           A.    Correct.

22           Q.    Okay.  And the way you did that was to



1   use the unstable sort in the Stata program?

2           A.    Correct.

3           Q.    And that's the part that we can't --

4   that cannot be replicated; right?

5           A.    Correct.

6           Q.    Okay.

7           A.    Let me also point out.  The issue arose

8   because the -- the claims database that was provided

9   was very messy.  There were duplicate records.

10  There were incorrect records.  There were a number

11  of issues with it, and so I tried to deduplicate the

12  database.

13              As I do that and as I exclude a few

14  resident-days that were, in my opinion, obviously

15  erroneous, I'm excluding resident-days from my

16  sampling frame.  That means that my -- that the

17  sampling frame to which I extrapolate the results

18  later is smaller than it could have been.

19              In other words, it's a conservative

20  approach to exclude any resident-day because the

21  ultimate extrapolation of total damages will be

22  smaller in expectation.



1        Q.   Well, you say it's conservative, but

2   the way you did it prevents our expert from being

3   able to replicate it; isn't that right?

4        A.   Well, again, I provided the same.  I

5   provided the dataset and I showed my work, so he

6   knows exactly what I did.

7        Q.   But you provided the results of your

8   sort?

9        A.   Yes.

10       Q.   The sort can't be replicated; right?

11       A.   That's correct.

12       Q.   Okay.  Now, you said that there were

13  some incorrect records in the data.

14            And what do you mean by "incorrect"

15  record?

16       A.   So let me give you an example.  There's

17  always a date from the beginning of the bill to the

18  end of the bill.  So a bill may span the period from

19  March 1st to March 20 or so.  In some cases, the

20  beginning date was after the end date.

21       Q.   Right.

22       A.   That's --



1          Q.    What did you do then?

2          A.    I threw it out.

3          Q.    Just threw it out?

4          A.    Yes.

5          Q.    Okay.

6          A.    That made the sampling frame smaller.

7    It's a conservative approach because the ultimate

8    extrapolated overpayments will be smaller as a

9    result.

10         Q.    Okay.  But what about the payment

11   amount on that date?  Did you look at that?

12         A.    No.

13         Q.    You didn't -- you didn't -- you didn't

14   -- the payment amounts weren't relevant to your

15   sort?

16         A.    No.

17         Q.    Okay.  But in the claims data that you

18   received, there was data entered under the

19   "total_paid" column; right?

20         A.    Correct.

21         Q.    Some had zeros?

22         A.    Many had zeros.

1          A.    For the same person.  Exactly.

2          Q.    Well, you were -- you were trying to

3     get it down to 300; right?

4          A.    Oh, no, no, no.  This is the sampling

5     frame.  It's the 4 million.

6          Q.    Before you calculated?

7          A.    The 1.5 million.

8          Q.    Okay.

9          A.    Yeah.  So by -- by making these

10    exclusions, I shrank the sampling frame.  I shrank

11    the 5 and a half million, and when I later

12    extrapolated back to that sampling frame, I only

13    extrapolated to the included resident-days, not to

14    the excluded ones, which would have led to a larger

15    overpayment.

16         Q.    Well, there's only one day.  You can't

17    count the same day twice.  It's only one day; right?

18    March 17th only happens -- that's only one day.  You

19    can't count March 17th as two days; right?

20         A.    You can because there could have been

21    two bills.  One to Medicare and one to Medicaid.

22         Q.    Okay.



1          A.    That's a fundamental misconception in

2   what I read from Mr. Boedeker.  He seems to think

3   that there is only one payor on one day.

4          Q.    Okay.  Well, let me ask you about that

5   then.

6               Let's say there are two payors, and

7   let's say their "total_paid" column is zero.

8               How did you decide the tiebreaker?  How

9   did you decide which one to use?

10         A.    Well, that was one of the vul- -- not

11  vulnerabilities -- that was one of the issues that

12  the unstable sort picked one at random.

13         Q.    Just picked one at random?

14         A.    It did.  It excluded one at random.

15         Q.    And that's the part that can't be

16  replicated because it was unstable?

17         A.    Correct.

18         Q.    So is it fair to say that if you --

19  because you used the unstable sort, if you ran the

20  program again to create the sampling frame, a

21  different payor might be selected?

22         A.    Correct.



1          Q.   A Medicaid day might become a Medicare

2     day?

3          A.   Correct.

4          Q.   Or vice versa?

5          A.   Correct.

6          Q.   Let me show you Mr. Boedeker's report.

7               Do you have a copy of the Boedeker

8     report there?

9          A.   I do.  I do.

10              MR. LYNAM:  Okay.  Do you have a

11    copy of the Boedeker report?  Okay.

12    BY MR. LYNAM:

13         Q.   Can you take a look at the Boedeker

14    report at page 25.

15         A.   Yes.

16         Q.   In Mr. Boedeker's report, at Table 1 on

17    page 25, he gave an example of a resident-day where

18    there were two different payors in the claim type.

19              You see that?

20         A.   Yes.

21         Q.   For the same day; right?

22         A.   Yes.



1          Q.    What if the amount in the "total_paid"

2    column was a negative number?  Did you use that?

3          A.    I can't remember now if it was whether

4    I took the absolute value before.  Because I believe

5    that if there was any number, I would recognize it

6    as suggestion that that was, indeed, a payment.

7          Q.    So even if there was a negative number

8    in the total field -- "total_paid" column, you used

9    that as the criteria for the tiebreaker?

10         A.    Yes.

11         Q.    Okay.

12                    MR. LOVE:  Terry, it's been about

13   an hour and a half.

14                    MR. LYNAM:  Yeah.  You want to

15   take a break?

16                    MR. LOVE:  Take a break.

17                    MR. LYNAM:  Sure.  Okay.

18                    THE VIDEOGRAPHER:  Going off the

19   record at 10:55.

20                    (Recess - 10:55 a.m. - 11:09 a.m.)

21                    THE VIDEOGRAPHER:  Going back on

22   record at 11:09.  This marks the beginning of DVD



 1   No. 2.

 2   BY MR. LYNAM:

 3         Q.   Dr. Panis, before the break, I believe

 4   you testified that you did some checking last night

 5   and concluded that 460 resident-days for 26

 6   residents were affected by the unstable sort?

 7         A.   Correct.

 8         Q.   Do you have backup to support that?

 9         A.   I do not.  I could do it again but...

10         Q.   How did you determine that then?

11         A.   I wrote a little program to check.

12         Q.   And you didn't save the results?

13         A.   No.

14         Q.   But you could run that again?

15         A.   Yeah.

16         Q.   Now, is -- is one of the opinions

17   you're going to give in this case that the unstable

18   sort only affected those 460 resident-days?

19         A.   I believe that's correct.

20              MR. LYNAM:  Okay.  We'd like the

21   backup to support that opinion then.

22   BY MR. LYNAM:



1          Q.   Now, for the remaining data

2    resident-days in the universe that you used, I

3    believe you testified you used other criteria to

4    decide which data entry to use in your sampling

5    frame?

6          A.   Yeah.  So it's only an issue when there

7    is both a Medicare and a Medicaid bill, and in such

8    cases I used the "total_paid" column and the check

9    number.

10         Q.   Did you explain that in your report

11   anywhere?

12         A.   No.

13         Q.   Your report simply said you engage in

14   the process of deduplicating; right?

15         A.   Right.  Right.

16         Q.   So just so I understand this, since

17   it's not in your report, the criteria you used were

18   whether there was a number, some amount, absolute

19   value of that amount in the "total_paid" column;

20   correct?

21         A.   I believe that's correct.  I would have

22   to look at my program, but yes.



1   thing, but I also was interested in whether the

2   case -- whether your report was accepted or your

3   testimony was accepted in any court judgment after

4   the deposition.

5          A.   It was not rejected.  It was not

6   excluded.  Let's put it that way.

7          Q.   Okay.

8          A.   I just don't know what happened to

9   these cases.

10         Q.   Okay.  And in the -- in the BridgePoint

11  Education case, were you working for the defendants

12  there?

13         A.   Yeah.

14         Q.   Okay.  Did you devise the sample there?

15         A.   Yes.

16         Q.   And you said there were two each of 100

17  each?

18         A.   Yeah.  Again, I don't recall the

19  details, but it's on that order, yes.

20         Q.   You don't -- you don't recall what the

21  universe was?

22         A.   A few thousand advisors.  Maybe 3,000,



 1    something like that.

 2            Q.    Okay.  And that's the same for -- okay.

 3    We've already covered the Rowe case, which covers

 4    the Hansen and the Sweeney cases.  They're all

 5    related?

 6            A.    Right.  Right.

 7            Q.    Okay.  And then the other ones had no

 8    sampling?

 9            A.    Correct.

10            Q.    Okay.  So am I correct then that you've

11    not provided in any prior case an expert report or

12    testimony where you devised the sampling frame and

13    methodology for a Medicare/Medicaid overpayment

14    case?

15            A.    I believe that's correct.

16            Q.    Okay.  Were any of these cases where

17    you did sampling False Claims Act cases?

18            A.    I believe so.  Foroosh case is, I

19    believe, a False Claims Act.

20            Q.    Okay.

21            A.    Masimo, I'm not sure if it was.

22    Wasserman, yes, that was false claim.



1           Q.   Well, the ones where you actually

2    sampled them focus on.

3           A.   Oh, okay.

4           Q.   Was the deferred annuity case a false

5    claims case?

6           A.   No.

7           Q.   That was a class action law or class

8    action?

9           A.   It was class action, but not a false

10   claim.

11          Q.   Okay.

12               How about the one for BridgePoint

13   Education?

14          A.   No, not a False Claims Act case.

15          Q.   Okay.  So you provided a sample in one

16   False Claims Act case, which would be the Foroosh

17   one then; is that right?

18          A.   No.  They drew the sample.  I commented

19   on it.

20          Q.   Oh, that's right.  You commented on it.

21          A.   Yeah.

22          Q.   Okay.  So you haven't actually devised



1    a sample for a False Claims Act case?

2              A.    I have, but they're not here.

3              Q.    They're not here because why?

4              A.    Because it never went to trial and

5    never went to a report or nothing was filed with the

6    court.

7              Q.    Nothing was filed with the court?

8              A.    Right.

9              Q.    The case was settled before it got that

10   far?

11             A.    Well, I'm thinking it was two cases now

12   and both -- I'm not sure if they settled yet, but I

13   drew samples in two cases and I'm not sure where it

14   stands.

15             Q.    You did sampling at the request of

16   counsel, but it was never used in any filing that

17   you know of?

18             A.    Not in the filing, no.

19             Q.    Okay.  Okay.  Have you been accepted as

20   an expert in a case involving allegations of

21   overbilling Medicare or Medicaid?

22             A.    Well, this is one; right?  Have I been



1   accepted?  I think so.

2          Q.   It remains to be seen what the judge is

3   going to do, actually.  (Laugh).

4          A.   Okay.  So the Foroosh case I was

5   accepted.

6          Q.   Well, was that --

7          A.   Well, I was --

8          Q.   Was that a Medicare case, though?  That

9   was the state.

10         A.   No, you're right.  It's a Denti-Cal.

11         Q.   Okay.

12         A.   Medicaid for dental -- yeah, Medicaid

13  for dental claims in California.

14              Well, Wasserman is definitely a False

15  Claims Act case.

16         Q.   But there was no sampling in that case?

17         A.   Correct.

18         Q.   Okay.  I was focused on cases where you

19  had engaged in sampling where you were accepted as

20  an expert.

21         A.   Right.  No, I don't think it's on the

22  list of --



1        Q.    Okay.

2        A.    -- the list of expert opinion and

3    expert witness experience.

4        Q.    Okay.  All right.  If a statistical

5    sample in a Medicare overbilling case determines

6    that the error rate is less than 5 percent, does the

7    government typically not extrapolate damages in

8    those cases?

9                    MR. LOVE:  Objection.

10                   THE WITNESS:  I think it depends

11   on the stage of the investigation.  I believe that

12   for routine audits 5 percent may be used as a -- as

13   a rule of thumb, and that claims are not pursued if

14   the error rate that is found in a small sample is

15   less than 5 percent.

16                   In other cases, I don't know what

17   the -- whether there is any rule of thumb.

18   BY MR. LYNAM:

19       Q.    Well, when you say in routine cases

20   there's an audit done if the error rate is less than

21   5 percent?

22       A.    Right.



1        Q.    What do you mean by a "routine case"

2   then?

3        A.    So there are so-called Medicare MACs,

4   Medicare administrative contractors I think they're

5   called, and there's some other bodies with different

6   acronyms that conduct routine audits of providers,

7   and when they find less than 5 percent, they don't

8   continue.

9        Q.    Okay.  Isn't it also the case that if

10  the Department of Justice or HHS is involved in a

11  case and they find less than 5 percent error rate

12  that they usually do not pursue the case as well?

13                    MR. LOVE:  Objection.

14                    THE WITNESS:  I don't know.

15                    MR. LYNAM:  What's the objection?

16                    MR. LOVE:  Foundation.

17                    MR. LYNAM:  I'm asking if he knows

18  that.

19                    MR. LOVE:  You asked him if it is

20  true.

21                    MR. LYNAM:  Yes.

22                    MR. LOVE:  If you want to

