THE UNITED STATES OF AMERICA and
THE STATE OF FLORIDA *ex rel.*
ANGELA RUCKH,

Plaintiffs,

v.

CMC II, LLC; SEA CREST HEALTH
CARE MANAGEMENT, LLC, d/b/a
LAVIE MANAGEMENT SERVICES OF
FLORIDA; SALUS REHABILITATION,
LLC, d/b/a LAVIE REHAB; 207
MARSHALL DRIVE OPERATIONS, LLC,
d/b/a MARSHALL HEALTH AND
REHABILITATION CENTER; 803 OAK
STREET OPERATIONS, LLC, d/b/a
GOVERNOR'S CREEK HEALTH AND
REHABILITATION CENTER,

Defendants.

CIVIL ACTION NO.
8:11 CV 1303 SDM-TBM

**ORAL ARGUMENT
REQUESTED**

**RELATOR'S MOTION PARTIALLY TO EXCLUDE
OPINIONS AND TESTIMONY OF
DEFENDANTS' EXPERT STEFAN BOEDEKER (OPINIONS 1 AND 2)**

Pursuant to Rule 702 of the Federal Rules of Evidence, Relator Angela Ruckh, by and

through her attorneys, respectfully submits this Motion Partially To Exclude Opinions and

Testimony of Defendants' Expert Stefan Boedeker (Opinions 1 and 2). Mr. Boedeker asserts

in Opinion 1 that Relator's expert Dr. Constantijn Panis was required to prove that Relator's

allegations were "true and correct" before designing his extrapolation method. Expert Report

of Stefan Boedeker ¶ 32 (Feb. 24, 2016) ("Boedeker Rep.") (attached hereto as Exhibit A). He also makes numerous claims regarding the proof required to establish a "corporate-wide scheme" in Opinions 1 and 2 (*see id.* ¶¶ 30, 33-37, 46-47), and asserts in Opinion 2 that the purported over- and underrepresentation of individual facilities in Dr. Panis's samples caused him to present "hugely inflated extrapolations" of overpayments (*see id.* ¶¶ 38-45, 48).

In another False Claims Act case, a district court has held that Mr. Boedeker may not testify to legal conclusions like those described above. *See United States ex rel. Martin v. Life Care Ctrs. of Am., Inc.*, Nos. 1:08-cv-251 et al., 2014 WL 4816006, at *4 (E.D. Tenn. Sept. 29, 2014). The same reasoning applies here. Neither party's experts may permissibly tell the jury that they have proven or disproven Relator's allegations; that issue is for the jury alone to decide. Mr. Boedeker's proposed testimony would impermissibly intrude on the Court's authority to determine the applicable law and instruct the jury as to that law. In addition, Mr. Boedeker is a statistician and is not competent to offer any opinion as to the evidence needed to establish liability under the False Claims Act.

Mr. Boedeker's opinions are also inconsistent with basic statistical principles in several regards. As such, they are unreliable and will not assist the jury. For example, at his deposition, he admitted that Dr. Panis did not need to "prove" a corporate-wide scheme to prepare a statistically valid estimate of total overpayments to the Defendants by the Medicare and Medicaid programs. Likewise, his opinions that Dr. Panis's extrapolations are "hugely inflated" are demonstrably unreliable. The Court should not permit Mr. Boedeker to testify to opinions that are plainly contradicted by basic statistical principles.

**<u>BACKGROUND</u>**

This case involves allegations of Medicare and Medicaid fraud at 53 skilled nursing facilities throughout Florida, operated by Defendants from January 1, 2008, through January 25, 2012 (the "Relevant Period"). At trial, Relator will show that Defendants' employees committed (a) Medicare fraud by, among other things, inflating (or "upcoding") the Resource Utility Group ("RUG") levels assigned to residents in MDS Assessments and corresponding bills to the federal government; and (b) Medicaid fraud by falsely certifying that they had created timely and adequate care plans – a condition of reimbursement – when in fact they had not.

Relator has developed ample documentary and testimonial evidence showing that Defendants knowingly presented false claims to the government for payment. At trial, Relator will establish that Defendants' fraudulent scheme extended to skilled nursing facilities throughout Florida and was perpetrated at senior levels in the organization. Because Defendants could not produce all records for all patients from all 53 facilities for the entire Relevant Period, and to minimize the burden on the Court and the jury that reviewing such evidence would entail, Relator has relied on a statistical sampling methodology and review of a sample of medical records to "produce an estimate of total overpayments to the [D]efendant[s] by the Medicare and Medicaid programs." Expert Report of Dr. Constantijn Panis ¶ 16 (Feb. 20, 2015) ("February Panis Rep.") (Dkt. No. 172-1).

"'[S]tatistical sampling methods and extrapolation have been accepted . . . as reliable and acceptable evidence in determining facts related to [False Claims Act] claims.'" Order, at 7 (Apr. 28, 2015) (Dkt. No. 215) (quoting *United States v. Robinson*, No. 13-cv-27-GFVY,

2015 WL 1479396, at *10 (E.D. Ky. Mar. 31, 2015)) (second alteration in original); *see also*

*United States ex rel. Martin v. Life Care Ctrs. of Am., Inc.*, 114 F. Supp. 3d 549, 565, 571

(E.D. Tenn. 2014) (statistical sampling methodology was appropriate where "the number of

claims makes it impracticable to identify and review each claim and statement" and to ensure

that "large-scale perpetrators of fraud" are not immunized from liability).

### A. Relator's Statistical Methodology To Estimate Damages

Relator's expert, Dr. Panis, designed the sampling methodology for assessing the

extent of Medicare and Medicaid overpayments to Defendants, using a "resident-day" as the

sample unit – *i.e.*, a day during which a patient resided in Defendants' Florida facilities

during the Relevant Period. February Panis Rep. ¶ 26. Dr. Panis drew a sample of resident-

days from Defendants' billing-claims data, which reflect that residents stayed in Defendants'

facilities for 5,530,089 days over the Relevant Period.[1] *See id.* ¶ 25.

Given the differences between Medicare and Medicaid requirements and in the nature

of the alleged fraud, Dr. Panis drew separate samples of Medicare resident-days and

Medicaid resident-days – *i.e.*, he "stratified" the sample by payor program. *Id.* ¶ 27. Dr.

Panis used a statistical software package to obtain random samples of 300 resident-days for

each program (the "Core Samples"). *Id.* ¶¶ 33-34. Dr. Panis also drew replacement samples

of 100 Medicare and 100 Medicaid resident-days (the "Replacement Samples"), anticipating

that Defendants might be unable to produce some documentation. *Id.* ¶¶ 35-36.

---

[1] Defendants represented that this claims data contained information for every resident of
their Florida facilities during the Relevant Period for whom Medicare or Medicaid was the
payor source. *See* Email from T. Dunsford to J. Ward (Feb. 3, 2015) (Dkt. No. 264-3).

Between March and June 2015, Defendants produced patient medical records and claims information relating to the sampled resident-days for which they could find such records. Defendants were unable to locate *any* files or claims information for 50 residents, covering 51 sampled resident-days.[2] SCIO Health Analytics conducted a medical-record audit review of the 749 files produced. *See* Expert Report of Shirley Bradley at 3 (Dec. 11, 2015) ("Bradley Rep.").[3] For Medicare Part A claims, Ms. Bradley determined the RUG level that should have been billed – *i.e.*, the "validated" RUG level. *Id.* at 7. If the validated RUG level was lower than the RUG level billed by Defendants, she classified the related claim as "with findings." *Id.* For those claims "with findings," Ms. Bradley determined the amount that should have been billed based on the validated RUG level. *Id.* at 7-8 & n.1. Ms. Bradley made findings for 253 of 320 Medicare Part A claims reviewed. *Id.* at 10.

For Medicaid and Medicare Part B claims, Ms. Bradley reviewed each patient's medical records to determine whether there was a valid comprehensive care plan that supported the services delivered. *Id.* at 8-10. If Ms. Bradley could not locate a care plan, she classified the related claim as a claim "with findings." *Id.* For such claims, Ms. Bradley concluded that reimbursement was not appropriate because, under relevant billing guidance and regulations, reimbursement is appropriate only when a valid comprehensive plan of care

---

[2] After Relator served expert reports on December 11, 2015, Defendants untimely produced more than 31,500 pages of additional medical records on January 22, February 10, and February 24, 2016. Relator has moved to preclude Defendants from relying on these late-produced documents and for sanctions, *see* Relator's Mot. To Preclude Defendants' Use of Untimely Produced Documents and for Sanctions (Jan. 28, Feb. 11, Feb. 18, 2016) (Dkt. Nos. 264, 266, 272), and that motion is pending resolution by the Court.

[3] To avoid burdening the Court and because the Reports of Shirley Bradley and Marc Vianello are referenced only as background information, Relator does not attach these reports to this Motion. We are prepared to provide them, however, at the Court's request.

has been developed for the patient. *Id.* at 9, 13-14. Ms. Bradley made findings for 79 of the 379 Medicaid claims, and for 5 of the 48 Medicare Part B claims. *Id.* at 13-14.

Spreadsheets containing Ms. Bradley's conclusions and relevant information were provided to Relator's expert Marc Vianello, a Certified Public Accountant. *See* Expert Report of Marc Vianello at 2-3 (as amended Mar. 22, 2016). For claims "with findings" for patients in the Core Samples selected by Dr. Panis, Because Defendants did not produce records for 25 Medicare and 17 Medicaid resident-days in the Core Samples, Mr. Vianello included computations for resident-days from the Replacement Samples where appropriate, consistent with Dr. Panis's methodology. *Id.* at 4.

Based on Ms. Bradley's and Mr. Vianello's determinations, Dr. Panis concluded that there were overpayments for 54% of the Medicare resident-days in the sample (161 out of the 300). Expert Report of Dr. Constantijn Panis ¶ 25 & tbl. 1 (Mar. 28, 2016) ("March Panis Rep.") (attached hereto as Exhibit B). The total overpayment associated with the sampled Medicare resident-days was $31,659, for an average overpayment of $105.53 per resident-day. *Id.* Dr. Panis concluded that there were overpayments for 21% of the Medicaid resident-days (62 out of 300). *Id.* ¶ 26 & tbl. 1. The total overpayment associated with the sampled Medicaid resident-days was $10,667, for an average overpayment of $35.56 per Medicaid resident-day. *Id.*

Dr. Panis extrapolated these results to the population, by multiplying the average overpayment per resident-day by the population of resident-days during the Relevant Period. The results are "point estimates" (*i.e.*, the most likely single estimates of overpayments). *Id.* ¶ 30. Dr. Panis's point estimate of Medicare overpayments is $158,748,064, and he

concluded that there is a 97.5% chance that the true overpayment exceeds $136,035,882.  *Id.*

¶ 33.  Dr. Panis's point estimate of Medicaid overpayments is $143,140,709, and he

concluded that there is a 97.5% chance that the true overpayment exceeds $110,854,610.  *Id.*

¶ 35.  The table below describes Dr. Panis's conclusions (from Tables 1 and 2 of his report):[4]

|  | Medicare | Medicaid | Total |
|---|---|---|---|
| Number of resident-days in population | 1,504,288 | 4,025,801 | 5,530,089 |
| Number of resident-days in sample | 300 | 300 | 600 |
| Number of days with overpayment | 161 | 62 | |
| Overpayment in entire sample | $31,659 | $10,667 | |
| Average overpayment per resident-day | $105.53 | $35.56 | |
| Standard deviation of daily overpayments | $136.05 | $70.59 | |
| Total overpayment in population | $158,748,064 | $143,140,709 | $301,888,774 |
|  |  |  |  |
| At a confidence level of 95% |  |  |  |
| Margin of error of total overpayment | $23,253,685 | $32,286,099 | $39,707,829 |
| As a percentage | 14.6% | 22.6% | 13.2% |
| Lower bound overpayment | $136,035,882 | $110,854,610 | $262,180,945 |
| Upper bound overpayment | $182,574,022 | $175,426,808 | $31,596,602 |

**B.      Mr. Boedeker's Criticisms of Dr. Panis's Methodology**

Defendants retained Mr. Boedeker solely to review and opine on Dr. Panis's

statistical approach.  *See* Boedeker Rep. ¶ 8.  He did not independently design a statistical

model or generate a sample based on patient information.  *See* Deposition of Stefan Boedeker

at 88:7-12 (Mar. 16, 2016) ("Boedeker Dep. Tr.") (excerpts attached hereto as Exhibit C).

---

[4] Dr. Panis conducted a supplemental analysis that assumes Defendants were not entitled to reimbursement for those Medicaid resident-days for which they could not find medical records.  March Panis Rep. ¶ 24.  Dr. Panis's point estimate of Medicaid overpayments using this approach is $167,191,650, and he concluded that there is a 95% chance that the true overpayment exceeds $138,621,062.  *Id.* ¶ 37.  In addition, Dr. Panis's conservative point estimate of combined potential Medicare and Medicaid penalties under the False Claims Act is $102,779,087, with a 97.5% chance that the true potential penalty exceeds $92,762,003.  *Id.* ¶ 41 & tbl. 3.

His opinion was based solely on his review of Dr. Panis's expert reports and the underlying information that Dr. Panis considered. He did not review any other evidence in this case.[5]

Relator seeks the exclusion of Mr. Boedeker's Opinions 1 and 2. *See id.* ¶¶ 30-49.[6] In Opinion 1, Mr. Boedeker opines that Dr. Panis's sampling plan improperly "assumes the existence of a corporate-wide scheme," *id.* ¶ 30, and asserts that, because Dr. Panis did not "stratify the universe [of all resident-days in the Relevant Period] by facility," his methodology "cannot possibly provide any proof of a corporate-wide scheme," *id.* ¶ 31. Mr. Boedeker opines that "to identify an allegedly corporate-wide scheme," Dr. Panis should have designed a sample to "test if the allegations in the Complaint are true and correct" and then "[a]ssess[ed] to what extent overpayments arose from the allegations that were proven to be true." *Id.* ¶ 32.

In Opinion 2, Mr. Boedeker goes on to conclude that "[t]he findings in Relator's sample fail to provide evidence of a corporate wide scheme." *Id.* at 16. He purports to identify "dis-proofs" of a corporate-wide scheme, *see id.* ¶¶ 34, 46, and opines that Dr. Panis's conclusions are not "evidence" that could support a finding of a False Claims Act violation. *See id.* ¶ 34 ("There is absolutely no statistical evidence or any evidence of any

---

[5] Mr. Boedeker has testified as an expert in numerous cases. In a recent decision in litigation brought by a class of Nordstrom employees, a district court struck his opinion as untimely. *See Balasanyan v. Nordstrom, Inc.*, 294 F.R.D. 550, 568 (C.D. Cal. 2013). In doing so, the court criticized Mr. Boedeker's statistical opinions as "deeply flawed," "highly deficient," and "not likely [to] be admissible under *Daubert*," noting (among other things) that it was "unclear whether the employees were randomly selected or even whether the population of employees was statistically significant." *Id.* at 568-69.

[6] In twelve other opinions, Mr. Boedeker criticizes various aspects of Dr. Panis's methodology. Relator intends to demonstrate deficiencies in these opinions through cross-examination of Mr. Boedeker at trial.

other kind in these results that could hold up the claim of a corporate-wide scheme to defraud Medicaid."); *id.* ¶ 46 ("This finding can hardly be interpreted as statistical proof of the claim of a corporate-wide scheme to defraud [Medicare]."). He offers numerous opinions of his "expectations" of what the data would show if there were a corporate-wide scheme, although he provides no explanation in support of these conclusions. *See id.* ¶ 35 ("If there were a corporate-wide fraudulent scheme in place, one would not expect to find zero Medicaid overpayments in approximately half of the facilities."); *id.* ¶ 36 ("[I]f in fact there was a corporate-wide scheme involving overbilling, one would not expect to observe a variation of alleged average daily Medicaid overpayments from $17 to $147 across facilities. Instead, the findings should indicate a much more uniform distribution of alleged daily overpayments across facilities."); *id.* ¶ 47 ("If in fact there was a corporate-wide scheme involving overbilling, one would not expect to observe this large degree of variation in alleged average daily overpayments across facilities. Instead, the findings should indicate a much more uniform distribution [of alleged daily overpayments] across facilities.").

In Opinion 2, Mr. Boedeker also relies on a flawed analysis to support his opinion that Dr. Panis's damages estimates are "mindboggling." *Id.* ¶ 34. He claims, first, that Dr. Panis's extrapolation of Medicaid overpayments is "upwardly biased" because "certain facilities are overrepresented in [the sample], while other facilities are underrepresented," and "the overrepresented facilities have higher average daily overcharges than the underrepresented facilities." *Id.* ¶ 39. But he supports this opinion with only two cherry-picked examples. *See id.* ¶¶ 40-41. He further claims that, because ten facilities had multiple resident-days in the Medicaid sample but only one with overpayments, "the

erroneous extrapolation of isolated incidents with miniscule overpayments leads to [a] hugely

inflated overpayment amount that cannot possibly be relied upon." *Id.* ¶ 45. With respect to

Medicare estimates, Mr. Boedeker opines that Dr. Panis's extrapolations are "hugely

inflated" because six facilities were associated with only one resident-day in the sample.

According to Mr. Boedeker, "the sample of size [of] one in these six facilities does not

represent a statistically valid sample." *Id.* ¶ 48.

## STANDARD

Rule 702 of the Federal Rules of Evidence provides:

> A witness who is qualified as an expert by knowledge, skill, experience,
> training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help
> the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data; (c) the testimony is the
> product of reliable principles and methods; and (d) the expert has reliably
> applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. It is a trial court's duty to act as gatekeeper and to keep misleading or

unreliable expert testimony from reaching the jury. *See Daubert v. Merrell Dow Pharm.,*

*Inc.*, 509 U.S. 579, 588-89 (1993). In doing so, the trial court should engage in a "rigorous"

three-part inquiry, considering whether: "(1) the expert is qualified to testify competently

regarding the matters he intends to address; (2) the methodology by which the expert reaches

his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in

*Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific,

technical, or specialized expertise, to understand the evidence or to determine a fact in issue."

*United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc). These three

criteria are "distinct concepts," and the trial court must "take care not to conflate them." *Id.*

The party offering the expert bears the burden of laying the proper foundation for the admission of such testimony, and of proving, by a preponderance of the evidence, that the testimony is reliable and admissible.  *See id.*

## ARGUMENT

### I.     Mr. Boedeker's Opinion 1 Is Unreliable and Will Not Assist the Jury

#### A.     Mr. Boedeker's Assertion that Dr. Panis Was Required To "Test" Relator's Allegations Is Unsupported by Law or Statistical Principles

In Opinion 1, Mr. Boedeker opines that Dr. Panis's methodology improperly "assumes the existence of a corporate-wide scheme."  Boedeker Rep. ¶ 30.  According to Mr. Boedeker, "to prove the existence of . . . a corporate wide scheme, a sampling design would have to be developed that would show a similar degree of fraudulent behavior at all 53 facilities."  *Id.*  Dr. Panis's statistical sampling methodology could be valid, Mr. Boedeker concludes, only if it first "test[ed] if the allegations in the Complaint are true and correct," and then assessed the extent to which the "overpayments arose from the allegations that were proven to be true."  *Id.* ¶ 32.  These opinions are unsupported by basic statistical principles and are inconsistent with the law.[7]

---

[7] Mr. Boedeker also comments on Relator's "very limited experience" working at Defendants' facilities.  Boedeker Rep. ¶ 30.  At deposition, Mr. Boedeker acknowledged that this information was irrelevant to his opinion, and he lacks personal knowledge of this matter.  *See* Boedeker Dep. Tr. at 136:17-137:10 ("[Q.]  And you appear to tie an opinion of the proper statistical approach to the length of the relator's tenure and the scope of her work in the facilities.  Is it your opinion in this case that Dr. Panis should have taken into account the length and scope of the relator's work at the facilities in developing a sampling and extrapolation methodology?  A.  I don't see that I say that anywhere here, no.  That was just an introduction here about how long she had worked there, but I don't tie that back to what Dr. Panis or how Dr. Panis should have taken that into account.  Q.  And that would be irrelevant, in other words?  A.  Yes.").  At trial, Mr. Boedeker should not be permitted to comment on Relator's work experience.

As an initial matter, Dr. Panis has drawn no conclusion, one way or the other, regarding the truth of Relator's allegations. It would be improper for him to do so, or to tell the jury that he had "proven" the existence of a corporate-wide scheme. Whether the False Claims Act has been violated is for the jury to decide. Dr. Panis's methodology merely estimates the amount of Medicare and Medicaid overpayments made to Defendants during the Relevant Period. *See* March Panis Rep. ¶ 1. An opinion from Mr. Boedeker might be appropriate if it considered Dr. Panis's approach as a matter of statistics. But Mr. Boedeker himself conceded at deposition that is not the thrust of his opinion, acknowledging that no statistical principle requires a statistician, in a False Claims Act case, to determine the existence of a corporate-wide fraud in order to perform a valid statistical analysis of the amount of Medicare and Medicaid overpayments across a patient population. *See* Boedeker Dep. Tr. at 148:11-18 ("[Q.] Is it your opinion that in order to perform a valid statistical analysis of the amount of Medicare and Medicaid overpayments, he has to determine there's a similar level of fraudulent behavior at all 53 facilities? A. I think I already answered that. He does not have to determine a corporate – or a level of fraud at each facility.").

Relator is aware of no court that has held that a statistician must first "prove" the existence of a corporate-wide scheme across a population in order to design a sampling methodology to extrapolate the amounts paid on false claims. Indeed, imposing such a requirement would run directly contrary to the basic reason for using a statistical sampling methodology, which this Court has already found proper in principle: to develop evidence based on a common, mathematically proven technique to make estimates of a characteristic of a population based on a sample of that population. *See Tyson Foods, Inc. v. Bouaphakeo*,

577 U.S. ___, 2016 WL 1092414, at *8 (Mar. 22, 2016) ("A representative or statistical

sample, like all evidence, is a means to establish or defend against liability."); *United States*

*v. Rosin*, 263 F. App'x 16, 29 (11th Cir. 2008) (per curiam) (purpose of statistical sampling is

to "provide a means of determining the likelihood that a large sample shares characteristics

of a smaller sample"); *Michigan Dep't of Educ. v. U.S. Dep't of Educ.*, 875 F.2d 1196, 1205

(6th Cir. 1989) (same); *In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.*, 984 F. Supp.

2d 1021, 1038 (C.D. Cal. 2013) ("the purpose of using a sample is to extrapolate results from

a small sample to a large population").

      Consistent with this authority, numerous courts have held, in False Claims Act and

medical-claim fraud cases, that a jury may consider evidence from statistical sampling in

determining damages and liability. The *Life Care Centers* decision is instructive. Like this

case, *Life Care Centers* concerned allegations of Medicare fraud in violation of the False

Claims Act against an operator of skilled nursing facilities, and Mr. Boedeker also submitted

an opinion on behalf of the defense in that case. *See* 114 F. Supp. 3d at 554-55.[8] The court

there rejected the defendant's argument that the government could not rely on evidence based

on statistical sampling and extrapolation, reasoning that "the number of claims makes it

impracticable to identify and review each claim and statement." *Id.* at 565.[9] Nothing in the

---

[8] The *Life Care Centers* court held that Mr. Boedeker "w[ould] not be permitted to testify as to legal conclusions at trial," and stated that it would address this issue at trial. *Life Care Centers*, 2014 WL 4816006, at *4.

[9] *See also*, *e.g.*, *United States v. Rogan*, 517 F.3d 449, 453 (7th Cir. 2008) (rejecting argument that district court had to address each of 1,812 claims on the ground that "[s]tatistical analysis should suffice"); *Miniet v. Sebelius*, No. 10-24127-CIV., 2012 WL 2930746, at *6 (S.D. Fla. July 18, 2012) ("it is undisputed that the Secretary may utilize statistical extrapolation to determine the amount of overpayment"); *United States ex rel.*

*Life Care Centers* decision – or any other legal authority – supports Mr. Boedeker's claim

that the validity of a sampling methodology turns on an initial "proof" by a statistical expert

of the existence of a corporate-wide scheme.

## II. The Court Should Preclude Mr. Boedeker from Offering Opinions Regarding the Proof Required To Establish a Claim Under the False Claims Act (Opinions 1 and 2)

In Opinions 1 and 2, Mr. Boedeker offers numerous opinions regarding the "proof"

necessary to establish a corporate-wide scheme under the False Claims Act.  He makes

statements about what he would have "expect[ed]" to find if "there were a corporate-wide

fraudulent scheme."  Boedeker Rep. ¶ 35; *see id.* ("[i]f there were a corporate-wide

fraudulent scheme in place, one would not expect to find zero Medicaid overpayments in

approximately half of the facilities"); *id.* ¶ 36 ("[I]f in fact there was a corporate-wide

scheme involving overbilling, one would not expect to observe a variation of alleged average

daily Medicaid overpayments from $17 to $147 across facilities.  Instead, the findings should

indicate a much more uniform distribution of alleged daily overpayments across facilities.");

*id.* ¶ 47 ("one would not expect to observe this large degree of variation in alleged average

daily overpayments across facilities . . . [and] the findings should indicate a much more

uniform distribution [of alleged daily overpayments] across facilities").  He claims to have

developed "dis-proofs" of a corporate-wide scheme, *id.* ¶¶ 34, 46, asserting that "[t]here is

absolutely no statistical evidence or any evidence of any other kind in these results that could

---

*Loughren v. UnumProvident Corp.*, 604 F. Supp. 2d 259, 261 (D. Mass 2009) ("extrapolation is a reasonable method for determining the number of false claims so long as the statistical methodology is appropriate"); *United States v. Cabrera-Diaz*, 106 F. Supp. 2d 234, 238-39 (D.P.R. 2000) (extrapolation from 461 sampled claims could be used to prove elements of liability in case involving fraudulent Medicare claims).

hold up the claim of a corporate-wide scheme to defraud Medicaid," *id.* ¶ 34; *see also id.*
¶ 46 ("[t]his finding can hardly be interpreted as statistical proof of the claim of a corporate-wide scheme to defraud Medicaid").

### A. Mr. Boedeker's Opinions Regarding the Proof Required To Make Out a False Claim Should Be Excluded

The Court should preclude Mr. Boedeker from offering opinions about the level of fraud necessary to constitute a corporate-wide scheme or about what is necessary to establish liability under the False Claims Act, for two reasons.

*First*, Mr. Boedeker's opinions regarding the "proof" needed to establish a False Claims Act violation impermissibly intrude on the Court's role to instruct the jury on the law. *See Montgomery v. Aetna Cas. & Sur. Co.*, 898 F.2d 1537, 1541 (11th Cir. 1990) (an expert "may not . . . tell the jury what result to reach"). To be sure, an "opinion is not objectionable just because it embraces an ultimate issue." Fed. R. Evid. 704(a); *Berry v. City of Detroit*, 25 F.3d 1342, 1353 (6th Cir. 1994) (expert may offer opinions "that suggest the answer to the ultimate issue or that give the jury all the information from which it can draw inferences as to the ultimate issue"). But an expert's testimony may not amount to a "'legal conclusion.'" *Life Care Ctrs.*, 2014 WL 4816006, at *3 (quoting *Shahid v. City of Detroit*, 889 F.2d 1543, 1547 (6th Cir. 1989)).

The *Life Care Centers* case is again helpful. There, the court rejected Mr. Boedeker's opinion regarding precisely the same issue: the evidence necessary to prove a corporate-wide scheme. The court ruled that "the contested portion of the expert report by Mr. Boedeker in which he makes the legal conclusion that a FCA claim may not be proven through statistics would not be admissible testimony," and held that Mr. Boedeker "w[ould]

15

not be permitted to testify as to legal conclusions at trial." *Id.* at *4.[10]  In doing so, the court noted the "subtle" distinction between expert testimony that goes to "an ultimate issue" and testimony that "amount[s] to a legal conclusion." *Id.* at *3.  By way of example, the court observed that it "would not allow a fingerprint expert in a criminal case to opine that a defendant was guilty (a legal conclusion), even though [it] would allow him to opine that the defendant's fingerprint was the only one on the murder weapon (a fact)." *Id.*

Mr. Boedeker's testimony regarding the proof necessary to make out a False Claims Act case is no different from an expert's impermissible conclusion, rejected in *Life Care Centers*, that "a defendant was guilty." *Id.*  Mr. Boedeker purports to opine on what one would expect if Defendants had perpetrated a "corporate-wide scheme" to defraud the government.  This opinion is nothing more than a legal conclusion about what one would expect if Defendants *were liable*.  Experts' testimony cannot contain legal conclusions because their testimony may convey "unexpressed, and perhaps erroneous, legal standards to the jury.  This invades the province of the court to determine the applicable law and to instruct the jury as to that law." *Torres v. County of Oakland*, 758 F.2d 147, 150 (6th Cir. 1985).  Accordingly, if an expert opines on terms that "have a separate, distinct and specialized meaning in the law different from that present in the vernacular, . . . exclusion is appropriate." *Id.* at 151.  This Court should exclude Mr. Boedeker's testimony regarding the evidence required to identify a corporate-wide scheme – that is, testimony regarding the

---

[10] While the *Life Care Centers* court reserved judgment on the government's motion, the practical effect of its ruling was to exclude the portions of Mr. Boedeker's testimony that amounted to legal conclusions.

meaning of the phrase "corporate-wide scheme" – for precisely the same reason the *Life Care Centers* court excluded his testimony.

*Second*, even if his opinions were not impermissible legal conclusions, they would be unreliable because Mr. Boedeker is a statistician and has no competence or expertise in assessing liability under the False Claims Act. Indeed, Mr. Boedeker conceded at his deposition that he had never reviewed claims of Medicare or Medicaid fraud. Boedeker Dep. Tr. at 153:20-154:7. He testified that he would not opine on the requirements of the False Claims Act. *Id.* at 153:12-15, 154:8-11. But Mr. Boedeker's assertions regarding what he would have "expected" to find if Defendants were perpetrating a corporate-wide scheme to defraud the government are precisely that: opinions regarding the requirements of the False Claims Act. When asked about his "expectations" regarding evidence of a corporate-wide scheme, he could identify no statistical principle that would enable him to identify the percent of Medicaid overpayments he would "expect" if a corporate-wide scheme were in place, *id.* at 174:21-175:3, or the "expected" anticipated distribution of overpayments, *id.* at 190:20-191:9.

Mr. Boedeker is thus simply not qualified to offer opinions on the level of evidence required to show a corporate-wide scheme or to make out a claim under the False Claims Act. *See*, *e.g.*, *City of Tuscaloosa v. Harcros Chems., Inc.*, at 158 F.3d 548, 565 (8th Cir. 1998) (excluding statistician's "assertions regarding the existence of a conspiracy in general, and his characterization of certain bids as 'signals' to co-conspirators" as "outside of his competence as a statistician"); *see also United States v. Paul*, 175 F.3d 906, 912 (11th Cir.

1999) (witness's review of literature in an area outside his field "did not make him any more qualified to testify as an expert . . . than a lay person who read the same articles").

### B. Mr. Boedeker's Opinion That It Is Necessary To Show a "Similar Degree of Fraudulent Behavior" at All of Defendants' 53 Facilities Is Unreliable and Will Not Assist the Jury

In Opinion 1, Mr. Boedeker opines that "to prove the existence of . . . a corporate wide scheme, a sampling design would have to be developed that would show a similar degree of fraudulent behavior at all 53 facilities." Boedeker Rep. ¶ 30. Thus, Mr. Boedeker claims, Dr. Panis would have had to "stratify" his sample by facility. *See id.* ¶ 31.[11] To the extent that Mr. Boedeker is permitted to point out to the jury that Dr. Panis did not stratify the data by facility, the Court should ensure that Mr. Boedeker's testimony is appropriately confined to his competence as a statistician.

In this case, Dr. Panis stratified the sampling frame by payor type – *i.e.*, whether the claim submitted was a Medicare or Medicaid claim. Mr. Boedeker claims that, because Dr. Panis did not also stratify by facility, his "sampling plan cannot possibly provide any proof of a corporate-wide scheme." *Id.* As discussed above (Part II.A), Mr. Boedeker should not be permitted to opine on the proof needed to establish a corporate-wide scheme or Defendants' liability under the False Claims Act. Accordingly, the Court should preclude him from testifying that stratification is necessary for the purpose of showing that all 53 facilities had a

---

[11] Stratification "involves classifying the sampling units in [a sampling] frame into non-overlapping groups, or strata." Centers for Medicare & Medicaid Services, *Medicare Program Integrity Manual* § 8.4.4.1.3 (rev. 377, eff. June 28, 2011) ("MPIM"). "The main object of stratification is to define the strata in a way that will reduce the margin of error in the estimate below that which would be attained by other sampling methods." *Id.* "While it is a good idea to stratify whenever there is a reasonable basis for grouping the sampling units, failure to stratify does not invalidate the sample, nor does it bias the results." *Id.* § 8.4.11.1.

similar level of fraudulent behavior.  More generally, however, the Court should reject the erroneous legal argument that Mr. Boedeker advances – *i.e.*, that Dr. Panis's sampling work is *per se* insufficient to assess liability and damages under the False Claims Act.  *See Life Care Ctrs.*, 114 F. Supp. 3d at 572 ("statistical sampling may be used to prove claims brought under the FCA involving Medicare overpayment").[12]

## III.  Mr. Boedeker's Opinion 2 Regarding the Representation of Individual Facilities in Dr. Panis's Sample Is Unreliable and Irrelevant

In Opinion 2, Mr. Boedeker offers three related opinions regarding the purported over- and underrepresentation of individual facilities in Dr. Panis's samples and opines that Dr. Panis presented "hugely inflated overpayment extrapolations."  Boedeker Rep. at 16.  In reaching these conclusions, Mr. Boedeker fails to consider relevant evidence, mischaracterizes the purpose and scope of Dr. Panis's analysis, and misstates fundamental statistical principles.  As a result, his opinions on this topic are unreliable and irrelevant, and the Court should exclude them in their entirety.

### A.  Overrepresentation and Underrepresentation of Individual Facilities

Mr. Boedeker first claims that "certain facilities are overrepresented in Dr. Panis's sample of 300 Medicaid resident-days, while other facilities are underrepresented."  Boedeker Rep. ¶ 39.  Citing only two examples of "overrepresented" facilities, Mr. Boedeker concludes, without further analysis, that "the overrepresented facilities" as a group "have

---

[12] The *Life Care Centers* court also rejected Mr. Boedeker's similar criticisms regarding the government's expert's approach to sample stratification.  *See* 2014 WL 4816006, at *17 ("Simply because [the government's expert] did not account for certain variables that are not necessarily related to overpayment does not make his design invalid. . . .  [If the expert] has reached his conclusion through a sound methodology, the Court will not deem his testimony inadmissible even if he could have designed the sample based on different variables.").

higher average daily overcharges than the underrepresented facilities." *Id.* "The result is an upwardly biased alleged overpayment extrapolation of $143.1 million." *Id.*

This analysis suffers from two fatal flaws. *First*, Mr. Boedeker's opinion is indefensible as a matter of statistical theory and practice. Logically, in any random sample, certain demographics will necessarily end up over- or underrepresented. Indeed, it would be exceedingly unlikely for each and every group to be represented exactly proportionally in a random sample. This is not a shortcoming of the random sampling method. In fact, the possibility that certain groups will be over- or underrepresented is irrelevant for the validity of conclusions drawn from random sampling. *See* William G. Cochran, *Sampling Techniques* (3d ed. 1977), ch. 2. A simple example proves the point. Suppose, in an election poll, a pollster learns, from calls to a random sample of 100 likely voters, that 55 support Ms. Smith, while 45 support Mr. Jones. Suppose further that young people are overrepresented in the sample. Such an occurrence might arise due to "sampling error," meaning that characteristics of the sample (and, perhaps, the results) differ from a target population, simply because one set of 100 people was randomly chosen rather than another set. But that does not render the survey useless or invalid. This type of sampling error is accounted for in the margin of error, which summarizes the uncertainty in the point estimate due to this kind of draw, among other things. But it does not render the point estimate "biased." *See id.*; *see also* Russell Schut, *Investigating the Social World* 157 (2014) ("Although a random sample has no systematic bias, it will certainly have some sampling error due to chance. . . . Imagine selecting randomly a sample of 10 people from a population comprising 50 men and 50 women. Just by chance, can't you imagine finding that these 10 people include 7 women and

only 3 men?  Fortunately, we can determine mathematically the likely degree of sampling error in an estimate based on a random sample . . . .").

Dr. Panis's model, like all properly designed statistical sampling models, accounts for the possibility that over- or underrepresentation of certain facilities might affect his point estimate, and the model results in a margin of error between 13% and 23% depending on the payor and the confidence level sought.  Nothing about that methodology renders Dr. Panis's estimates "upwardly biased," as Mr. Boedeker claims.  Mr. Boedeker's criticism thus ignores basic statistical principles and, as a result, it is unreliable and should be excluded.  *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999) (court must ensure "that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field"); *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1293 (11th Cir. 2005) (in assessing reliability, court should consider whether expert's views are "generally accepted by the scientific community").

*Second*, even if Mr. Boedeker's opinion were defensible from a statistical standpoint, he has marshaled no reliable evidence to support his conclusion that "the overrepresented facilities have higher average daily overcharges than the underrepresented facilities." Boedeker Rep. ¶ 39.  Instead, he simply cherry-picked two examples – resident-days from the Sea Breeze Health Care and North Florida Rehab and Specialty Care facilities – that happened to be overrepresented in the Medicaid sample and to have above-average overpayments.  But Mr. Boedeker ignored contrary evidence from Defendants' 51 other Florida facilities, including facilities that were overrepresented in the Medicaid sample and

had below-average overpayments (such as the Keystone facility), and facilities that were underrepresented in the sample and had above-average overpayments (such as the Tallahassee Heritage facility). At deposition, Mr. Boedeker admitted that he had not even considered such cases in his analysis. *See* Boedeker Dep. Tr. at 199:21-200:3 ("Q. Did you consider whether there are any facilities with lower than average overpayments that are over-represented in the sample? A. I don't think I did an overall analysis based on that."); *id.* at 196:19-197:3 ("Q. Did you consider whether there are facilities with higher than average overpayments that are underrepresented in the sample? A. From what I recall, I didn't find or I don't have an example in my report. So that's – Q. So you didn't consider that? A. I don't recall if there were any.").

Mr. Boedeker attempted to defend his deficient methodology by arguing that the inflationary effect of the overrepresented facilities with below-average overpayments is larger than the deflationary effect of the underrepresented facilities with above-average overpayments. *See id.* at 199:4-12 ("Q. And does [the Heritage Tallahassee example] affect your conclusion that Dr. Panis's overpayment extrapolation is upwardly biased? A. Yeah, because this example shows that – in my [Sea Breeze] example we had $123 and here [Heritage Tallahassee] we have $50. So one is over-represented and the difference is much larger. So net net those two facilities would still have an inflationary impact on the – on the point estimate."). This is pure speculation. Indeed, Mr. Boedeker admitted that he failed even to consider whether there might be other examples in the dataset of facilities that diminish this supposed "inflationary" impact – or even eliminate it entirely. *See supra* pp. 21-22 (quoting Boedeker Depo. Tr. at 199:21-200:3, 196:19-197:3).

Mr. Boedeker's methodology thus amounts to the "selective use of facts" and, as such, "fails to satisfy the scientific method and *Daubert*." *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Practices & Prods. Liab. Litig.*, MDL No. 2:14-mn-02502-RMG, 2015 WL 7422613, at *8 (D.S.C. Nov. 20, 2015), *order amended on recon.*, 2016 WL 827067 (Feb. 29, 2016) (quoting *Barber v. United Airlines, Inc.*, 17 F. App'x 433, 437 (7th Cir. 2001)); *see also General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."). The Court should exclude this opinion on this basis alone.

### B. Facilities with Few Sampled Resident-Days

Mr. Boedeker observes that "[t]here were ten facilities where (i) multiple days are sampled for a facility, and (ii) out of the sampled days in the facility there was only one day where alleged overpayments were found." Boedeker Rep. ¶ 42. He opines that "it is incorrect to extrapolate that one isolated alleged overpayment without further analysis of more days in that facility" and that "[a]ny extrapolation calculated based on just one day with an alleged overpayment will be inherently unreliable." *Id.* He next notes that "[t]he ten days where Relator's medical review expert found an alleged overpayment amounted to $1,588 in alleged overpayments," *id.* ¶ 44, and concludes that "these small, sporadic instances of alleged overpayments (only one overpayment in each of the ten facilities) resulted in alleged extrapolated Medicaid overpayments in excess of $21.3 million," *id.* Similarly, Mr. Boedeker points out that "six facilities were represented with a [Medicare] sample size of one," *id.* ¶ 48, and concludes that "results from a sample of size one cannot be used for

extrapolation purposes," *id.* These supposed sample-size issues, Mr. Boedeker asserts, "lead[] to hugely inflated extrapolations of alleged overpayments." *Id.*

Mr. Boedeker's opinions that it is "incorrect to extrapolate . . . one isolated alleged overpayment without further analysis of more days in that facility" and that "results from a [facility] sample of size one cannot be used for extrapolation purposes," *id.* ¶¶ 42, 48, are unsupported by basic statistical principles. Extrapolating sampled data points to an entire population is precisely the purpose of a sampling methodology. *See Rosin*, 263 F. App'x at 29 (statistical sampling "provide[s] a means of determining the likelihood that a large sample shares characteristics of a smaller sample"); *In re Countrywide*, 984 F. Supp. 2d at 1038 ("the purpose of using a sample is to extrapolate results from a small sample to a large population"). That the overpayments of $1,588 on ten resident-days – 3.33% of the Medicaid sample – extrapolate to overpayments of $21.3 million in the entire set of resident-days during the relevant period is simply a function of basic statistical sampling and extrapolation, which this Court has already held may be used in the False Claims Act context. Mr. Boedeker's opinion that extrapolation from sampled data points to an entire population is "incorrect" is wrong as a matter of basic statistical principles, and, as a result, it would be misleading and confusing to the jury to permit Mr. Boedeker to offer such testimony. *See supra* Part III.A.

To the extent Mr. Boedeker intends to opine that Dr. Panis's methodology is unreliable because single data points do not provide information about the level of overpayments at individual facilities for which the sample contains only a single resident-day with overpayments, *see* Boedeker Rep. ¶ 45, the Court should exclude that opinion because it

is both irrelevant and incorrect.  It is irrelevant because Dr. Panis has drawn no conclusion –

nor was he asked to – regarding overpayments at any individual facility.  And it is incorrect

because a small sample size does not make an extrapolation "inherently unreliable" in the

sense that the point estimate will be incorrect.  Instead, a smaller sample size simply leads to

a larger margin of error.  *See* Cochran, *Sampling Techniques*, ch. 2; Schut, *Investigating the*

*Social World* 157; *supra* Part III.A.

## CONCLUSION

For the foregoing reasons, the Court should grant Relator's Motion To Partially

Exclude Opinions and Testimony of Defendants' Expert Stefan Boedeker (Opinions 1 and 2).

## LOCAL RULE 3.01(g) CERTIFICATION

Counsel for Relator has attempted in good faith to work with Defendants' counsel and met and conferred with Defendants' counsel on March 31, 2016, but has been unable to reach agreement as to the relief requested in this Motion.

## REQUEST FOR ORAL ARGUMENT

Relator respectfully requests oral argument on this Motion and estimates that 20 minutes would be required for argument.

Dated: April 5, 2016                               Respectfully submitted,

                                                   */s/ Silvija A. Strikis*
Kevin J. Darken (FL. Bar No. 0090956)              Silvija A. Strikis (*pro hac vice*)
THE COHEN LAW GROUP                                Joseph S. Hall (*pro hac vice*)
201 East Kennedy Boulevard, Suite 1000             Rebecca A. Beynon (*pro hac vice*)
Tampa, Florida 33602                               Bradley E. Oppenheimer (*pro hac vice*)
Telephone: (813) 225-1655                          Jeffrey A. Love (*pro hac vice*)*
Facsimile: (813) 225-1921                          KELLOGG, HUBER, HANSEN, TODD,
kdarken@tampalawfirm.com                             EVANS & FIGEL, P.L.L.C.
                                                   1615 M Street, N.W., Suite 400
                                                   Washington, D.C. 20036
Rory Delaney (*pro hac vice*)                      Telephone: (202) 326-7900
DELANEY KESTER LLP                                 Facsimile: (202) 326-7999
745 Atlantic Avenue, 8th Floor                     sstrikis@khhte.com
Boston, Massachusetts 02111                        rbeynon@khhte.com
Telephone: (857) 498-0384                          jhall@khhte.com
royston@delaneykester.com                          boppenheimer@khhte.com
                                                   jlove@khhte.com

                                                   Charles F. Kester (*pro hac vice*)
                                                   DELANEY KESTER LLP
                                                   4505 Las Virgenes Road, Suite 203
                                                   Calabasas, CA 91302
                                                   Telephone: (818) 974-8627
                                                   Facsimile: (818) 914-6911
                                                   charles@delaneykester.com
                                                   *Counsel for Relator*

---

* Not admitted in the District of Columbia. Practice supervised by members of the firm.

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on April 5, 2016, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to counsel of record for Defendants.

*s/ Silvija A. Strikis*