# Exhibit B

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | |
|---|---|
| THE UNITED STATES OF AMERICA and THE STATE OF FLORIDA *ex rel.* ANGELA RUCKH,<br><br>Plaintiffs,<br><br>v.<br><br>CMC II, LLC; SEA CREST HEALTH CARE MANAGEMENT, LLC, d/b/a LAVIE MANAGEMENT SERVICES OF FLORIDA; SALUS REHABILITATION, LLC, d/b/a LAVIE REHAB; 207 MARSHALL DRIVE OPERATIONS, LLC, d/b/a MARSHALL HEALTH AND REHABILITATION CENTER; 803 OAK STREET OPERATIONS, LLC, d/b/a GOVERNOR'S CREEK HEALTH AND REHABILITATION CENTER,<br><br>Defendants. | CIVIL ACTION NO.<br>8:11 CV 1303 SDM-TBM |

**EXPERT REPORT OF CONSTANTIJN PANIS, Ph.D.**

Advanced Analytical Consulting Group, Inc.
March 28, 2016
(Amended from December 11, 2015)

I, Constantijn (Stan) Panis, hereby submit the following report:

**Scope of Work**

1. I have been engaged by Kellogg, Huber, Hansen, Todd, Evans & Figel, PLLC (Counsel), counsel for the Relator Angela Ruckh, to provide an opinion on the estimated amount of Medicare and Medicaid overpayments to Defendants based on a statistical sampling of Defendants' claims. My report of February 20, 2015 explained how I selected a statistical sample of 300 resident-days that were reimbursed by Medicare and another sample of 300 resident-days that were reimbursed by Medicaid. Records for those 600 resident-days (or their replacements, in case of missing patient files) have now been reviewed and overpayments, if any, determined. The current report documents how I extrapolated overpayments in the samples to the population of resident-days at issue in this litigation. As requested by Counsel, I also estimated the range of penalties that would apply based on the estimated number of false claims. Appendix A lists the documents upon which I relied for this report.

2. My firm Advanced Analytical Consulting Group, Inc. (AACG) bills its professional fees on an hourly basis according to the positions held within the firm. My billing rate on this engagement is $550 per hour. Compensation is not contingent on the outcome of this case.

3. This report is based on the full extent of my knowledge as of this date. I reserve the right to revise my conclusions if any new facts come to my attention.

**Qualifications**

4. I am a Principal at AACG, a Massachusetts corporation that provides economic and statistical consulting services relating to healthcare and other issues.

5. My educational background is as follows: in 1984, I received a Bachelor of Arts degree in economics from the University of Groningen in the Netherlands. In 1986, I received a Master's degree in business economics from the same institution. In 1988, I received a degree in Dutch Civil Law, also from the University of Groningen. In 1992, I received a Ph.D. in economics from the University of Southern California in Los Angeles, California.

6. From 1986 to 1996 and from 1997 to 2004 I was employed by The RAND Corporation. My final position at RAND was Senior Economist. From 2004 to 2009 I was employed by Deloitte Financial Advisory Services LLP (Deloitte) as a Manager/Senior Manager of Economic and Statistical Consulting. I joined AACG in 2009. I have taught graduate and undergraduate courses in economics, statistics, and econometrics (the application of statistical methods to economic data) at the University of California at Irvine and at the University of Southern California. I also co-founded EconWare, Inc., a company that developed and sold statistical software to disentangle causality, reverse causality, and selection effects in economic models. My curriculum vitae is included as Appendix B. It lists all cases in which I have served as an expert.

7. In the late 1980s I became interested in healthcare issues. My Ph.D. dissertation developed a method to quantify the health benefits of prenatal care and hospital deliveries to infants. I have since published more than 20 books and articles in the *Journal of Health Economics*, *Journal of Human Resources*, *Medical Care*, *Health Affairs*, *Health Policy Research*, and other professional journals, including on statistical methods to distinguish causality from correlation.

8. My former employer The RAND Corporation is a nonprofit institution that specializes in conducting research on such public policy issues as national security, healthcare, employment, and social security. While at The RAND Corporation, I directed numerous healthcare research studies, including on Medicare costs and utilization. These studies were almost entirely funded by the National Institutes of Health, the Centers for Medicare and Medicaid Services (CMS), the U.S. Department of Labor, and the Social Security Administration.

While at Deloitte and also currently at AACG, I continued conducting healthcare research for the U.S. Department of Labor.

9. In the course of my research and litigation support, I routinely design, draw, analyze, or comment on statistical samples. I was co-Principal Investigator of the Third Malaysian Family Life Survey, have drawn and analyzed samples for the U.S. Department of Labor, and have drawn and analyzed or commented on samples of medical billing records in False Claims Act litigation.

**Introduction**

10. It is my understanding that the Defendants are operating skilled nursing facilities (SNFs) and that this litigation concerns 53 facilities in Florida. See Appendix C for a listing of the 53 facilities. Medicare, Medicaid, and other parties may pay for resident-stays; stays that were reimbursed by Medicare or Medicaid are at issue in this litigation. It is further my understanding that this litigation is concerned with stays from January 1, 2008 to January 25, 2012 ("reference period") only.

11. Reimbursement rates of Medicare Part A are based on the resident's Resource Utilization Group (RUG), a categorization that is designed to reflect the level of care a resident needs. Each RUG corresponds to a daily reimbursement rate, with higher payments for residents with greater care needs. At certain intervals, SNFs are required to determine a resident's appropriate RUG through a questionnaire known as a Minimum Data Set (MDS) assessment. It is my understanding that the Relator in this matter alleges that the Defendants "upcoded" the RUG levels of residents, i.e., exaggerated a resident's care needs. As a result, Defendants are alleged to have been overpaid by Medicare.

12. Reimbursement rates of Medicaid in Florida are a flat amount per day. To be eligible for reimbursement, SNFs must meet certain conditions. Among other things, they need to complete and implement care plans to address residents' needs. It is my understanding that the Relator in this matter alleges that care plans were completed late, only partially completed, or not completed at all. As a

result, Defendants are alleged to have collected Medicaid reimbursements for which they were not eligible.

13. Reimbursement rates for Medicare Part B are based on the therapy provided to the patient. As with Medicaid, SNFs must complete and implement a care plan to address residents' therapy needs under Medicare Part B. It is my understanding that Relator's allegations regarding care plans being completed late, only partially completed, or not completed at all are also relevant to Medicare Part B patients.

14. My report of February 20, 2015 explained how I selected statistical samples of resident-days during the reference period that were reimbursed by Medicare or Medicaid. I selected samples of 300 Medicare and 300 Medicaid resident-days, for a total of 600 resident-days. Anticipating that some records were lost, misplaced, rendered illegible, or destroyed, I also drew replacement samples of 100 Medicare and 100 Medicaid resident-days. (The samples of 300+300 resident-days are referred to as the "Core" samples; the alternate 100+100 resident-days are referred to as "Replacement" samples.)

15. My report of February 20, 2015 documented that the Defendants served 1,504,288 Medicare and 4,025,801 Medicaid resident-days, for a total of 5,530,089 resident-days. These resident-days form the "population" to which results from the samples need to be extrapolated.

16. It is my understanding that the False Claims Act or other legal sources under certain circumstances allow for the imposition of penalties, and that the penalty may be between $5,500 and $11,000 per false claim.[1]

17. This report documents how I extrapolated overpayments in the sample of 300 Medicare resident-days to the population of 1,504,288 Medicare resident-days. The extrapolation involves scaling up the overpayments in the sample by a factor of 1,504,288/300 = 5014.29 to estimate overpayments in the Medicare

---

[1] E.g., "The False Claims Act: A Primer." U.S. Department of Justice. Available at http://www.justice.gov/sites/default/files/civil/legacy/2011/04/22/C-FRAUDS_FCA_Primer.pdf.

population. It also involves calculating a margin of error around the total overpayment estimate. The report further documents estimates of potential penalties for claims submitted to Medicare.

18. This report also documents the extrapolation of overpayments in the sample of 300 Medicaid resident-days to the population of 4,025,801 Medicaid resident-days, and the estimation of potential penalties for claims submitted to Medicaid.

**Review of the Samples**

19. It is my understanding that Counsel retained SCIO Health Analytics to review the patient records produced by Defendants that relate to the resident-days in my samples with the objective to determine whether Medicare or Medicaid were overcharged by Defendants during the billing cycles that included the resident-days I selected. I further understand that Counsel retained Vianello Forensic Consulting LLC to process the information provided by SCIO Health Analytics and accounting records provided by Defendants in order to determine the Medicare or Medicaid overpayments, if any, for each individual resident-day in the samples that SCIO Health Analytics identified as indicating that Medicare or Medicaid were overcharged by Defendants.

20. It is my understanding that the processes performed by these other experts included a review of medical records, care plans, submitted claims, and actual reimbursements made by Medicare and Medicaid as reflected in Defendants' records. It further involved the determination of reimbursements to which the Defendants were entitled ("but-for reimbursements").

21. The difference between a resident-day's actual reimbursement and the but-for reimbursement is equal to the overpayment for that resident-day.

22. Counsel provided me with spreadsheet files containing overpayments for a subset of resident-days in my samples. The spreadsheets also identified a subset of sampled resident-days for which the Defendants could not locate patient

information (i.e., no patient file). Counsel informed me there had been no determination that remaining resident-days in the samples had been reimbursed improperly. This information permitted me to determine overpayments, if any, for 300 Medicare and 300 Medicaid resident-days.

23. The spreadsheets indicated that the Defendant did not produce any patient files for 25 Medicare and 17 Medicaid resident-days in my Core samples. In their place, I substituted the first 25 Medicare and the first 17 Medicaid resident-days from the Replacement samples. If any of those similarly involved a resident-day for which Defendants could not locate any patient file, another Replacement resident-day was substituted. The resulting 300 Medicare and 300 Medicaid resident-days form the basis for my main analysis.[2]

24. The procedure described in the previous paragraph does not take any position on the reason why the Defendants could not locate certain patient files; I substituted alternates for sampled resident-days with missing patient files. For Medicaid, if a patient file was missing, a potential interpretation is that there was no evidence of a care plan for that resident-day. At the request of Counsel, I have also prepared a supplemental analysis in which Medicaid resident-days with missing patient files were considered cases for which no reimbursement was due. In other words, no replacements were substituted for those Medicaid resident-days.

**Overpayments in the Samples**

25. Table 1 summarizes the overpayments in the samples of resident days. In the Medicare sample, the review identified an overpayment for 161 out of 300 resident-days (54%). There was no determination of improper reimbursement in the other 139 resident-days (46%), and the overpayment for those days is therefore zero. The overpayment by Medicare for the entire sample was $31,659. The average overpayment was $31,659 / 300 = $105.53 per resident-day. (This

---

[2] It is my understanding that all Replacement resident-days were reviewed, but my analysis used only as many as were required to replace missing Core resident-days.

average overpayment was calculated over all resident-days in the sample, not just over resident-days with a non-zero overpayment.)

**Table 1. Summary of Overpayments in the Samples**

|  | Medicare | Medicaid |
|---|---|---|
| Number of resident-days in sample | 300 | 300 |
| Number of days with overpayment | 161 | 62 |
| Overpayment in entire sample | $31,659 | $10,667 |
| Average overpayment per resident-day | $105.53 | $35.56 |
| Standard deviation of daily overpayments | $136.05 | $70.59 |

26. Similarly, the review found improper reimbursements for 62 out of 300 (21%) resident-days reimbursed by Medicaid and there was no finding of improper reimbursement for the other 238 resident-days (79%). Overpayments in the entire Medicaid sample were $10,667, or $35.56 per resident-day.

27. The bottom row of Table 1 shows standard deviations of daily overpayments. As explained in my report of February 20, 2015, a standard deviation measures the variability of overpayments in the sample. It is an important metric to gauge uncertainty and to calculate the margin of error.

28. The standard deviation of daily overpayments was $136.05 in the Medicare sample and $70.59 in the Medicaid sample.

**Extrapolation of Overpayments in the Samples to the Populations**

29. As noted above, extrapolation involves scaling up sample results to the population and calculating the margin of error.

30. For Medicare, the average daily overpayment of $105.53 per resident-day implies total overpayments in the population of $105.53 x 1,504,288 = $158,748,064.[3]

---

[3] Dollar amounts in this report are rounded, but calculations were carried out based on more precise numbers, so that rounding errors may arise. For example, average daily Medicare overpayments are reported as $105.53, but the calculations use a more precise number (namely $31,659.11 / 300 = $105.53036667).

Similarly, for Medicaid the average daily overpayment of $35.56 per resident-day implies total overpayments in the population of $35.56 x 4,025,801 = $143,140,709. These amounts represent my "point estimates," i.e., the most likely single estimates of overpayments by Medicare and Medicaid, respectively. (I also refer to point estimates as "best estimates.") The point estimate of combined overpayments is $301,888,774. See the top panel of Table 2.

**Table 2. Estimates of Total Overpayments in the Populations**

|  | Medicare | Medicaid | Total |
|---|---|---|---|
| Number of resident-days in population | 1,504,288 | 4,025,801 | 5,530,089 |
| Number of resident-days in sample | 300 | 300 | 600 |
| Average overpayment per day | $105.53 | $35.56 |  |
| Total overpayment in population | $158,748,064 | $143,140,709 | $301,888,774 |
|  |  |  |  |
| At a confidence level of 95%: |  |  |  |
| Margin of error of total overpayment | $23,253,685 | $32,286,099 | $39,707,829 |
| As a percentage: | 14.6% | 22.6% | 13.2% |
| Lower bound overpayment | $135,494,379 | $110,854,610 | $262,180,945 |
| Upper bound overpayment | $182,001,749 | $175,426,808 | $341,596,602 |
|  |  |  |  |
| At a confidence level of 90%: |  |  |  |
| Margin of error of total overpayment | $19,496,522 | $27,069,545 | $33,308,015 |
| As a percentage: | 12.3% | 18.9% | 11.0% |
| Lower bound overpayment | $139,251,542 | $116,071,165 | $268,580,758 |
| Upper bound overpayment | $178,244,587 | $170,210,254 | $335,196,789 |

31. As explained in my report of February 25, 2015, sampling necessarily involves a certain level of uncertainty. To determine overpayments precisely, one would need to review all resident days. Instead, only a sample was reviewed. A different sample would most likely yield approximately the same estimates, but probably not the exact same estimates. Statistical science offers the tools to quantify the inherent uncertainty, often expressed in terms of a margin of error and an associated confidence level.[4] The smaller the margin of error, the more precise an estimate is.

---

[4] E.g., page 12 of *Sampling Techniques*, William G. Cochran, 3rd edition, 1977. Since the population is very large, I ignore the so-called finite-population correction. The finite population correction would very slightly reduce the margin of error.

32. Table 2 shows margins of error at two levels of confidence: 95% and 90%. Consider the 95% margin of error for Medicare overpayments. The point estimate of Medicare overpayments is $158,748,064 and the 95% margin of error is $23,253,685. This means that with 95% probability, the true overpayments were between $158,748,064 plus or minus $23,253,685, i.e., between $135,494,379 and $182,001,749. These are the estimated lower and upper bounds of Medicare overpayments; also see the table. Of course there is a chance that the true overpayment is outside those bounds, namely a 2.5% chance that it is less than $135,494,379 and a 2.5% chance that it is more than $182,001,749. Put differently, there is a 97.5% chance that the true overpayment exceeds $135,494,379.

33. The table also shows 90% margins of error and lower and upper bounds. Based on the sample, my best estimate of Medicare overpayments is $158,748,064, and there is a 95% chance that the true overpayment exceeds $139,251,542.

34. Similarly, Table 2 shows margins of error and lower and upper bounds for Medicaid and for both payors combined.

35. Based on the sample, my best estimate of Medicaid overpayments is $143,140,709, and there is a 95% chance that the true overpayment exceeds $116,071,165.

36. Based on the sample, my best estimate of combined Medicare and Medicaid overpayments is $301,888,774, and there is a 95% chance that the true overpayment exceeds $268,580,758.

37. Paragraph 24 discussed a supplemental analysis of Medicaid overpayments in which resident-days for which the Defendants could not locate patient files are considered ineligible for reimbursement. Under that theory, the number of overpayments in the Medicaid sample 73 out of 300 (24%),[5] the average

---

[5] It is my understanding that a reimbursement issue was identified for a 74th case, but the overpayment by Medicaid was zero.

overpayment was $41.53, and the standard deviation $74.38. My best estimate of total Medicaid overpayments is $167,191,784, and there is a 95% chance that the true overpayment exceeds $138,668,829 (not shown in the tables). My best estimate of combined Medicare and Medicaid overpayments under that theory is $325,939,848, and there is a 95% chance that the true overpayment exceeds $291,443,876.

**Estimation of Potential Penalties**

38. As noted above, it is my understanding a penalty of between $5,500 and $11,000 per false claim may apply. Suppose a patient was resident for 40 days, and the facility submitted two claims related to this resident. If Medicare overpaid for each of the 40 days, the penalty would be between 2 x $5,500 = $11,000 and 2 x $11,000 = $22,000. In other words, while extrapolating overpayments involves scaling up a daily overpayment by the number of resident-days, for purposes of extrapolating penalties, the number of claims is the relevant scaling factor.

39. I am adopting a conservative approach to estimating potential penalties through two assumptions. First, I assume that the penalty is at most $5,500-$11,000 per resident, even if multiple false claims may have been submitted for that resident. Second, I assume that the fraction of residents with false claims is the same as the fraction of sampled resident-days with overpayments. (In many cases, a subset of days for a particular resident were overpaid and the remainder did not have evidence of an overpayment, i.e., the fraction of residents with any overpaid days is greater than the fraction of overpaid days.)

40. The claims database that was provided by the Defendants included 31,398 Medicare residents and 7,918 Medicaid residents.[6] The Medicare and Medicaid samples include 299 and 293 unique residents, respectively. One or more

---

[6] Some residents triggered claims to both Medicare and Medicaid, such as when Medicare benefits were exhausted. The counts in the text refer to the payor at the start of a resident's stay, i.e., they represent unique individuals.

overpayments were identified for 161 (54%) Medicare and 62 (21%) Medicaid resident-days. At penalties of $5,500, the average penalty per Medicare resident is estimated to be 54% x $5,500 = $2,962 and 21% x $5,500 = $1,164 per Medicaid resident. Multiplying these figures by the number of residents in the population, I conservatively estimate potential penalties of $92,986,385 for Medicare and $9,215,147 for Medicaid. See the top panel of Table 3. At penalties of $11,000, the conservative penalty estimates are twice as high: $185,972,769 for Medicare and $18,430,294 for Medicaid (not shown in the table).[7]

### Table 3. Estimates of Total Potential Penalties in the Populations

|  | Medicare | Medicaid | Total |
|---|---:|---:|---:|
| Number of residents in population | 31,398 | 7,918 | 39,316 |
| Number of residents in sample | 299 | 293 | 592 |
| Number of residents with overpayment(s) | 161 | 62 | 223 |
| Average penalty per resident (at $5,500) | $2,962 | $1,164 |  |
| Total penalty in population (at $5,500) | $92,986,385 | $9,215,147 | $102,201,531 |
| At a confidence level of 95%: |  |  |  |
|    Margin of error of total penalty | $9,814,164 | $2,048,674 | $10,005,483 |
|      As a percentage: | 10.6% | 22.2% | 9.8% |
|    Lower bound overpayment | $83,172,220 | $7,166,473 | $92,196,048 |
|    Upper bound overpayment | $102,800,549 | $11,263,821 | $112,207,015 |
| At a confidence level of 90%: |  |  |  |
|    Margin of error of total penalty | $8,228,436 | $1,717,625 | $8,392,820 |
|      As a percentage: | 8.8% | 18.6% | 8.2% |
|    Lower bound overpayment | $84,757,949 | $7,497,522 | $93,808,712 |
|    Upper bound overpayment | $101,214,821 | $10,932,771 | $110,594,351 |

41. Similar to the procedure for overpayments in Table 2, Table 3 also shows the margins of error and lower and upper bounds of total potential penalties. Based on a penalty level of $5,500, my conservative point estimate of combined Medicare and Medicaid potential penalties is $102,201,531, and there is a 95% chance that the true potential penalty exceeds $93,808,712. At penalties of $11,000, the conservative combined penalty estimates are twice as high, with a

---

[7] For parsimony, I do not present the counterpart of Table 3 at a penalty level of $11,000. All dollar amounts would be twice as high as those in Table 3.

best estimate of $204,403,063 and a 95% chance that the true potential penalty exceeds $187,617,424.

**Summary**

42. Based on overpayments identified in samples of 300 Medicare and 300 Medicaid resident-days, I estimate total overpayments to the Defendants during the reference period to be about $302 million. With 95% probability, total overpayments exceeded $269 million. If Medicaid cases with missing patient files are considered ineligible for reimbursement, my best estimate of total overpayments is about $326 million with a lower bound of $291 million. Also, at a penalty level of $5,500, I estimate total potential penalties to be about $102 million. With 95% probability, total potential penalties exceeded $94 million. At a penalty level of $11,000, total potential penalties would be twice as high.

Constantijn Panis, Ph.D.
March 28, 2016