**UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

THE UNITED STATES OF AMERICA
and THE STATE OF FLORIDA *ex rel.*
ANGELA RUCKH,

      Plaintiffs,

          v.

CMC II, LLC; et al.,

      Defendants.

CIVIL ACTION NO.
8:11 CV 1303 SDM-TBM

**DISPOSITIVE MOTION
ORAL ARGUMENT REQUESTED
(Estimated Time: 60 minutes)**

**DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

      Pursuant to Federal Rule of Civil Procedure 56, Defendants move this Court for an order granting them summary judgment.

## I.   INTRODUCTION

      It is "a fairly obvious notion that a False Claims Act suit ought to require a false claim." *United States ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011); *Uqruilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1052 (11th Cir. 2015) ("[T]he submission of a false claim is the *sine qua non* of a False Claims Act violation.").  The "central question" in a False Claims Act case is, therefore, "whether the defendant ever presented a false or fraudulent claim to the government."  *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 785 (4th Cir. 1999).  Relator, Angela Ruckh, filed this action under the federal False Claims Act

1

("FCA"), 31 U.S.C. §§ 3729-3733, and the Florida False Claims Act, Fla. Stat. § 68.082.  Neither of those statutes provides for liability under the circumstances at issue in this case.[1]

Relator's allegations stem from services provided to residents of Defendants' 53 Florida Skilled Nursing Facilities ("SNFs") operated by Defendants' predecessor, LaVie, from January 2008 through January 2012.  Statement of Undisputed Facts ("SOF") ¶ 2.  Relator worked at two of Defendants' SNFs for 39 days in 2011.  SOF ¶ 3.  Her allegations about those two SNFs have now been inflated to include over 5 million resident-days for all 53 of Defendants' Florida SNFs during a four-year period.  Relator does not, and cannot, claim to have personal knowledge of any allegation pertaining to the facilities where she did not work, or for time periods when she was not employed at a LaVie SNF.  Relator admits that she never visited any of the other 51 Florida facilities she now includes in her allegations.  SOF ¶ 4.  She does not know anything about the operation of those facilities, and is not familiar with those facilities' documents.  SOF ¶ 5.  Relator has also crafted new allegations wholly outside her Revised Second Amended Complaint (the "Complaint")—about which she does not claim to have personal knowledge—based on a chart audit conducted by her "experts," looking for any and all possible deficiencies in Defendants' documentation.  SOF ¶ 6.

---

[1] There is no dispute that the Florida FCA is substantially the same as the federal FCA, SOF ¶ 1, and therefore all the arguments made herein as to the federal FCA apply with equal force to Relator's state FCA claims.  *See, e.g.*, *United States ex rel. Schubert v. All Children's Health Sys.*, No. 8:11-cv-1687, 2013 U.S. Dist. LEXIS 53932, at *14–15 (M.D. Fla. Apr. 16, 2013) (finding where state FCA action alleged the same facts as a federal FCA action, and because "the Florida False Claims Act mirrors the federal False Claims Act and is subject to the same pleading standard," a state claim must be dismissed when the federal claim is dismissed); *United States ex rel. Osheroff v. Tenet Healthcare Corp.*, No. 09-22253, 2012 U.S. Dist. LEXIS 96434 at *7, n.4 (S.D. Fla. July 12, 2012) ("[A] relator who fails to state a claim under the federal FCA necessarily fails to state a claim under the related state statutes.") (citations omitted).

Relator's search for support for her allegations has encompassed years of virtually unlimited, but fruitless, discovery. Defendants produced over 4 million documents and over 1 million additional pages of resident medical records, answered over 100 interrogatories and requests for admission, and made over 20 employees and former employees available for deposition across the country. Relator has essentially had open access to Defendants' business for years, based on her 39 days of work at two Defendant SNFs. None of that fact discovery has generated any support for Relator's allegations, much less a genuine issue of material fact for trial.

Relator's expert discovery efforts have been similarly futile. Relator disclosed five "expert" witnesses—including herself—who separately and collectively failed to provide competent opinions in support of Relator's allegations. As discussed in more detail in Defendants' Motions to Exclude each of Relator's "experts," being filed concurrently with this Motion, the majority of the purported expert testimony Relator intends to offer at trial regarding her experts' chart review and resulting extrapolation to exorbitant damage claims is inadmissible, and therefore cannot be considered on summary judgment. In any event, none of the proffered testimony creates a material issue of fact for trial, as discussed in further detail below.

Meanwhile, individuals employed at all levels of Defendants' operations during the relevant time period, from senior executives to therapists and floor nurses, have denied the Complaint's core allegations across the board. Deponents universally denied, among other things, (1) improperly providing medically unnecessary therapy to increase reimbursement rates, SOF ¶ 7, (2) engaging in knowingly inadequate care planning, SOF ¶ 8, (3) pressuring employees to improperly code resident information to increase reimbursement rates, SOF ¶ 9, (4) giving or receiving bonuses of any kind as a reward for improper coding to increase

reimbursement rates, SOF ¶ 10, (5) providing inadequate treatment to any resident, SOF ¶ 11, or (6) falsifying documents of any kind, SOF ¶ 12.

Deponents also provided ample, unrebutted testimony that Defendants had robust compliance policies in place throughout the four-year period to ensure that all employees followed applicable state and federal regulations.  SOF ¶ 13.  There is no dispute that Defendants' compliance efforts also included self-auditing and monitoring activity, frequent employee training programs, mandatory testing to ensure employee understanding of company compliance policies, and a compliance hotline for any and all employees to use.  SOF ¶ 14.

Defendants' experts have further provided unrebutted opinions and testimony that are fatal to Relator's claims, including that (1) residents at Defendants' Florida facilities consistently received medically necessary treatment that was appropriately billed to the government; (2) state surveyors conducted over a thousand surveys of practices at Defendants' SNFs during the relevant time period, examining many of the same topics that are alleged in the Complaint, and did not impose any monetary sanction of the sort Relator now seeks for any survey deficiency noted; and (3) any billing and coding errors that do exist occur at such a low rate that they would not even trigger additional government review, much less retroactive denials of payment applied statewide through an extrapolation like the one Relator now seeks to apply in this case.  SOF ¶ 15.

Relator is seeking incredible damages amounting to approximately $159 million arising from alleged overpayments by Medicare, and approximately $143 million arising from alleged overpayments by Medicaid (before possible trebling and penalties).  These astronomical amounts are based on allegations that have become totally unmoored from anything Relator did or did not observe during her very brief employment at two LaVie SNFs.  Instead, Relator has turned this

litigation into a chart audit that has no relationship to the fraud allegations in her Complaint, and that could never establish a knowing false claim as a matter of law.

## II.   LEGAL FRAMEWORK

### A.  Summary Judgment

Summary judgment is appropriate if the moving party can show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

### B.  The False Claims Act

A viable FCA claim requires a relator to establish "(1) a false or fraudulent claim; (2) which was presented, or caused to be presented, by the defendant to the United States for payment or approval; (3) with the knowledge that the claim was false."  *Barys ex rel. United States v. Vitas Healthcare Corp.* 298 F. App'x 893, 894 (11th Cir. 2008) (per curiam) (internal quotation and citation omitted).  "The False Claims Act does not create liability merely for a health care provider's disregard of Government regulations or improper internal policies unless, as a result of such acts, the provider knowingly asks the Government to pay amounts it does not owe."  *United States ex rel. Clausen v. Lab. Corp. of Am., Inc.*, 290 F.3d 1301, 1311 (11th Cir. 2002) (citations and internal marks omitted).

#### 1.  Falsity

To establish FCA falsity, Relator must show that Defendants breached a governmental rule, regulation, or standard that would render the claim false.  *See, e.g.*, *United States v. Southland Mgmt. Corp.*, 326 F. 3d 669, 674–75 (5th Cir. 2003) ("[W]hether a claim is valid

5

depends on the contract, regulation, or statute that supposedly warrants it.  It is only those claims

for money or property to which a Defendant is not entitled that were 'false' for purposes of the

False Claims Act."); *United States v. Prabhu*, 442 F. Supp. 2d 1008, 1026 (D. Nev. 2006)

("Claims are not 'false' under the FCA unless they are furnished in violation of some controlling

rule, regulation or standard.") (citation omitted).  Moreover, a statement must be objectively false

for an FCA violation to occur.  *See United States ex rel. Yannacopoulos v. Gen. Dynamics*, 652

F.3d 818, 836 (7th Cir. 2011) ("A statement may be deemed 'false' for purposes of the False

Claims Act only if the statement represents 'an objective falsehood.'") (citation omitted).[2]

## 2.  Knowledge

Mere negligence does not trigger FCA liability; Defendants must have "knowingly asked

the government to pay amounts it does not owe."  *United States ex rel. Urquilla-Diaz v. Kaplan*

*Univ.*, 780 F.3d 1039, 1052, 1058 (11th Cir. 2015) ("Congress did not intend to turn the False

Claims Act, a law designed to punish and deter fraud, 'into a vehicle either punishing honest

mistakes or incorrect claims submitted through mere negligence or imposing a burdensome

obligation on government contractors rather than a limited duty to inquire.'") (internal citation

omitted) (quoting *United States v. Sci Applications Int'l Corp.*, 626 F.3d 1257, 1274 (D.C. Cir.

2010)); *United States ex rel. Burlbaw v. Orenduff*, 548 F.3d 931, 949 (10th Cir. 2008) ("[S]imple

negligence does not violate the FCA."); *United States ex rel. Farmer v. City of Houston*, 523 F.3d

---

[2]  *See also United States ex rel. Wilson v. Kellogg Brown & Root*, 525 F.3d 370, 377–78
(4th Cir. 2008) (noting that to prove falsity, plaintiffs must show that "the statement or conduct
allegd . . . represent[s] an objective falsehood"); *United States v. AseraCare*, No. 2:12 CV-245,
2015 U.S. Dist. LEXIS 167312, at *25–26 (N.D. Ala., Nov. 3, 2015) ("The law . . . establishes
that '[t]he FCA requires proof of an objective falsehood to show falsity' . . . . And even more
important to this case is the law mandating that '[e]xpressions of opinion, scientific judgments,
or statements as to conclusions about which reasonable minds may differ *cannot be false*.'"
(internal quotations and citations omitted)); *United States ex rel. Lawson v. Aegis Therapies*, No.
CV-210-072, 2015 U.S. Dist. LEXIS 45221, at *32 (S.D. Ga., Mar. 31, 2015) (same).

333, 338 n.9 (5th Cir. 2008) (noting that the FCA's "mens rea requirement is not met by mere negligence or even gross negligence" and requires at least "aggravated gross negligence" or an "extreme version of ordinary negligence") (citation omitted).  Additionally, scientific or medical disagreement does not result in the "knowing" submission of "false" claims.  *See United States ex rel. Hill v. Univ. of Med. & Dentistry*, 448 F. App'x. 314, 317 (3d Cir. 2011) (instructing that evidence reflecting mere scientific disagreement is "not evidence as to defendants' knowledge of the falsity[,]" and thus, FCA "liability does not attach").[3]

## III.   ARGUMENT

To survive summary judgment, Relator must demonstrate evidence of her allegations sufficient to establish a genuine issue of material fact for trial.  Allegations lacking any support outside Relator's own self-serving, conclusory statements must fail as a matter of law.  *See Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990) ("To survive summary judgment, the plaintiff must [ ] present concrete evidence in the form of specific facts . . . . Mere conclusory allegations and assertions will not suffice.") (citation omitted); *United States ex rel. Chabot v. MLU Servs.*, No. 6:06-cv-1528, 2010 U.S. Dist. LEXIS 38045, at *2 (M.D. Fla. Apr. 18, 2010) ("[C]onclusory allegations without specific supporting facts have no probative value.")

---

[3]*See also United States ex rel. Roby v. Boeing Co.*, 100 F. Supp. 2d 619, 625 (S.D. Ohio 2000) ("Expressions of opinion, scientific judgments, or statements as to conclusions about which reasonable minds may differ cannot be false.") (citation omitted); *United States ex rel. Milam v. Regents of the Univ. of Cal.*, 912 F. Supp. 868, 886 (D. Md. 1995) ("At most, the Court is presented with a legitimate scientific dispute, not a fraud case.  Disagreements over scientific methodology do not give rise to False Claims Act liability.") (citation omitted); *United States ex rel. Boisjoly v. Morton Thiokol, Inc.*, 706 F. Supp. 795, 810 (N.D. Utah 1988) ("[The certification] reflects an engineering judgment. . . . It is clearly not a statement of fact that can be said to be either true or false, and thus cannot form the basis of a FCA claim."); *see generally United States ex rel. Lockyer v. Haw. Pac. Health*, 490 F. Supp. 2d 1062, 1075 (D. Haw. 2007) ("Where there is dispute among experts about the requirements of the law, a practice which may constitute a technical violation of one expert's assessment but is in compliance with another expert's opinion does not give rise to fraud.") (citation omitted), *aff'd* 343 F. App'x 279 (9th Cir. 2009).

(quoting *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985)); *United States ex rel. Vargas v. Lackmann Food Serv.*, 510 F. Supp. 2d 957, 965 (M.D. Fla. 2007) ("[C]onclusory allegation[s] [are] not sufficient to withstand summary judgment.").[4]   Relator cannot demonstrate a genuine issue of material fact as to the claims in her Complaint, or claims she has improperly sought to develop in discovery, and summary judgment in Defendants' favor is appropriate on all of them.

### A. Relator's allegations regarding provision of therapy services to residents must fail.

Relator cannot satisfy the FCA's falsity and knowledge elements regarding the provision of rehabilitation therapy to residents.  Relator claims that Defendants overstated or misrepresented residents' therapy needs, SOF ¶ 16, and manipulated the timing of therapy during assessment look-back periods, SOF ¶ 17, to improperly increase reimbursement from Medicare.[5]  Remarkably, Relator has not offered any evidence from any physician or licensed therapist to support her therapy allegations.  Witnesses Relator deposed unanimously denied those allegations, so the only remaining proffered support is a chart audit conducted by her "expert," Shirley Bradley.  But Ms. Bradley (a nurse), and the two auditors working under her direction (also nurses), are not licensed therapists of any kind, and are therefore unable to opine about the medical necessity of any therapy treatment provided to any resident.  SOF ¶ 20.[6]

---

[4] Under that standard, the Court should grant Defendants' Motion with respect to Relator's TRICARE allegations.  Relator has not developed any documentary or testimonial evidence to support her allegations concerning TRICARE, and those allegations must fail as a matter of law.

[5] Relator's allegations concerning misrepresentation of therapy provided pertain to a practice known as "concurrent therapy." SOF ¶ 18.  Relator has not developed any evidence that Defendants improperly utilized or billed concurrent therapy outside her conclusory allegations, and, in fact, deponents consistently denied her allegation.  SOF ¶ 19.  The Court should grant Defendants' Motion with respect to Relator's concurrent therapy allegation as a matter of law.

[6] Ms. Bradley, made, at most, 156 findings concerning therapy that resulted in an overpayment.  Thirty-seven of those findings were based exclusively on documentation that is no

Instead, Ms. Bradley made "findings" that (1) the documentation reviewed did not support the therapy billed, or (2) that therapy minutes provided to some residents decreased after the Assessment Reference Date "ARD,"[7] indicating to the Relator that therapy minutes were inappropriately increased immediately before the ARD to record more minutes on the MDS and obtain additional reimbursement.  SOF ¶ 22.

Although Relator acknowledges that medically necessary therapy is appropriate,[8] she has not developed any evidence that a *single* resident at Defendants' Florida facilities received therapy that was not medically necessary, and cannot establish a false claim on that basis alone.  Relator must be able to point to a therapy claim and state "this one is objectively false."  She cannot.  *See, e.g.*, *United States ex rel. Lawson v. Aegis Therapies, Inc.*, No. CV 210-072, 2015 U.S. Dist. LEXIS 45221, at *34 (S.D. Ga. Mar. 31, 2015) (observing that the government did not "come forward with admissible evidence of a single claim and [say] 'this one is objectively

---

longer available for review, so her conclusion that therapy was inappropriate for those residents has no clinical basis.  As Defendants' expert, Dr. Gregory Palega, noted in response to Relator's deposition questioning, it is not surprising that approximately 50 medical records were missing out of a universe of 800 because missing medical records are common in the healthcare industry, especially in a case like this one where the provider has multiple locations.  SOF ¶ 21. Moreover, where there was missing documentation in the record, Relator did not use readily available replacement records that were available for the sample group reviewed.  Finally, missing documentation, alone, cannot establish a false claim.  *See United States ex rel. Schuhardt v. Wash. Univ.*, 361 F. Supp. 2d 992, 997 (E.D. Mo. 2003) ("[F]ailure to properly document a service does not, by itself, state a claim for relief under the FCA."), *rev'd in part on other grounds by* 390 F.3d 563 (8th Cir. 2004).  *See generally United States ex rel. Davis v. Dist. of Columbia*, 679 F.3d 832, 840 (D.C. Cir. 2012).

[7] The ARD is a date used to compute therapy minutes on the Minimum Data Set ("MDS"), which is submitted to the government.

[8] SOF ¶ 23.  Additionally, as the Court has already noted, Relator alleges that false claims were submitted because residents were treated without regard for what their "circumstance justified."  *See* ECF No. 215 at 2, n.1 (Ruckh alleges that false claims were submitted because Defendants charged "more for a patient than the circumstance justified," and that therapy was provided "regardless of whether that level of care was merited").  Under Relator's own theory, then, when a resident's circumstances *do* justify the treatment provided, the billing for those services is appropriate.

false[,]'" and concluding that "allegations of debatably improper therapy" could not, under the circumstances, create a material issue of fact in an FCA action).[9]

Indeed, here it is not even a question of whether "reasonable" clinical minds can disagree about whether therapy services are medically necessary and reasonable because the only qualified and admissible clinical evidence is that residents received medically necessary therapy services that assisted the residents, after suffering a health setback, to materially improve regarding mobility deficits (inability to walk), diminished ability to transfer (stand up and sit down, move in, out, and around the bed independently and move in and out of chairs or wheelchairs), balancing challenges, and difficulty accomplishing their activities of daily living independently, such as eating, grooming, dressing and bathing.  SOF ¶ 24.

Specifically, Defendants' clinical expert, Dr. Gregory Palega—the only medical doctor who either party has had review any of the files for residents in the sample group, and the only person competent to assess the medical necessity of therapy provided—found by reviewing the entire file that therapists at Defendants' Florida facilities provided therapy that was medically

---

[9] *See also United States v. AseraCare Inc.*, No. 2:12 CV-245, 2015 U.S. Dist. LEXIS 167312, at *23, 25 (N.D. Ala. Nov. 3, 2015) (finding in FCA medical necessity case that "a difference of opinion is not enough[,]" and ruling that the FCA requires an objective falsehood), *aff'd sua sponte* 2016 U.S. Dist. LEXIS 42986 (N.D. Ala. March 31, 2016); *United States ex rel. Hill*, 448 F. App'x. at 317 (explaining that scientific disagreement is not evidence of a defendant's knowledge of falsity and cannot create FCA liability); *United States ex rel. Wall v. Vista Hospice Care, Inc.*, 778 F. Supp. 2d 709, 718 (N.D. Tex. 2011) ("[A]n FCA complaint about the exercise of a physician's judgment must be predicated on the presence of an objectively verifiable fact at odds with the exercise of that judgment, not a matter of subjective clinical analysis."); *United States ex rel. Hockett v. Columbia/HCA Healthcare Corp.*, 498 F. Supp. 2d 25, 65 n.29 (D.D.C. 2007) ("[W]here reasonable medical minds might differ over the preferred course of treatment, FCA liability will be inappropriate."); *Prabhu*, 442 F. Supp. 2d at 1029, 1032–33 (D. Nev. 2006) (rejecting the government's medical necessity FCA claim because there is a wide range of reasonable medical and scientific judgment regarding how precisely a medical service should be documented and the physician's conduct fell within that range and thus because "reasonable minds may differ" regarding whether the practice conformed to law – and there is no "true" or "false" answer within that range – "the Government has not established falsity as a matter of law").

necessary and reasonable.  SOF ¶ 25.  In particular, for the 56 residents with alleged

overpayments based, not on a clinical review of any medical record, but simply on an increase in

therapy minutes before an ARD, 22 of them did not have any unexpected variation in therapy

minutes around an ARD at all.  SOF ¶ 26.  In other words, even if, bizarrely enough, one could

establish that a therapy service was medically necessary or not based upon mere fluctuations in

therapy minutes, the daily amount of therapy minutes for those residents surrounding an ARD

did not, on their face, show any unusual pattern of therapy increases or decreases.  SOF ¶ 27.  In

fact, in several cases, the therapy provided after the ARD was *greater* than it was before the

ARD.  SOF ¶ 28.  This means that the facility actually provided more therapy than was captured

by the billing for those residents.  SOF ¶ 29.  Of the remaining 34 resident records Dr. Palega

reviewed, 33 of them had a clearly documented medical explanation for decreasing or fluctuating

therapy, which Relator never even attempts to rebut.  SOF ¶ 30.[10]

---

[10] Relator makes a related allegation that Defendants' inappropriately used "grace days"
to capture increased therapy provided to residents before the ARD.  SOF ¶ 31.  As discussed
above, there is undisputed evidence that the therapy provided to residents was medically
necessary and reasonable, which defeats Relator's allegation concerning grace days.  Moreover,
aside from Relator's failure to prove any medically unnecessary services, the Relator's
contention fails as a matter of law.  CMS's RAI Manual 2.0, § 2.5, effective for claims prior to
October 1, 2011, provides that "[g]race days may also be used to more fully capture therapy
minutes or other treatments.  The use of grace days allows clinical flexibility in setting ARDs,
and should be used sparingly."  CMS's RAI Manual 3.0, § 2.8, effective for claims on or after
October 1, 2011, provides that "[t]here may be situations when an assessment might be
delayed…or additional days are needed to more fully capture therapy or other treatments."
CMS' RAI Manual 3.0, on its face, has no limitation on using grace days "sparingly."  Ms.
Lowrie-Morris agreed that grace days could be properly used to "more fully capture therapy"
which, there is no clinical dispute, was medically necessary in this case.  SOF ¶ 32.  Courts
routinely rule that where the government's underlying rule is, at most, ambiguous, Relator must
point to official governmental guidance that would warn the defendant away from its reasonable
interpretation (here that grace days may be used to more fully capture medically necessary
therapy services).  *See, e.g.*, *United States ex rel. Purcell v. MWI Corp.*, 807 F.3d 281, 289–90
(D.C. Cir. 2015).  Relator does not do that here, and cannot.

Moreover, Ms. Bradley employed a demonstrably improper methodology in assessing the claims regarding therapy because she applied a regulatory standard that did not exist at the time the claims were submitted.  SOF ¶ 33.  Just to be clear, Relator is seeking treble damages and massive civil penalties for Defendants' purported failure to comply with a regulation that *did not exist* at the time the claims were submitted.  Prior to October 1, 2011, when CMS altered its policy regarding Change of Therapy assessments, SNFs were only required to assess a resident for Medicare purposes on or around days 5, 14, 30, 60, and 90 of the resident stay, when therapy ended, or when the resident was hospitalized, discharged, and later re-admitted to the SNF from the hospital.  SOF ¶ 34.  None of the residents Ms. Bradley claims had improperly increased therapy before an ARD were subject to the new CMS policy applying a rolling 7-day observation window from the prior ARD.  SOF ¶ 35.  As a result, there was no mechanism for reassessing those residents due to a simple change in therapy minutes.  SOF ¶ 36.  Ms. Bradley's findings based on an improper application of the new assessment regime to findings concerning alleged increases in therapy around an ARD prior to October 1, 2011 (*i.e.*, all of her findings concerning ramped up therapy) should be disregarded as a matter of law because the new assessment regime did not apply retroactively.  SOF ¶ 37.

## B.  Relator's allegations concerning supposed deficiencies in care planning must fail.

Relator alleges that Defendants did not develop care plans for certain Medicare and Medicaid residents, and on that sole basis alleges that Defendants submitted false claims, which alone, according to Relator, resulted in a $143 million Medicaid overpayment.  SOF ¶ 38.  Relator's care planning allegations fail for three independent reasons: (1) appropriate care planning did occur in conformance with law, and hence no "false" claim was submitted; (2) alleged inadequate care planning constitutes a condition of participation, not a condition of payment, which is not actionable under the FCA; and (3) even if, contrary to fact, inadequate

care planning occurred as to a single claim and care planning constituted a condition of payment, Relator cannot prove that Defendants "knowingly" violated the regulations governing care planning.

The federal standard for care planning is set out in 42 C.F.R. § 483.20(k). That regulation requires SNFs to "develop a comprehensive care plan for each resident that includes measurable objectives and timetables to meet a resident's medical, nursing, and mental and psychosocial needs that are identified in the comprehensive assessment." 42 C.F.R. § 483.20(k)(1). The regulation does not define "comprehensive care plan," and there is no indication that a comprehensive care plan is a single, specific document, as Relator's own witness has conceded. SOF ¶ 39. The Florida regulation concerning care planning, Fla. Admin. Code § 59A-4.109, similarly requires SNFs to develop a care plan for each resident. While the Florida regulation also does not define "care plan," it instructs that a resident's care plan should be comprised of many documents including, but not limited to, "physician's orders, diagnosis, medical history, physical exam, and rehabilitative or restorative potential." Fla. Admin. Code §§ 59A-4.109(1)(a)-(c).

Relator cannot demonstrate any "false" claim because, as Dr. Palega's medical review revealed, adequate care planning occurred at Defendants' facilities consistent with federal and state requirements. Dr. Palega's review of the available medical records for residents with allegedly inadequate care planning that resulted in an alleged overpayment confirmed that adequate care planning occurred for all of them. Dr. Palega reviewed the entire resident file for residents with alleged overpayments related to insufficient care planning, rather than just the narrow portions Relator's experts reviewed, and identified evidence of medically appropriate and adequate care planning throughout. SOF ¶ 40. Relator cannot meet her burden under the FCA's

falsity element because she cannot show that residents failed to receive medically appropriate care. While Relator's nurse auditors may disagree with Dr. Palega's clinical judgment, that is not sufficient to establish the submission of a false claim. *See supra* notes 3 and 9.

Even if adequate care planning did not exist as to an individual resident's claim, which is contrary to the facts here, it would constitute, at most, a breach of a condition of participation, not payment, and hence is not actionable under the FCA. *See, e.g.*, *United States ex rel. Ortolano v. Amin Radiology*, No. 5:10-cv-583, 2015 U.S. Dist. LEXIS 9724, at *25 (M.D. Fla. Jan. 28, 2015) ("[V]iolations of a condition of participation do not form the basis of an FCA claim.") (citations omitted).[11] Conditions of participation are not actionable under the FCA because the FCA does not apply to mere regulatory violations. *See Urquilla-Diaz*, 780 F.3d at 1045 ("Liability under the False Claims Act arises from the submission of a fraudulent claim to the government, not the disregard of government regulations or failure to maintain proper internal procedures.") (quoting *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1012 (11th Cir. 2005)). Instead, there must be a falsehood that affects the government's willingness to pay—*i.e.*, a condition of payment, not a condition of participation—because "[i]mproper practices standing alone are insufficient." *Hopper v. Solvay Pharms., Inc.*, 588 F.3d 1318, 1328 (11th Cir. 2009).

The undisputed facts in this case confirm that care planning constitutes a condition of participation and not payment. Here, the State of Florida conducted 1,213 surveys of LaVie's facilities over the four-year period that exhaustively looked into, among other things, the

---

[11] "Conditions of payment are those which, if the government knew they were not being followed, might cause it to actually refuse payment." *United States ex rel. Conner v. Salina Reg'l Health Ctr.*, 543 F.3d 1211, 1220 (10th Cir. 2008). "Conditions of participation, as well as a provider's certification that it has complied with those conditions, are enforced through administrative mechanisms, and the ultimate sanction for violation of such conditions is removal from the government program." *Id.* at 1220 (citing *United States ex rel. Mikes v. Straus*, 274 F.3d 687, 701–02 (2d Cir. 2001).

existence of adequate care planning.  SOF ¶ 41.  Surveyors consider documentation, but also conduct interviews with residents, family members, visitors, staff, and volunteers.  *See* Publication 100-07, State Operations Manual Appendix P, Survey Protocol for Long Term Care Facilities.  Thus, the survey results are particularly indicative of Defendants' compliance here because a survey of quality of care issues, including care planning, goes well beyond the limited documentation review Ms. Bradley conducted.[12]  Out of the 1,213 surveys, surveyors only identified 24 instances (less than 2% of all surveys) where individual facilities had significant administrative findings regarding inadequate care planning, which reflects nothing more than a very low rate of error and certainly not a systemic fraud at the corporate level.  SOF ¶ 42.

Moreover, Relator does not set forth any proof that would transform a violation of a condition of participation—alleged inadequate care planning—into an actual FCA claim for payment by linking the alleged inadequate care planning to the provision of worthless Medicaid services to a *single* Medicaid beneficiary.  As courts have pointed out under these circumstances, the FCA is not a vehicle for medical malpractice claims; FCA liability requires a much higher showing that services provided effectively had no value at all.  *See United States ex rel. Absher v. Momence Meadows Nursing Ctr., Inc.*, 764 F.3d 699, 710 (7th Cir. 2014) (recognizing that for a service to be worthless, "the performance of the service must be so deficient that for all practical purposes it is the equivalent of no performance at all.") (citation omitted).  "It is not enough to offer evidence that the defendant provided services that are worth some amount less than the services paid for."  *Id.*  Rather, the services must be "worthless," not just "worth less."  *Id.*[13]

---

[12] It is worth noting that the documents Ms. Bradley reviewed were only those still in existence in 2015, years after the residents were treated.  They do not necessarily reflect what would have existed at the time surveys took place.

[13] Relator is under the misapprehension that care planning is a condition of payment based on her erroneous interpretation of a CMS Manual her regulatory "expert" did not understand.

Misunderstanding this basic tenet of FCA liability, Relator claims that the lack of a "meaningful" care plan in three residents' files, out of hundreds reviewed in this case, negatively affected the level of care Medicaid residents received in all Defendants' Florida facilities.  SOF ¶ 45.  The person at whom those allegations are directed categorically denied them, and Relator has presented no additional evidence demonstrating that the three residents received "worthless" services.  SOF ¶ 46.  In fact, documents Relator was shown during her own "expert" deposition directly refute her allegations about one of the residents who was fully and appropriately evaluated for the services Relator claims the resident was denied due to her Medicaid "payer source."  SOF ¶ 47.  Similar allegations Relator makes about two other residents are also unsupported, and should be ignored because they cannot establish FCA liability as a matter of law.  SOF ¶ 48.[14]

Finally, there was no evidence that defendants "knowingly" breached Medicare and Medicaid's care planning rules.  Consistent with Dr. Palega's review, and state surveyors' review during 1,213 surveys, Defendants applied a correct understanding of what, from a regulatory perspective, constitutes adequate care planning.  Relator applies a different standard, which is not

---

Ms. Lowrie-Morris cited to CMS's Medicare Program Integrity Manual as evidence that care planning constitutes a condition of payment.  SOF ¶ 43.  However, while that provision references inpatient rehabilitation hospitals, home health agencies, and hospices, it makes no reference to SNFs and the completion of care plans as being a condition of payment in that setting.  *See* Program Integrity Manual, § 3.2.3.1.  Contrary to what Relator's experts understand, under Medicare, an "inpatient rehabilitation hospital" is an entirely different setting, operating under entirely different rules, than a skilled nursing facility.  SOF ¶ 44.

[14] Rather than being refused therapy based on his Medicaid status, one of the residents actually, himself, refused numerous attempts to provide medically necessary therapy.  SOF ¶ 49.  Relator testified at her deposition that she does not even remember the resident referred to in paragraphs 181-183 of her Complaint, and cannot identify any evidence to support her allegation.  SOF ¶ 50.  Conclusory allegations cannot establish FCA liability.  *Earley*, 907 F.2d at 1081 ("To survive summary judgment, the plaintiff must present concrete evidence in the form of specific facts . . . . Mere conclusory allegations and assertions will not suffice.") (citations omitted).

present in the applicable regulations, requiring the creation of a single care plan document.

Relator's erroneous belief about what the regulations require does not create a material issue

here, however, because courts acknowledge that defendants do not knowingly submit false claims

when they act within a reasonable interpretation of what is, at worst, an ambiguous regulation,

and there is no official governmental guidance that would have warned the defendant away from

its reasonable interpretation of the law.  *See, e.g.*, *United States ex rel. Purcell v. MWI Corp.*, 807

F.3d 281, 288–90 (D.C. Cir. 2015) (finding under the FCA's knowledge element, that where the

defendant's interpretation of the government's ambiguous guidance was reasonable, there is no

liability if government failed to identify guidance from the court of appeals or the relevant

agency that would have warned the defendant away from its interpretation and it was undisputed

that the government had never published any written guidance on what the ambiguous term

meant); *United States ex rel. Ketroser v. Mayo Found.*, 729 F.3d 825, 831–32 (8th Cir. 2013);

*United States ex rel. Hixson v. Health Mgmt. Sys., Inc.*, 613 F.3d 1186, 1190 (8th Cir. 2010).

### C. Relator's allegations that Defendants falsely coded ADL scores to increase reimbursement rates must fail.

Relator alleges that employees at Defendants' facilities falsely inflated ADL scores at the

direction of Regional Reimbursement Specialists to increase RUG scores, and hence Medicare

reimbursement.  SOF ¶ 51.  But because there is undisputed, empirical evidence that Defendants'

facilities actually *undercoded* ADL scores as compared to other Florida SNFs, Relator cannot

meet the elements necessary for FCA liability, and thus, summary judgment in favor of

Defendants is appropriate.

Relator cannot establish that any "false" ADL score was submitted to Medicare for

essentially all the claims she reviewed.  Of the 284 Medicare Part A resident files Ms. Bradley

reviewed for ADL coding issues, her findings translated to only 29 alleged overpayments.  SOF ¶

52. Ultimately, out of those 29, Defendants' experts concluded that 20 were accurately coded.[15] At most, then, there are nine instances out of 284 files reviewed (~3%) where a miscoded ADL score could have resulted in an overpayment based upon existing documentation.  SOF ¶ 53.

Relator also cannot establish the "knowing" submission of any false claim, even in the relatively few instances in which clinical proof is no longer available to validate the claim, for at least four reasons.  First, even assuming Relator is correct that ADLs were inaccurately coded for nine residents, an error rate that low demonstrates that there was no knowing submission of a false claim.  *See, e.g.*, *Prabhu*, 442 F. Supp. 2d at 1034  (providing that a "low error rate" disproves the contention that defendants "knowingly" engaged in a pattern of submitting false or fraudulent claims that would entitle the Government to treble damages and substantial civil fines) (citations omitted).[16]

Second, discovery has specifically disproven Relator's contention that Defendants typically upcoded ADL scores.  *See* SOF ¶ 54 (Complaint allegation that "RUC was typical"). There is undisputed evidence that Defendants' Florida facilities actually *undercoded* ADLs.  As Derrick Deeter explained in his deposition, Certified Nursing Assistants ("CNAs") often failed to accurately account for all the care they provided to residents, meaning that ADL scores for residents in Defendants' Florida facilities often under-represented the amount of assistance residents needed.  SOF ¶ 55.  Mr. Deeter's observations are borne out by an analysis of publicly-

---

[15] As previously noted, whatever clinical disagreement exists between Relator's experts and Defendants' experts concerning the functional level of a particular resident as reflected in an ADL score cannot give rise to a false claim and therefore cannot create a genuine issue of material fact for trial.  *See supra* notes 3 and 9.

[16] *See also United States ex rel. Watson v. Conn. Gen. Life Ins. Co.*, No. 98-6698, 2003 U.S. Dist. LEXIS 2054, at *55 (E.D. Pa. Feb. 11, 2003) (clarifying that a "high rate of accuracy undermines any contention that [the defendant] knowingly engaged in a pattern of failing" to adhere to the governing standard regarding claims submission), *aff'd* 87 F. App'x 257 (3d Cir. 2004).

available data reflecting billings by all Florida SNFs for RUG scores with a high ADL

component (*i.e.*, a RUG score such as "RUC" with a "C" ADL component). That data, which is

undisputed, objectively shows that, rather than *upcoding*, Defendants' facilities were below

average for Florida SNFs in RUG billings with a high ADL component each year for the entire

relevant time period. SOF ¶ 56. Relator's allegation that Defendants upcoded ADLs as a matter

of course is empirically false.

Third, a knowing violation does not occur when alleged errors run in both directions.

*See, e.g.*, *United States ex rel. Taylor-Vick v. Dr. Smith,* 513 F.3d 228, 232 (5th Cir. 2008)

(concluding that where defendants engaged in under-billings as well as overbillings, all the

relator showed was that defendants "were negligent billers, which does not offend the FCA").

As the clinical review of Scott Heichel demonstrated, even in the limited group of residents

whose ADL information resulted in an alleged overpayment, Defendants billed a lower RUG

than was justified by the resident's ADLs. SOF ¶ 57.

Fourth, the facts establish that Defendants were, at worst, no more than merely negligent

in coding ADL scores because Defendants developed and implemented a comprehensive

compliance program to ensure accurate billing and coding. *See, e.g.*, SOF ¶ 58. ADL coding

was an area of focus for Defendants' employee training because ADL scoring has a subjective

component, and ADL scores can fluctuate throughout a resident's stay, throughout a 24-hour

period, and even at different times during the same nursing shift. SOF ¶ 59. Defendants'

thorough, top-down approach to billing and coding compliance is clear evidence of their intent to

ensure accurate ADL coding. *See Urquilla-Diaz*, 780 F.3d at 1062 (ruling that even if a person's

certification of compliance with law was "unreasonable" there would be no FCA violation unless

the relator can demonstrate that reliance amounted "to gross negligence[,]" and finding where, in

part, defendant had a robust compliance system, that reckless disregard under the FCA could not

be established); *see also United States ex rel. Hefner v. Hackensack Univ. Med. Ctr.*, 495 F.3d

103, 110 (3d Cir. 2007) (ruling that defendant "demonstrated" its "lack of recklessness" by

devoting considerable resources to compliance).

**D.  Relator's allegations concerning the identities and credentials of individuals signing MDS forms do not establish a false claim and must fail.**

Relator alleges that Defendants concealed their so-called fraudulent scheme by

misrepresenting the identity and credentials of individuals who signed MDS forms.  SOF ¶ 60.

Relator asserts that this is supposedly evidence of Defendants' knowledge that claims were false.

SOF ¶ 61.  Relator's experts have pointed to only four instances, however, where someone other

than a Registered Nurse ("R.N.") signed an MDS form.  SOF ¶ 62.  Only one of those instances

resulted in an overpayment.  SOF ¶ 63.  Four alleged instances out of nearly 800 reviewed files

demonstrate nothing more than inadvertence, not a knowing FCA violation.  *See United States ex*

*rel. Ruhe v. Masimo Corp.*, 977 F. Supp. 2d 981, 995 (C.D. Cal. 2013); *Prabhu*, 442 F. Supp. 2d

at 1029, 1034; *United States ex rel. Watson v. Conn. Gen. Life Ins. Co.*, No. 98-6698, 2003 U.S.

Dist. LEXIS 2054, at *55 (E.D. Pa. Feb. 11, 2003).

Relator also cannot establish FCA liability because the presence of an R.N.'s signature on

an MDS form is not a condition of payment.  *See United States ex rel. Ortolano v. Amin*

*Radiology*, No. 5:10-cv-583, 2015 U.S. Dist. LEXIS 9724, at *25 (M.D. Fla. Jan. 28, 2015)

(stating that "a provider's certification that it has complied" with regulatory requirements is

enforced administratively, and not through denial of payment) (citations omitted).  Here, the

provision of medically necessary and reasonable services supports Defendants' bills to the

government.  SOF ¶ 64.  Relator cannot point to any specific instance where a resident did not

receive medically appropriate treatment and services as a result of a non-R.N. signing any MDS

form, or received "worthless" services, and thus cannot establish that any claim was false on that

basis.

**E.   There is no evidence that any MDS nurse was ever paid a cash bonus for upcoding, and that allegation must fail.**

Relator claims that a LaVie employee told her that MDS nurses were offered cash

bonuses for upcoding.  SOF ¶ 65.  That employee denied Relator's accusation outright under

oath, and every other witness Relator asked about cash bonuses denied ever receiving one at all,

much less for fraudulently inflating RUG levels.  SOF ¶ 66.  Relator's allegation is nonsensical

given that Defendants' ADL scores were actually lower than statewide averages (and hence any

alleged bonus apparently had no effect on coding practices).  Further, Relator does not attempt to

link her allegation to any specific ADL scores submitted to the government, which is fatal to her

claim.  *Lawson*, 2015 U.S. Dist. LEXIS 45221 at *33–34 (Relator must "come forward with

admissible evidence of a single claim and sa[y] 'this one is objectively false'").  In short, Relator

has not adduced any evidence to support her allegation about cash bonuses, cannot demonstrate

any genuine issue of material fact about it, and it cannot survive Defendants' motion for

summary judgment.  *See Urquilla-Diaz.*, 780  F.3d at 1050 ("[Relator] must offer more than a

mere scintilla of evidence" and "must make a showing sufficient to permit the jury to reasonably

find on its behalf.") (citation omitted).

**F.   Allegations outside the complaint.**

A False Claims Act complaint must meet the heightened pleading standard of Rule 9(b),

and requires allegations concerning "facts as to time, place, and substance of the defendant's

alleged fraud." *Clausen*, 290 F.3d at 1308; *see also Hopper*, 588 F.3d at 1324 (applying Rule

9(b) pleading standard to causes of action brought under the FCA).  As a result, Relator cannot

expand the allegations in her complaint through discovery because doing so improperly

circumvents the heightened pleading standard required in False Claims Act cases. *United States ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1359–60 (11th Cir. 2006) ("The particularity requirement of Rule 9 is a nullity if Plaintiff gets a ticket to the discovery process without identifying a single claim.") (internal quotations and citations omitted); *United States ex rel. Phalp v. Lincare Holdings, Inc.*, 116 1326, 1341 (S.D. Fla. 2015) ("[D]istrict courts must guard against the situation where a plaintiff does not specifically plead the minimum elements of their allegation, and is able to learn the complaint's bare essentials through discovery.") (internal quotation and citations omitted). Here, the precise evils anticipated by these courts occurred. Relator, without properly amending her Complaint in compliance with Rules 12(b)(6) and 9(b), used discovery to perform a general audit of over 600 claims Defendants submitted at every facility over a four year period. Although Relator's numerous allegations concerning missing documentation, improper use of extensive service RUGs, and improper use of depression diagnoses were raised only by her experts' reports, do not appear in her Complaint, and should therefore be ignored, Defendants address them now in turn as those allegations would also fail as a matter of law even if they had been properly pled in the Complaint.

Relator served expert reports and supporting materials on December 11, 2015, articulating, for the first time, that she was alleging overpayments based exclusively on her inability to locate MDS forms in the files for 91 residents in the sample group. SOF ¶ 67. This allegation does not appear in Relator's Complaint. SOF ¶ 68. Even if it did, the allegation that a missing MDS form in a resident's file establishes a false claim fails for three additional reasons.

First, missing documentation, standing alone, does not create FCA liability. *See United States ex rel. Schuhardt v. Wash. Univ.*, 361 F. Supp. 2d 992, 997–98 (E.D. Mo. 2003) ("[F]ailure to properly document a service does not, by itself, state a claim for relief under the FCA."), *rev'd*

*in part on other grounds by* 390 F.3d 563 (8th Cir. 2004); *United States ex rel. Davis v. Dist. of Columbia*, 793 F.3d 120, 125 (D.C. Cir. 2015) ("A false certification of compliance with a statute or regulation cannot serve as the basis for a *qui tam* action under the False Claims Act unless payment is conditioned on that certification.") (citation omitted). Second, the MDS forms are not missing. SOF ¶ 69. Once Defendants became aware of Relator's intention to seek damages on the ground that MDS forms were missing, they undertook an additional search of historic LaVie electronic records and were able to locate each and every MDS form that Relator claimed was missing. SOF ¶ 70. These MDS forms demonstrate beyond any reasonable dispute that MDS assessments were performed and documented in compliance with applicable regulations.[17] Third, there is no evidence that the services captured by the MDS forms were not performed, or that the services were not medically necessary. In fact, Dr. Palega's review of available documentation for residents whose allegedly missing MDS resulted in an overpayment demonstrated that the services reflected on the MDS were medically appropriate and reasonable. SOF ¶ 72. There can also be no legitimate dispute that the MDS forms were completed and submitted to the government, because doing so is a necessary step to obtain the very payments that Relator now alleges were improper. SOF ¶ 73.

The other allegations Relator has improperly made outside her complaint also fail. Her claim that Defendants improperly billed for extensive services (*e.g.*, IV medication, trach care, isolation, etc.) is not in the complaint, and appears only in Ms. Bradley's report. Even if that allegation had been properly pled, it does not establish FCA liability because extensive services were coded correctly over 90% of the time. SOF ¶ 74. *See, e.g., Prabhu*, 442 F. Supp. 2d at

---

[17] The accuracy of these MDS forms is not in dispute. Although Defendants have repeatedly invited Relator to examine the MDS forms and supplement her expert reports, she has declined to do so. SOF ¶ 71.

1029, 1034.  Relator's allegation that Defendants improperly used depression diagnoses to increase reimbursement, which appears exclusively in Ms. Lowrie-Morris's report, is based on a single document that Ms. Lowrie-Morris concedes does not establish that any depression diagnosis was improperly applied to any resident.  SOF ¶ 75.  Conversely, publicly available data shows that the percentage of total resident days billed involving a depression classification were minimal, and fully consistent with the utilization of depression RUGs by SNFs throughout Florida.  SOF ¶ 76.

Finally, Relator served interrogatory responses claiming that Defendants continued to treat a resident—E.H.—even after he passed away in July 2012, implying that Defendants submitted false claims to the government seeking reimbursement for that treatment.  That claim is, unfortunately, typical of the irresponsible, conclusory, and inflammatory allegations that permeate this case.  Resident E.H. was not the beneficiary of any government insurance, Medicare or otherwise, at the time of his death, which occurred outside the relevant time period. SOF ¶ 77.  Defendants did not submit any claim for payment to the government for E.H. after December 2011.  SOF ¶ 78.  While there may be some documentation errors in resident files from time to time, no one but Relator has ever intimated that the files are unreliable in their entirety.  No family member, resident, staff member, nurse, or physician has raised an issue about integrity of the files, and staff rely on them daily to provide medically appropriate care to residents.  Relator's contention that Defendants submitted false claims for E.H. is based on nothing more than a documentation error, and is demonstrably false.[18]

---

[18] For the reasons stated herein, Defendants have rebutted the presumption of knowledge previously imposed by the Court.  *See* Aug. 12, 2015 Order, ECF No. 235.  In summary, the undisputed facts show that (1) residents received medically necessary and reasonable treatment that was properly billed to the government, (2) Defendants had extensive compliance programs

## IV.    CONCLUSION

There is no genuine issue of material fact left for trial in this case, and Defendants'

Motion for Summary Judgment should be granted.


Dated: April 5, 2016                                    Respectfully submitted,

                                                        */s/ Robert S. Salcido*

                                                        Robert S. Salcido (*pro hac vice*)
                                                        rsalcido@akingump.com
                                                        Terence J. Lynam (*pro hac vice*)
                                                        tlynam@akingump.com
                                                        AKIN GUMP STRAUSS HAUER & FELD LLP
                                                        1333 New Hampshire Avenue, NW
                                                        Washington, D.C. 20036
                                                        Telephone: (202) 887-4000
                                                        Facsimile: (202) 887-4288

                                                        Tina Dunsford (Florida Bar No. 624721)
                                                        tdunsford@flhealthlaw.com
                                                        FLORIDA HEALTH LAW CENTER
                                                        501 E. Kennedy Blvd., Suite 775
                                                        Tampa, Florida 33602
                                                        Telephone: (813) 517-1661
                                                        Facsimile: (813) 517-1668

                                                        *Counsel for Defendants*

---

in place to ensure accurate coding and billing, and (3) the error rate for any coding and billing
errors that did occur is so low that it refutes the knowing submission of any false claims.

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that on April 5, 2016, I electronically filed the foregoing

document with the Clerk of the Court using the CM/ECF system, which will send a notice of

electronic filing to counsel of record for Plaintiffs.

<u>*/s/ Terence J. Lynam*</u>

**Terence J. Lynam**

*Attorney for Defendants*