# Exhibit A

# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

| | |
|---|---|
| THE UNITED STATES OF AMERICA and THE STATE OF FLORIDA *ex rel.* ANGELA RUCKH,<br><br>    Plaintiffs,<br><br>v.<br><br>CMC II, LLC; SEA CREST HEALTH CARE MANAGEMENT, LLC, d/b/a LAVIE MANAGEMENT SERVICES OF FLORIDA; SALUS REHABILITATION, LLC, d/b/a LAVIE REHAB; 207 MARSHALL DRIVE OPERATIONS, LLC, d/b/a MARSHALL HEALTH AND REHABILITATION CENTER; 803 OAK STREET OPERATIONS, LLC, d/b/a GOVERNOR'S CREEK HEALTH AND REHABILITATION CENTER,<br><br>    Defendants. | CIVIL ACTION NO.<br>8:11 CV 1303 SDM-TBM<br><br>**ORAL ARGUMENT REQUESTED** |

## <u>DECLARATION OF DR. CONSTANTIJN PANIS</u>

I, Constantijn Panis, declare under penalty of perjury as follows:

1. I understand that Defendants' expert Stefan Boedeker has criticized the method I used to derive the sampling frame from which I drew a random sample of resident-days. In particular, he asserts that because I used the default sorting method in Stata – a standard computer program used regularly in academic and professional statistical analysis – to de-duplicate the data Defendants provided to Relator, "another statistician cannot replicate the universe of resident-days from which the sample was drawn." *See* Defs. Mot., Ex. C (Declaration of S. Boedeker) (Apr. 1, 2016) ("Boedeker Decl.").

2. I do not agree with this criticism. At trial, I will explain to the jury that the issue Mr. Boedeker identifies (1) does not prevent another statistician, or Defendants, from replicating and critiquing my sampling frame; (2) does not affect the total number of resident-days in my sampling frame; (3) affects the Medicare-Medicaid mix in the sampling frame by at most only 0.03%; and (4) does not affect the reliability of my damages estimates in any meaningful way.

3. As I have explained in my report, in designing my method, I used patient resident-days as the sampling unit. Data produced by Defendants reflect that residents stayed in Defendants' facilities for 5,530,089 days from January 1, 2008, through January 25, 2012. For 604,951 resident-days of the 5,530,089 total resident-days in the sampling universe, Defendants' data identified both Medicare and Medicaid as the payor.

4. To weed out potential inaccuracies, I used other data, including information provided by Defendants about the source of payment for the claim associated with the resident-day, to decide whether to associate the resident-day with a Medicaid or Medicare claim.

5. For 38,530 resident-days, no such other information was available to guide that decision. For these resident-days, I allowed the Stata computer program to select the payor. In other words, Stata selected the payor for, at most, only 0.7% of resident-days in the sampling frame.

6. To address Mr. Boedeker's criticisms and to evaluate the effect of excluding resident-days from either the Medicaid sampling frame or the Medicare sampling frame, I performed the de-duplication procedure 1,000 times and compared the resulting 1,000 sampling frames to the sampling frame that I used as the basis for my sampling.

7. The total number of resident-days in my sampling frame (5,530,089) was not affected by Stata's default sort procedure, but the Medicare-Medicaid mix varied very slightly across the 1,000 replications. The proportion of resident-days that were assigned to a different payor in the initial sampling frame and this latest analysis was always less than 0.3%.

8. The net effect on the Medicaid and Medicare sampling frames, moreover, was even smaller, because some resident days switched from Medicare to Medicaid, and some switched from Medicaid to Medicare, so these offsetting changes cancelled each other out. Indeed, while the gross difference was always smaller than 0.3%, the net difference was always even smaller – less than 0.03%, or 3 in 10,000, in each of my replications.

9. I provided workpapers describing this analysis in a letter from Relator's counsel to Defendants' counsel on March 28, 2016. *See* Defs. Mot., Ex. D, Letter from R. Beynon to T. Lynam (Mar. 28, 2016).

10. In the same correspondence, I provided Defendants with an amended version of the report I filed in this case on December 11, 2015. The amendments to that report reflected updated data on one resident-day provided to counsel by Relator's accounting expert, Marc Vianello. *See* Expert Report of Dr. Constantijn Panis (Dec. 11, 2015, as amended Mar. 28, 2016) ("Amended Panis Report"), at 8 (Table 2) and 11 (Table 3) (reflecting updated estimates of overpayments and potential penalties, respectively).

11. In the course of making those amendments, I updated my calculations of the margins of error corresponding to my estimates of total overpayments to Defendants from Medicare and Medicaid. *See id.* I made this amendment to address a criticism Mr. Boedeker made of my initial calculations of these margins of error. Specifically, Mr. Boedeker pointed out that I should have used the sample size as the denominator in my calculations of the margins of error. *See* Boedeker Decl. ¶ 23. In order to address this concern, I modified

my calculations. In doing so, the damages estimate became slightly more precise: the margin of error narrowed by 0.17% and the 90% lower bound of overpayments by Medicaid is 0.04% larger than the original lower bound ($116,071,165 instead of $116,025,936).

12. In addition, in the amended report, I made an adjustment to correct the total amount of overpayments in the Medicaid analysis I undertook based on the assumption that, if records could not be located, payment was inappropriate. Overpayments in the sample were corrected by $0.01, from $12,459.01 to $12,459.02, resulting in aggregate overpayments increasing proportionately.

Dated: April 19, 2016

Constantijn Panis, Ph.D.