**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

THE UNITED STATES OF AMERICA and
THE STATE OF FLORIDA *ex rel.*
ANGELA RUCKH,

        Plaintiffs,

        v.

CMC II, LLC; SEA CREST HEALTH
CARE MANAGEMENT, LLC, d/b/a
LAVIE MANAGEMENT SERVICES OF
FLORIDA; SALUS REHABILITATION,
LLC, d/b/a LAVIE REHAB; 207
MARSHALL DRIVE OPERATIONS, LLC,
d/b/a MARSHALL HEALTH AND
REHABILITATION CENTER; 803 OAK
STREET OPERATIONS, LLC, d/b/a
GOVERNOR'S CREEK HEALTH AND
REHABILITATION CENTER,

        Defendants.

CIVIL ACTION NO.
8:11 CV 1303 SDM-TBM

**ORAL ARGUMENT**
**REQUESTED**

**RELATOR'S OPPOSITION TO**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

        Relator, by and through her undersigned attorneys, hereby submits this memorandum

in opposition to Defendants' motion for summary judgment (Dkt. No. 292).

**INTRODUCTION**

        Defendants assert that the record evidence would not permit a reasonable jury to find

that Defendants submitted even a single "false or fraudulent claim" to either Medicare or

Medicaid.  Defendants also argue that the evidence would compel a reasonable jury to find

that they have rebutted the presumption of knowledge that this Court imposed as a sanction

for their blatant discovery misconduct.  In reality, the evidence here shows that Defendants

engaged in a years-long corporate scheme to bilk Medicare and Medicaid through the submission of numerous false or fraudulent Medicare and Medicaid claims resulting in millions of dollars in ill-gotten Government funds. Defendants repeatedly argue that the Court should credit their employees' denials of the Complaint's allegations. But that is not how summary judgment works. The evidence supporting Relator's claims is voluminous, and Defendants cannot avoid a jury trial simply by ignoring that evidence and asking the Court to credit their self-serving (and manifestly incredible) testimony.

## FACTS

Defendants engaged in an illegal scheme to obtain inflated Medicare and Medicaid reimbursements for treatment supposedly provided to patients in 53 skilled nursing facilities ("SNFs") in Florida. Defendants pursued their illegal objective through various strategies to exploit Medicare and Medicaid reimbursement rules in violation of the federal and Florida False Claims Act ("FCA"). Under Medicare, SNFs receive more money the more care they provide; Defendants thus overstated the care supposedly provided to patients. Under Medicaid, SNFs receive the same reimbursement amount no matter how much care they provide; because SNFs' incentive is to give less care, Florida Medicaid requires SNFs as a condition of payment to maintain and follow detailed "care plans" to protect patient health. Defendants failed to create those care plans but sought full reimbursement anyway.

Defendants were fully aware of their wrongdoing. One employee testified: "Q: Have you heard of facilities increasing therapy around assessment reference dates in order to inflate the RUG? A: Yes, sir." Defendants' Chief Compliance Officer recognized that they were likely violating the FCA but recommended that they not take action in response. And a

potential outside investor told Defendants' CEO that █████████████████████

███████████████████████████████  Relator's Statement of Additional Material

Facts ("SOF") ¶¶ 115, 147-149.  The following summarizes only some of the abundant

evidence, which is set forth in greater detail in the accompanying SOF.

I.      **Defendants' Medicare Scheme**

  A.      **Overview of Medicare Reimbursement Rules**

   Medicare reimburses SNFs based on a patient's resource utilization group ("RUG")

level.  SOF ¶ 80.  The "RUG" level is a three-letter code.  For rehabilitation RUG levels,

which are the focus of this case, the first letter is always "R".  The second letter indicates the

amount of speech, physical, or occupational therapy the patient received:  Low (L), Medium

(M), High (H), Very High (V), or Ultra High (U).  The third letter indicates the amount of

assistance that patient needed for activities of daily living (an "ADL score"), which ranges

from "A" (the lowest) to "X" (for "extensive").  Thus, the highest rehabilitation RUG level is

RUX ("ultra-high" therapy; "extensive" ADL score); "RLA" is the lowest ("low" therapy;

ADL score of "A").  SOF ¶ 81.  The government claim form (Form UB-04) requires SNFs to

report the patient's RUG level for each period the patient stayed at the SNF.  SOF ¶¶ 82-83.

Just changing one letter (e.g., RVX to RUX) can increase the SNF's reimbursement by

hundreds of dollars per patient for each claim.  SOF ¶ 84.

   Each SNF is required by law to accurately determine a patient's RUG level using a

Minimum Data Set ("MDS") assessment that must be done during specified intervals.  42

C.F.R. §§ 413.343, 483.20.  The MDS assessment establishes the RUG level that will apply

until the next assessment, based on the patient's condition in the seven days ending on the

assessment reference date.  For example, if a patient is assessed at RUG level "RUX" based on an assessment reference period of days 25-31, the SNF's reimbursement will be based on that RUG level from day 31 until the next MDS assessment (normally around 60 days), even if the patient's needs decrease on day 32.  SOF ¶ 85.  SNFs do not attach the MDS assessment to their UB-04 claim form, but they must submit it separately and maintain it in case the Government audits the claim.  *See* 42 C.F.R. §§ 413.343(a), 483.20(d).  If the SNF does not timely complete a compliant MDS assessment, Medicare reimburses the SNF at a much lower "default" rate.  *See* 42 C.F.R. § 413.343(c).

### B. Inflated RUG Levels

Defendants' most blatant and straightforward scheme was to seek reimbursement based on RUG levels that overstated both the amount of therapy provided and the patient's ADL score.  Defendants' senior officers directed employees to increase patients' RUG levels to achieve corporate profit targets irrespective of actual needs.  For example, Defendants directed employees to place any patient physically capable of receiving "ultra" ("RU") or "very high" ("RV") therapy levels into those categories, absent approval from a Regional Vice President (RVP).  SOF ¶ 86.  RVPs often were not medical professionals, did not examine patients, and could not assess patients' actual needs.  SOF ¶ 87.  RVPs also told facilities they should hit targets for the percentage of ultra-high therapy patients.  SOF ¶ 88 ("Currently [RUs] are at 59.81%.  Company goal is 70%.").  One presentation instructed employees to ask, "is it RU or why not?"  SOF ¶ 89.  A former employee testified that he felt pressure to trick patients into agreeing to more therapy: "[supervisor] told us don't use the word 'therapy.'  Just use the word 'we're going to go to the dining room,' . . . ." SOF ¶ 90.

Defendants also pressured employees to falsify patients' ADL scores. During the budgeting process for one year, LaVie's Director of Clinical Reimbursement proposed to require facilities to reduce the percentage of patients in the ADL "A" category (the lowest ADL score) by as much as 22 percentage points. SOF ¶ 91. When ADL scores were lower than Defendants wanted (i.e., with a large percentage of patients in the "A" category, which corresponds to the lowest reimbursement rates), they contacted the facilities to inform them that the percentage of "A" patients "should be" lowered to meet corporate targets. SOF ¶ 92. An RVP described a policy of prohibiting facility employees from "locking" any "A" ADL score without first speaking to the facility's senior managers. SOF ¶¶ 93-95, 157, 161-162.

As one would expect, Defendants' top-down mandates to increase RUG scores resulted in numerous claims that overstated patients' RUG levels. Relator's expert Shirley Bradley did a comprehensive audit of a sample of 320 Medicare patient files and found at least 80 cases in which Defendants billed the government for amounts of therapy greater than what the patient actually received according to contemporaneous medical records. SOF ¶ 96. For example, in one case (patient #536 in Ms. Bradley's report), Defendants claimed reimbursement for 720 minutes of physical and occupational therapy over seven days – just enough to bill at "rehab ultra" levels. SOF ¶¶ 97-98. But Defendants' own medical records do not indicate that the patient received any therapy at all, resulting in an overcharge of $1,905.47 for that one-week billing period. *Id.*; *see also* ¶¶ 99-102, 233-238.[1]

Defendants also submitted claims with falsely inflated ADL scores. For instance, for patient #446, Defendants billed the patient with a "C" ADL score, when contemporaneous

---

[1] To the extent Defendants challenge the admissibility of Relator's experts' testimony, she incorporates by reference her responses to those motions.

medical records indicate that the patient had an ADL score of "B".  Defendants claimed

$1,735.35 in unlawful reimbursement for the billing period.  SOF ¶ 103.  As another

example, Defendants billed patient #466 at RUG level RUX, when there was no support in

the medical record that the patient had actually received extensive services.  SOF ¶ 104.[2]

Defendants also falsified MDS assessments, which provide the RUG levels used in

claims.  In numerous cases, Defendants overstated the number of therapy minutes that the

patient received or the patient's ADL scores.  SOF ¶ 96.  For example, patient #247's MDS

assessment indicated that she received 750 minutes of therapy in the prior seven days,

whereas Defendants' medical records show that she received just 630.  SOF ¶ 105.  In other

cases, Ms. Bradley found no evidence that the patient actually received *any* therapy during

the relevant period.  Yet the Defendants sought reimbursement for these patients based on the

inflated treatment information contained in the falsified MDS assessments.[3]  SOF ¶ 106.

### C.  Inflating Treatment During Assessment Periods ("Ramping")

Defendants also pursued a variant of the same scheme – known as "ramping."

Because RUG levels are based on an MDS assessment reporting information from a prior

seven-day period, Defendants were able to defraud Medicare by falsely inflating the therapy

provided during those periods.  Patient #743 illustrates this scheme.  In the weeks before and

after the assessment window (highlighted), the patient received an average of 390 minutes of

therapy a week.  But during the assessment window, Defendants reported 720 minutes –

---

[2] Defendants (at 23) argue that the Complaint does not allege improper billing of extensive services, but it is simply a type of ADL upcoding, which was properly pleaded.

[3] Defendants' MDS assessments were rife with other deficiencies.  For example, Defendants often failed to complete timely MDS assessments to support their reimbursement claims.  SOF ¶ 107.  One of Defendants' employees, Caroline Packer, signed MDS assessments months after the fact.  SOF ¶¶ 108-110.  Defendants failed to have a registered nurse (RN) sign numerous MDS assessments, in violation of applicable regulations.  *See* SOF ¶ 111.

exactly the amount needed for Defendants to bill Medicare at an "ultra high" therapy ("RU")

for the ensuing billing period even though they actually provided far less therapy. SOF ¶ 112.

| Week | Physical Therapy (mins) | Occupational Therapy (mins) | Total Therapy (mins) |
|------|------|------|------|
| April 9-15 | 225 | 195 | 420 |
| April 16-22 | 150 | 135 | 285 |
| April 23-29 | 390 | 330 | 720 |
| April 30 - May 6 | 250 | 285 | 535 |
| May 7-13 | 300 | 15 | 315 |

This pattern occurred repeatedly around multiple assessment periods for the same patient.



SOF ¶ 113.  This was no coincidence; it was a deliberate effort to inflate RUG levels for the

subsequent billing period.  For example, one Director of Rehabilitation wrote (in all capitals)

that when the schedule "says by the patients [sic] name that they are in an ARD (assessment

period) that means that *you have to get those minutes for the day.  Not under or over*."  SOF

¶ 114 (emphasis added).  A former Director of Rehabilitation testified: "Q: Have you heard

of facilities increasing therapy around assessment reference dates in order to inflate the

RUG?  A: Yes, sir."  SOF ¶ 115.  A former RVP also testified of manipulating assessment

look-back periods, "That's the nature of the game. . . .  That's the business."  SOF ¶ 116.

**II.     Defendants' Efforts to Receive Improper Medicaid Reimbursements**

Because Medicaid payments do not increase with the amount of services provided, Defendants concocted a different scheme to bilk Medicaid.  Rather than overstate the care provided to patients, Defendants sought to increase their profits by avoiding provision of needed care.  For example, when patients were evaluated for therapy needs, Medicare patients could be referred to the therapy department with no additional hurdles, but Medicaid patients could not be referred without advance notice to the facility administrator.  SOF ¶ 117.  A former Director of Rehabilitation testified about a Medicaid patient who, despite falling at least eight times in six months, including from her wheelchair, was not evaluated for therapy and was not given a new wheelchair that she could stay in.  SOF ¶ 118.

Defendants' Medicaid scheme centered around care plans.  Care plans document the patient's medical needs and formalize a plan of treatment.  They are designed to help ensure that patients receive the care they need.  SOF ¶ 239.  Florida's Medicaid regulations thus require, as a condition of reimbursement, that facilities complete care plans for all residents, *see infra* p. 13, and Federal and state rules require that SNFs provide all care called for by those plans, 42 C.F.R. §§ 483.25, 483.45; Fla. Medicaid Nursing Servs. Coverage & Limitations Handbook at i, 2-27 (July 2004) ("Coverage Handbook").  Because care plans generally result in more patient treatment (and thus higher cost), Defendants often failed to create them.  Defendants knew they were failing to comply with this critical requirement.  For example, a Regional Reimbursement Specialist wrote that "[m]edical [r]ecords that have been closed for almost 60 days have missing ADL records, care plans, and MDS assessments."  SOF ¶ 119.  In another email, employees discuss "missing items such as care

plans" from residents' charts at Defendants' Rio Pinar facility.  SOF ¶ 120.  Senior employees were aware that care plans at Defendants' Governors Creek facility were "a mess," and that "mock surveys" at Defendants' Rosewood facility indicated that "MDS [assessments] and care plans were an issue but we know that."  SOF ¶ 121.

Out of the 379 Medicaid patients sampled, 79 patient files contained no care plan for the relevant date.  SOF ¶ 122.  Nonetheless, Defendants obtained an average of more than $168 *per day* in Medicaid reimbursements for those patients.  SOF ¶ 123.

## III.     Falsification of MDS Assessments and Other Patient Records

To hide their scheme from Medicare auditors and Medicaid state surveyors, Defendants also falsified patient records and even removed accurate records from the files. In response to audit requests from the Medicare fiscal intermediary, for instance, Defendants' employees were instructed to "[r]emove all care plans that do not support the need for all three therapy services" from residents' medical records.  SOF ¶ 124.  Defendants recognized that including accurate documentation might "sway [the] claim in a negative direction."  SOF ¶ 125.  When faced with audits or subpoenas, "corporate" employees would instruct local facility employees to recreate missing documentation from patient files, including missing MDS assessments, to avoid liability.  SOF ¶ 126.  Defendants also created backdated and backfilled documents to make it appear as if the patient's medical records were complete.  In one instance, a facility employee purported to sign and date a medical form on October 30, 2010, even though the form itself, on its face, indicates that it was not created until March 2012.  SOF ¶ 127.  In another case, Defendants recorded a patient engaging in activities of

daily living even after the patient had already died.  SOF ¶ 128.[4]  Other obvious falsified

records include records showing treatment on dates that do not exist, such as February 30 and

31, SOF ¶ 129, or on dates on which the patient was not present in the facility.  SOF ¶ 130.

## LEGAL STANDARD

The FCA is "the primary law on which the federal government relies to recover losses

caused by fraud." *McNutt ex rel. United States v. Haleyville Med. Supplies, Inc.*, 423 F.3d

1256, 1259 (11th Cir. 2005).  Relator's claims fall under three FCA provisions and analogous

Florida FCA provisions.  The first provision, § 3729(a)(1)(A), prohibits knowingly

presenting a "false or fraudulent claim" or causing presentation of such a claim.  The second

provision, § 3729(a)(1)(B), prohibits making or using (or causing to be made or used) a

"false record or statement material to a false or fraudulent claim."  The third provision,

§ 3729(a)(1)(G), prohibits making or using (or causing to be made or used) a "false record or

statement material to an obligation to pay" the Government, or knowingly concealing or

improperly avoiding such an obligation.  *See* Fla. Stat. § 68.082(2)(a), (b), & (g).

A claim can be "false or fraudulent" either if it is "factually false" – *i.e.*, demands

payment for services never actually rendered – or if it is "legally false" – *i.e.*, falsely

represents compliance with legal prerequisites to payment.  *United States v. Space Coast*

*Med. Assocs., L.L.P.*, 94 F. Supp. 3d 1250, 1259 (M.D. Fla. 2015).  The essence of a false

claim is that it asserts a right to more money than the claimant is legally entitled to.  A claim

thus can be false even without an affirmative misstatement of fact if it fails to disclose

---

[4] Defendants argue (at 24) that this document is irrelevant because they billed a private payor rather than the government.  But a jury could reasonably draw the inference that Defendants had a pattern or practice of falsifying records in this manner.

material violations of the Government's conditions of payment.  *See id.*[5]  The FCA defines

knowledge as "actual knowledge," "deliberate ignorance," or "reckless disregard"; it does

not require "specific intent to defraud."  31 U.S.C. § 3729(b)(1).

Summary judgment is appropriate only if Defendants establish "that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law."  Fed. R. Civ. P. 56(a).  Because Relator bears the burden to prove a "false or fraudulent

claim" or "false record or statement," she must produce evidence showing that there is a

genuine issue for trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  But because

Defendants bear the burden of disproving knowledge under this Court's prior orders, *see* Dkt.

Nos. 218, 235, they must produce evidence showing the absence of a genuine factual dispute.

*See United States v. Four Parcels of Real Prop. in Greene & Tuscaloosa Ctys. in State of

Ala.*, 941 F.2d 1428, 1438 (11th Cir. 1991) (en banc).  In both cases, "[t]he evidence of the

non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."

*Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir. 1992).

## ARGUMENT

**I.   The Record Creates A Triable Issue of Fact On All of Relator's FCA Claims**

**A.   A Reasonable Jury Could Find That Defendants Presented False or
Fraudulent Claims (31 U.S.C. § 3729(a)(1)(A))**

Defendants contend that Relator has adduced no evidence of a "false or fraudulent

claim."  But that contention simply ignores the ample evidence that Defendants submitted

numerous "false or fraudulent" UB-04 forms to Medicare and Medicaid.[6]

---

[5] The Eleventh Circuit has never adopted a requirement that a "false claim" or "false record or statement" be "objectively false."  The word "objective" appears nowhere in the text and courts are not free to add requirements to the statute.  *See, e.g.*, *Alabama v. N. Carolina*, 560 U.S. 330, 352 (2010).

**1.  Factually False Claims.**  Defendants submitted UB-04 forms that falsely overstated the patient's RUG level.  For example, the UB-04 form for patient #247 reported a RUG level of RUX, corresponding to 720 or more minutes of therapy.  However, the evidence shows that the patient, in fact, received only 630 minutes of therapy during the relevant period, which should have been reported as RV.  SOF ¶¶ 99-102, 105.  Patient #536 apparently received no therapy but Defendants billed at Ultra High.  *See supra* p. 5.  Those are straightforward "factually false" claims.

As Ms. Bradley will testify based on her comprehensive review of patient files, Defendants systematically reported inflated RUG levels on their UB-04 forms.  She found that in 128 out of the 320 Medicare claims she reviewed (40%), the RUG level was inflated either because the number of therapy minutes reported, the ADL score, or both, were higher than what is reflected in the contemporaneous medical records.  SOF ¶ 132.

**2.  Legally False Claims.**  Defendants also submitted claims that are legally false because Defendants violated – and failed to disclose that they violated – legal prerequisites to payment under Medicare and Medicaid.[7]  Such claims are "false or fraudulent" because they assert a right to Government funds to which the claimant is not legally entitled and because they misleadingly omit facts material to the Government's payment decision.

As explained above, Medicare regulations provide that SNFs may be reimbursed for rehabilitation services only if they have completed an accurate and timely MDS assessment

---

[6] Defendants concede the UB-04 forms they produced reflect information from claims submitted to the government.  SOF ¶ 131.  Thus, if the UB-04 forms were false or fraudulent, there is no dispute that Defendants presented them or caused them to be presented to the United States for payment or approval.
[7] *See, e.g.*, *Space Coast Med. Assocs.*, 94 F. Supp. 3d at 1259; *U.S. ex rel. Freedman v. Suarez-Hoyos*, 781 F. Supp. 2d 1270, 1278-79 (M.D. Fla. 2011); *U.S. ex rel. Chabot v. MLU Servs., Inc.*, No. 6:06-cv-1528, 2010 WL 1539975, at *5 (M.D. Fla. Apr. 18, 2010).

that supports the amount of reimbursement claimed. *See supra* p. 4. Defendants repeatedly submitted claims for reimbursement even though they violated that condition of payment. In some cases, the MDS assessments were themselves falsified. In other cases, MDS assessments were not completed on time. And in other cases they were not signed by a registered nurse as expressly required by applicable regulations. *See supra* note 3.

Defendants' Medicaid claims were also legally false insofar as they did not create care plans as required by Medicaid regulations. *See supra* p. 8. Defendants argue (at 14-16) that care planning is a condition of Medicaid participation, not a condition of payment, but a requirement can be both, and Florida law clearly and expressly makes care planning a condition of payment as well. *See* Coverage Handbook at 2-27 (requiring care plans); *id.* at i (stating that handbook requirements are conditions of payment); Fla. Admin. Code Ann. r. 59G-4.200 (incorporating Coverage Handbook by reference); ECF 288 at 11-12.[8] Defendants (at 12-13) cite their expert's opinion that appropriate care planning did occur, but ample evidence belies that claim, and Defendants are not entitled to have that factual dispute resolved in their favor at summary judgment.

**3.** Defendants contend (at 10-11) that their expert will opine that the medical records show that the RUG level in each and every claim was accurate. But the battle of experts is for the jury to resolve; the court cannot declare winners and losers at summary judgment.[9]

---

[8] The Florida Medicaid Provider General Handbook ("Provider Handbook") also states that "Medicaid payments for services that lack required documentation or appropriate signatures will be recouped." Provider Handbook 2-57 (2008 vers.); *see also id.* at 2-8; Fla. Admin. Code Ann. r. 59G-5.020 (incorporating Provider Handbook by reference).

[9] *See, e.g.*, *ParkerVision, Inc. v. Qualcomm Inc.*, 969 F. Supp. 2d 1372, 1377 (M.D. Fla. 2013) (disagreement between experts "is all that is required to deny the motion"); *Ramirez v. Judd*, No. 8:12-cv-2819, 2015 WL 506315, at *6 (M.D. Fla. Feb. 6, 2015), *aff'd*, 610 F. App'x 959 (11th Cir. 2015) (where

Moreover, even Defendants' experts agree that certain of Defendants' claims are inconsistent with the patient's treatment records; they only disagree as to how many. Defendants' expert Scott Heichel, for instance, "agree[d] with SCIO findings" that the ADL score was unsupported for 9 claims and that the extensive services need (ADL score "X" or "L") was unsupported for 23 claims.  SOF ¶ 133.  Likewise, Defendants' expert Gregory Palega indicated that he could not identify a medical justification for decreasing therapy immediately after an MDS assessment date for one claim – which supports Ms. Bradley's conclusion that Defendants engaged in "ramping" for that patient.  SOF ¶ 134.  Moreover, Defendants' expert does not contradict Ms. Bradley's findings that at least 12 Medicaid patients lacked care plans, or that the amount of therapy minutes for numerous patients was overstated.  SOF ¶ 135.  Defendants are not entitled to summary judgment when their own experts agree that at least some of Defendants' claims *were* false.

Defendants also argue (at 9) that Relator has not adduced evidence that the treatment patients received was medically unnecessary.  But lack of medical necessity is not an element of Relator's claims, and thus not a "material" fact on which summary judgment could be granted.  *See Tipton*, 965 F.2d at 998.  Defendants' argument (at 10-11) that Relator's claims require resolving competing clinical judgments is a red herring.  Contrary to Defendants' repeated mischaracterizations (at 10, 15), Relator's theory of falsity does not require proof that Defendants provided medically inadequate care.  Relator's core claim is that Defendants submitted claims for reimbursement for services that were never provided at all, or provided

---

parties' experts conflict, summary judgment improper); *Cooper v. Marten Transp., Ltd.*, 539 F. App'x 963, 968 (11th Cir. 2013) (per curiam) (same).

in knowing violation of Medicare and Medicaid regulations.[10]

Defendants also dispute (at 10-11) that they engaged in "ramping," and point to their experts' testimony that the fluctuations in therapy minutes can be explained in most (but not all) cases by the patient's particular medical needs. Those opinions are not "undisputed." The evidence surveyed above shows that Defendants manipulated patient therapy motivated by corporate profit, not the Hippocratic Oath. Moreover, applicable regulations require, as a condition of payment, that the MDS assessment present an accurate picture of the patient's status. 42 C.F.R. §§ 483.20(g), 413.343. If a patient receives low levels of therapy every day before and after the MDS assessment but receives high levels during the assessment period, the assessment does not accurately reflect the patient's continuing status. *See* chart on p. 7, *supra*.[11] Defendants' claims are thus at least impliedly false.

### B.      The Evidence Supports Relator's Claims Under 31 U.S.C. § 3729(a)(1)(B)

Section 3729(a)(1)(B) prohibits making or using (or causing to be made or used) a "false record or statement" material to a "false or fraudulent claim." A reasonable jury could conclude that Defendants violated this provision by creating MDS assessments that falsely inflated patients' therapy levels and ADL scores. *See supra* pp. 5-6; SOF ¶¶ 86-106. Those

---

[10] Defendants' argument (at 15) that Defendants' services were not "worthless" is likewise misplaced. Although some courts have opined that an FCA claim based on "quality of care" must prove that the services were so deficient as to be worthless, the Eleventh Circuit has never adopted that limitation, which has no basis in the FCA and is at odds with the law of other circuits. *See United States v. Science Applications Int'l Corp.*, 626 F.3d 1257, 1268-69 (D.C. Cir. 2010). In any event, any such limitation is irrelevant to Relator's case, which is based largely on evidence that Defendants falsely billed for services never provided. *See United States v. Houser*, 754 F.3d 1335, 1348 (11th Cir. 2014).

[11] Defendants also argue that Ms. Bradley's methodology for assessing ramping was improper because it relied on a regulation that was not in effect at the time of most claims. Relator incorporates the response contained in her opposition to Defendants' Motion to Exclude Shirley Bradley, which is being filed concurrently. To summarize briefly, Ms. Bradley did not find fault with Defendants' records because they violated the regulation. Rather, she used the regulation as guidance to determine whether the MDS assessments presented an accurate picture of the patient's condition – a requirement in place for the entire relevant time period in this case.

false MDS assessments were clearly "material" to Defendants' reimbursement claims.  If the Government had audited Defendants' files, the false MDS assessments would have made it appear that the invoices were accurate.  The false MDS assessments thus "complete[d] the fraud."  *United States v. Triple Canopy, Inc.*, 775 F.3d 628, 639 (4th Cir. 2015) ("The false scorecards make the invoices appear legitimate because, in the event the COR reviewed the guards' personnel files, the COR would conclude that Triple Canopy had complied with the marksmanship requirement."), *petition for cert. pending*, No. 14-1440.

Indeed, Medicare regulations explicitly require completion of an accurate MDS assessment as a condition of payment.  *See* SOF ¶ 136.  As Defendants' Rule 30(b)(6) witness admitted, MDS assessments are "important" to the claims submission process because "You need to submit it to get paid."  SOF ¶ 137.  The face of the MDS assessment further confirms that the assessment is material to claims, because it requires a certification stating: "I understand that this information is used . . . as a basis for payment from federal funds.  I further understand that payment of such federal funds . . . is conditioned on the accuracy and truthfulness of this information."  SOF ¶ 138.

Defendants' falsification of other patient records also establishes a violation of § 3729(a)(1)(B).  As explained above, the evidence shows that Defendants created false patient files – including by removing relevant documents from those files – that were material to their invoices because they made the false invoices appear legitimate.  Indeed, Defendants' employees openly stated that if harmful documentation was not removed from the patient file, it could "sway the claim in a negative direction."  *See supra* pp. 9-10.

## C.     The Evidence Supports Relator's Claims Under 31 U.S.C. § 3729(a)(1)(G)

Defendants' falsification of MDS assessments and other patient records also establishes a violation of § 3729(a)(1)(G), which prohibits knowingly making or using (or causing to be made or used) a "false record or statement material to an obligation to pay or transmit money or property to the Government," or "knowingly conceal[ing] or knowingly and improperly avoid[ing] or decreas[ing]" such an obligation.

After Defendants submitted their falsely inflated reimbursement claims, they were still at risk of audit.  Government auditors look to underlying patient records, including MDS assessments, to scrutinize the SNF's reimbursement claim.  SOF ¶ 139.  To the extent the auditors found that patients' files did not adequately support Defendants' reimbursement claim, Defendants would have been obligated to return any overpayment received from the Government.  *See, e.g.*, 42 C.F.R. § 405.371(a)(3).  Defendants would also have been subject to other monetary penalties and FCA liability.  *See* 42 U.S.C. §§ 1320a-7a(a)(10), -7k(d).

Defendants' falsification of those patient files thus clearly constituted the making of a "false record or statement" that was "material" to Defendants' potential obligation to repay any overpayments improperly obtained from the Government.  Courts have repeatedly recognized that § 3729(a)(1)(G) properly applies in analogous circumstances.[12]

In sum, Defendants' contention that Relator has failed to adduce evidence of even a single "false or fraudulent" claim, record, or statement is simply contrary to the voluminous record.  Instead, Defendants ask this Court to grant summary judgment by ignoring Relator's

---

[12] *See, e.g.*, *U.S. ex rel. Matheny v. Medco Health Sols., Inc.*, 671 F.3d 1217, 1223 (11th Cir. 2012) (applying § 3729(a)(1)(G) where defendants had an obligation to return overpayments to the Government and created false records to hide the fact that they had received overpayments); *United States v. Bourseau*, 531 F.3d 1159, 1169 (9th Cir. 2008) (same).

evidence and crediting the testimony of Defendants' experts over that of Relator's. That is impermissible under basic summary judgment standards. *See Allen*, 121 F.3d at 646.

## II.      Defendants Are Not Entitled To Summary Judgment On Knowledge

Knowledge is a jury question and "generally is not appropriate for determination on summary judgment." *S.E.C. v. Mannion*, No. 1:10-cv-3374, 2013 WL 1291621, at *13 (N.D. Ga. Mar. 25, 2013) (citing cases). That is even more true because this Court has imposed a presumption that Defendants acted knowingly. Dkt. Nos. 218, 235. Defendants thus bear the burden of overcoming that presumption beyond any genuine factual dispute. *See* Fed. R. Evid. 301; Defs.' Mot. at 24 n.18. Defendants do not offer any affirmative evidence regarding their state of mind.[13] Rather, they argue based purely on three pieces of circumstantial evidence – none of which comes close to satisfying their heavy burden.

*First*, Defendants argue (at 18-19) that they acted innocently because only a small percentage of claims were "false or fraudulent." It is true that *Defendants*' experts acknowledge only that a small number of claims was false or fraudulent. *See supra* pp. 13-14. But *Relator's* expert analysis shows that *45%* of Defendants' claims were false or fraudulent. SOF ¶ 140. That evidence shows Defendants knew, or were reckless in failing to know, that their claims were false or fraudulent. *See supra* pp. 11-12. Again, the genuine factual dispute between the parties' experts precludes summary judgment.[14]

---

[13] Defendants argue (at 17) that knowledge is lacking if they acted based on a reasonable – even if erroneous – interpretation of an ambiguous regulation. But Defendants have offered no evidence that they actually adopted any such interpretation, and they are not entitled to summary judgment based on a *post hoc* rationalization. *See U.S. ex rel. Chilcott v. KBR, Inc.*, No. 09-cv-4018, 2013 WL 5781660, at *8 (C.D. Ill. Oct. 25, 2013).

[14] Defendants' cases are inapposite. *United States v. Prabhu*, 442 F. Supp. 2d 1008 (D. Nev. 2006), relied on "undisputed record evidence" that defendant's "billing practice conformed to a reasonable interpretation of ambiguous regulations that he, and his staff, believed in good faith were proper." *Id.* at

*Second*, Defendants argue (at 18-19) that they must have been innocent because they also under-reported RUG levels in some claims.  But Defendants cite only the self-serving testimony of one of their employees, Derick Deeter, and data supposedly showing that Defendants were below average among other Florida SNFs for high ADL scores.  That evidence, even if credited, would not *compel* a reasonable jury to find that Defendants acted innocently.  Defendants' argument asks the Court to draw inferences from the facts in their favor, rather than Relator's favor, in violation of basic summary judgment standards.

*Finally*, Defendants argue (at 19-20) they had "extensive compliance programs in place to ensure accurate coding and billing."  But the evidence belies that contention. Defendants had *no* audit function with respect to their billing.  *E.g.*, SOF ¶¶ 141, 148-149. Moreover, multiple employees testified that neither they nor any other employee to their knowledge ever made a single report to the compliance department.  SOF ¶ 142.

Defendants also ignore all the evidence that they acted knowingly.  That evidence includes corporate-wide policies pressuring employees to inflate RUG levels.  Facilities that fell below their budgeted RUG levels were subjected to onerous "focus calls"; facilities that met their budgets were praised.  SOF ¶ 143.  Facilities that did not meet their "required" budgets were told to increase RUG levels to make up the shortfall.  SOF ¶ 144.  Those budgets could not realistically be met without inflating RUG levels and ADL scores beyond what patient needs required.  SOF ¶ 145.  Defendants' policies required no approval to place

---

1029.  Defendants have offered no such evidence – much less undisputed evidence – here.  In *U.S. ex rel. Watson v. Conn. Gen. Life Ins. Co.*, No. 98-6698, 2003 WL 303142, at *13 (E.D. Pa. Feb. 11, 2003), the court found that Relator had not identified any evidence to support a knowing violation.  Here, Relator has adduced voluminous evidence that Defendants had a deliberate corporate strategy of inflating RUG levels – including billing for services never rendered – to pad their bottom line.

patients in high ADL scores, but multiple layers of onerous administrative approvals to put patients in low ones.  SOF ¶¶ 93-95.  And RVPs were dictating RUG levels even though they have no medical training and thus no basis to evaluate patient needs.  SOF ¶¶ 87-88.

Moreover, there is ample additional evidence that Defendants were aware of false or fraudulent claims.  First, no claim was submitted without going through a "match meeting," in which facility leadership (LaVie employees) and the therapy director (a Salus employee) would check every claim prior to submission.  SOF ¶ 146.  The detail involved in that process virtually guarantees that those employees would have known that the claims were false.  Second, corporate "regional reimbursement specialists" tasked with supervising the MDS assessment and claims process at the facilities reported upward that care plans (a required condition of payment) were missing throughout the facilities, "but we know that."  SOF ¶ 121.  Third, LaVie's Chief Compliance Officer noted the likelihood that LaVie was incurring FCA liability but expressly recommended that the company not investigate it; similarly, an outside investor's ████████████████████████████████████████ ████████████████████████  SOF ¶¶ 147-149.  And, in the event that an employee attempted to report fraudulent activity – as Relator did – high-level executives intervened to minimize the scope of any investigation to avoid learning the actual extent of the fraud occurring.  SOF ¶ 150.  A reasonable jury could readily conclude from this and other evidence that Defendants knew – or were reckless in not knowing – that they were submitting false or fraudulent claims.  *See also* SOF ¶¶ 154-173, 181, 209-232.

## CONCLUSION

The Court should deny Defendants' motion for summary judgment.

Dated:  April 19, 2016

Respectfully submitted,

_s/ Silvija A. Strikis_

Kevin J. Darken (FL. Bar No. 0090956)
THE COHEN LAW GROUP
201 East Kennedy Boulevard, Suite 1950
Tampa, FL 33602
Telephone: (813) 225-1655
Facsimile: (813) 225-1921
kdarken@tampalawfirm.com

Silvija A. Strikis (*pro hac vice*)
Joseph S. Hall (*pro hac vice*)
Rebecca A. Beynon (*pro hac vice*)
Bradley E. Oppenheimer (*pro hac vice*)
Jeffrey A. Love (*pro hac vice*)[*]
KELLOGG, HUBER, HANSEN, TODD,
   EVANS & FIGEL, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, DC 20036
Telephone:  (202) 326-7900
Facsimile:  (202) 326-7999
sstrikis@khhte.com
jhall@khhte.com
rbeynon@khhte.com
boppenheimer@khhte.com
jlove@khhte.com

Rory Delaney (*pro hac vice*)
DELANEY KESTER LLP
745 Atlantic Avenue, 8th Floor
Boston, MA 02111
Telephone:  (857) 498-0384
royston@delaneykester.com

Charles F. Kester (*pro hac vice*)
DELANEY KESTER LLP
4505 Las Virgenes Road, Suite 203
Calabasas, CA  91302
Telephone:  (818) 974-8627
Facsimile:  (818) 914-6911
charles@delaneykester.com

*Counsel for Relator*

---

[*] Not admitted in the District of Columbia.  Practice supervised by members of the firm.

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on April 19, 2016, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to counsel of record for Defendants.

*s/  Silvija A. Strikis*