**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**THE UNITED STATES OF AMERICA**
**and THE STATE OF FLORIDA**
*ex rel.* **ANGELA RUCKH,**

                **Plaintiff,**

**v.**                                                  **Case No. 8:11-cv-1303-T-23TBM**

**CMC II, LLC, et al.,**

                **Defendants.**
_____/

**O R D E R**

THIS MATTER is before the Court on **Relator's Motion to Preclude Defendants'**

**Use of Untimely Produced Documents and for Sanctions** (Doc. 264) and Supplements

thereto (Docs. 266, 272 and 328), and Defendants' responses in opposition to each (Docs.

267, 268, 275).[1]  Hearings on the Motion were held on February 22, 2016, and April 14, 2016.

As explained below, the Motion is **GRANTED in part** and **DENIED in part**.

**I.**

        This suit is brought on behalf of the United States and the State of Florida pursuant

to the *qui tam* provisions of the False Claims Act (FCA), 31 U.S.C. §§ 3729-3732 and the

Florida False Claims Act, Fla. Sta. §§ 68.081 et seq.  In short, Relator alleges Defendants

submitted or caused to be submitted false claims to Medicare and Medicaid in connection

_____

        [1]The pleadings are supported by discovery requests and responses, emails, excerpts of
depositions, and declarations.  *See* (Doc. 264-1 to 264-10; Doc. 267-1 to 267-3).

with patients at their skilled nursing facilities ("SNF") in Florida.  This discovery dispute

centers on what to do about the Defendants' late production of Minimum Data Set ("MDS")

Assessments[2] and other medical records in January and February 2016, well after the close of

discovery on October 30, 2015, and Relator's expert witness disclosures on December 11,

2015.  The procedural history pertinent to this dispute as set forth by Relator follows.

On January 23, 2014, Relator requested that Defendants produce "All Patient

Records, MDS Assessments, Claims, and any drafts of the foregoing relating to any resident

specifically referred to in the Complaint."  (Doc. 264-1).  On August 18, 2014, Relator

requested production of a broader set of MDS Assessments:  "All MDS Assessments

submitted to any Government Health Agency during the Relevant Period and relating to

services or treatment provided at any of the Relevant Facilities."  (Doc. 264-2).  Following

discussions between the parties, this request subsequently was narrowed to medical records

relating to the 800 patients identified in Relator's statistical sample.  *See* (Doc. 264-3, Doc.

264-4).

Between March and June 2015, Defendants produced patient records, including

MDS Assessments, related to the 800 patients in the statistical sample.  At a hearing on April

27,

---

[2]As explained by Relator, an MDS Assessment is "a report established by CMS [the United States Centers for Medicare and Medicaid Services] and ACHA [the Florida Agency for Health Care Administration] that summarized the medical condition and treatment provided to a particular resident at a SNF."  (Doc. 75, ¶ 5).  "Defendants were required regularly to submit MDS Assessments to CMS for each resident, and the information in those MDS Assessments formed the basis for reimbursement from Medicare, Medicaid, and TRICARE."  *Id.*

2

2015, Defendants represented to the Court and to Relator that they had "made production of the medical records," and that Relator had "the medical records . . . need[ed] in order to finish the [expert review] methodology." (Doc. 264 at 3).[3] Defendants reported that medical records for 742 of the requested patient files had been produced. (Doc. 264-5 at 2).

On June 30, 2015, to confirm that Defendants' production was complete, Relator issued another request for production for "All Documents referencing or relating to any of the Sample Patients, including any medical records, correspondence, MDS Assessments, and documentation of any Claim made to any Government Health Agency (including, but not limited to, any Forms UB-04), to the extent any such Documents were not previously produced in this action." (Doc. 264-6). On August 10, 2015, in response to Relator's request, Defendants represented that they already had produced all MDS Assessments in their possession. (Doc. 264 at 4).[4] Specifically, Defendants stated:

> Defendants assert that they have produced all reasonably responsive documents in response to previous requests for production of documents from Relator, including, without limitation, medical records for Sample Patients produced March 26, 2015, through and including June 4, 2015. In addition, MDS Assessments are included within the Sample Patients medical records, which were previously produced to Relator, as stated above, and in the Defendants' Response to Relator's Second Request for Production, dated April 12, 2013 [sic].

*Id.*

---

[3]The docket does not reflect that a transcript of the proceeding has been filed.

[4]Relator states this document was not filed because Defendants labeled it confidential.

In supplemental interrogatory responses served on October 27, 2015, Relator identified various issues arising out of the review of the medical files of the 800 sample patients.[5] Pertinent to this dispute, Relator informed Defendants that no MDS Assessments were identified in 72 files [of the 91 files which have now been produced albeit untimely]. She also advised that she intended to seek relief under the False Claims Act based on these missing MDS Assessments and the other deficiencies that had been identified in the audit. (Doc. 264 at 5).

On October 30, 2015, in response to Relator's Requests for Admission, Defendants reiterated that they had produced all responsive medical records in their possession. (Doc. 264-7 at 25-26). Also on that date, fact discovery closed. (Doc. 231). The parties jointly sought and received extensions for certain depositions, but neither party requested that the discovery deadline be extended to allow for addition document production.

On December 11, 2015, Relator served opening expert reports in accordance with the expert disclosure deadlines. One of Relator's experts reviewed all medical records Defendants produced for the approximate 800 sample patients to assess whether Defendants had overbilled Medicare or Medicaid. That expert concluded that, for approximately 90 of the patient records she audited, the claims Defendants submitted to Medicare were not supported because the files for those patients were missing MDS Assessments. (Doc. 264 at 6).

---

[5]Relator states these responses were not filed because they contain protected patient information.

4

On December 23, 2015, Defendants moved for a 60-day extension of the expert rebuttal report deadline of January 11, 2016, and requested a corresponding adjustment to the other deadlines in the scheduling order.  Defendants urged the extension was needed because of the number and magnitude of Relator's four initial expert reports.  (Doc. 255).  Given Relator's expert's opinions of insufficient documentation, Defendants submitted in support a declaration from their expert stating, among other things, that an assessment of the alleged missing documentation would have to be performed.  (Doc. 255-4).

As asserted by Relator and not disputed by Defendants, beginning in January 2016, without prior notice to Relator, Defendants made "supplemental" production of more than 31,500 pages of medical records.  (Doc. 272 at 2).  On January 22, 2016, Defendants produced more than 18,000 pages of MDS Assessments related to 91 of the total patients sampled.  (Doc. 264 at 6).  According to Defendants, the documents were not maintained in the patients' paper files already produced; rather, they were obtained from the company's electronic database.  (Doc. 264-9).  In response to that production, the Relator filed her instant Motion seeking to preclude Defendants from using those documents.  (Doc. 264).  Thereafter, on February 10, 2016, Defendants made "additional production" of 5,000 plus pages of additional records from the patient files for 12 of the Medicaid patients in the sample group. (Doc. 266).

A hearing on this matter was held via telephone on February 22, 2016.  Among other things, Defendants indicated that "with regard to the MDS, all our expert will say is that these MDS were produced on January 22nd, therefore, rebutting the Relator's claim that the MDS didn't exist."  (Doc. 277 at 26).

Two days later, on February 24, 2016, Defendants made another "untimely production" of approximately 8,000 pages of documents consisting of additional records from the patient files for 24 of the patients in the sample group.  (Doc. 272-1).

On February 25, 2016, Defendants served five expert rebuttal reports.  (Doc. 272 at 2).  Relator claims these reports do not merely point to the existence of the belatedly produced medical records but at least four of the reports rely extensively on the contents of the belatedly produced medical records as the basis of numerous expert opinions.

## II.

By her Motion, Relator seeks an Order (1) precluding Defendants and their experts from using or relying on Defendants' untimely production or any other medical records Defendants have not yet produced;[6] (2) sanctioning Defendants by entering judgment for Relator with respect to all patients in the sample for whom Defendants had not produced relevant MDS Assessments by the close of discovery, October 30, 2015; and (3) awarding Relator attorney's fees and costs for bringing her Motion.  In support, Relator cites Rules 26(e)(1)(A) and 37(c)(1) and case law addressing the broad discretion a court has to fashion appropriate sanctions for abuses in the discovery process.  Relator urges Defendants have made no showing that the untimely disclosures were substantially justified or harmless.[7]  To the contrary, Relator contends that if Defendants' belated production is permitted, she would

---

[6]Relator seeks to bar Defendants' use of the late produced records but not her reliance on the same.

[7]Relator asserts that the "form and importance of the information itself suggests that Defendants may have chosen to hide it from earlier discovery," and she urges the Defendants should not be able to sandbag her by producing these matters after the close of discovery. (Doc. 264 at 15-16).

be prejudiced significantly by incurring considerable additional expenses in legal fees and expert costs in reviewing these matters to determine the import on the expert reports already produced.[8]  Relator also contends the permitting the same would require additional discovery, which would delay these proceedings further.  In support of the request for default, Relator notes that Rule 37 and case law addressing the same require a showing of willfulness or bad faith.  Relator urges, however, that a finding of willful misconduct and bad faith is supported by the difficult course of discovery in this case, which previously resulted in sanctions against Defendants; her numerous efforts to discover the MDS Assessments as outlined above; Defendants repeated assurances that all such matters had been produced; and the sheer volume of late produced records from the electronic database, which Defendants only searched after the close of discovery.  Relator urges that a lesser sanction will not serve the interests of justice or cure the harm absent considerable additional costs.  (Doc. 264).

Defendants respond that they have met their discovery obligations and acted reasonably and in good-faith in complying with discovery requests.  Defendants note they produced 1.1 million pages of residents' files and reasonably assumed that the files contained MDS Assessments because that is where the same are placed.  Given the volume of material in the patient files, they urge it was not reasonably possible to review each file before it was produced and that is why a small number of files were produced without MDS Assessments.  They acknowledge that it was only after Relator's expert, Shirley Bradley, identified 91 files

---

[8]Relator asserts that although Defendants advised the Court during the February 22, 2016, conference that their expert[s] would rely on the belatedly produced documents only to rebut her expert's opinion that 91 patient files were missing MDS Assessments, Defendants' experts are relying on the late-produced medical records in other ways, including by rendering numerous opinions based on the contents of those records.

with missing MDS Assessments that their own experts searched for and located electronic versions of the MDS Assessments.  Again, Defendants urge this was not unreasonable because they reasonably assumed the production of the paper file would contain these matters and the electronic database only contained duplicates unnecessary to be separately searched. Defendants also urge that when they learned otherwise, they conducted a reasonable, good-faith search for the records in the electronic database and produced the additional matters promptly in accordance with their discovery obligations and as part of their own expert disclosures.  Defendants deny the other allegations of intentional wrong-doing and urge that prior discovery rulings of the Court have nothing to do with this dispute and can not form a basis for the extreme sanctions sought by Relator.

On the matter or prejudice, Defendants argue that extreme sanctions are not warranted because Relator is not prejudiced by the production of a "relatively small number of documents" during the expert discovery period and months before trial.  Defendants complain that Relator now adopts a new theory of liability, one not pleaded in her operative complaint, that record keeping errors - missing MDS Assessments from resident files - amount to false claims under the FCA.[9]  Defendants urge that, because Relator has been

---

[9]As Defendants couch this "new" argument, Relator claims that MDS Assessments (or other records) missing from patient files means that MDS Assessments were never completed, and thus reimbursement requests related to the same equals a false claim.  Defendants urge that argument cannot be sustained either factually or legally for several reasons.  For instance, Defendants contend the absence of a particular MDS Assessment from a patient's file, years after a claim was submitted, does not prove a false claim, particularly when the actual claim for payment submitted to Medicare reflected on the UB-04 forms produced to Relator in this litigation identified the date when such assessment occurred.  Moreover, defense expert reviews of the files show that medically necessary services were provided to the relevant residents.

unable to otherwise establish her allegations of false claims, she is now asking the Court, under the guise of a discovery sanction, to adopt a fiction in the form of a factual finding that MDS Assessments do not exist when in fact they do, and that such equates to a violation of the FCA.[10]  Even if Relator will suffer some prejudice as a result of the late production of this discrete set of MDS Assessments, Defendants maintain that any prejudice is easily remedied by giving Relator's experts additional time to analyze the MDS Assessments and supplement their reports.  Further, to the extent Relator claims she will incur additional expenses in examining the late produced MDS Assessments, Defendants urge that hardly supports the requested relief.  Under the circumstances, Defendants contend that an order striking documents and granting default is not an available remedy as a matter of law.  According to Defendants, Relator's request for default judgment on nonexistent claims lacks merit because case law precludes her from asserting new FCA claims at this late stage of the proceedings and no such theory of liability as now argued by her experts exists under the FCA.

Finally, Defendants urge that they should not be precluded from relying upon these MDS Assessments because allowing Relator to argue they do not exist is false and obscures the real facts.  Moreover, Defendants argue they need these records to rebut Relator's damages theory and the claims that they billed for services that were never done.  (Doc. 267).

---

[10]Defendants also complain that under the protocol established by Relator for the review of the patient sample, missing files and incomplete files were to be set aside and another file was to be substituted in and reviewed.  Defendants urge that Relator's experts failed to abide by that protocol and instead came up with the new theory that the missing records resulted in false claims.  In doing so, Defendants assert that Relator's experts extrapolated huge losses arising from reimbursements made on files, which while incomplete, were not intended to be assessed under the protocol.

## III.

### A.

Rule 26 addresses a party's duty to supplement their responses to discovery requests. In pertinent part, it states:

> A party who has . . . responded to an interrogatory, request for production, or request for admission--must supplement or correct its disclosure or response:
>
> (A)    in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, . . . ; or
>
> (B)    as ordered by the court

Fed. R. Civ. P. 26(e)(1).  "[I]nformation 'is incomplete or incorrect' in 'some material respect' if there is an objectively reasonable likelihood that the additional or corrective information could substantially affect or alter the opposing party's discovery plan or trial preparation."  *Sender v. Mann*, 225 F.R.D. 645, 654 (D. Colo. 2004) (citations omitted).

Rule 37 provides sanctions for parties who fail to identify a witness or provide information as required by Rule 26(a) or (e).  In that event, it provides:

> the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.  In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard:
>
> (A)    may order payment of the reasonable expenses, including attorney's fees, caused by the failure;
>
> (B)    may inform the jury of the party's failure; and
>
> (C)    may impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)-(vi).

Fed. R. Civ. P. 37(c)(1).

Rule 37 also provides sanctions for parties who fail to comply with a discovery order.  Possible sanctions include, but are not limited to, the following:

    (i)    directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims;

    (ii)    prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;

    (iii)    striking pleadings in whole or in part;

    (iv)    staying further proceedings until the order is obeyed;

    (v)    dismissing the action or proceeding in whole or in part;

    (vi)    rendering a default judgment against the disobedient party;[11] or

    (vii)    treating as contempt of court the failure to obey any order except an order to submit to a physical or mental examination.

---

[11]Default judgment is to be used as a sanction only as a last resort and when less drastic sanctions would not be able to ensure a party's compliance with the court's order. *Navarro v. Cohan*, 856 F.2d 141, 142 (11th Cir. 1988)).  To impose such an extreme sanction, the party's noncompliance must be "due to willful or bad faith disregard of court orders which cannot reasonably be expected to be remedied by lesser but equally effective sanctions." *EEOC v. Jacksonville Shipyards, Inc.*, 690 F. Supp. 995, 998 (M.D. Fla. 1988) (citing *Adolph Coors Co. v. Movement Against Racism*, 777 F.2d 1538, 1542-43 (11th Cir. 1985)).

Fed. R. Civ. P. 37(b)(2)(A)(i-vii).[12]  Once the moving party makes a prima facie showing that the other party violated a discovery order, the non-moving party must demonstrate that it was impossible to comply in order to avoid sanctions.  *In re Chase & Sanborn Corp.*, 872 F.2d 397, 400 (11th Cir. 1989).  "To succeed on this defense, however, the [non-moving party] must go beyond a mere assertion of inability and satisfy [its] burden of production on the point by introducing evidence in support of [its] claim."  *Id.* (quoting *United States v. Hayes*, 722 F.2d 723, 725 (11th Cir. 1984)).  Moreover, the non-moving party must show that all reasonable efforts were made to comply with the discovery order.  *Id.*

Courts are given broad discretion in fashioning appropriate sanctions for violations of discovery orders.  *Malautea v. Suzuki Motor Co.,* 987 F.2d 1536, 1542 (11th Cir. 1993). "Rule 37 sanctions are imposed not only to prevent unfair prejudice to the litigants but also to insure the integrity of the discovery process."  *Aztec Steel Co. v. Fla. Steel Corp.*, 691 F.2d 480, 482 (11th Cir. 1982).

A court may also award sanctions pursuant to its inherent authority.  "Courts have the inherent authority to control the proceedings before them, which includes the authority to impose 'reasonable and appropriate' sanctions."  *Martin v. Automobili Lamborghini Exclusive, Inc.*, 307 F.3d 1332, 1335 (11th Cir. 2002) (citing *Malautea*, 987 F.2d at 1545). To exercise this power, the court must find that a party acted in bad faith.  *Id.* (citing *In re Mroz*, 65 F.3d 1567, 1575 (11th Cir. 1995)).

---

[12]Regardless of whether the court imposes any other sanction, once the court finds that a party has failed to comply with its order it "must order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust."  Fed. R. Civ. P. 37(b)(2)(C).

**B.**

On this record, I am constrained to conclude that Defendants' supplemental disclosure of the 91 MDS Assessments and other patient records beginning in January 2016 is wholly unreasonable and without substantial justification when considered in light of all the circumstances in this case.  Relator has from the outset contended that the primary instrument of Defendants' fraud was the MDS Assessment.  *See* (Doc. 75 at ¶ 5).  Relator also has repeatedly sought to discover MDS Assessments and related RUG levels,[13] among other patient records, for well over two years of this litigation.  And, Defendants repeatedly reported to Relator that all such matters had been produced.  Similar representations were made by Defendants to the Court.  Obviously, the representations were incorrect.  Defendants now contend that the untimely disclosures were not willful because they promptly rectified the problem once it was brought to their attention upon the production of Relator's expert reports on December 11, 2015.  Even if not willful, I find these late disclosures evidence the same careless disregard for the discovery process and this Court's prior Orders.  *See* (Doc. 71; Doc. 151 at 7, n.6; Doc. 218).  The sole justification now offered by Defendants is that they initially acted reasonably in assuming patient files were complete and would include MDS Assessments when produced.  By claiming that they only learned of the deficiency in their production when Relator served her expert reports, Defendants highlight that they ignored

---

[13]As explained by Relator, "[u]nder the Medicare and TRICARE programs, a SNF's reimbursement for a resident is based on the resident's classification in one of over 50 Resource Utilization Groups ("RUGs") as reported in the resident's MDS Assessment.  The RUG level is determined based on information reported in the MDS Assessment and reflects the resident's need for nursing staff assistance to perform common Activities of Daily Living, such as walking or using the toilet, and the amount of rehabilitative therapy (measured in minutes) provided to the resident."  (Doc. 75, ¶ 6).

their obligations in responding to discovery and appear to suggest that Relator is somehow to blame. In light of the varied attempts by Relator to obtain this evidence and Defendants' repeated assurances that their production was complete, this argument is without merit. Relator repeatedly sought full patient records and MDS Assessments up to the close of discovery when she specifically advised Defendants that no MDS Assessments had been identified in 72 files and that she would seek relief on that basis. Even if Defendants' belated production of these matters was not willful, as in intentional, it reflects that Defendants made representations to Realtor and the Court without having undertaken full investigation even after being put on notice and only after receiving the opponent's expert reports after the close of discovery. The efforts then expended were too little too late to satisfy the discovery process and the obligations to Relator.

Turning to possible prejudice and harm, as indicated above Defendants urge that sanctions are unwarranted because there is little to no harm to Relator in this apart from possible additional expenses which might be incurred in reassessing the late MDS Assessments.[14] They also urge that any harm is easily alleviated by allowing Relator's experts additional time to reassess their opinions in light of this material. Even if there is some truth in those contentions, Defendants ignore that "Rule 37 sanctions are imposed not only to prevent unfair prejudice to the litigants but also to insure the integrity of the discovery

---

[14]Somewhat perversely, Defendants' argument suggests that Relator actually benefitted from the late disclosure because it allowed her experts to concoct a new theory of liability and greater damages based on the missing MDS Assessments. They argue Relator should not be afforded that benefit, but if she is, their experts should be able use the late records to argue against it. Such suggestion ignores that Defendants are to blame for this mess, not Relator.

process." *Aztec Steel Co.,* 691 F.2d at 482.  Here, I am obliged to again find the discovery

processes have been abused along with the Relator in the late production of these records and

sanctions against Defendants are in order.

      Of the remedies proposed in the Motion and addressed at the hearing,[15] an Order

barring the use of the late produced MDS Assessments (as well as any other documents

belatedly produced) by Defendants *and* granting Relator a default judgment on the FCA

claims as to those particular patients goes too far.  That result would allow Relator to benefit

from an apparent fiction - that MDS Assessments were not conducted *and* a dispositive ruling

essentially finding that any claims made for those patients were false.  While it is arguably

reasonable in the circumstances to endorse that fiction, the entry of default would allow

Relator the benefit of a theory of liability which may not be supported by the allegations or

the law.[16]  On the other hand, continuing this case for a few additional months so that Relator

and her experts can conduct additional review and perhaps reassess opinions is unfair to

Relator, would undoubtedly impose unwarranted financial burdens on Relator, and at the

same time allow Defendants an undeserved benefit after having again disrupted the processes

of the Court.

---

[15]Relator has filed an unsolicited supplement proposing alternative sanctions (Doc. 328), to which Defendants have replied (Doc. 332).  Those have been considered as well.

[16]Defendants urge that this theory of liability is first introduced in Realtor's expert reports and is thus untimely.  Relator wholly disagrees.  I do not reach that issue on this discovery dispute.  As for Defendants' contention that the mere fact that a file was incomplete would not, in of itself, render a claim on that file false, there is support for the argument, and I have considered those cases in this matter.  However, that contention is better left for resolution on the pending motion for summary judgment or after factual development at trial.

After careful consideration, I conclude that, moving forward, Defendants are prohibited from supporting their defenses and experts' opinions or opposing the Relator's claims with any discovery produced after December 11, 2015, the date Relator served her expert reports, or with any testimony about such records or based on the same.  If adjustment to expert reports is necessary, the burden of that endeavor appropriately falls on Defendants. While this sanction may allow Relator the benefit of a fiction, Defendants are to blame for that circumstance.  This sanction does not prevent Defendants from challenging the legal sufficiency of such claims on other legal or factual grounds.  It is also appropriate to award Relator the reasonable fees and costs she incurred in connection with the preparation of this Motion and the oral arguments taken on April 14, 2016.  Relator is directed to file an affidavit and memorandum in support of the hourly rates and hours claimed within twenty (20) days from the date of this Order.  Any award hereunder shall be assessed along with other costs awarded Relator at the conclusion of the case or used as an offset to such costs as may be assessed against her.

16

## IV.

Accordingly, **Relator's Motion to Preclude Defendants' Use of Untimely Produced Documents and for Sanctions** (Doc. 264) be **GRANTED in part** and **DENIED in part** as set forth herein.

Done and Ordered in Tampa Florida this 22nd day of April 2016.

THOMAS B. McCOUN III
UNITED STATES MAGISTRATE JUDGE

Copies to:
United States District Judge, Steven D. Merryday
Counsel of Record

17