1                    IN THE UNITED STATES DISTRICT COURT
                       MIDDLE DISTRICT OF FLORIDA
2                            TAMPA DIVISION

3

4

       ANGELA RUCKH,                    :
5                                       :
              Plaintiff,                :
6                                       :
                                        : CIVIL   8:11-cv-1303-T-
7      vs.                              : NO.:    23TBM
                                        :
8                                       : DATE:   April 14, 2016
       CONSULATE MANAGEMENT             :
9      COMPANY, LLC., et al.,           : TIME:   11:10 a.m.
                                        :
10            Defendant.                : PAGES:  1 - 59
       --------------------------- :
11

12

13                   TRANSCRIPT OF MOTION HEARING
            BEFORE THE HONORABLE THOMAS B. McCOUN, III
14              UNITED STATES MAGISTRATE JUDGE

15

16

17     Court Reporter: Lynann Nicely, RPR, RMR, CRR
               Official Court Reporter
18             801 N. Florida Avenue
                     Suite 13B
19             Tampa, Florida 33602

20     Proceedings recorded and transcribed by computer-aided
       stenography.
21

22

23

24

25

```
 1                    A P P E A R A N C E S

 2
        For the Relator:
 3

 4                JOSEPH S. HALL, ESQ.
                  SILVIJA A. STRIKIS, ESQ.
 5                Kellogg, Huber, Hansen, Todd, Evans & Figel
                  1615 M Street NW
 6                Suite 400
                  Washington, D.C.  20036
 7
                  ROYSTON DELANEY, ESQ.
 8                745 Atlantic Avenue Fl3
                  Boston, Massachusetts  02111
 9
                  KEVIN J. DARKEN, ESQ.
10                The Barry A. Cohen Legal Team
                  201 E. Kennedy Boulevard
11                Suite 1950
                  Tampa, Florida  33602
12

13      For the Defendants:

14
                  TERENCE J. LYNAM, ESQ.
15                TINA E. DUNSFORD, ESQ.
                  ROBERT S. SALCIDO, ESQ
16                Akin, Gump, Strauss, Hauer & Fed, LLP
                  Suite 400
17                1333 New Hampshire Avenue NW
                  Washington, D.C.  20036
18

19

20

21

22

23

24

25
```

```
1               P R O C E E D I N G S

2          THE COURT:  Let's call the case, please.

3          COURTROOM DEPUTY CLERK:  Angela Ruckh vs.

4   Consulate Management Company LLC, et al., Case

5   Number 8:11-cv-1303-T-23TBM.

6          THE COURT:  Good morning, we're here for

7   further hearing regarding motion filed by the

8   Relator back in January related to the untimely

9   production of documents.  We record the proceedings

10  electronically here, feeds off the microphone there

11  in front of you.  In my court you're entirely

12  welcome to remain seated the entire time.  When you

13  do speak, identify yourself, if you would, in case

14  we need to get a transcript, and speak into the mic.

15  If you do, we'll make a good record here.

16          Why don't we have everybody state their

17  appearance, starting with plaintiff's counsel.

18          MS. STRIKIS:  Sylvija Strikis and Joseph Hall

19  from Kellogg Huber for Relator.

20          MR. DARKEN:  Kevin Darken for Relator.

21          MR. DELANEY:  Rory Delaney for the Relator.

22          THE COURT:  And for defendant?

23          MR. LYNAM:  Good morning, Your Honor, Terrence

24  Lynam for the defendants.

25          MR. SALCIDO:  Robert Salcido here on behalf of
```

1      the defendants.

2           MS. DUNSFORD:  Tina Dunsford for the

3      defendants.

4           THE COURT:  Okay.  We -- as apparent now, must

5      be apparent now -- decided after the last hearing we

6      had on this motion that we would let this thing run

7      its course in terms of production of defendants'

8      expert reports and then make a determination as to

9      what to do with this fine mess that's been created

10     here.

11          We'll go ahead and start with -- we've got a

12     number of questions.  Why don't we start with

13     Relator.  You don't need to go from A to Z in this

14     matter, we're fully familiar with the underlying

15     facts.

16          It appears to me beyond dispute that the

17     production that was made either in January or those

18     productions made in February were untimely, related

19     to matters that should have been provided earlier,

20     could have been provided earlier.  But the question

21     becomes in the circumstances here:  What's the

22     appropriate remedy for that?  If I'm

23     understanding -- and I have not read the expert

24     reports, but if I'm understanding from discussion

25     with my law clerk the opinions rendered by Relator's

1          experts, the missing MDS records would account for a

2          considerable part of the calculation of damages --

3          or significant part anyway.  Which leaves us with a

4          situation where it appears there were MDS

5          assessments for those 91, would allow for the

6          argument -- or for an inflated request for damages

7          that frankly isn't based on the record.

8              That said, where do we go with this?  Start

9          with you and we'll probably bounce back and forth

10         here a little bit.  And forgive me if I interrupt,

11         but that's the way I do arguments.  Go ahead.

12             MS. STRIKIS:  Thank you, Your Honor.  This is

13         Silvija Strikis for Relator.

14             It is correct that Relator's expert, Shirley

15         Bradley, reviewed files and made findings where MDS

16         assessments were missing in about 91 cases.  As a

17         procedural issue, Ms. Bradley reviewed all the

18         patient files that defendants produced on a timely

19         basis and only some of them ended up in the

20         damages -- the ultimate damages computation through

21         Marc Vianello who is a damages expert, and Stan

22         Panis who is the statistical extrapolation expert.

23         So it's not all 91 that end up in there.  I think

24         roughly just from a quick look I think it's probably

25         more like 56 patients have that issue.

1          Many of those patients also had subsidiary

2     documentation that might be the things such as

3     therapy minutes and things like that.  But the rate

4     that Ms. Bradley stated should have been used in the

5     case of a missing MDS assessment is the default

6     rate, AAA, that the federal government pays when

7     there is no MDS assessment submitted -- no timely

8     MDS assessment submitted.

9          THE COURT:  Am I correct in suggesting that

10     her calculations appear to be -- even if they were

11     consistent with what she was looking at, they now

12     appear to be inconsistent with the record?

13          MS. STRIKIS:  Your Honor, we actually do not

14     know that and could not know that without further

15     analysis of the --

16          THE COURT:  Has there been any further

17     analysis since the production?

18          MS. STRIKIS:  There has not been further

19     analysis by our experts since the production.  What

20     we have done is we have received the rebuttal expert

21     reports from defendants which criticize our

22     expert's -- not just for the fact that there were,

23     you know, MDS assessments were subsequently found;

24     they have many opinions that resolve around the new

25     records and as I said the opinions are sort of

1          infected with these late-produced documents

2          throughout defendants' expert reports.

3                 THE COURT:  Let me ask you, from your

4          perspective how does the calculation by -- you said

5          her name, Ms. -- who was the expert you just

6          mentioned?

7                 MS. STRIKIS:  Bradley?

8                 THE COURT:  Ms. Bradley?

9                 MS. STRIKIS:  Yes.

10                THE COURT:  How does her calculation permeate

11         through your other experts' opinions?

12                MS. STRIKIS:  Ms. Bradley reviewed all the

13         patient files -- her CO who she works with reviewed

14         all the patient files that defendants produced.  We

15         had asked for 800, they produced roughly 750.  She

16         reviewed all of those files and made findings on

17         various issues, including some that she couldn't get

18         past validation because there was no MDS assessment.

19                THE COURT:  Quick question -- and again, I'm

20         throwing you off where I asked you to go.  But is it

21         the plaintiff's position that if a file was -- was

22         it the plaintiff's assumption, maybe, expert's

23         assumption, if the file was missing documents like

24         MDS assessment or some of the other records, the

25         so-called Medicare or Medicaid records that are

1    referred to here in the motions, that any claim

2    there was a false claim?

3         MS. STRIKIS:  The working assumption of the

4    experts reviewing the files was that there was not

5    justification for a claim that was submitted if

6    there is no evidence in the patient's file how the

7    blood level that was billed was computed, whether

8    the person received therapy -- there is no therapy

9    minutes noted in the file --

10        THE COURT:  And then somewhere along the line

11   that was computed to some monetary amount by either

12   that expert, Bradley, or somebody else?

13        MS. STRIKIS:  Ms. Bradley went through all the

14   files and noted for Medicare patients -- which these

15   MDS assessments mostly resolved around -- went and

16   per the claims form determined the RUG level, which

17   is basically the billing level, at which defendants

18   had billed the patient originally.  And then she

19   recomputed the billing level that was actually

20   supported by the patient's file.  And this also

21   revolves around a date certain, the date that was

22   chosen for this statistical sample.

23        THE COURT:  If you can speak to this, the

24   production of the additional -- the late production

25   of the additional MDS records, assessment records,

1     has what effect, from your perspective, on that

2     expert report and any of the later expert reports

3     that rely on her work?

4          MS. STRIKIS:  The late production would

5     require Relator not only to understand the nature of

6     the late production, where it came from, were --

7     let's say the MDS assessments as the first example.

8     Were the MDS assessments the ones that were actually

9     submitted?  We attempted to ask defendants' experts

10    about the MDS assessments, did they know whether

11    they were actually submitted.  Defendants' expert,

12    Peter Dressel, whose group actually pulled the MDS

13    assessments, did not know, did not know if they were

14    really sort of the whole provenance did not know if

15    they were signed, did not know if they indicated

16    they were signed by the person who actually prepared

17    them, had no information about the background.

18         Dr. Palega, another of defendants' experts who

19    relies on these documents, said he kind of glanced

20    at them to see if they were filled out, but he

21    didn't know if the score on the documents matched

22    the records or if they were signed.  So there would

23    be a whole issue of figuring out what these

24    documents exactly are and how much validity they can

25    have.  And if they're not signed and there is no

```
1    record of when they were actually sent to the

2    government, that would probably be an issue that

3    Relator would --

4         THE COURT:  So you don't automatically accept

5    the suggestion made by the defendants that these

6    were the MDS assessments that would have been relied

7    upon for payment.

8         MS. STRIKIS:  We do not have a basis to do

9    that.  And to go a little farther, so even if we got

10   past that and we accepted the MDS assessments, and

11   putting aside the issue that some are not signed or

12   other things that are required by law, the next

13   issue would be for Ms. Bradley to take a look at the

14   MDS assessments, see if it matches up with the

15   billing, see if it matches up with other records in

16   the file.  Because, for example, an MDS assessment

17   that we received might show it the same level that

18   was billed, but the patient's file might still

19   indicate less therapy than was billed on the MDS

20   assessment.  So --

21        THE COURT:  From your perspective, her work

22   would have to be redone, at least to the extent of

23   these additional records.

24        MS. STRIKIS:  Correct.  And you had asked

25   earlier about how the information flows through the
```

1        other experts.  So Ms. Bradley presented the new RUG

2        level which could range from AAA, which is the

3        default rate that was put in place for the MDS

4        assessments that were not there, and any other range

5        of RUG levels.  And Marc Vianello, who is a forensic

6        accountant, went in to defendants' accounting

7        records then for each of these patients to see what

8        the patients billed per the claim form, what was

9        ultimately the net effect of the billing in their

10       billing records, and -- which is really sort of the

11       RUG level that they ultimately billed for the

12       patient -- and what Medicare or Medicaid paid for

13       the patient so that we could actually compute

14       damages -- which he also comes up with -- for the

15       specific day, based on what was actually paid by the

16       government for the day.

17            So in Medicare there are sometimes co-pays and

18       things like that and we wanted to make sure that we

19       didn't overstate what Medicare had paid.  So he

20       draws it down to the daily amount that the

21       government actually paid, relying solely on

22       defendants' records that he had to dig through

23       because defendants would not give us a concise

24       report out of their accounting system.

25            And then from there the statistical experts,

1       Stan Panis, takes the information from the forensic

2       accountant, Marc Vianello, and extrapolates it over

3       the Medicare days, based on the information that

4       defendants produced that year or more ago regarding

5       patients and the days of stay in their facilities in

6       Florida.

7            THE COURT:  All right.  The appropriate remedy

8       here is what?

9            MS. STRIKIS:  The appropriate remedy is that

10      the documents not be used and that default be

11      entered in the claims that Relator's expert could

12      not fully assess, if in fact these documents are

13      what defendants say they are and they just did not

14      produce them.  This is what is required to deter

15      defendants in this case, given the history

16      especially, and in other cases, from not undertaking

17      the same sort of discovery limitations.

18           Rule 37 basically requires that they not use

19      the documents unless their failure to produce is

20      substantially justified or harmless --

21           THE COURT:  Does the converse apply under this

22      remedy where they can't use the documents but you

23      can?

24           MS. STRIKIS:  I believe that that would

25      actually be the appropriate result, yes.  I don't

```
 1    know that we -- I haven't considered that issue, I

 2    don't know that there would be some reason we would

 3    want to use them, but --

 4         THE COURT:  Expect for the fact that it

 5    resulted in a fairly large number in terms of the

 6    images.

 7         MS. STRIKIS:  No, use the new documents, if

 8    that's what you're saying.

 9         THE COURT:  Okay, I see.  So your suggestion

10    is, one, they can't use these late-produced

11    documents, and two, that a default be entered as to

12    what, those particular claims?

13         MS. STRIKIS:  As to the findings of

14    Ms. Bradley --

15         THE COURT:  So the court should accept as a

16    matter of fact the findings by Ms. Bradley.

17         MS. STRIKIS:  Yes.

18         THE COURT:  Okay.

19         MS. STRIKIS:  And Your Honor, I think that

20    this is consistent with numerous cases cited in

21    Relator's briefing including First Coast, which

22    rejects a "no harm/no foul" approach to discovery

23    failures and delays that would involve redoing

24    briefing, getting into discovery of what was

25    produced or not produced or why, whether the
```

```
 1      discovery that we received is even complete.  The --

 2             THE COURT:  What is the appropriateness of the

 3      court doing that if -- and I guess we don't know

 4      this for certain because your experts haven't gone

 5      back and examined it, but the appropriateness of the

 6      court doing this in circumstances where it could

 7      result in a damage award that's not justified by the

 8      facts?  Is it just that's the punishment they pay

 9      for the screw-up there?

10             MS. STRIKIS:  I believe that that is the

11      punishment for discovery failures.  And the Eleventh

12      Circuit case, Malautea, that we cite in our brief

13      basically says the probable merit of a late-produced

14      case does not preclude the imposition of a default

15      judgment sanction against the litigant.  Discovery

16      orders must be obeyed, even by those foreseeing

17      ultimate success in the district court.

18             Here they just willfully did not produce this

19      information and now seek to use it when it's in --

20             THE COURT:  Let's talk about that assertion.

21      I have previously found a lack of diligent

22      compliance with discovery on behalf of the

23      defendants and it's all part of the record here.  So

24      this appears to be just to be -- arguably it's just

25      more of the same.  They didn't learn their lesson
```

1        the first or second time and they still haven't

2        learned their lesson and here we are again arguing

3        about why they didn't timely produce something.

4            But you assert that the violation was willful.

5        Why would they willfully -- in this particular

6        instance willfully withhold those MDS assessments?

7        I mean, as opposed to carelessly overlooking them or

8        not digging deep enough and looking into the

9        electronic file to find these matters?  What would

10       be the benefit to the defendants to willfully not

11       produce the MDS assessment?  I'm having a hard time

12       seeing why they would benefit from doing that, other

13       than if they just wanted to punish you by messing up

14       your damages calculation, which I'm not willing to

15       go to at this point.

16           MS. STRIKIS:  Well, I'm not sure that they

17       have to prove that they were willful.  I mean, there

18       are plenty of cases --

19           THE COURT:  No, I don't know that you do, but

20       the use the term willful, so I'm asking you about

21       it.

22           MS. STRIKIS:  Okay, plenty of cases suggest

23       that even carelessness, especially repeated

24       carelessness, is worthy of significant sanctions.

25       But we have many allegations in the case

1      about unsigned MDS assessments or that are

2      improperly signed, they have been altered, that were

3      not completed on a timely basis, things like that,

4      that could be a basis for withholding documents

5      until it's determined if they're relevant, if they

6      absolutely need to be produced.  This is --

7           THE COURT:  But at this point you haven't

8      looked at those close enough to be able to make that

9      right, assertion?

10          MS. STRIKIS:  We don't even know enough about

11     the provenance of the documents to know exactly

12     where they came from, why they -- whether they

13     actually match what was submitted to the government,

14     et cetera.  And on the patient files, the same

15     thing.  With respect to the MDS assessments which

16     were the first tranche of late documents that came,

17     the basis for late production cited by defendants

18     was that they went and looked at -- they didn't want

19     to double produce so they didn't go to their

20     electronic database, which I think is not a proper

21     response to discovery anyway, but they didn't

22     want --

23          THE COURT:  Well, they make the argument --

24     I'm playing devil's advocate with you, but they make

25     the -- because I'll probably hear it again, but they

1    make the argument that, look, the approach they did

2    take by going through the actual files was the

3    reasonable approach in this particular case, that

4    results in excess of a million documents and it was

5    not unreasonable that they didn't review every

6    single file to determine whether it had every single

7    document that perhaps should have.  I guess I'll

8    have to decide whether or not that was reasonable.

9    You would assert no?

10        MS. STRIKIS:  I would assert no.  And one

11   reason I would assert no, in addition to what we've

12   previously briefed, is when we have now received the

13   additional patient documents which purportedly came

14   from the facilities which are where defendants claim

15   that they thoroughly searched, which is sort of

16   their excuse, as it were, for not going to the

17   electronic MDS database, it turns out that they

18   didn't actually do the full search on the facilities

19   because they are coming up with additional patient

20   documents from the facilities.

21        THE COURT:  When you use the term patient

22   documents, you're talking about this other ten,

23   13,000 documents that also has been lately produced?

24        MS. STRIKIS:  Right, that rolled in in three

25   tranches, two of which led to supplemental briefing

1          for Your Honor.  We got some more after that, we

2          didn't file another supplement because we felt we

3          had the issues before the court.  But that sort of

4          makes the argument that oh, this was just missing an

5          electronic database that we thought was covered in

6          the patient files sort of not compelling to me.

7               THE COURT:  What is the, if you can articulate

8          -- I think I understand what your claim of harm is

9          with regards to not getting the MDS assessments in a

10         timely manner.  What's the harm to plaintiff's

11         position, Relator's position, with this other three

12         tranches of documents as you describe them, patient

13         documents?  What effect is that likely to have?

14              MS. STRIKIS:  It's essentially the same issue.

15         We have not had our expert review these documents

16         and during the time that -- since we received

17         basically our hearing and since we received

18         defendants' expert reports, we had basically a month

19         to review their reports and get all the depositions

20         done under the trial schedule which we very much

21         want to stick to and should be entitled to stick to.

22         So during that time we did not go through these

23         additional thousands of patient documents to see how

24         much they affect any of Ms. Bradley's findings.

25              THE COURT:  Do those surface in defendants'

1       expert reports?

2           MS. STRIKIS:  They did.  They surfaced in the

3       Documents Relied On section.  There is not a clear

4       line in any of the exhibits and sort of detail

5       underlying defendants' expert reports about exactly

6       with what they are pulling from where, but I presume

7       that some -- for example, Dr. Palega, who reviewed

8       the files for them, I presume some of his

9       conclusions -- I know some of his conclusions come

10      from the additional documents, I just don't know on

11      a particular patient the extent to which anything

12      comes from anywhere because he also testified that

13      you had to look at the entire file for all time and

14      that it has sort of Gestalt approach to whether

15      there is a comprehensive care plan in the file even

16      if there isn't one.

17          THE COURT:  What's the fallback position, if

18      you have one, to the appropriate remedy?  If the

19      court is not inclined to want to strike the

20      documents and grant you default as requested, what's

21      the fallback position?

22          MS. STRIKIS:  The fallback position is that we

23      would need to -- as defendants acknowledge -- task

24      our experts with considering this, they would need

25      time, they would need -- we would want discovery on

1    these documents, where they're from, what they are,

2    who pulled them.  It seems that Peter Dressel, one

3    of the experts, pulled them, it didn't really know

4    much other than he was tasked with the typing of a

5    person's name and location and pulling up what came

6    up.

7         We would also want time obviously to do the

8    reports and we have this cascading report, so Marc

9    Vianello needs Shirley Bradley's findings and

10   Dr. Panis needs Marc Vianello's findings.  And we

11   would ask that defendants be sanctioned for the cost

12   and time of this motion and the additional work that

13   was required by our experts, that defendants be

14   required to pay for it.

15        I know there was some cases set in our brief

16   where defendants have to post a bond of money to pay

17   for that, which I would probably ask for given that

18   it took a very long time to collect the costs of

19   copies for purposes of the medical files that we

20   agreed to share.  And if there is -- they should

21   also bear the cost of any deposition, et cetera, but

22   we really think the exclusion of the documents is

23   the most supported outcome here.

24        THE COURT:  Have you all deposed all of the

25   defense experts?

```
 1            MS. STRIKIS:  Yes.

 2            THE COURT:  Okay.  I probably took you with

 3       away from whatever you intended to argue.  Is there

 4       anything else you want to throw in at this point?

 5       Then I'm going to go to defendants.

 6            MS. STRIKIS:  Well, you know the record in

 7       this case, but we -- there is some notion that

 8       Relator -- somehow it's the fault of the Relator or

 9       Relator didn't ask properly for the right documents,

10       et cetera.  We ask --

11            THE COURT:  You don't need to spend a lot of

12       time on that.

13            MS. STRIKIS:  Okay.  And then I would just

14       say --

15            THE COURT:  Realize this, they -- "they" being

16       defendants -- do make several -- they stated in

17       several places in their argument that this MDS

18       assessment issue was not a part of your complaint.

19       Now, I know it's been a part of previous discovery

20       arguments and so on, but what do you say to that

21       particular argument about it's not a part of your

22       complaint?  This is sort of a newfound theory for

23       false claim.

24            MS. STRIKIS:  The MDS assessment has been

25       central to the complaint.  There are many
```

1      allegations about MDS assessments in the complaint.

2      Paragraph 5 says basically it's a primary instrument

3      of the fraud.   Paragraph 11, for example, talks

4      about integrity issues.   Paragraph 110 talks about

5      the Relator coming in to do late MDS assessments,

6      which of course would be subject to this default

7      rate when they were submitted.   There are many other

8      references to MDS assessments and issues around

9      preparation of them, submission of them on a timely

10     basis, et cetera.

11          THE COURT:   Okay.   Mr. Lynam or whoever is

12     going to argue for defendants?

13          MR. LYNAM:   Yes, Your Honor, good morning,

14     Terence Lynam for the defendants.   Your Honor, the

15     issue of whether the defendants acted in good faith

16     here and whether their document production is

17     reasonable, in order to analyze that I think the

18     court needs to understand what the protocol was for

19     the production of these medical records, the

20     1.1 million medical pages, pages of medical records

21     we produced.

22          Their statistical expert, Dr. Panis, came up

23     with this protocol and it was 600 of Medicare and

24     Medicaid -- 300 each -- plus 200 replacement files,

25     100 each of Medicare and Medicaid.   And Dr. Panis

1    said in his report why he wanted the additional 200

2    replacement files, and I quote from his report, he

3    said, "Anticipating that some records were lost,

4    misplaced, rendered illegible or destroyed."  That

5    was the protocol that was set up.

6        The defendants incurred the additional cost

7    and expense of producing these additional 200

8    replacement files.

9        Now, they were produced over a year ago --

10   last March, April, that the timeframe.  And the

11   Relator did not give us updates as to how they were

12   using these replacement files, they simply got all

13   these files from us, again 1.1 million pages.  The

14   first notice that we received as to how they were

15   using these replacement files was in their expert

16   reports in December, on December 11th.  And we

17   learned at that time that they did not use the

18   replacement files when documentation was "lost,

19   misplaced, rendered illegible or destroyed."

20   Instead they said if there is no documentation,

21   that's a false claim.

22       Now, I took the deposition of their

23   statistician, Dr. Panis, last month, and he set up

24   this protocol and then Ms. Bradley reviewed the

25   files.  And I asked him, Could Ms. Bradley have

1          simply reviewed a replacement file with some of this

2          documentation was missing?  And he said Yes, she

3          could have, she just didn't do it.

4               And Your Honor, our position is the Relator

5          made a strategic decision here not to use these

6          replacement files when there was documentation

7          missing from the files they got.  But that was why

8          we produced them in the first place, and we incurred

9          significant expense in doing so.

10              And Your Honor, what's particularly

11         interesting here is what Ms. Bradley said in her

12         deposition.  She works for a company called SCIO

13         Health Analytics which does audits of managed care

14         companies.  That's the business that she's in.  And

15         she said that if her company, in doing one of these

16         audits, finds that documentation doesn't support the

17         billed code, she issues what she calls a findings

18         letter, making a finding, and then the company being

19         audited has the opportunity to send in additional

20         documentation to support the billing.  And if the

21         addition documentation supports the billing, then

22         they reverse the finding.  That's what she said.

23              That's the industry standard here because

24         these companies get audited all the time by

25         regulators asking for documentation.  And

1    Ms. Bradley established an industry standard that

2    you make a finding, which is what she did in her

3    expert report.  She said in her expert report that

4    she did an audit.  This case is essentially an audit

5    case.  And she made findings in her report, that's

6    what she calls them, of missing documentation.  We

7    then looked for the missing documentation and with

8    we produced it.

9         But again, Ms. Bradley's protocol that she

10   uses with all her other clients when she's doing

11   these audits is to let the company being audited

12   look for the missing documentation, which is what we

13   did.

14        We also submitted the declaration of

15   Mr. Thomas from the defendants' company, who

16   established -- and this is unrebutted -- that the

17   normal protocol when you're being audited is you get

18   an opportunity to respond to the audit.  If there is

19   documentation missing, you then go and you can try

20   to locate the additional documentation.  And that's

21   what happened here.

22        So Your Honor, our sort of threshold position

23   here is that what's happened here is a result of

24   we're not blaming the Relator for the nonproduction

25   of the electronic versions of the files, we never

1    said that, but we do think that they bear the

2    responsibility of the strategic decision they made

3    not to use replacement files when files were missing

4    large gaps of documentation, which some of them

5    were.  So they bear the consequence of that, they

6    didn't want to go back and look at these replacement

7    files for those files, apparently, it didn't fit

8    their theory.

9         THE COURT:  Let me get my bearings straight

10   here about the replacement files.  Is it agreed that

11   that protocol of substituting in a replacement file

12   was not followed here, or -- because you say that

13   your expert reviewed all of the 750 files that were

14   produced or whatever and 72 of the 91 patients --

15   there is a total of 91 missing MDS assessments.

16        Do you agree that under the protocol that was

17   agreed to, that file should have been set aside and

18   one of the replacement files used?  Or does her

19   total finding of 91 files, whatever the exact number

20   is of files missing MDS, does that include some of

21   the replacement files as well?

22        MS. STRIKIS:  This is a question for me?

23        THE COURT:  Yeah.  Multiple questions there.

24   Do you read that as a protocol, one; and two, was it

25   followed in this case?  And three, my question is

1  the total number of files she identifies that didn't

2  have these MDS assessments in them, did that include

3  any of the replacement files or was that just in the

4  600 group analyzed?

5      MS. STRIKIS:  Ms. Bradley reviewed all the

6  files that were produced, including ones that for

7  purposes of the sample which was sent to the

8  defendants way back when they pulled the files,

9  there were sort of core patients and replacement

10  patients.  They only could find 750 of the 800, so

11  Ms. Bradley reviewed 750 files.

12      For purposes of the protocol of putting in

13  replacement patient files, we did that when a

14  patient's file was missing, so there were

15  significant number of the actual files missing.  We

16  did not do that any time the patient might have been

17  missing documentation and that was not the original

18  protocol design, including because there are many

19  allegations about unsupported documentation, therapy

20  provided that was is supported by the record, that

21  is not a circumstance in which we would substitute a

22  patient file or we'd be substituting away past the

23  additional patient files.

24      THE COURT:  Okay, I think -- let me go back to

25  Mr. Lynam here.

1          MR. LYNAM:  Your Honor, on that point they

2    didn't tell us that they weren't interpreting

3    Dr. Panis's protocol that way.  They set this

4    protocol, we didn't have a chance to negotiate it,

5    they filed a motion with the court last year and

6    they said this is what we want to do.  Dr. Panis

7    said he would pick replacement files and I quoted

8    what Dr. Panis had said the replacement files were

9    for:  "Lost, misplaced, rendered illegible or

10   destroyed."  Obviously some of these files were

11   misplaced because we found an electronic backup for

12   the MDS.  So we were under the impression that the

13   protocol covered when documentation like that was --

14          THE COURT:  Wasn't it adequate just to go to

15   the files and not look at the electronic file?

16   [Inaudible] discovery here.

17          MR. LYNAM:  My response to that would be to

18   again look at Mr. Thomas' affidavit as to what --

19   and this is again an unrebutted assertion that he

20   made, that the normal protocol is to produce the

21   paper copies of the files at the facilities because

22   that's where the complete record will be, all the

23   nurses notes, all the other notes that are in the

24   file and a copy of the MDS.  And for the large --

25   the vast majority of these patient records, the MDS

1    were in the file.  And in fact, even for some of the

2    patients where they had a missing MDS, they're only

3    focusing on the MDS for that sample date, but there

4    were other MDS in the file for those patients, it's

5    just that they couldn't find the one that was around

6    that sample date.

7         But Mr. Thomas's declaration I think

8    establishes what's reasonable and what the industry

9    norm is, they should produce the documents, the

10   actual physical file at the facility because it's

11   the most complete record.  And he had a reasonable

12   good faith basis, there is no -- absolutely no

13   evidence of willful conduct here.  As Your Honor

14   pointed out, we have no reason to withhold

15   additional records, these MDS records.  If we had

16   known they were going to take the position that

17   every time they can't find something in the file,

18   it's a false claim, we would have been in dialogue

19   with them about that.  But we didn't hear that until

20   we got their expert report and then we went and we

21   found these MDS.

22        By the way, Your Honor, we produced them on

23   January 22nd, almost three months the ago.  They

24   have had these MDS for three months.  All our expert

25   said about those MDS -- which is just what I

1    indicated in our last conference on February 22nd --

2    was that he located them and they exist and they

3    constitute the 91 that they were asking for.  So --

4        THE COURT:  The discovery of those MDS

5    assessments, that filters through your expert's

6    opinions as well, right?

7        MR. LYNAM:  It doesn't filter through very

8    much at all because all our expert said is that they

9    were produced.  It doesn't filter into anything else

10   because there is no other findings relating to them

11   other than that they exist.  So the Relator had

12   three months to decide how they wanted to react to

13   the fact that these MDS exist.

14       What's interesting, Your Honor, is after we

15   took the depositions, after I took and my partner

16   took some of the depositions -- took all the

17   depositions of their expert, they supplemented and

18   amended some of their expert reports based on errors

19   we pointed out in the deposition.  They supplemented

20   at least two other expert reports.  But they really

21   kind of sat back on this MDS issue, they could have

22   supplemented that by now if they wanted to.  But

23   frankly, they would rather have the issue than the

24   solution.  The solution was we gave them to them in

25   January and they exist.

1          THE COURT:  From their perspective they would

2     say why should we be forced into undergoing these

3     additional costs because of your late production.

4     What is your response to that?

5          MR. LYNAM:  Well, I understand that that's

6     their position, but my first response is that they

7     should have used the replacement files which was

8     part of the protocol because we incurred the expense

9     of producing them for that very purpose.  They made

10     a strategic decision not to.

11          And my second response is that we in good

12     faith produced a physical copy of the file at the

13     facility, not knowing that there would be something

14     that would be missing that we'd have to go look for

15     until they gave us the expert reports.  And then

16     once we looked for them, we had this obligation to

17     produce them.

18          But it is not a significant exercise here to

19     simply acknowledge in the expert reports that this

20     part of Ms. Bradley's findings -- because she's got

21     multiple findings, the MDS is only one of them --

22     that the MDS finding that these don't exist has been

23     rebutted.  And that's really all it's going to take

24     for them to modify that portion of the report.  As

25     I've said, they have already modified some of their

 1          reports already.

 2               THE COURT:  Do you agree that before their

 3          expert would be able to do that, counsel would have

 4          to conduct discovery to verify the authentication of

 5          it, to confirm that this was in fact used in the

 6          particular claim and all this additional discovery

 7          that might be required there?

 8               MR. LYNAM:  We, they had the opportunity, Your

 9          Honor, already to take -- they doing Mr. Dressell's

10          deposition, he's the one who included in his report

11          that he located these additional MDS.  So they had

12          the opportunity then to ask him anything they wanted

13          about the location of them.

14               As far as the signatures on them, we've

15          already explained these were the electronic data

16          backups, they don't bear physical signatures.  And

17          they understand that; they want to make an issue

18          about signatures and they make an issue out of the

19          fact that their client claims their signature was

20          altered.  But these MDS don't cover the period that

21          she worked at the facility, so there is no issue

22          about her name being on these documents.  So I would

23          submit that as well.

24               Your Honor, as far as --

25               THE COURT:  That's just in practice -- if you

1    were to submit a claim that lacked the MDS

2    assessment or some of the other patient records that

3    were mentioned earlier, would you receive payment?

4         MR. LYNAM:   No.  It's actually impossible to

5    get paid without an MDS assessment because the MDS

6    assessment is what generates the RUG code which is

7    the billing code.  So the facility has to have a RUG

8    code in order to get paid.  So if there was no MDS

9    assessment done, the bill -- first of all, they

10   wouldn't submit it because they wouldn't have a RUG

11   code.  And there has been testimony throughout the

12   fact depositions that before any bills are

13   submitted, that each facility conducts a match

14   meeting where they match up, make sure all the

15   records that they need to support the claim are in

16   fact there so that they can submit.

17        So it would be impossible to get paid without

18   an MDS.  And so we have testimony about that and we

19   have -- actually, we have some of our experts, even

20   independent of the physical -- the MDS that we

21   produced in January, there is going to be expert

22   testimony that there is other indications in the

23   file that the MDS were done, including the point I

24   just made, you can't submit the bill without it.

25        As far as the default, Your Honor, there is no

1        willful conduct here, there really is no basis for

2        that.   And it's important to understand what they're

3        trying to accomplish with a default because they

4        take Ms. Bradley's finding of missing MDS and then

5        their statistician extrapolates this over this

6        universe of 5.5 million resident days so that a

7        small amount of a few thousand dollars gets

8        multiplied into tens of millions of dollars.

9             Their claim here is $302 million, based on

10       what their expert found of $42,000 in findings.   So

11       they extrapolate.   So a default here would actually

12       extrapolate something that isn't factually correct,

13       that these documents don't exist, into an even

14       larger amount of money that there would be no basis

15       for and I think it would be a serious error in the

16       case to go forward on that theory.

17            As far as what was in the complaint, Your

18       Honor, we have the complaint here and it's true that

19       they allege things about the MDS in the complaint.

20       But what they're alleging -- you can look on page 34

21       is where their section starts on MDS.   And the

22       heading is defendants encouraged nurses to upcode

23       the MDS.   I mean, that's the allegation we were

24       faced with, that they were upcoding MDS.

25            There is no allegation in the complaint that

1    the MDS weren't done, that they didn't exist and

2    therefore we were billing on the basis of no MDS

3    being done.  That's not in there.  So that's why

4    we've asserted quite strongly throughout all our

5    papers that they're proceeding on a theory that they

6    never presented in the complaint, which they can't

7    do under the False Claims Act.

8         And Your Honor, on the other points about, you

9    know, they're sort of casting some doubt about the

10    accuracy of these electronic MDS.  Frankly, from

11    what I heard described, that would all go to the

12    weight, not the admissibility of the MDS.  If they

13    want to argue that there is no signature on it and

14    therefore it doesn't look right or something, that

15    would go to the weight and not the admissibility.

16         As far as the additional records that we

17    produced from the medical files, again after we got

18    their expert report and we found that there were

19    other documents that they were claiming were not in

20    the file, we did a review of that.  Obviously we

21    wanted to see whether what they were saying was

22    right.  And what we noticed was that there were some

23    time gaps in some of the productions.  You have to

24    remember, some of these residents are long-term care

25    residents and they're in the facility for over a

1    year and the records can be stored at different

2    times, so it appeared that there was some gaps of

3    records that had not been produced.

4         So we went to try to look for them and what we

5    found, we got some files back from the defendants,

6    from the company, and we had our expert look at them

7    and some of them it turned out had already been

8    produced and some of them had not.  But we wanted to

9    give them this group because some of them had not

10   been produced, but some of them clearly had been

11   produced, they were sort of mixed in together.  So

12   we gave them some additional documents.  And we

13   noted in our transmittal letters that we believe

14   some of these documents have already been produced

15   and so they got them as well.

16        Some of those documents -- whether they help

17   us or hurt us, we have to produce them because we

18   got them.  Some of those documents they may feel are

19   helpful to them, but they haven't attempted to

20   really analyze them, they have had them for about

21   two months now and they could analyze them and if

22   they think they need to revise something, they can,

23   but they haven't done that.  So they're claim of

24   this prejudice of having to redo their expert

25   reports, I mean, they can redo them now if they

1    want, we haven't objected, they have done that on

2    some of the other points that we've rebutted in

3    deposition.

4         THE COURT:   You think the appropriate remedy

5    is what, continue to trial, allow the additional

6    discovery, redo the reports, retake expert

7    depositions?   I mean, basically start all over on

8    the experts?

9         MR. LYNAM:   I don't think it's necessary to

10   start all over on the experts, Your Honor, because

11   they had the opportunity to do that when they took

12   all the experts in March and they elected not to

13   pursue this in their depositions.

14        If they want to revise their report to take

15   into account and some additional new calculations as

16   a result of these additional documents, they can do

17   that and they can revise their report.   The numbers

18   change probably -- won't change -- when you get to

19   the extrapolation, everything is going to be

20   hundreds of millions even if they take out the MDS.

21   We're fighting for the life of the company here,

22   they want to basically get hundreds of millions of

23   dollars here.   If they take out $5,000 from their

24   MDS, they're still going to have a claim of a couple

25   hundred million that we're going to have to fight.

1        So I don't think it's necessary for them to

2   take any more depositions.  They can revise the

3   numbers in their expert report and we'll go to trial

4   based on that.

5        THE COURT:  Who should pay the cost of that?

6        MR. LYNAM:  Your Honor, I think -- again, I

7   think they could have -- I don't think we should,

8   for the simple reason that the protocol was that the

9   replacement files were there to be used and they

10  elected not to use them and therefore they made that

11  strategic decision so they have created this problem

12  instead of doing that according to the protocol that

13  Dr. Panis established.  So I don't think we should

14  have to.  Like I said, they have revised their

15  expert reports on other points, they could revise

16  them again on this and we can go to trial on the

17  same schedule.

18        THE COURT:  I'm going to go back to you.

19  Comment on that last comment he made, basically

20  related to who should bear the cost if that was the

21  way that we go on this, or that is the way we go on

22  this.  It was a protocol, it wasn't followed by

23  Relator's experts, we've got a mess on our hands but

24  that's in part of your making, your client's making

25  because your expert didn't -- chose not to go to the

1        replacement files and substitute them in.

2            I want you to respond to that.  I also want

3        you to respond to the allegations about what

4        actually was alleged with regards to the MDS

5        assessments and what is now being claimed.  I mean,

6        is the theory morphed in an inappropriate way, which

7        is what they're suggesting, into something that was

8        not alleged.

9            But start with this if we allow some

10       additional time which would necessitate a

11       continuance of the trial and all sorts of additional

12       discovery, I think, who should bear the cost of

13       that?

14           MS. STRIKIS:  We believe the defendant should

15       bear the cost of that, under any circumstances,

16       regardless whether the court agrees with Mr. Lynam

17       that some protocol was violated, which we do not

18       agree with.

19           THE COURT:  Was a copy of that protocol on the

20       record?  The Panis protocol, is that in the record?

21       I don't recall.

22           MR. LYNAM:  I believe it's -- in the motion

23       that the Relator filed to allow the sampling last

24       year, in the body of that I believe Dr. Panis

25       describe the group he was going to select and the

1        replacement group and what it was for.  So I believe

2        it's in a court pleading.

3            MS. STRIKIS:  So basically the history of the

4        sampling issue in this case is that we in

5        November 2014 wanted to discuss sampling and how a

6        sampling approach could be used in this case.  And

7        defendants' counsel refused to even consider

8        sampling, which led to the filing of a motion

9        regarding whether sampling could be used in this

10       case.  Attached to that was a Dr. Panis report, I

11       think it might be part of the record as part of

12       those proceedings about how sampling could be

13       approached.

14           The court declined to rule on whether Panis's

15       proposal would pass doubt under all circumstances

16       but said that sampling was an approach that could be

17       used.

18           We endeavored to talk to defendants about how

19       sampling could be used.  They refused to talk to us.

20       If they wanted to talk to us then about some notion

21       that when they produce files, they're not actually

22       complete the first time and so they would want to

23       build into some sampling expert report two rounds

24       of -- sort of discovery, they would get our initial

25       findings and then they would have a chance to rebut

1      and then we'd have a chance to rebut, they could

2      have done that as part of -- they could have asked

3      for that as part of the scheduling order in the

4      case.  They did not.

5           So as an aside to this, the whole notion that

6      we were supposed to do our expert reports and then

7      present some sort of information to them about our

8      findings and then adjust, when that's not anywhere

9      in the scheduling order, it just conflates what they

10     claim happens in other circumstances but is not what

11     happens in litigation discovery.

12          And the additional issue -- they have also

13     misstated what Dr. Panis intended which is that we

14     did use substitutes when entire files were missing.

15          With respect to the notion that also goes to

16     expense, they said they had extreme expense in

17     finding the files.  First of all, back at the stage

18     when they were refusing to agree to any sampling

19     protocol, they were offering to produce all 45,000

20     patient files, so their expense was minuscule to

21     what they were actually asking for back then.  And

22     they had the obligation to produce these documents.

23          In addition, we shared the expense of actually

24     making the production copies of the documents.  Our

25     own people -- Kellogg Huber had to send staff to go

1   get the documents, we found the copy vendor, we

2   negotiated a low price so that the parties would not

3   have to bear expensive costs because I think what

4   defendants came back with was some exorbitant amount

5   for copying, we fronted it and then had to get

6   reimbursed for half of it from defendants.  So the

7   parties shared the primary expense of actually

8   producing the medical records.

9        Your additional question was -- about the MDS

10   assessments as a source of the fraud.  Claims about

11   the MDS assessment are central to this case,

12   including that they have been falsified, that they

13   do not match up with the records that were sent to

14   the government, et cetera.  And what defendants

15   attempt to do here, there could be any reason an MDS

16   assessment wasn't in the file including that it was

17   removed because it didn't match or wasn't supported

18   by the record for the claim --

19        THE COURT:  But if it was removed, would they

20   have gotten paid?

21        MS. STRIKIS:  If the MDS assessment was

22   submitted and removed -- well, presumably on

23   anything that we have findings on, they did get

24   paid.  They could have submitted a claim form

25   without an MDS assessment and just put in a RUG

1    code.  And when an MDS assessment was not actually

2    done timely but somehow is backdated, it is also

3    false if it asks for a reimbursement rate at

4    anything other than the default rate which is what

5    necessarily applies if the MDS assessments are not

6    completed.

7        So there are many reasons and allegations

8    about MDS assessments in our complaint that support

9    the notion that claims regarding -- any issues

10   really regarding MDS assessments are encompassed in

11   our complaint.  And what they're essentially asking

12   for is if -- is sort of the notion that if

13   defendants withheld discovery, then all of a sudden

14   Relator has no claims, which is kind of counter to

15   common sense.

16       THE COURT:  The suggestion by Mr. Lynam is

17   that the discovery of these additional MDS

18   assessments doesn't filter through their expert

19   reports in the manner in which you indicate they

20   filter through your reports.  Do you agree with

21   that?

22       MS. STRIKIS:  I do not agree with that, Your

23   Honor.  In the document we filed on February 29th,

24   Document 272 on pages 4 through 6, we talk about

25   just briefly because we had just received the

1    reports I think the day -- you know, a couple days

2    before.  But we talk about and give examples of how

3    the MDS assessments and the late-produced documents

4    filter through, including all manner of computation

5    of net financial error rates and --

6         THE COURT:  Is that suggested if we open the

7    door to you going back and making your changes, we

8    then have to allow the door to be open for

9    defendants to reconfigure theirs as well?

10        MS. STRIKIS:  Presumably they would want to

11   rebut what our experts come up with, I guess, if

12   there is a --

13        THE COURT:  Do you agree with that?  Because

14   you're suggesting that really what you're suggesting

15   be reopened is not that significant a deal.  I mean,

16   it's just a matter of going back and correcting the

17   assumption that there was no MDS and that should be

18   easy to rectify.

19        If it filters through there, the remaining

20   experts as suggested by counsel, then it's far more

21   than that.  And I guess what I was asking her to do

22   was to argue your point that it doesn't really

23   filter through your experts as much; she would

24   suggest that it does.  And if it does, then

25   presumably you'd want to reopen discovery, too?

1          MR. LYNAM:  I don't think we would to any

2    significant extent.  If all they're going to do is

3    just recalculate based on the fact that the MDS are

4    there, we've already done our calculations based on

5    that, so there is nothing that we would have to

6    change.

7          If they come up with some new finding about

8    the MDS that they now want to look at, then we want

9    to respond to that.  But if it's just that the MDS

10   are there, we calculated on the basis that they were

11   there.

12         Your Honor, on the points that you asked about

13   what's in the complaint, I mean, I would just direct

14   the court again to the section beginning on page 34

15   of the revised second amended complaint is pretty

16   extensive about their theory of the MDS, but nowhere

17   in there do they allege that MDS assessments were

18   not being done at all and that they're somehow not

19   in the file.  That's not part of this case and

20   that's what was the new allegation when we got the

21   expert reports.

22         With regard to the original protocol, last

23   year when the sampling was done I would ask

24   Ms. Dunsford, who was involved in that, to address

25   the court on some of the back and forth that took

```
 1        place, if that's helpful to the court to understand

 2        it.

 3                THE COURT:  Briefly, yes, ma'am.

 4                MS. DUNSFORD:  Yes, Your Honor.  The end of

 5        November we had a good faith call with Mr. Ward in

 6        which he asked if we would consider sampling.  Of

 7        course, speaking with the defendant, they did not

 8        want to go forward with sampling, specifically

 9        because the complaint specifically says there is

10        upcoding and we wanted identifications of where we

11        were looking for upcoding.

12                We did offer, in the beginning of December and

13        there was numerous emails to that account, that they

14        could -- and it's also put in a letter on the

15        twelfth production -- that they could actually come

16        to all the facilities, bring their copier, copy

17        company, and copy the records at each facility and

18        they would actually see how the documents were kept

19        in the ordinary course of business with these

20        medical records.  They did not take us up on that.

21                As you then know, we have filed a couple of

22        motions that had to be heard and the court allowed

23        us to revise the case management scheduling order

24        the end of December.

25                We then --  they had still not told us what
```

1    the protocol was going to be on sampling.  We had

2    not really gone any farther on sampling.  So what

3    was done is that if they were going to file any kind

4    of sampling motion, they could and that was in the

5    case management scheduling order.

6         February 6th we receive a list of 600 core

7    patients and 200 replacement patients and what we

8    actually received was a request from Mr. Ward that

9    we actually give all the documents that are

10   necessary to support the claims for that specific

11   day.  They actually gave us a day.

12        And of course, I then had a telephone call,

13   good faith call with Mr. Ward in which I said I

14   can't give you the documents to support a claim, you

15   need to tell me what documents you want, or I can

16   give you the entire medical records.

17        After discussing that, because we weren't

18   going to make the decision for him on what he wanted

19   to see, we decided to give him all 600 of the

20   patients' medical records.

21        What then came up was in front of you on April

22   21, 2015, was the issue of did we have to pay for

23   copying the medical records.  We paid for the Fed Ex

24   expense, overnight secured delivery because of

25   HIPAA, for all -- and it is about 750 medical

1    records, and we gave them spreadsheets through the

2    process of letting know which ones we had and which

3    ones were missing, which came down to the 51 that

4    everybody knows.

5         And on April 21st you advised Mr. Ward -- and

6    I think Mr. Hall was at that hearing and Ms. Strikis

7    was on the phone -- that as long as we made them

8    available, it was their responsibility to copy the

9    medical records.  But you also told them on that day

10   that because their vendor was only taking 50 boxes

11   at a time, that their vendor needed to hurry up and

12   take more boxes.

13        The vendor still continued to take 50 boxes at

14   a time because of the load.  It was a lot -- we

15   filled up four large offices full of medical

16   records.  We finally got them copied.

17        The reason why we agreed to pay for half is we

18   were going to have to then send them off to our copy

19   vendor to get them copied for us because we would

20   need the same medical records to look at, we were

21   not going to keep originals due to HIPAA.

22        Our copy vendor couldn't even get the copies

23   from them until late April because their copy vendor

24   didn't start returning our boxes of original medical

25   records until late April.  So because of that, the

1        client agreed to split the cost with them.   So

2        that's where the cost of copying.

3            The costs that we incurred was the additional

4        150 that we went ahead and got for what we called

5        the replacement files because by the time their

6        vendor was actually obtaining the files, by the time

7        we knew with all the discovery that was going on to

8        make the copies, we thought it would be better to go

9        ahead and get the facilities to start looking for

10       all of them.

11           It wasn't as easy as going into an actual

12       medical records room at a nursing home.   Things were

13       held in offsite storage units and somebody had to go

14       in there for purposes of storage.   So that's the

15       process of where the medical records were.

16           It was always the understanding with my

17       conversations with Mr. Ward that they were -- their

18       sample size was to be 600 and the replacement files

19       were to replace if we could not have the actual

20       documents in those files.

21           And Mr. Ward initially in the emails asked for

22       the specific documents, they weren't asking for the

23       whole record.   I'm the one that suggested to

24       Mr. Ward, You need to take the whole medical record

25       and decide what you need for your review, I can't

1    tell you that this is all you're going to need.  So

2    initially they didn't even want the whole record,

3    but we gave them all the record for 751 I think is

4    the exact number.

5         THE COURT:  I'm looking at Document 172-1,

6    which is an exhibit to Document 172 frankly which

7    I'm not sure what that was.  But anyway, it's the

8    protocol that's suggested by Mr. Panis here, if

9    you're interested.  Seems to suggest that

10   replacement file would be used if the patient file

11   was missing or it would be used if documents missing

12   in a patient file.

13        That said, in the review that took place if it

14   became obvious that whatever total number it was

15   from the sample, those files didn't have the MDS,

16   that would even by your argument seem to me to set

17   up certain alarms in the person reviewing it because

18   of the role that the MDS plays.  So I'm --

19        MR. LYNAM:  Well, Your Honor, to that point

20   about the review, as Ms. Dunsford was explaining,

21   the way the procedure worked then was that we had

22   350 boxes of these records and Mr. Thomas in his

23   affidavit in opposition to their motion explained

24   that the company didn't have the resources to do a

25   file audit before they produced the records for

1    copying and production to the other side.  It would

2    have been very costly in terms of manpower and also

3    in terms of the time, it would have significantly

4    delayed the production of the records.  So he made I

5    think a reasonable decision to produce the records

6    without doing a file audit, which is typically how

7    you do it in response to a state auditor.  You give

8    him the records and they come back and say hey, we

9    can't find this in there, go see if you can find it.

10        And again, this case is an audit.  Ms. Bradley

11    is the auditor, she said she couldn't find things,

12    we went and looked for them.  But we didn't know

13    they weren't there until the expert report in

14    December.

15        MS. STRIKIS:  Your Honor, if I could respond

16    briefly to the last point.  On the notion that

17    defendants could not review the files, well, they

18    always had access to the database apparently and

19    their expert, Peter Dressel, reported that it was

20    not difficult to type in the name of the patient,

21    the date or date range, and the facility, and his

22    people actually printed that out, after getting our

23    report and apparently looking and confirming that

24    the MDS assessments were not in fact in the patient

25    files as they're actually required to be.

1          In addition, in one of the -- at least one of

2     the patient files that we received, there was an

3     indication -- there was a slip sheet that talked

4     about a March 2015 file audit for that patient and

5     it had a check list of what documents were in the

6     file.

7          Now, we asked our witnesses about this during

8     discovery and nobody understood what type of

9     audit -- their 30(b)(6) on audits didn't know what

10     type of audit this was.  But it suggests at least

11     that file was looked through to see if it was

12     complete before it was turned over to us, which

13     would be consistent with what they do and what

14     witnesses have testified that they do when they

15     receive a state audit is they do look through files

16     and documents, indicating that they removed

17     documents as well from files.

18          It was also -- this was like the state audit

19     process to the extent that we continued throughout

20     the summer to ask them if they had any more

21     documents, any more patient files, any more relevant

22     documents.  We are not required to specific

23     documents by name, that's not a requirement for our

24     discovery obligations.  Their discovery obligations

25     were to produce everything that they had regarding

1      the patient files, especially MDS assessments

2      because those were called out front and center in

3      numerous document requests, I think they're called

4      out front and center in the email traffic between

5      J.B. Ward and Tina Dunsford, and we could not

6      have -- I don't think we could have done anything

7      else to let them know that we needed these

8      documents.

9           And in fact in October we provided them with

10     interrogatory responses that indicated these

11     documents were missing.  So no one on the

12     defendants' side appears to have been being careful

13     in any way when responding that they had given us

14     all the documents when receiving our October

15     interrogatory responses that indicated MDS

16     assessments were missing, et cetera, that that just

17     was not addressed at all by defendants until they

18     got our expert reports.

19          And even then, Your Honor, they -- the

20     defendants came to us in late December and asked for

21     an extension of the timing for their expert reports.

22     This is weeks after they have received our expert

23     reports.  They did not mention to us that they were

24     in the process of finding additional documents that

25     they knew they had to bolster their expert's

1    rebuttal opinions.

2        I will tell you that my protocol would have

3    been if I had received something that had truly

4    surprised me that something was missing, I would

5    have endeavored to call as promptly as possible.

6    Instead, they asked for an extension from the court

7    without saying anything [inaudible due to coughing].

8    They had their experts go in and look for additional

9    documents and their file reviewer testified to the

10   protocol that he used is he basically made sort of

11   initial findings on his own or the people reviewing

12   files for him that there were documents missing or

13   documents didn't support, is probably a better way,

14   there was no documentation to support the level of

15   billing, which of course is a false claim if that

16   doesn't exist and you're billing for things that

17   weren't provided.  And they followed up on the

18   patients he told them to look for.

19       So there was also -- this is part of the

20   reason if we get into this we want discovery because

21   there is also no indication, are there other patient

22   files that they didn't produce that they haven't

23   given to us because maybe they support our claims as

24   opposed to maybe helping the defendants' experts?

25   It's not clear.  And they did not produce that

1          information promptly, they produced it after their

2          experts had used it.

3               And how we know this is because the experts'

4          lists of materials provided include references to

5          additional trials for Joseph Hall, XYZ facility,

6          without Bates numbers.  So what they did is they let

7          the experts go through these files and figure out

8          whether they were relevant or not and then they

9          Bates numbered them and produced them later.  And

10         probably the same with the MDS assessments, Your

11         Honor.

12              MR. LYNAM:  Your Honor, just to explain that,

13         because that's really a misleading impression.  When

14         we got our extension requests in December, we didn't

15         know that there were other documents to produce.  I

16         mean, [inaudible] laid out the chronology in

17         correspondence with Relator's counsel.  We didn't

18         have any other documents to produce.  We asked for

19         an extension because of the voluminous nature of

20         their expert reports.

21              And then we started looking to see if there

22         were additional documentation.  And the process,

23         yes, required our experts to look at them to see

24         whether or not these were in addition to what had

25         already been produced.  So once they determined that

1    these had not been produced like the MDS, we then

2    Bates stamped them and sent them to them.   There

3    wasn't any hiding the ball on them.   But first we

4    had to know whether there was any additional

5    documents to produce.   Then we got some stuff and we

6    asked our experts to look at it and that's why they

7    got them in January.   But I just don't -- I really

8    take strong exception to this implication that we

9    were sort of sandbagging anybody.   We didn't know

10   until we produced them that these were additional

11   documents to be produced.

12        MS. STRIKIS:   Your Honor, we received patient

13   files all the way through February up to the --

14        MR. LYNAM:   And same thing with the ones in

15   February.   We got them later on and then we had our

16   experts review them and then we sent them over after

17   they reviewed them and as I said in my letter to

18   them, some of these may have already been produced,

19   but we have to give them to you because some have

20   not been.

21        THE COURT:   Okay.   Last word?

22        MS. STRIKIS:   Your Honor, you had asked

23   about relief.   One other type of relief that if the

24   documents are not stricken -- as we argue they

25   should be -- one other relief that courts have given

1    at the nonproducing party's option is an instruction

2    to the jury that evidence was withheld.  So we would

3    ask the court to consider that in case we would be

4    interested in pursuing that at our option.  And I

5    think we have covered that, Your Honor, unless you

6    have further questions.

7         THE COURT:  Anything else?

8         MR. LYNAM:  Your Honor, we cited several cases

9    that I think are on point in our briefs.  On the

10   point about whether failure to maintain physical

11   possession of a document amounts to a false claim,

12   the answer is clearly no.  So *Davis vs. District of*

13   *Columbia*, the DC circuit case that we cited in our

14   brief, is right on point on that.  So they shouldn't

15   be getting a default judgment on something that

16   isn't a false claim.

17        We cited several cases with regard to these

18   discovery issues such as the *Caslin vs. Personal*

19   *Care Products* case where Magistrate Judge Baker in

20   Orlando dealt with a similar issue, denied the

21   motion for sanctions and said the remedy was to let

22   the other side amend their expert report.

23        And we cited several other cases like that,

24   including an opinion by Judge Honeywell here in this

25   court similar where she found that there was no

1          "gotcha" tactics being played, so Rule 37 sanctions

2     weren't appropriate and we think they apply here.

3     Thank you.

4          MS. STRIKIS:  Your Honor, can I respond on the

5     Davis point?  MDS assessments is different here

6     because even as defendants have said, it is a

7     condition of payment to come up with the RUG score

8     and the MDS assessment.  And in addition, Davis is a

9     very different case which involved whether the

10    defendant was required to maintain some

11    documentation supporting cost reports that actually

12    was maintained in the possession of the Relator.  So

13    it's a very different case than what we have here.

14         With respect to the other cases that Mr. Lynam

15    cited, the situation there are much different.  I

16    would refer the court to cases that we cite like

17    *Bray & Gillespie, First Coast*, and the cases that we

18    have cited regarding striking experts in some of our

19    supplements, *Sunroof de Mexico* and U.S. Exrail and

20    *North East Medical*.

21         THE COURT:  Thank you.

22         (The proceedings adjourned at 12:27 p.m.)

23

24

25

1                    C E R T I F I C A T E

2

3      STATE OF FLORIDA              )

4      COUNTY OF HILLSBOROUGH  )

5          I, Lynann Nicely, RMR, CRR, Official Court

6      Reporter for the United States District Court, Middle

7      District, Tampa Division,

8          DO HEREBY CERTIFY, that I was authorized to and

9      did, through use of Computer Aided Transcription,

10     report in machine shorthand the proceedings and

11     evidence in the above-styled cause, as stated in the

12     caption hereto, and that the foregoing pages,

13     numbered 1 through 59, inclusive, constitute a true

14     and correct transcription of my machine shorthand

15     report of said proceedings and evidence.

16         IN WITNESS WHEREOF, I have hereunto set my hand in

17     the City of Tampa, County of Hillsborough, State of

18     Florida, April 28, 2016.

19

20

21              /s/ Lynann Nicely
                 Lynann Nicely, RMR, CRR,
22               Official Court Reporter

23

24

25