UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

THE UNITED STATES OF AMERICA
and THE STATE OF FLORIDA *ex rel.*
ANGELA RUCKH,

    Plaintiffs,

v.                                                                                          CASE NO. 8:11-cv-1303-T-23TBM

CMC II LLC, et al.,

    Defendants.
_____/

## **ORDER**

Operators of fifty-three skilled nursing facilities (SNFs) in Florida, the defendants move (Doc. 292) for summary judgment on the relator's claims under the Federal False Claims Act and the Florida False Claims Act. The defendants begin the motion by observing that the plaintiff worked only briefly at only two of the defendant's fifty-three Florida SNFs and "never visited any of the other 51 Florida facilities." The defendants next remark that discovery has required the production of four million documents, a million pages of "resident medical records," and more than twenty depositions of present and former employees. The defendants declare that "[n]one of that fact discovery has generated any support for the relator's allegations, much less a genuine issue of material fact for trial." The defendants contend that "the majority of the purported expert testimony" of the relator's five

expert witnesses, including the relator herself, is inadmissible and that the relator's damage claim, based mostly on expert opinion, is "exorbitant," "unmoored," and "astronomical."

Further, the defendants cite a corporate compliance program, including self-auditing and monitoring, employee training and testing, and a compliance hotline; countervailing expert and other testimony about suitable treatment and "appropriate" billing; surveys by state regulatory authorities that resulted in no "monetary sanction"; and the occurrence of "billing and coding errors" at an inconsequential frequency that failed to "trigger" additional government review. In summary, the defendants characterize the present action as a mere "chart audit that has no relation to the allegation in [the relator's] complaint."

The defendants argue that the relator's "chart audit" reveals nothing that conforms to the definition of a "false claim," that is, a claim submitted in knowing violation of a controlling statute, regulation, or rule. The defendants contend that the relator has offered no competent matter of record to establish the knowing falsity of any claim for payment by the defendants. The defendants argue that the relator has offered (1) only "findings" by an "expert" (unqualified, the defendants argue), (2) only the claim that necessary documentation was inadequate or missing, (3) only unexplained "trends" in therapy minutes, and similar claimed irregularities in record-keeping — but not a single instance of therapy characterized by a qualified medical professional as "medically unnecessary" and, hence, "objectively false."

The defendants contrast the medical expertise of the doctor who opines for the defendants with the medical expertise of the "nurse" who opines for the relator. While emphasizing that a difference in (qualified) medical opinion creates no claim for fraud, the defendants urge that no medically unnecessary therapy is shown directly by competent evidence and, hence, no knowing false claim is shown. The defendants assert that the regulations the relator applies when determining the defendants' compliance were not effective at the pertinent time and have no retrospective application. The defendants deny the existence of a binding, regulatory definition of a "comprehensive care plan" but insist (1) that the available documents demonstrate that a medically acceptable and comprehensive care plan existed for each patient and (2) that the existence of the care plan negates any knowing violation, a requirement for a false claim. The defendants insist that, at most, the maintenance of a comprehensive care plan is a condition of participation, which is administratively enforced and which is not a condition of payment of the sort necessary to a false claim.

The defendants argue that, although the relator claims false inflation of ADL scores to increase RUG scores (and, hence, to falsely increase Medicare payments), only a minuscule and insignificant miscoding occurred and the miscoding is so slight as to negate an inference of any intent to submit a knowingly inflated or overcoded claim. Also, the defendants reason that the presence of undercoding, much like the presence of compliance programs, strongly tends to negate an inference of knowing

and intentional submission of a false claim.  Similarly, the defendants assert that the relator's complaints about unqualified persons signing MDS forms is both statistically insignificant and an administratively enforced condition of participation (not a condition of payment).  In any event, the defendants assert that the relator demonstrates no instance of the failure to deliver "medically appropriate care."

The defendants claim that some of the relator's attacks are not alleged in the complaint and, therefore, are not at issue.  For example, the defendants claim that the relator equates the absence of an MDS form with an overpayment, an equation the defendants reject for the reasons that a missing form is not a fraud, that the forms are not missing, and that a missing form does not prove that a medical service was not performed.  The defendants contest other putatively "outside the complaint" attacks, including claims of improper diagnoses of depression and claims of billing for medical treatment administered after a patient's death.

In response, the relator presents the specter of a "years long corporate scheme to bilk Medicare and Medicaid" and to reap "millions of dollars in ill-gotten government funds."  The relator begins the response with a description of "Defendants' Medicare Scheme" of "inflated RUG levels," which the relator characterizes as the defendants' "most blatant and straightforward scheme," based on overstating the amount of therapy administered to a patient and on overstating the patient's underlying ADL score. The relator states (Doc. 322 at 4), "Defendants senior officers directed employees to increase patients' RUG levels

to achieve corporate profit targets irrespective of actual needs." No citation to the record immediately follows that sentence; a series of putative examples follows that sentence. But the examples are more anecdotal than comprehensive or encompassing and are more than a little equivocal (in the sense of permitting several competing inferences). The same pattern — a generalization followed by an equivocal example — repeats in the balance of the section.

Next, the relator charges a form of "ramping" or "falsely inflating the therapy" and cites the example of Patient #743 (Doc. 322 at 6) as evidence of "a deliberate effort to inflate RUG levels for the subsequent billing period." Again, the example is equivocal, the medical assessment is dubious, and the quantification is weak or absent. (Also, here and elsewhere no mention appears of a normal error rate or an equivalent, acceptable, even inevitable fluctuation in the reporting of medical matters — as in the reporting of any other human activity, such as lawyers reporting billable hours).

The relator argues that, although the defendants schemed to increase patient services and to cheat Medicare, the defendants employed a scheme to decrease patient services and to cheat Medicaid. The relator's familiar pattern persists: a broad charge and equivocal and scant evidence. For example, the relator argues that Florida requires a "complete care plan" as a "condition of reimbursement." The relator follows, "Defendants often failed to create them." Often? And no citation follows. Based on that conclusory allegation, the relator concludes that "Defendants

knew they were failing to comply." The relator follows with the claim that 79 of 379 "Medicaid patients sampled" contained "no care plan for the relevant date," but that assertion permits several competing inferences and leaves pertinent but unanswered questions.

The relator next posits that the defendants maintained a broad program of the falsification of records. This section conforms to the pattern of generalization followed by equivocation but not quantification, although a taste of anecdotal evidence is supplied ("in one instance" and "in another case").

In the argument section, the relator includes a brief legal discussion (largely uncontested) and focuses thereafter on "factually false claims" and "legally false claims." In support of the former, the relator states (Doc. 322 at 12):

> As Ms. Bradley will testify based on her comprehensive review of patient files, Defendants systematically reported inflated RUG levels on their UB-04 forms. She found that in 128 out of 320 Medicare claims she reviewed (40%) the RUG level was inflated either because the number of therapy minutes reported, and ADL score, or both, were higher than what is reflected in the contemporaneous medical records.

Assuming admissibility, the Bradley testimony offers some pertinent evidence of a scheme — certainly not conclusive, perhaps not even persuasive (not for the judge to determine) after cross-examination and countervailing expert testimony, but at least somewhat more than no evidence (and creating at least something more than no issue.)

Also, the relator posits a program by the defendants of "legally false claims" that "violated . . . legal prerequisites to payment under Medicare and Medicaid." Again, the relator relies on claims of inaccurate MDS assessments, claims of falsified MDS assessments, and claims of MDS assessments not signed by a registered nurse, as well as Medicare claims unsupported by a required care plan.

In the section of the response discussing "legally false claims," the relator, deflecting the defendants criticism of the qualifications of the relator's "expert" and rebutting the claim that the relator's attacks are a mere conflict in medical opinion, the relator includes a useful clarification (Doc. 322 at 14):

> Defendants also argue (at 9) that Relator has not adduced evidence that the treatment patients received was medically unnecessary. But lack of medical necessity is not an element of Relator's claims, and thus not a "material" fact on which summary judgment could be granted. *See Tipton*, 965 F.2d at 998. Defendants' argument (at 10–11) that Relator's claims require resolving competing clinical judgments is a red herring. Contrary to Defendants' repeated mischaracterizations (at 10, 15), Relator's theory of falsity does not require proof that Defendants provided medically inadequate care. Relator's core claim is that Defendants submitted claims for reimbursement for services that were never provided at all, or provided in knowing violation of Medicare and Medicaid regulations.

The bulk of the balance of the relator's response attempts to negate the defendants' claims that the false claims are, at most, quantitatively inconsequential, that an "under-reported RUG level" appears in some claims, and that compliance programs negate the knowledge element of the relator's claims. The remainder of the relator's response recapitulates the anecdotal and equivocal assertions of fact that

characterize the response and attempts a shotgun blast in defense of the relator's claims for relief.

The defendant's motion for summary judgment, although strong, falls short of compelling the conclusion that the record presents no genuine issue of material fact for determination by a jury. The motion (Doc. 292) is **DENIED**.

ORDERED in Tampa, Florida, on December 1, 2016.

_____
STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE