UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

THE UNITED STATES OF AMERICA
and THE STATE OF FLORIDA *ex rel.*
ANGELA RUCKH,

Plaintiffs,

v. CASE NO. 8:11-cv-1303-T-23TBM

CMC II LLC, et al.,

Defendants.
_____________________________________/

**ORDER RESOLVING CERTAIN**
***IN LIMINE* MOTIONS BY THE DEFENDANTS**

Under Rule 702, the defendants move (Doc. 283) to exclude the testimony of Shirley Bradley, and the relator opposes (Doc. 320) the motion. The defense attacks Bradley, a registered nurse, as unqualified to opine about both the "appropriateness" of treatment and "the clinical reasons that have contributed to a decrease in therapy." (Doc. 283 at 8) Next, the defendants argue that Bradley's analysis is not "based on Medicare standards that were applicable at the time." (Doc. 283 at 9) The relator responds that Bradley:

> determined whether Defendants improperly billed the government for patient treatment — not whether any individual patient should have received more, less, or a different type of therapy based on his or her clinical condition.
>
> . . . .
>
> Neither Ms. Bradley nor her colleagues made any judgment as to whether a patient should have received more care or a different type of

> care; their assessment was limited to whether the care the patient received was consistent with the RUG level at which the patient was billed. In short, any judgment of a treatment's "medical necessity" is unnecessary to Ms. Bradley's assessment.

(Doc. 320 at 5–6) Bradley is qualified (1) to read the pertinent medical records and to determine what therapy was noted during a specified time and (2) to read medical records for the immediately following time and to determine what therapy the records report as administered compared to the therapy billed. This exercise is beyond the ken of a typical juror but well within the training, knowledge, and experience of Bradley.

Apparently, Bradley used in her analysis for events before October 2011 an analytical framework later officially adopted for events after October 2011. That the pertinent authority adopted a method of fraud detection as mandatory after a stated time hardly disqualifies an analyst from applying the method to identify fraud allegedly occurring at a time before the method was adopted officially. The issue to which Bradley's testimony is aimed is an unwarranted divergence, however reasonably detected, between therapy administered and therapy billed and not non-compliance, identified by a specified means, with a government regulation:

> To determine whether Defendants "ramped" any of their claims, Ms. Bradley looked at the level of therapy resources that were provided to a patient in the look-back period relevant to the coding on a patient's MDS assessment and compared that information to the actual amount of therapy the patient received subsequent to that time, based on the documentation included in his or her medical file.

(Doc. 320 at 10) Bradley's written report confirms the relator's description of Bradley's opinion. The defendants' motion (Doc. 283) is **DENIED** (to the extent of the relator's description of the proposed testimony).

The defendants move (Doc. 284) under Rule 702 to exclude the testimony of Marc Vianello. The relator opposes (Doc. 316) the motion. Essentially, the defendants claim that Vianello is unfamiliar with the arcana of Medicare and Medicaid and billing and payment for each. The defendants resort to an explanation of "the UB-04 form" in a purposeful but vain and transparent effort to bestow a convincing aura of opaque mystery on billing and payment. As his report confirms, Vianello's work and his consequent opinion are within the typical, straightforward business of a qualified and experienced forensic accountant, which he is. The defendants' motion (Doc. 284) is **DENIED**.

The defendants move (Doc. 290) under Rule 702 to exclude the testimony of Marvette Lowrie-Morris. The relator opposes (Doc. 319) the motion. The defendants claim to proffer through Lowrie-Morris these opinions:

> (1) she will assist the jury to understand the complex terminology used in the SNF industry and Medicare and Medicaid requirements and billing processes applicable to reimbursement for services provided by SNFs; (2) she will describe the various ways in which, based on her experience, certain practices explained in her report are susceptible to abuse by unscrupulous SNFs attempting to obtain funds improperly from the Government; and (3) she will testify as to whether such practices, in addition to obtaining Government funds improperly, compromise patient care. *See* Lowrie-Morris Rep. at 6–7. Ms. Lowrie-Morris is qualified to offer all of these opinions, and they are directly relevant and helpful to the jury on the core issues in this case.

(Doc. 319 at 6) The defendants' objection accosts Lowrie-Morris's opinion for an array of reasons, many of which at first seem unresponsive to the relator's description of the expected testimony. Resort to Lowrie-Morris's report permits a more reliable assessment of her proposed testimony.

On page 11, Lowrie-Morris opines that "in several instances" the defendants "did not develop or maintain care plans" and that defendants provided "*ad hoc* care" that "may have caused residents' health to decline." Certainly Lowrie-Morris can testify (if otherwise admissible) to what she saw (or didn't see) in the records she reviewed, but she is unqualified to opine (to speculate) on the character and extent of any connection between a missing record and a health consequence of the missing record (that is, a putative connection between record-keeping and physical health). (Doc. 319 at 15)

On page 12, based on two e-mails, Lowrie-Morris opines that a supervisor "appears" to order the removal of a care plan from records. Lowrie-Morris immediately generalizes and universalizes the episode and opines that "a practice of removing care plans that contradict therapy being provided is improper." (Doc. 319 at 17) However, no apparent basis exists for Lowrie-Morris to find the presence of a "practice." Next, Lowrie-Morris opines that this supposed "practice could also interfere with resident care." In other words, Lowrie-Morris infers poor care for residents based on the inference of a "practice," the existence of which, in turn, is inferred from an episode. This "reasoning" is unscientific, unreliable, and

inadmissible — a classic (and amateurish) compounding of weak and unwarranted inferences.

At page 16, this defective reasoning is repeated. Lowrie-Morris infers a "practice" from an event, infers "likely" record-keeping "distortions" from the "inferred" practice, and from the inferred "distortions" further infers likely impairment of a "resident's chances for a full recovery." Lowrie-Morris's opinion is an unreliable and inadmissibly promiscuous compounding of highly attenuated inferences.

At pages 18, 22, 27, 30, 34, 39, 41, 44, and 49 of her report (Doc. 319), Lowrie-Morris renders opinions that assume this same form: these few documents or events "indicate to me" that "at least in these instances" *X* or *Y* happened; a pattern of *X* or *Y* "could" or "could probably" lead to "poor quality care," which might reduce a patient's "chance of recovery." The particular words used by Lowrie-Morris vary somewhat, but the form of her "opinion" persists throughout her report. Cast in this form and resting upon such an insubstantial (at least unsubstantiated), selective, and intolerably attenuated foundation, Lowrie-Morris's opinion falls dramatically short of a reliable and admissible expert opinion.

Again, the defendants argue persuasively that Lowrie-Morris's opinion depends on a "very small subset" of "hand-selected," "cherry-picked" data, nowhere established as representative of the pertinent universe of data. The defendants argue persuasively that Lowrie-Morris is unqualified to opine on "the medical necessity of

therapy" or the medical consequences of too much or too little therapy. As the defendants argue, Lowrie-Morris's testimony about a possible correlation between billing practices and the quality of health care is outside of her competence.

In conclusion, a careful review of the motion and response and an examination of Lowrie-Morris's report confirms that the defendants are largely correct and that the relator is largely incorrect about the admissibility under Rule 702 of Lowrie-Morris's theories. With the exception of Lowrie-Morris's explaining the "terminology used in the SNF industry" (that is, the matter appearing at Doc. 319 at 6 as opinion #1), the defendants' motion to exclude her testimony (Doc. 290) is **GRANTED**.

The defendants move (Doc. 291) to exclude the "expert" testimony of the plaintiff Angela Ruckh, who served briefly as an employee at two SNFs operated by the defendants. The relator responds in opposition (Doc. 317). The defendants attack Ruckh's ability to offer "unbiased expert testimony" because, as the plaintiff in a *qui tam* action, she is eligible to receive a large sum of money in proportion to the result achieved, if favorable. But the tainting influence of money and other self-interest on the credibility of testimony is a matter that tests the weight of the testimony and not the admissibility of the testimony.

More to the point, the defendants complain that either (1) Ruckh is a Rule 26(a)(2)(B) expert who must disclose a report, which Ruckh has not, or (2) Ruckh is a Rule 26(a)(2)(C) expert, who must provide a "summary of the facts

and opinions to which the witness is expected to testify." Ruckh first purported to accomplish the required Rule 26(a)(2)(C)(ii) disclosure in a three-paragraph, two-page paper (Doc. 291-2). Ruckh's "disclosure" fell brutally short of satisfying Rule 26(a)(2)(C)(ii). Here is the whole substance of the first "disclosure":

> Ms. Ruckh may testify regarding the following subjects: completion of and requirements applicable to MDS assessments; care planning practices and requirements applicable to the preparation of care plans; the preparation of and requirements applicable to ADL and RUG scores; and delivery of nursing care, including professional standards of care. Ms. Ruckh may also testify regarding any subjects on which Defendants' experts testify.
>
> The facts and opinions to which Relator may testify include the appropriateness of the practices regarding patient care, care planning, and MDS assessment completion that she observed at Defendants' facilities and for which she has gained further understanding through her review of materials and information provided in discovery. Examples of the types of facts and opinions to which Relator may testify are included in Relator's responses to Defendants' First Set of Interrogatories, including Relator's response to Interrogatory No. 2 and the accompanying attachments.

In short, the initial "disclosure" conveys to the defendants that Ruckh is available to testify on her own behalf on almost any issue in the action (including "any subjects on which the Defendants' experts testify") and that Ruckh, rather than disclosing the "facts and opinions" to which she will testify, will disclose only select "examples of the types of facts and opinions to which Relator may testify" (some of which are putatively "included" in some specified interrogatory answers). Of course, Ruckh is at liberty to decline to disclose her opinions and their basis, but she is not

entitled to both decline to disclose her opinions and their basis and to offer her opinions and their basis during testimony to a jury.

Ruckh later undertook to "amend" the disclosure. (Doc. 291-3) The amendment repeats the content of the first disclosure (including both the "any subjects on which Defendants' experts testify" provision and a referral to some interrogatory answers as "examples of the types of facts and opinions" to which Ruckh might testify). The amendment adds a mention of an array of other topics that Ruckh might "assist the jury in understanding . . . ." Following this promise of assistance is a list of prospective testimonial topics and objectives rendered in the following form: assist the jury in understanding what the A is and what the B is, explaining how and when C is accomplished, explaining the relation between D and E. Ruckh's disclosure directs the reader to the "revised second amended complaint" at ¶¶ 33–51 and 62–69. The "disclosure" continues with a series of paragraphs in the format "Ruckh may explain," but the disclosure nowhere includes a glimpse of the explanation itself or the basis for the undisclosed explanation.

At most, Ruckh's Rule 26(a)(2)(C)(ii) disclosure discloses the contents of the facts and opinions (if any) appearing in paragraphs 33–51 and 62–69 of the revised complaint (Doc. 75) and in attachments A through F to certain interrogatory answers (not available on the docket), to which she alludes in her disclosure. (Doc. 291-3 at 4–5) No other meaningful disclosure has occurred, and Ruckh's "expert" testimony

is necessarily limited accordingly. Of course, this restriction is minimal because, as the relator states:

> Ms. Ruckh is principally a fact witness in this litigation. She will offer testimony regarding the illegal activities she personally observed at Defendants' facilities concerning their submission of false claims for reimbursement and their wrongful practices regarding the preparation of MDS assessments, activities of daily living ("ADL") and resources utilization group ("RUG") scores, care plans, and other issues.

(Doc. 317 at 6) The defendants' motion (Doc. 291) is **GRANTED-IN-PART** and **DENIED-IN-PART** in accord with the preceding discussion.

The defendants submit an "omnibus motion *in limine*" (Doc. 349) divided into seven parts (MILs #1–#7), to which the relator responds (Doc. 354) in opposition. MIL #1 attacks the admissibility of five HHS OIG reports and a GOA report that examine aspects of the SNF industry. The defendants insist that the HHS reports are too general to inform the issues of this action and that the OIG report examines quality of care issues concededly not at issue in this action. The relator counters that the reports condemn as "wrongful or abusive" some practices of the defendants; that the defendants were aware contemporaneously of the condemnation in the government reports; and that the defendants' awareness evidences the defendants' "knowing" submission of false claims. In any event, each report itself is inadmissible, but the relator can inquire about the witness's knowledge of the existence of a report and about the witness's understanding of the content of the

report, which is the pertinent information. MIL #1 is **GRANTED-IN-PART** in accord with this paragraph.

MIL #2 seeks to exclude evidence of "third party cases, investigations, and settlements" involving SNFs other than the defendants' fifty-three Florida SNFs. The relator responds that information about, for example, DOJ investigations and settlements is admissible during rebuttal to counter the testimony of Peter Dressel that the defendants' SNFs billing compared favorably to the industry and, therefore, the state of billing in the industry did not notify the defendants that fraudulent upcoding and other fraudulent practices occurred in the defendants' SNFs. Each party — for its own purpose — wants to look selectively at events elsewhere in the SNF industry. But the parties' respective proposed undertakings are quantitatively and qualitatively different. Accused of knowing submission of falsely inflated claims, the defendants invoke billing and other numbers in the industry to demonstrate that nothing in the numbers alerted the defendants to any inflated or false billing within the defendants' business. Dressel's evidence is straight-forward and permits the direct inference that the defendants' billing was at or below industry standards — therefore not notifying the defendants of fraud. On the other hand, the relator undertakes to demonstrate that "third-party cases, investigations, and settlements" involving other SNFs somehow notified the defendants of their own fraudulent billings. Determining reliably what, if anything, prompted, supported, and concluded any "third-party cases, investigations, and settlements" implies an

extensive, tangential, and distracting stream of evidence, response and rebuttal, and argument — all in pursuit of a weak counter-inference of knowledge. The evidence of "third-party cases, investigations, and settlements" addressed in MIL #2 is shrouded in uncertainty and controversy, likely to waste time and divert and distract the jury, and carries a highly prejudicial but unconfirmed suggestion of pervasive fraud in the industry. MIL #2 is **GRANTED**.

In MIL #3 the defendants attempt to exclude evidence of "backdated MDS assessment forms" because "backdating" is mentioned nowhere in the 77-page, 246-paragraph revised second amended complaint; because the term "backdating" is prejudicially suggestive; and because "backdating," even if true and proven, is irrelevant in a False Claims Act action because the date on an MDS assessment form does not pertain to whether the defendants properly billed the government for services rendered. The relator responds with reference to the evidence that a SNF employee backdated "a number of" ("numerous" and "a number of" are famously evasive terms) MDS assessments. The parties' papers discuss the quantification of "backdating" and the basis, if any, to extrapolate from backdating by one employee to corporately approved or required "backdating" chargeable to the corporate employer. The evidence of Ms. Packer's "backdating" sounds — absent a proper predicate — trivial, legally inconsequential, and violative of Rule 403. However, a ruling on MIL #3 is **DEFERRED** until trial.

MIL #4 requests a broad exclusion of "evidence of Medicare and Medicaid claims that did not result in an overpayment by the government under Relator's experts' damages analysis . . . ." (Doc. 349 at 10) The relator answers that this evidence is necessary to compute a civil penalty under 31 U.S.C. § 3729(1) and pertinent to knowledge and intent. The interplay between damages and the civil penalty in a "mischarge" FCA action exceeds the scope of an order on a motion *in limine*. This issue is better resolved elsewhere. MIL #4 is **DENIED WITHOUT PREJUDICE** to renewal as an evidentiary objection or otherwise.

MIL #5 requests an exclusion of evidence "based on allegations outside the relevant time period" and cites as authority a magistrate judge's order (Doc. 151) resolving a discovery dispute. In general the magistrate judge's order correctly preserves the bounds fixed in the latest complaint (Doc. 75), which is the time toward which the pleadings, the proof, and the verdict are primarily directed. The bound, however, is not absolute, owing to nuances such as described by the relator: "[S]ome of Defendants' accounting records relating to claims submitted to the government within the relevant time period were created after the relevant time period had ended." Generally, the boundaries of Doc. 151 will govern temporally the evidence, but the inevitable nuance precludes the monolithic imposition of the boundary sought by the defendants. On the issue of time, distinguishing details that separate the relevant from the irrelevant is more reliably accomplished at trial. MIL #5 is **DENIED**.

MIL #6 and MIL #7 are **GRANTED** for the reasons and to the extent stated by the defendants.

ORDERED in Tampa, Florida, on December 21, 2016.

STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE