UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA
AND STATE OF FLORIDA
*ex rel.* ANGELA RUCKH,

     Plaintiffs,

v.                               CASE NO. 8:11-cv-1303-T-23TBM

SALUS REHABILITATION, LLC
et al.,

     Defendants.
_____/

## ORDER

     The Federal False Claims Act and the Florida False Claims Act permit the federal government and the state government, respectively, acting through a relator, to recover damages for a material and knowing misrepresentation to the government about a product or service sold to the government. Rather than claim that the defendants — the owners and operators of fifty-three specialized nursing facilities — billed the government for unnecessary, inadequate, or incompetent service, the relator asserts that the failure to maintain a "comprehensive care plan," ostensibly required by a Medicaid regulation, renders fraudulent the defendants' Medicaid claims. Also, the relator asserts that a handful of paperwork defects (for example, unsigned or undated documents) compel the decisive inference that the defendants never provided the therapy evidenced by the paperwork and billed to Medicare. In

other words, the relator won judgments for almost $350 million based on the theory "that upcoding of RUG levels and failure to maintain care plans made [the defendants'] claims to Medicare and Medicaid false or fraudulent." (Doc. 454 at 2)

But the relator offered no meaningful and competent proof that the federal or the state government, if either or both had known of the disputed practices (assuming that either or both did not know), would have regarded the disputed practices as material to each government's decision to pay the defendants and, consequently, that each government would have refused to pay the defendants. Not only did the relator fail to prove that the governments regarded the disputed practices as material and would have refused to pay, but the relator failed to prove that the defendants submitted claims for payment despite the defendants' knowing that the governments would refuse to pay the claims if either or both governments had known about the disputed practices. In fact, both governments were — and are — aware of the defendants' disputed practices, aware of this action, aware of the allegations, aware of the evidence, and aware of the judgments for the relator — but neither government has ceased to pay or even threatened to stop paying the defendants for the services provided to patients throughout Florida continuously since long before this action began in 2011. For these and for each of the other reasons argued by the defendants, the judgments cannot stand.

## THE MATERIALITY AND SCIENTER DEFECT

After suffering adverse judgments for $347,864,285, the defendants move (Docs. 452 and 455) under Rule 50 for judgment as a matter of law and move under Rule 59 for a new trial. The relator responds (Doc. 454) in opposition. The defendants' motion includes a particularized and careful "overview" of the evidence, which this order will not repeat (the record is already sorely overburdened). The balance of the defendants' forty-page motion details the reasons for entering judgment as a matter of law or for granting a new trial or remittitur.

The defendants argue persuasively that the relator failed to offer evidence of materiality, defined unambiguously and required emphatically by *Universal Health Services, Inc. v. Escobar*, 136 S. Ct. 1989 (2016). In fact, the evidence and the history of this action establish that the federal and state governments regard the disputed practices with leniency or tolerance or indifference or perhaps with resignation to the colossal difficulty of precise, pervasive, ponderous, and permanent record-keeping in the pertinent clinical environment. The evidence shows not a single threat of non-payment, not a single complaint or demand, and not a single resort to an administrative remedy or other sanction for the same practices that result in the enormous verdict at issue.

Also, the defendants argue persuasively that the relator failed to offer competent evidence that the defendants knew that the governments regarded the disputed practices as material but, despite the defendants' guilty knowledge, the

defendants requested money from the governments. Of course, with no evidence that the governments regarded the disputed practices as material, establishing the defendants' knowledge of materiality seems at least impractical, if not impossible (after all, until one proves, say, that the moon is green cheese, one cannot prove that someone else knows that the moon is green cheese). As the defendants correctly state:

> Relator's evidence proves the contrary: Medicaid and Medicare consistently *paid* "in the mine run of cases" despite Medicare's routine audits and Medicaid's knowledge of billing and documentation deficiencies . . . .

(Doc. 452 at 21)

Since *Escobar* appeared, several circuit courts have elaborated and faithfully applied *Escobar*'s instructions. *See, e.g.*, *United States ex rel. Harman v. Trinity Indus., Inc.*, 872 F.3d 645 (5th Cir. 2017); *United States ex rel. Petratos v. Genentech, Inc.*, 855 F.3d 481 (3d Cir. 2017); *Abbott v. BP Expl. & Prod., Inc.*, 851 F.3d 384 (5th Cir. 2017); *United States ex rel. Kelly v. Serco, Inc.*, 846 F.3d 325 (9th Cir. 2017); *D'Agostino v. ev3, Inc.*, 845 F.3d 1 (1st Cir. 2016). *Escobar* is the unquestionably controlling and guiding authority on materiality and scienter under the False Claims Act.

*Escobar* overtly undertakes "to clarify some of the circumstances in which the False Claims Act imposes liability" for "implied false certification." 136 S. Ct. at 1995. Writing for the unanimous court in *Escobar*, Justice Thomas at the outset explicitly confirms that "implied false certification theory can be a basis for liability" (1) if a claim for payment "makes specific representations about the

goods or services provided"; (2) if the defendant "knowingly fails to disclose the defendant's non-compliance with a statutory, regulatory, or contractual requirement"; and (3) if the "omission renders those representations misleading." 136 S. Ct. at 1995. *Escobar* concludes that the False Claims Act transforms the defendant's material and knowing "omission" — the "failure to disclose" the non-compliance — into a compensable misrepresentation for which a relator can maintain an action. Conversely, *Escobar* necessarily means that if a service is non-compliant with a statute, a rule, or a contract; if the non-compliance is disclosed to, or discovered by, the United States; and if the United States pays notwithstanding the disclosed or discovered non-compliance, the False Claims Act provides a relator no claim for "implied false certification" (although some other claim, maintainable by the United States in its own name, or some regulatory authority, exercisable by the United States, might attach under other law).

Also at the outset, Justice Thomas pointedly emphasizes *Escobar*'s holding that liability for "implied false certification" depends not on the government's label — "condition of payment" or "condition of participation" or the like — but that "to be actionable under the False Claims Act" a "misrepresentation about compliance . . . must be material to the Government's decision to pay":

> What matters is not the label the government attaches to a requirement, but whether the defendant knowingly violated a requirement that the defendant knows is material to the Government's payment decision.

136 S. Ct. at 1996.  In other words, the False Claims Act requires the relator to prove both that the non-compliance was material to the government's payment decision and that the defendant knew at the moment the defendant sought payment that the non-compliance was material to the government's payment decision.

More particularly, *Escobar* addresses whether a vendor's failure to disclose the violation of "statutory, regulatory, or contractual requirements constitutes . . . an actionable misrepresentation."  136 S. Ct. at 1999.  *Escobar* again encapsulates the holding:

> Accordingly, we hold that the implied certification theory can be a basis for liability, at least where two conditions are satisfied: first, the claim does not merely request payment, but also makes specific representations about the goods or services provided; and second, the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths.

136 S. Ct. At 2001.  Because of the centrality of the "materiality inquiry," which *Escobar* describes also as "the False Claims Act's materiality requirement," *Escobar* expounds further the attributes of the required materiality.

First, *Escobar* rejects any notion that "materiality" requires the violation of an express condition of payment or the violation of some other "express signal" from the buyer about "the importance of the qualifying information."  136 S. Ct. at 2001.  Next, *Escobar* explains that a misrepresentation subjects a defendant to liability under the False Claims Act only if "material to the other party's course of action."  136 S. Ct. at 2001.  Also, *Escobar* confirms that a supplier is not entitled to "deliberate ignorance" of, or to "reckless disregard" of, the materiality of a representation about

the goods or services; the law imputes to a vendor the knowledge of a reasonable person situated as the vendor is situated.

*Escobar* illustrates the latter principle with an instructive example:

> If the Government failed to specify that guns it orders must actually shoot, but the defendant knows that the Government routinely rescinds contracts if the guns do not shoot, the defendant has "actual knowledge." Likewise, because a reasonable person would realize the imperative of a functioning firearm, a defendant's failure to appreciate the materiality of that condition would amount to "deliberate ignorance" or "reckless disregard" of the "truth or falsity of the information" even if the Government did not spell this out.

136 S. Ct. at 2001–02. *Escobar*'s defective gun example is informative. The featured defect wholly defeats a gun's primary purpose and entirely deprives the government of the value and utility of the gun. As *Escobar* explains, the defect is so fundamental and the consequence of the defect is so readily perceptible that the law imputes to the seller knowledge of the materiality of the defect. No reasonable government purchases for a soldier a gun that won't shoot, and no reasonable seller of guns thinks otherwise.

*Escobar* concludes by prescribing how the "materiality requirement should be enforced." 136 S. Ct. at 2002. In beginning the enforcement explanation, *Escobar* unmistakably characterizes both the materiality and the scienter requirement as "rigorous." 136 S.Ct. at 2002. *Escobar* specifies that a "rigorous" and "demanding" standard for materiality and scienter precludes a False Claims Act claim based on a "minor or unsubstantial" or a "garden-variety" breach of contract or regulatory violation. 136 S. Ct. at 2003. Instead, *Escobar* assumes and enforces a course of

dealing between the government and a supplier of goods or services that rests comfortably on proven and successful principles of exchange — fair value given for fair value received. *Escobar* rejects a system of government traps, zaps, and zingers that permits the government to retain the benefit of a substantially conforming good or service but to recover the price entirely — multiplied by three — because of some immaterial contractual or regulatory non-compliance. A principal mechanism to ensure fairness and to avoid traps, zaps, and zingers is a rigorous standard of materiality and scienter. For this reason (among others), as *Escobar* emphasizes, the government's payment to a vendor despite knowledge of a defect "very strongly" evidences the defect's immateriality. 136 S. Ct. at 2003.

*Escobar* reinforces this understanding of the False Claims Act by acknowledging the "essentially punitive" effects of the False Claims Act's remedial mechanism: treble damages plus a civil penalty "of up to $10,000 per false claim." 136 S. Ct. at 1996. Treble damages plus $11,000 (after adjusting for inflation) per false claim is not a remedy lawfully imposed on a supplier who delivers substantially compliant goods or services that are received and accepted by a government with knowledge of, or with indifference toward, some immaterial, formalistic, or technical non-compliance. At an irreducible and necessary minimum, the "essentially punitive" False Claims Act requires proof that a vendor committed some non-compliance that resulted in a material deviation in the value received and requires

proof that the deviation would materially and adversely affect the buyer's willingness to pay.

The dispute in *Escobar* exemplifies the requirement of a "rigorous and demanding" inquiry about materiality. In *Escobar* the government paid for mental health services and medication for a teenager. The providers of the health care were unlicensed and mostly unqualified. Although identifying "herself as a psychologist with a Ph.D.," the provider who diagnosed the teenager as bi-polar and who prescribed the medicine that led to the teenager's death was a nurse with a "degree" from an "internet college." 136 S. Ct. at 1997. No reasonable purchaser would accept or pay for psychiatric or psychological diagnosis and treatment from, or accept or pay for psychotropic medication prescribed by, an array of charlatans and quacks. With predictable and sound reciprocity, the law charges the charlatans and quacks with knowledge of their own disrepute, that is, with knowledge that the information they have designed to misrepresent, hide, and distort would, to say the least, materially influence the decision of the party deciding whether to pay.

*Escobar* concludes with a paragraph characterized as "rules" — not characterized as advice or as recommendations but as "rules" — to apply "when evaluating materiality under the False Claims Act":

> [T]he Government's decision to expressly identify a provision as a condition of payment is relevant, but not automatically dispositive. Likewise, proof of materiality can include, but is not necessarily limited to, evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement. Conversely, if the Government pays a particular claim in

> full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material. Or, if the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position, that is strong evidence that the requirements are not material.

136 S. Ct. at 2003–04.

Controlled by the imperatives of *Escobar*, an objective and a "rigorous and demanding" evaluation of the evidence in this action confirms the validity of the defendants' assault on the judgments. Much about the evidence in the present action, evidence assembled and presented by lawyers recognized as among the nation's elite in prosecuting a False Claims Act action, attests to the relator's inability to meet the "rigorous and demanding" standard of *Escobar*. The record fatally wants for evidence of materiality and scienter; the evidence that exists gravitates contrary to materiality and scienter. The defendants delivered the services for which the governments were billed; the governments paid and continue to pay to this day despite the disputed practices, long ago known to all who cared to know.

The record suffers an entire absence of evidence of the kind a disinterested observer, fully informed and fairly guided by *Escobar*, would confidently expect on the question of materiality: evidence of how government has behaved in comparable circumstances. For example, one might expect evidence of whether record-keeping deficiencies have resulted in the sudden and indefinite discontinuation of payment to providers of health care services to elderly, disabled, dependent, and other especially vulnerable patients; evidence of whether, when, and to what extent, especially in

dealing with a large organization that serves thousands of acute-care patients, an administrative remedy, rather than a sudden and unexpected refusal to pay, is required or preferred to address administrative non-compliance, including a record-keeping deficiency; evidence of whether governments are content — assisted by a regime of rigorous and regular inspections, audits, and accounting — to permit record-keeping practices that largely achieve the ends of, but differ from, the prescribed record-keeping; or evidence otherwise establishing the historical response of government to a long-standing non-compliance by a large provider of services in a pervasively regulated and monitored industry with a slim profit margin that, nonetheless, provides essential service to a large and vulnerable population without an available, alternative, health care provider.

The fraud in *Escobar* — unqualified mental health providers and substandard mental health care — profoundly and manifestly affects a government's willingness to pay, a fact undoubtedly obvious to the provider. Also to emphasize and clarify, *Escobar* offers the hypothetical but instructive example of a vendor selling to the government a gun that will not shoot, a defect that renders the weapon useless and valueless, as the vendor well knows.

But would the result in *Escobar* differ — that is, would *Escobar* countenance complete disgorgement times three plus punitive penalties — if the properly and currently licensed vendor of the mental health services was fully qualified and had prescribed and treated correctly but had failed, say, to attach to each patient's file a

required proof of current licensure? Would the result in *Escobar*'s gun example differ if the gun actually shot as represented but if the gun manufacturer failed to retain a required copy of the results of a required test firing of each weapon (even though the test occurred and the gun passed the test)? *Escobar* is silent on the answer to each of these illustrative hypotheticals, but *Escobar* indisputably requires that, before a party can employ the False Claims Act to effect a disgorgement of the entire price times three for the unqualified mental health services or for the hypothetical defective gun, the relator must prove (1) that, if informed that the proof of licensure was not attached to the file or if the certificate of test firing was not retained, the government would have chosen the remedy of a refusal to pay and (2) that the vendor knew or reasonably should have known the government would refuse entirely to pay but, nonetheless, remained silent, invoiced the government, and accepted the money.

In the present action, the relator's burden was to show that the federal government and the state government did not know about the record-keeping deficiency but, had the governments known, the governments would have refused to pay the operators of fifty-three specialized nursing facilities for services rendered, products delivered, and costs incurred. More specifically, the required proof likely would need to exclude the governments' choosing to resort to a more moderate, more proportional, more efficacious remedy, such as delivery of a "notice of non-compliance," accompanied by a stern demand for, and a fair deadline for, compliance. Or to exclude the governments' choosing to resort to some mediated

solution or to an administrative hearing or to an order to show cause. Or perhaps the governments' offering a price adjustment. Who knows? The record is effectively barren of evidence on how the governments might have addressed the disputed practices and, as the parties were notified timely by the trial judge, the dearth of evidence left the jurors to guess. The resulting verdict, which perpetrates one of the forbidden "traps, zaps, and zingers" mentioned earlier, cannot stand. The judgments effect an unwarranted, unjustified, unconscionable, and probably unconstitutional forfeiture — times three — sufficient in proportion and irrationality to deter any prudent business from providing services and products to a government armed with the untethered and hair-trigger artillery of a False Claims Act invoked by a heavily invested relator.

The relator acknowledges that "[d]efendants' principal argument is that the record does not contain sufficient evidence of materiality to support a verdict for false claims . . . ." (Doc. 454 at 12) The relator includes a brief discussion of *Escobar* but repairs promptly to several district court decisions and to a few isolated and incompetent items of testimony in an attempt to confine and dilute *Escobar*'s "rigorous and demanding" materiality requirement. At most, the relator is able to raise from the fatally deficient record only a faint and formless specter of the necessary materiality. This will not do.

First, the relator cites three district court decisions, none of which approaches resolving the issue that controls the present action. In *U.S. ex rel. Brown v. Celgene*

*Corp.*, 226 F. Supp. 3d 1032 (C.D. Cal. 2016), Celgene sought and received payment for "off-label" uses of certain drugs, a practice that (the court finds) renders the resulting claim "statutorily ineligible for reimbursement." *Celgene* denies a motion for summary judgment and holds that evidence of a statutory prohibition on the government's paying for an off-label use is sufficient to create a genuine dispute of material fact on materiality, even though the record showed other instances of knowing off-label reimbursement, showed more than ten years of knowledge by Medicare of off-label prescriptions disclosed by Celgene, and showed continued reimbursement by Medicare during the six years of the False Claims Act action. Whether right or wrong (likely wrong on a fair application of *Escobar*), the district court ruled nothing other than that a factual issue precludes summary judgment on materiality if a statute prohibits payment.

Next, the relator cites *United States v. Planned Parenthood of the Heartland, Inc.*, 2016 WL 7474797 (S.D. Iowa 2016), which has little or no bearing on the present dispute and which assesses the sufficiency of a pleading challenged by a Rule 12(b)(6) motion. *Planned Parenthood* summarizes the challenged complaint:

> First, [the complaint] alleges that Defendant knowingly
> violated multiple laws and regulations in its prescription and
> distribution of [birth control pills] and birth control patches, resulting
> in the submission of false claims and receipt of unwarranted
> reimbursement, as well as its failure to return money owed to the
> Government. Second, [the complaint] alleges that Defendant
> knowingly sought reimbursement for abortion-related services that are
> outside the scope of Medicaid coverage. Finally, [the complaint]
> alleges that Defendant failed to reduce its requests for reimbursement
> for the amount of donations Defendant solicited and received from
> patients.

2016 WL 7474797 at 7. Unremarkably, *Planned Parenthood* finds (only) that the allegations of Counts I and II are sufficient to defeat a motion to dismiss. The relator in the present action unhelpfully transports from *Planned Parenthood* the unexceptional observation that a valid prescription from a licensed physician "represents the heart of prescription medication regulation." In fact, this observation accords strongly with the discussion in *Escobar* of medical fakery and deception. To say the least, *Planned Parenthood* says little, if anything, about the proof of materiality required to sustain judgments of about $350 million entered on a jury's verdict after a month-long jury trial.

The relator mentions another district court opinion, *United States v. Crumb*, 2016 WL 4480690 (S.D. Ala. 2016) (Steele, C.J.), an excellent opinion about the requirements of pleading but an opinion with only, at most, a tangential relation to the present circumstance (a fact tacitly conceded by the "*see also*" signal).

With no help from the Supreme Court or the courts of appeals, and only trivial support from the district courts, the relator turns for comfort to "common sense," in praise of which the relator cites *United States ex rel. Beauchamp v. Academi Training Center, Inc.*, 220 F. Supp. 3d 676 (E.D. Va. 2016), an opinion that avowedly resolves only "whether relator's second amended complaint adequately alleges an implied false certification claim under 31 U.S.C. § 3729(a)(1)(A), as required by [*Escobar*]." 220 F. Supp. 3d at 677. The defendant, a private security company, contracted to provide protection for diplomats and the like in Afghanistan. The defendant

allegedly submitted "false weapons qualifications" — carefully note this distinction, among other distinctions, from the present case — "for the services of [protective services personnel] who had not fulfilled the WPPS contract's weapons qualifications requirement." 220 F. Supp. 3d at 678. The contractor billed the government for both the unqualified personnel and the weapons training, testing, and qualifications that never occurred (but evidence of which was fabricated and presented to the United States). The district court analyzed the allegations and found close parallels to *Escobar* :

> Indeed, the similarities are striking. Just as the clinic in *Escobar* submitted "claims for payment using payment codes that corresponded to specific counseling services," defendant used payment codes (such as "PSS") indicating that defendant's PRSs provided particular services, such as weapons instruction. *Id.* at 2000. Just as the clinic's employees used identification numbers "corresponding to specific job titles," defendant's invoice in this case repeatedly refers to job titles such as "shift leader" or "firearms instructor." Further, just as the clinic's use of the payment codes represented "that it had provided [various medical services]," defendant's use of the "PSS" billing code represented that defendant had staffed fully qualified, weapons-trained PRSs on its security assignments. *Id.* And just as "[a]nyone informed that a social worker at a Massachusetts mental health clinic provided a teenage patient with individual counseling services would probably — but wrongly — conclude that the clinic had complied with core Massachusetts Medicaid requirements," so, too, anyone informed that PRSs providing armed protection for governmental officials in a high-risk country or warzone like Afghanistan would probably — but wrongly — conclude that the PRSs were qualified to handle the very firearms they needed to protect those officials.

220 F. Supp. 3d at 681. The district court correctly found that, if a reasonable purchaser knew that the guards who carried machine guns and whose ability to capably fire the guns might mean the difference between life or death for Americans in Afghanistan, the reasonable purchaser would refuse to pay if the guards *were*

*actually not qualified*, a conclusion that the district court found within the scope of "common sense." But, more to the present point, *actually not qualified* is decisively different from *fully qualified but not in possession of a certificate*.

The leap of logic and the gap in "common sense" is too great to apply the otherwise unimpeachable ruling in *Beauchamp* to the decisively different facts of the present action. The defendants in the present action used qualified providers who ably provided services in accord with orders issued by qualified professionals but who, for example, could not — years later — identify a "comprehensive care plan" for each patient. "Common sense" falls far, far short of dictating that in the later event a reasonable purchaser would abruptly refuse to pay those providing continuing and sustaining health care to a mass of highly vulnerable and mostly elderly and frail patients.

Next, the relator reprises some of the usual arguments that might have worked before *Escobar*. The relator cites to opinion testimony from a few witnesses, none of whom were competent or qualified to testify or disclosed as experts to testify — and none of whom in fact testified — on the controlling question, that is, on the actual and expected conduct of the federal or state government when confronted with a record-keeping deficiency or any other deficiency by a health care provider engaged actively in providing qualified and essential health care to thousands of aged, infirm, and dependent patients at scores of residential facilities throughout the third largest state in the United States. Neither these witnesses nor any other witnesses in the trial

answered that question and, as a result, no one is able to do more than the jury did —
launch a wild guess.  (My guess is that under these circumstances no government
answerable to the people would refuse to pay, especially in Florida and especially in
the pertinent patient population, unless every administrative and other remedy was
exhausted and until an alternative provider was identified and prepared to capably
serve the same patients without interruption.)

The question presented in this action is not, for example, whether a written
and retained comprehensive care plan is "important" or "essential" or "prescribed"
or the like to an extent that in some hypothetical or generic circumstance a
government might refuse to pay one or two or several invoices or even the invoices
from a facility or two or a physician or two.  The question is not that simple because
the relator aggressively "ramped up" and immeasurably escalated the present
dispute — albeit a "ramping up" and an escalation effected by the diciest possible
form of sparse and attenuated statistical sampling — into a systemic dispute that
forces a systemic challenge that requires systemic answers (and that offers the
prospect of a systemic judgment creating a systemic danger with public
consequences).

In other words, the controlling question is not whether on a small scale — a
patient or a few patients or a facility or even a few facilities or one physician, one
therapy, or one pharmaceutical — but whether on a large scale, on the scale of a
major statewide provider of a scarce health care resource in a large and potent state,

the federal government or the state government would refuse to pay the provider because of a dispute about the method or accuracy of payment after the government has permitted a practice to remain in place for years without complaint or inquiry. Or, on the other hand, would the government have insisted on a new *modus operandi* for the future?  Or would a new form of computing RUGs have emerged or a new kind of "comprehensive care plan"?  The record is silent.  One can only launch ones best guess.

Every day that the government continues to pay for a good or service, notwithstanding some known or unknown non-compliance and, consequently, the greater the proposed repayment times three in the event of a successful False Claims Act action, the greater the practical impediment to proof of materiality.  Why?  If a non-compliance is found quickly and remains small, the government might likely demand perfect performance and full accounting.  If a non-compliance is larger and lingers longer and the repayment times three becomes a burden that threatens the vitality of the vendor and threatens the public interest, the government might not demand repayment times three.  For example, if (this is hypothetical) the only manufacturer of the only booster that can launch the United States' nuclear warheads is found to have failed to maintain metallurgical test results (the metals passed the tests) required by the Department of Defense and if the repayment times three for the price of the booster powering each American ICBM would cripple or kill the only available manufacturer, would the government demand the payment (or, more to the

point, would the government allow a private party to demand the payment in exchange for a percentage of the take)?  To answer that inquiry, *Escobar* demands proof of materiality in the circumstances as they are at the time for which the proof is offered and in the place, in the industry, and in the other regnant circumstances that attend the moment for which the proof of materiality is offered.  That proof is manifestly absent in the present action, despite a month of opportunities to offer the proof and a basketful of warnings that the proof was lacking.

## OTHER DEFECTS

Also, the defendants argue that the evidence was insufficient to support False Claims Act liability against the "Management Entity" under Medicaid and Medicare and under a "presentment," "caused to be presented," or "false record or statement" theory of False Claims Act liability.  By the "Management Entity," the defendants mean the now-defunct Sea Crest Health Care Management, LLC, and the successor-in-interest, CMC II, LLC.  A review of the voluminous record confirms the validity of this argument.  In fact, the record confirms that the Management Entity submitted no claims at all; each of the fifty-three specialized nursing facilities directly and individually submitted claims through a common electronic portal, a practice known and approved by the governments.  And the defendants argue persuasively that the evidence fails to support a "caused to be presented" claim against the Management Entity.  As the defendants observe, a "corporate scheme" not embodied in some identified person or persons who could and did hatch, direct, and implement the

scheme is not sufficient to support a False Claims Act "caused to be presented" claim. Stated somewhat differently, a scattering of claims in a smattering of facilities is a wholly insufficient basis from which to infer the existence of a massive, authorized, cohesive, concerted, enduring, top-down, corporate scheme to defraud the government. As the defendants argue, the relator attempts retrospectively to convert evidence offered and received for a limited and different purpose into evidence to support the existence of a corporate scheme. Although the success of this sleight-of-hand conversion is essential to sustain the relator's claims and the resulting judgments against the Management Entity, the attempted conversion must fail. As the defendants explain with admirable clarity:

> The "cause to be presented" theory, however, requires some evidence of a connecting causal link between the defendant's actions and the submission of a specific false claim[.] Neither Relator's expert statistical extrapolation nor her evidence of a "corporate scheme" are relevant to the existence of such a link. The Court stated that Relator had the burden, "by somehow, some means, [to] spread the knowledge and the scheme throughout the 53" Florida SNFs. Relator's evidence fails to meet this burden, and her inability to connect corporate knowledge with a directive and, in turn, a specific false claim cannot establish [a False Claims Act] violation, and therefore cannot support the jury's verdicts.

(Doc. 452 at 33) The defendants correctly conclude that the evidence fails to support a verdict against the Management Entity and correctly argue that the relator fails entirely to connect the testimony about "RUG budgets," "LaVie meetings," and "corporate profits" to any particular claim "actually submitted" to the governments. Similarly, the evidence fails to show that the Management Entity produced, or caused the production of, a "false record or statement" material to a false claim.

## CONCLUSION

In his recent opinion in *Harman*, which (especially Part IV(C)) I commend to the reader's focused attention, the estimable Judge Patrick Higginbotham considers at length *Escobar*'s "rigorous and demanding" materiality requirement. After toiling with *Escobar* and with several recent circuit court opinions that apply *Escobar*, Judge Higginbotham concludes that "continued payment by the federal government after it learns of the alleged fraud substantially increases the burden on the relator in establishing materiality." 872 F.3d at 663. A closer reading of *Harman* persuades the disinterested reader that Judge Higginbotham finds the government's continued performance after non-compliance more consequential than his words explicitly reveal. (Undoubtedly His Honor's many years of judicial experience effectively cautioned against announcing a more exacting rule than resolution of the dispute-at-hand requires.)

But certainly the government that continues to pay full fare for a product or service despite knowledge of some disputed practice, some non-compliance, or some other claimed defect, relentlessly works itself into a steadily tightening bind that at some point becomes disabling because the government (or the relator, who sues in the government's stead) must prove that had the government known the facts the government would have refused to pay. In other words, at some point, this burden, growing incrementally more formidable each day, presents to the government the insurmountable burden of proving that the government would not do exactly what

history demonstrates the government in fact did (and continues to do until this moment).  In this action, I find the relator's claims fatally ensnared in that intractable bind.

The defendants' renewed motion (Docs. 452 and 455) for judgment as a matter of law is **GRANTED**.  Alternatively, the request (Doc. 452 at 37–40) for a new trial is conditionally **GRANTED** for the reasons explained above and for the reasons identified and satisfactorily explained in the defendants' motion.  The judgments (Docs. 432 through 436) against the defendants are **VACATED**.  The clerk is directed (1) as to all claims to enter judgment for the defendants and against Angela Ruckh, the United States, and the State of Florida and (2) to close the case.  The defendants' motion for remittitur is **DENIED AS MOOT**.

ORDERED in Tampa, Florida, on January 11, 2018.

_____
STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE